## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| VIKY SARAI FLORES BENITEZ, ANA DELMI BENITEZ ALVARADO, JAVIN BENIGNO SANTOS GALVEZ, and J.S.R., a minor,<br><br>*Plaintiffs,*<br><br>v.<br><br>STEPHEN MILLER,  JEFFERSON B. SESSIONS, KIRSTJEN NIELSEN, KEVIN McALEENAN, and UNITED STATES OF AMERICA,<br><br>*Defendants.* | **No.**<br><br>**COMPLAINT** |

### INTRODUCTION

1.      In summer 2018, Defendants and other U.S. government employees cruelly separated fourteen-year-old Viky Sarai Flores Benitez from her mother, Ana Benitez Alvarado, and nine-year-old J.S.R. from his father, Javin Benigno Santos Galvez, in an attempt to coerce the two families to abandon their asylum claims and to deter others fleeing violence and danger in Central America from seeking refuge in the United States. Defendants then sent both children thousands of miles away to Connecticut while incarcerating each parent in Texas and preventing communications between parent and child.

2.      With force and deceit, Defendants caused extraordinary trauma, in violation of U.S. and international law prohibitions against torture. Plaintiffs are among the thousands of asylum-seeking families whom the government irreparably traumatized pursuant to its unconscionable family separation policy — a policy that Defendants and other senior officials at the White House,

1

Department of Justice (DOJ), and Department of Homeland Security (DHS) crafted, issued, and executed to unlawfully deter asylum seekers from entering the United States.

3.      Days after arresting Viky and her mother and detaining them in a freezing, windowless cell, Defendants used the ruse of permitting Viky her first shower to snatch her away. Immigration officials told Ms. Benitez Alvarado that adults could not accompany their children to the showers, and that they would bring Viky back when she had finished. This was a lie. Instead, Defendants took Viky from her mother. Viky did not see her mother again until a judge of this court ordered their reunification two months later.

4.      Defendants also arrested Mr. Santos Galvez and his son J.S.R. soon after they crossed the Southern border and detained them for several days in harsh conditions. Late one night, immigration officials woke Mr. Santos Galvez and ordered him to step outside. Mr. Santos Galvez tried to rouse his young son, but Defendants prevented him from doing so and immediately hustled the father away. The next morning, a terrified J.S.R. woke up alone in a cage, without any idea where his father was or why he had left. Defendants held J.S.R. for more than a month without allowing him to communicate with his father or any other relative.

5.      After tearing Viky and J.S.R. away from their parents and forcibly transporting both children to a residential shelter in Connecticut, DHS agents withheld information from the distraught children and parents about their respective whereabouts, keeping them confused, terrified, and alone without any ability to communicate with each other.

6.      Shortly after arriving in Connecticut, a child psychiatrist diagnosed both Viky and J.S.R. with severe Post-Traumatic Stress Disorder (PTSD) resulting from Defendants' forcible separation from their parents.

7.     Viky and J.S.R. were plaintiffs in emergency federal habeas petitions in 2018 seeking to reunite with their respective parents in freedom.

8.     In a July 13, 2018 opinion, Judge Victor Bolden concluded that "the constitutional rights of J.S.R. and [Viky] have been violated, and that irreparable harm has occurred as a result." *J.S.R. by and through J.S.G. v. Sessions,* 330 F.Supp. 3d 731, 733 (D. Conn. 2018). The Court went on to order the government to redress "the effects of the constitutional violation suffered by these minor children, namely trauma or more precisely, Post-Traumatic Stress Disorder," including by reunifying the families. *Id.*

9.     Since reuniting with their parents, Viky and J.S.R. have continued to experience severe emotional trauma. Viky suffers from bouts of fear, melancholy, and anxiety, which sometimes cause her to cry before falling asleep or while at school. Even now, at age thirteen, J.S.R. fears being taken from his father again. J.S.R. becomes anxious when away from his father, and to this day he is frightened of law enforcement officers.

10.    The parents of J.S.R. and Viky, Ms. Benitez Alvarado and Mr. Santos Galvez, have also continued to experience emotional trauma as a result of being forcibly separated from their children. Following release from immigration custody, Ms. Benitez Alvarado began experiencing intense migraines and difficulty sleeping, which have impaired her ability to work and to perform daily household tasks. Even when she sends her daughter to school, she is fearful she might not see her again. When Ms. Benitez Alvarado sees law enforcement officials or vehicles, she fears she will be re-detained apart from her daughter. Mr. Santos Galvez has nightmares about being forcibly separated from his son. He still has difficulty being apart from J.S.R. because he is frightened of being separated from him again.

11.    Defendants Miller, Sessions, Nielsen, and McAleenan, along with other U.S.

government officials who planned, ordered, and orchestrated Viky and J.S.R.'s forcible separation from their parents pursuant to the family separation policy, intentionally inflicted severe psychological and physical harm on the Plaintiffs.

12.     Defendants maliciously used these tactics to coerce the Plaintiffs into abandoning their asylum claims and to deter other migrants from seeking refuge in the United States, a right protected under domestic and international law. This conduct constitutes torture under U.S. and international law. The United States is also liable under the Federal Tort Claims Act for the injuries caused by its employees and officials.

13.     These two families can never be made whole. However, justice requires redress for the suffering inflicted by the unlawful, cruel, and tortious conduct of Defendants and the U.S. government.

<u>JURISDICTION AND VENUE</u>

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346(b), and 1350.

15.     Venue is proper under 28 U.S.C. §§ 1402(b), 1391(e)(1) because Plaintiffs reside in the District of Connecticut, a substantial part of the events, acts, or omissions giving rise to the claims occurred in this District, and no real property is involved in this action.

<u>PARTIES</u>

16.     Plaintiff Viky Sarai Flores Benitez ("Viky"), now eighteen years old, was fourteen years old at the time of the events described in this Complaint. She was separated from her mother, Plaintiff Ana Benitez Alvarado, on or about May 16, 2018. Viky is from El Salvador and now resides in New Haven, Connecticut.

17.     Plaintiff Ana Delmi Benitez Alvarado ("Ms. Benitez Alvarado") is thirty-seven years old and is from El Salvador. She was separated from her daughter, Viky, on or about May

16, 2018. Ms. Benitez Alvarado resides in New Haven, Connecticut.

18.     Plaintiff J.S.R., now thirteen years old, was nine years old at the time of the events described in this Complaint. He was separated from his father, Plaintiff Javin Benigno Santos Galvez, in June 2018. J.S.R. is from Honduras and now resides in New Haven, Connecticut.

19.     Plaintiff Javin Benigno Santos Galvez ("Mr. Santos Galvez") is thirty-five years old and is from Honduras. He was separated from his son, Plaintiff J.S.R., in June 2018. Mr. Santos Galvez resides in New Haven, Connecticut.

20.     Stephen Miller was the Senior Advisor to the President in 2017-18. Defendant Miller was the architect of the family separation policy and other racist immigration policies to deny asylum seekers refuge in the United States and to unlawfully deter those in danger from seeking protection here. He co-directed and oversaw implementation of the family separation policy across agencies. He is sued in his individual capacity.

21.     Defendant Jefferson B. Sessions, III was the Attorney General of the United States in 2017-18. Defendant Sessions issued the Zero Tolerance policy, a DOJ policy mandating prosecution of migrants entering the United States without authorization used to justify family separation. He is sued in his individual capacity.

22.     Defendant Kirstjen Nielsen was the Secretary of Homeland Security in 2017-19. Defendant Nielsen oversaw DHS implementation of the family separation policy. She is sued in her individual capacity.

23.     Defendant Kevin McAleenan was the Commissioner of Customs and Border Protection (CBP) in 2017-18. He implemented the family separation policy, including the Zero Tolerance policy, at the Southern border and oversaw the separation of children from their parents, including Viky and JSR. He is sued in his individual capacity.

5

24.     Defendant United States of America is sued under the Federal Tort Claims Act for the tortious acts of its employees, including employees of DOJ, DHS, and DHS agencies CBP and Immigration and Customs Enforcement (ICE).

**STATEMENT OF FACTS**

I.     **DEFENDANTS FORCIBLY SEPARATED VIKY FROM MS. BENITEZ ALVARADO.**

     A.     ***Viky and Ms. Benitez Alvarado Fled Death Threats in El Salvador and Immigration Agents Forcefully Separated Them in the United States.***

25.     Ms. Benitez Alvarado fled El Salvador in May 2018, with her then-fourteen-year-old daughter, Viky. The two had spent months in hiding, prompted by the murder of Ms. Benitez Alvarado's domestic partner—a man she referred to as her husband and Viky's father figure—by the gang Mara Salvatrucha (MS-13).

26.     Viky and Ms. Benitez Alvarado arrived in the United States on or around May 13, 2018 after crossing the Rio Grande on a raft. CBP agents detained them shortly thereafter, in or around Rio Grande City, Texas.

27.     Immigration officials initially confined Viky and Ms. Benitez Alvarado in a *hielera* (often translated as "icebox"), a facility designed to temporarily hold noncitizens near the Southern border, but where Defendants held Viky and Ms. Benitez Alvarado for days. Defendants forced them to sleep on the floor with aluminum blankets in frigid temperatures and denied them the ability to bathe.

28.     Although immigration officials apprehended Viky with her mother and detained them together, on or around May 15, 2018, DHS processed Viky separately from her mother. At that time, Defendants falsely classified Viky as an "unaccompanied juvenile," pursuant to the "Zero Tolerance directive to prosecute all eligible subjects."

29.     Shortly thereafter, on or around May 16, immigration officials interviewed Ms.

6

Benitez Alvarado. These officers told her that Viky would remain in the United States while Ms. Benitez Alvarado would be deported to El Salvador.

30.    That same day, immigration officials told Ms. Benitez Alvarado and her daughter that they were taking Viky to shower—the first opportunity she had had to do so since Defendants incarcerated the pair in the *hielera*—and that adults could not accompany children to the showers.

31.    The agents falsely told both Ms. Benitez Alvarado and her daughter that Viky would return after showering.

32.    Instead, immigration officials used this falsehood to effectuate the separation of mother and daughter. When Viky did not return, Ms. Benitez Alvarado asked immigration officers about her daughter. The officers gave her conflicting information: that they did not know where Viky was and that she was in Houston.

33.    Upon realizing that Defendants had deceived her and separated her from her daughter, Ms. Benitez Alvarado was distraught. She cried and had trouble sleeping and eating.

### B.    *DHS Officials Transferred Viky Thousands of Miles from her Mother, to a Shelter in Connecticut, Where She Was Diagnosed with PTSD.*

34.    DHS transferred Viky to the custody of the Office of Refugee Resettlement (ORR), a unit of the U.S. Department of Health and Human Services (HHS), at the Noank Community Support Services shelter in Groton, Connecticut on or around May 16, 2018.

35.    After her traumatic separation from her mother and the long journey from Texas to Connecticut, the fourteen-year-old arrived at the shelter in the late evening. Shelter staff then interviewed her at length, beginning about 9:15 p.m. Shelter intake reports state that Viky had difficulty completing the interview because she couldn't stop crying.

36.    Around five days after her arrival in Connecticut, Viky met with a mental health clinician. The staff member reported that Viky was "still concerned about the whereabouts of her

mother." The clinician "encouraged [Viky] to practice coping skills to help manage her emotions in regards to the separation from her mother."

37.    The clinician met with Viky three more times over the next three weeks. No one could tell Viky where her mother was. The shelter assisted Viky in contacting relatives in El Salvador, who also had no information about her mother's whereabouts.

38.    On or around June 13, 2018—almost one month after Viky was separated from her mother—shelter staff finally located Ms. Benitez Alvarado in ICE custody in Encinal, Texas.

39.    According to ORR records, Viky's first contact with her mother was on June 21, 2018—*thirty-six days after Defendants separated mother and daughter*. Their first phone call lasted only about ten minutes, during which time Ms. Flores-Benitez was too distraught to communicate and instead sobbed into the phone.

40.    On July 1, 2018, Dr. Andrés Martin, M.D., M.P.H., a child psychiatrist retained by undersigned counsel in connection with federal habeas litigation, met with Viky to conduct a mental health evaluation. Dr. Martin diagnosed her with PTSD.

41.    Dr. Martin attributed her condition to "chronic and latent trauma that stemmed from [Viky's] prior exposure to violence," including the recent death of her father figure, exacerbated by "being forcibly separated from her mother soon after she entered this country."

42.    On the Child PTSD Symptom Scale, Viky scored twenty-one out of a possible twenty-five – well above the cut-off of the fifteen necessary for a diagnosis of PTSD.

43.    Dr. Martin predicted long-lasting physical and mental health consequences from the separation, including "lifelong anxiety disorders; mood disorders, including depression; and physical illness stemming from trauma and stress." Dr. Martin recommended immediate reunification of Viky with her mother to mitigate the lasting traumatic effects of their separation,

as well as appropriate trauma-informed psychotherapeutic interventions.

44.     Throughout her ordeal, Viky experienced traumatic symptoms including depression, hopelessness, sleeplessness, tearfulness, and an inability to answer questions coherently.

### C.     Defendants Tormented Ms. Benitez Alvarado.

45.     DHS detained Ms. Benitez Alvarado in La Salle County Regional Detention Center in Encinal, Texas, and at another facility in Pearsall, Texas.

46.     The day after DHS officials separated Ms. Benitez Alvarado from her daughter, agents took her to a place called the "dog house," named for its terrible conditions. She cried when taken there without her daughter.

47.     Two immigration officers taunted and mocked Ms. Benitez Alvarado.

48.     Ms. Benitez Alvarado tried to tell these officers that she and her daughter could not return to El Salvador for fear of being murdered. The officers responded, "Your lives don't matter," or words to that effect. An officer told Ms. Benitez Alvarado that because she had no male partner, her reason for coming to the United States must be only economic, not fear-based.

49.     The two officers repeatedly laughed at Ms. Benitez Alvarado. When she asked about her daughter, they said "maybe you stole your daughter," or words to that effect, insinuating that she may have traveled with an unrelated child to obtain a speedier release from detention.

50.     Two male DHS officers attempted to coerce Ms. Benitez Alvarado into signing paperwork agreeing to be deported. One officer falsely stated that if she pursued an asylum case, she would be in detention for eight to ten more months without her daughter.

51.     At the time, Defendants were forcing Ms. Benitez Alvarado to sleep on the floor of her holding cell. Ms. Benitez Alvarado felt that almost a year without her daughter and in those

conditions would cause her to die.

52.     The DHS officer told Ms. Benitez Alvarado that if she signed the paper, she would be released from detention, so she signed even though she did not want to. All Ms. Benitez Alvarado could think about was to be reunited with her daughter.

53.     Ms. Benitez Alvarado continued to experience significant emotional and physical distress from being separated from her daughter, including extreme sadness, difficulty breathing, and tightness in her chest, for which she asked to see a doctor. She understood her pain as that of a mental breakdown.

54.     On the only phone call she was permitted, prior to the initiation of Viky's federal habeas petition, Ms. Benitez Alvarado was so distraught and tearful that she was unable to communicate with Viky.

55.     Defendants' mistreatment has had lasting effects on Ms. Benitez Alvarado. She experiences migraines and chest pain. She often has a hard time concentrating and sleeping. She still wonders why officers laughed and taunted her while she was trying to find her daughter.

II.     **DEFENDANTS FORCIBLY SEPARATED J.S.R. FROM MR. SANTOS GALVEZ.**

    *A.     J.S.R. and Mr. Santos Galvez Fled Death Threats in Honduras and DHS Officials Forcibly Separated Them in the United States.*

56.     Mr. Santos Galvez was born in 1987 and raised in Trujillo, Colón, Honduras. Around 2007, Mr. Santos Galvez migrated to the United States to find work to support his family, but immigration agents apprehended him and sent him back to Honduras.

57.     Mr. Santos Galvez's son J.S.R. was born in Honduras in 2009. In 2014, Mr. Santos Galvez assumed full custody of J.S.R. from the boy's mother. In that same year, Mr. Santos Galvez and his current partner, Dorca Najera, had their first child, W.J.S.N.

58.     Throughout this time, Mr. Santos Galvez was actively involved with the National

Party of Honduras, as set forth in more detail in his immigration case filings.

59.     Since his life was in danger due to his political activity, Mr. Santos Galvez and Ms. Najera determined that he and J.S.R. needed to leave Honduras. Due to Ms. Najera's high-risk pregnancy, only J.S.R. and Mr. Santos Galvez fled Honduras. They left around April 2018.

60.     J.S.R. and his father traveled for about two months. The trip was long and arduous.

61.     While in Mexico, Mr. Santos Galvez worked slaughtering chickens for an acquaintance. His earnings allowed the two to buy meals and send money to Honduras for his family, but the pair still struggled.

62.     Mr. Santos Galvez and J.S.R. did not feel safe in Mexico, and so after a month, they traveled north. On or about June 11, 2018, they crossed the Rio Grande River in an inflatable raft.

63.     CBP arrested Mr. Santos Galvez and J.S.R. soon after they crossed the river.

64.     CBP officers incarcerated Mr. Santos Galvez and J.S.R. for about three nights in a *hielera*. The facility was large, frigid, and windowless. It contained wire cages, each crowded with people. Defendants kept the lights on at all times in the *hielera*, and because of this, Mr. Galvez and J.S.R. could not tell night from day.

65.     During their time in the *hielera,* agents gave Mr. Santos Galvez and J.S.R. two aluminum blankets and one thin mattress topper. Mr. Santos Galvez gave the items to his child. J.S.R. has memories of his father crying and constantly shaking in the *hielera*. Seeing the only stable family figure in his life in such a state terrified the boy and caused him great anguish.

66.     The family's time in the *hielera* ended when immigration agents entered and told Mr. Santos Galvez to leave his sleeping son behind and head outside. He tried to wake J.S.R., but the agents stopped him and told him that he would see J.S.R. shortly. Once Mr. Santos Galvez had exited the *hielera*, however, the DHS agents prevented him from returning, thus forcibly and

dishonestly separating father and son.

67.     Immigration agents told Mr. Santos Galvez that he would never see his son again. Convulsed with fear, Mr. Santos Galvez wrapped himself around a pole in the facility and cried out for his son while an officer threatened to tase him.

### B.     DHS Officials Transferred J.S.R. Thousands of Miles from His Father, to a Shelter in Connecticut, Where He Was Diagnosed with PTSD.

68.     After immigration agents separated J.S.R. from his father, they caged the nine year-old with other young children for approximately four days.

69.     J.S.R. asked several times to see his father, but DHS officials claimed not to know why he was not with his father and deceived him into believing that they would be reunited soon.

70.     J.S.R. cried for his father frequently and witnessed the other young children in the cages crying. The officials overseeing the cages did not do anything to comfort the children. J.S.R. did not understand why he was separated from his father, when he would see him again, or whether he was at risk of being returned to Honduras, a place he associated with violence and death.

71.     DHS transferred J.S.R. to ORR custody at the Noank Community Support Services shelter in Groton, Connecticut on or around June 16, 2018.

72.     A legal services attorney appointed to assist J.S.R. in Connecticut attempted unsuccessfully to locate Mr. Santos Galvez and facilitate contact between father and son.

73.     On or about June 28, 2018, the attorney learned that J.S.R. had spoken to his father for the first time since they were separated the previous day. Father and son were not able to exchange many words because they were both sobbing for most of the call.

74.     On July 1, 2018, Dr. Martin evaluated J.S.R. He diagnosed J.S.R. with PTSD and concluded that immigration officers caused J.S.R.'s PTSD when they forcibly separated the child from his father.

75.     During his meeting with J.S.R., Dr. Martin employed two standardized instruments commonly used to diagnose PTSD.

76.     The first, the Trauma Health Questionnaire, is an inventory of potentially traumatic exposures. J.S.R. scored positively on fourteen out of twenty-three possible items.

77.     The second, the Child PTSD Symptom Scale (CPSS) scale, has two parts. The first part asks about symptoms of trauma during the two weeks prior to the evaluation. J.S.R. scored thirty-eight out of a possible fifty-one, well above the cutoff of fifteen required for a PTSD diagnosis.

78.     In the second part of the CPSS, J.S.R. was asked about domains of his life in which his exposure to trauma interfered with his functioning. J.S.R. scored seven out of seven. Dr. Martin noted that J.S.R.'s life was disturbed in every domain that the instrument measured.

79.     Dr. Martin concluded that J.S.R.'s chronic trauma stemmed from his exposure to violence and loss from an early age and "was triggered by the acute trauma of forcible separation from his father." Dr. Martin predicted long-lasting physical and mental health consequences, including "lifelong anxiety disorders; mood disorders, including depression; and physical illness stemming from trauma and stress" because of the separation.

80.     Dr. Martin recommended the immediate release and reunification of J.S.R and his father to mitigate the lasting traumatic effects of their separation. He also recommended that J.S.R. receive appropriate trauma-informed psychotherapeutic interventions.

81.     On or around July 2, 2018, the day after J.S.R. filed a federal habeas petition, he was able to speak to his father again via a videoconference. Mr. Santos Galvez noticed that his son was different. J.S.R. is a bright child, but during the call, J.S.R. was unable to focus. An ICE officer was present with Mr. Santos Galvez during the call.

82.     After Dr. Martin's evaluation, Noank Community Support Services arranged a visit with J.S.R.'s medical provider at the Community Health Center of Groton.

83.     A pediatric clinician at Noank Community Support Services noted that J.S.R. "needs evaluation for underlying depression." The treatment notes were "referral to BH [behavioral health] team for evaluation and treatment due to trauma from travel and separation."

84.     Throughout J.S.R.'s time at Noank Community Support Services and while separated from his father, J.S.R. did not sleep at night because he felt that he needed to remain vigilant. He did not trust adults, and the government's forceful separation of the family continued to harm him, causing J.S.R. depression and tearfulness.

   **C.     Mr. Santos Galvez Suffered Physical, Emotional, and Mental Harm Due to DHS's Unlawful Separation of Him from His Son.**

85.     While J.S.R. was transferred to Connecticut, Mr. Santos Galvez remained detained in Texas. DHS officers told Mr. Santos Galvez that he would never see J.S.R. again.

86.     Mr. Santos Galvez feared that when J.S.R. woke up without him, the boy would assume that his father had abandoned him. The prospect of never seeing J.S.R. again caused Mr. Santos Galvez, a usually healthy and positive person, to cry, faint, and become sick.

87.     After the separation, Mr. Santos Galvez appeared in criminal court and admitted he had entered the country without permission. Immigration agents then took Mr. Santos Galvez to Port Isabel Service Detention Center in Los Fresnos, Texas. An immigration officer there told Mr. Santos Galvez that he had come alone without a son and that they would deport him. Mr. Santos Galvez protested that he had arrived with J.S.R., but the officer insisted that all the documentation indicated that he had come alone and would be deported.

88.     The officer's inaccurate information caused Mr. Santos Galvez to become very emotional and cry. He told the agent that he needed to see his son and he did not want to leave

J.S.R. without a parent.

89.     In the middle of the exchange, Mr. Santos Galvez remembered that officers had given him and J.S.R. a card listing their possessions when they were arrested. Mr. Santos Galvez had kept J.S.R.'s card hidden, because he had heard that officers took away children's cards so as to deny the existence of a parent-child relationship and then justify deportations. When Mr. Santos Galvez showed the cards to the officer, the officer acknowledged that there was a mistake.

90.     ICE officers eventually took Mr. Santos Galvez from Port Isabel to the South Texas Detention Center (STDC) in Pearsall, Texas. At STDC, Mr. Santos Galvez repeatedly asked ICE officers if someone could tell him how J.S.R. was doing or where he was. No agent helped him.

91.     The separation caused Mr. Santos Galvez to become deeply depressed. He could not eat, became very sick, developed a golf ball-sized growth on his armpit, and felt weak.

92.     A mental health evaluation conducted during Mr. Santos Galvez's time at STDC noted that he "does not know about his son['s] whereabouts and would like to speak with his son. . . . [Patient] was crying at times during the interview. [Patient's] stressors were processed and coping skills techniques were discussed."

93.     Eventually, ICE officers shipped Mr. Santos Galvez back to Port Isabel Detention Center. He remained there for about nineteen more days. Officers refused to tell him anything about J.S.R. An attorney who met with Mr. Santos Galvez at Port Isabel could see him "pacing the hallway" while he waited to meet with her. During the meeting he was "just beside himself," "so wound up and tense," and "very, very desperate" to find out where his son was. "The number of times that he broke down and started crying" during their meeting were too many to count.

94.     Finally, Mr. Santos Galvez's attorneys were able to arrange for him to talk to J.S.R. by phone, and then via videoconferencing. Mr. Santos Galvez noticed that J.S.R.'s demeanor was

dramatically different. He could see that J.S.R. was confused and sad. While he was happy to see his son, the change in the child's demeanor broke Mr. Santos Galvez's heart.

### III.   JUDGE BOLDEN CONCLUDES DEFENDANTS VIOLATED THE CONSTITUTIONAL RIGHTS OF VIKY AND J.S.R.

95.     On July 2, 2018, Viky and J.S.R. filed federal habeas petitions and sought to compel reunification with their parents out of detention.

96.     After briefing from the parties and an evidentiary hearing, in an opinion dated July 13, 2018, Judge Bolden concluded that "the constitutional rights of J.S.R. and [Viky] have been violated" and "irreparable harm has occurred as a result."

97.     Consequently, the Court ordered the parties to address the trauma the children had experienced, including through family reunification and post-relief care. *Id.*

98.     Both children were promptly reunited with their parents and released from ICE physical custody in Connecticut, where they have resided since.

### IV.   THE U.S. GOVERNMENT'S FAMILY SEPARATION POLICY WAS DELIBERATELY CRUEL AND INHUMANE.

#### A.   *Defendants Intentionally Separated Families to Unlawfully Coerce Newly Arrived Asylum Seekers and Deter Future Asylum Seekers.*

99.     In early 2017, Defendants Miller, Nielsen, and other government officials discussed a preliminary policy that would separate families at the Southern border as a means to discourage Central Americans from seeking asylum in the United States.

100.     In April 2017, Defendant Sessions sent a memorandum to federal prosecutors entitled "Renewed Commitment to Criminal Immigration Enforcement." In the memo, Defendant Sessions instructed each U.S. Attorney Office on the Southwest Border to work with DHS to develop prosecution guidelines for illegal entry and re-entry violations. The memo states "[t]hese guidelines should aim to accomplish the goal of deterring first-time improper entrants."

16

101.     In July 2017, ICE ended the Family Case Management Program, which allowed asylum seekers to remain in the community during the pendency of their proceedings while receiving case management services like legal and social services. Ending this program signaled a concerted policy of prolonged detention of asylum seekers.

102.     Subsequently, between March and November 2017, Defendants Miller, Nielsen, and McAleenan, along with other officials, implemented a pilot program in El Paso, TX. It ran for several months and previewed what would become the U.S.'s family separation policy ("El Paso Initiative"). Off. of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Human Services*, DEP'T OF JUSTICE, at ii (Jan. 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf ("2021 DOJ OIG Report").

103.     Defendants used results from the El Paso Initiative to launch a zero-tolerance program across the entire Southern border.

104.     In December 2017, Defendants Nielsen, McAleenan, and others supervised the development of a policy memorandum entitled "Policy Options to Respond to Border Surge of Illegal Immigration." It explained that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in [Health and Human Services] custody" and that the policy would have a "substantial deterrent effect" ("2017 Family Separation Memo").

105.     Following the issuance of the 2017 Family Separation Memo, Defendants Miller, Sessions, Nielsen, and McAleenan, along with other government officials, conspired to expand forcible separations of children and parents along the Southern border.

106.     In early 2018, Defendants Miller, Sessions, Nielsen, McAleenan, and other officials discussed family separations in multiple meetings. They also drafted, reviewed, or edited

memoranda that detailed how to deter new migration by separating families at the Southern border.

107.    For example, on April 6, 2018, then-Attorney General Sessions issued a memorandum requiring federal prosecutors along the Southwest border to charge and prosecute the misdemeanor offense of illegal entry into the United States for all referred cases.

108.    In a subsequent press release, the DOJ confirmed that the government would implement a Zero Tolerance policy for "criminal illegal entry" under 8 U.S.C. §1325(a). In the release, Defendant Sessions stated, "I warn you; illegally entering this country will not be rewarded, but instead be met with the full prosecutorial powers of the [DOJ]."

109.    Previously, asylum seekers, especially families, had not been systematically referred for prosecution for unlawful entry. Prior to the Zero Tolerance policy, less than one-third of CBP apprehensions had resulted in criminal prosecutions.

110.    Thus, the Zero Tolerance policy resulted in the separation of families entering the United States along the Southern border.

111.    On April 23, 2018, Defendant McAleenan co-authored a memorandum to Defendant Nielsen seeking further approval for expanded family separations along the Southern border (the "2018 Family Separation Memo"). The memorandum presented options for increasing prosecutions at the border.

112.    Pursuant to the government's family separation policy, DHS referred parents for prosecution, and DOJ would initiate a prosecution for illegal entry. DHS would transfer the parent – but not the accompanying child – to the custody of the U.S. Marshals. DOJ would conclude the prosecutions rapidly, often in forty-eight hours or less, with the parent pleading guilty and receiving a sentence of time served. DOJ would then return the parent to DHS custody.

113.    However, DHS refused to reunite parent and child upon the parent's return to DHS

custody. In fact, in the brief period when the U.S. Marshals held a parent for prosecution, DHS frequently moved the child, sometimes far across the country.

114.    In practice, ICE and DHS objected to rapid reunification. In emails between ICE and DHS officials in May 2018, DHS shared concerns that "adults that were separated from their children" returned *too quickly* upon entering a guilty plea, as it resulted "in a situation in which the parents are back in the exact same facility as their children – possibly in a matter of hours – who have yet to be placed in ORR custody."

115.    In a May 10, 2018 email, CBP was ordered "to prevent this from happening" and asked to confirm with DHS "that the expectation is that we are NOT to reunite the families and release."

116.    DHS officials knew and intended that its officers might transfer the child to another DHS facility or to ORR custody, even when a parent went to court and returned to DHS detention the same day. In some cases, DHS purposely transferred parents to another facility after DOJ had completed a prosecution, in order to separate a family

117.    Through the meetings, memoranda, and other directives, Defendants Miller, Sessions, Nielsen, McAleenan, and other government officials, directed DHS employees to separate families at the Southern border, and DHS employees knowingly and purposefully did so.

> **B. Each Defendant Was Instrumental in the Development and Implementation of the Family Separation Policy.**

118.    Multiple Inspector General reports establish that each Defendant was indispensable to the development and implementation of the family separation policy.

119.    "[Attorney General] Sessions and a small number of other DOJ officials understood that DHS would change its policy in response to the Zero Tolerance policy and begin referring to DOJ for criminal prosecution of adults who entered the country illegally with children and that

prosecution of these family unit adults would result in children being separated from them, at least temporarily." 2021 DOJ OIG Report at *i*.

120.    The OIG further "determined that the [Office of the Attorney General (OAG)] was a driving force behind the decision to refer family unit adults for prosecution, as evidenced by Sessions' and the OAG's urging and support for this change to DHS policy between December 2017 and May 2018." *Id.* at 34.

121.    Defendants Sessions and Nielsen were deeply involved in ensuring that family units like the Plaintiffs' were prosecuted and split apart—even over the objections of U.S. attorneys implementing the Zero Tolerance policy on the Southwest border. *Id.* at 27-33.

122.    In May 2018, during a Cabinet meeting at the White House, Defendant Sessions complained to President Trump that Defendant Nielsen must stop allowing Central America asylum-seekers into the country. In response, President Trump berated Nielsen, asking why over 50,000 people had been already arrested crossing the border.

123.    On May 1, 2018, Defendant McAleenan indicated that regular prosecution of adults in family units would begin shortly and provided examples of prosecutions that had already resulted in the separation of children from their parents. *Id.* at 30. These statements confirm his knowledge of the natural and foreseeable consequences of such prosecutions. *Id.* Defendant McAleenan confirmed his intent to continue the separations. *Id.*

124.    On May 3, 2018, Defendant Sessions' talking points for a White House meeting stated that "[t]he prosecution of an adult member of a family unit will necessarily result in their transfer to the U.S. Marshals Service. Any minors in the family unit will remain in DHS custody, and likely eventually be transferred to the Office of Refugee Resettlement." *Id.* at 31.

125.    Moreover, in a speech on May 7, 2018, Defendant Sessions affirmed the

government's intention to separate parents and children, stating: "[I]f you're smuggling a child, then we will prosecute you and that child will be separated from you as required by law." *Id.* at 1.

126.    On May 11, 2018, in conversations with attorneys who expressed concerns regarding the policy, Defendant Sessions stated, "[i]f care [sic] about kids, don't bring them in; won't give amnesty; [sic] to people with kids." *Id.* at 39.

127.    When Defendant Sessions responded to concerns from community leaders on June 14, 2018, he insisted that "having children does not give you immunity from arrest and prosecution." *Id.* at 56.

128.    Defendant Sessions was aware of the separations that resulted from the policy he urged, and he doggedly advanced them as a tool for deterring migration.

129.    In June 2018 on Twitter, Defendant Nielsen denied the existence of a family separation policy, even though she had signed and implemented the 2018 Family Separation Memo only weeks before.

130.    Defendant Nielsen knew the potential risks and consequences of this policy to families but chose to implement it anyway.

131.    In meetings with President Trump and Defendant Miller, Defendant Nielsen explained that DHS lacked the resources to separate children from their parents, prosecute the parents, and then reunite the family in a timely manner. Defendant Nielsen acknowledged that the process "could get messy and children could get lost in an already clogged system."

132.    A separate DHS Inspector General report found that DHS and CBP did not have Information technology (IT) systems adequate to track separated families and that "CBP officials have been aware of these IT deficiencies since at least November 2017 when U.S. Border Patrol conducted an initiative [El Paso Initiative] that mirrored the *Zero Tolerance Policy*." Off. of the

Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families*, DEP'T. OF HOMELAND SEC., at *i* (Nov. 25, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf ("2019 DHS OIG Report"). The agency's refusal to address these known IT problems frustrated efforts to reunite families.

133.    Defendant McAleenan confirmed in a June 2018 interview that the purpose of the Zero Tolerance policy was "to dissuade crossing between ports of entry, which is dangerous for people making those crossings."

134.    In the same interview, Defendant McAleenan acknowledged the policy of family separation: "We're prosecuting the parents; they're temporarily separated for prosecutors. So they go to the U.S. marshals; they will be prosecuted by the U.S. attorney's office. Then they're detained by ICE while the child is sent to Health and Human Services, in the custody of HHS."

135.    In July 2019, Defendant McAleenan also testified before Congress that he understood the family separation policy to be a means to avoid piecemeal enforcement of immigration law. By prosecuting entrants without "exception[] . . . prosecutions increased from about 20 percent of amenable adults to 50 percent of amenable adults."

136.    Once CBP classified a young person as an Unaccompanied Alien Child (UAC), CBP would transfer the minor to ORR custody. This transfer had to be completed within 72 hours. Off. of the Inspector General and Government Accountability Off., *Special Review – Initial Observations Regarding Family Separation Issues under the Zero Tolerance Policy*, DEP'T OF HOMELAND SEC., at 3 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf ("2018 DHS OIG Report").

137.    CBP violated the 72-hour requirement in many cases, and instead, it confined

minors classified as UACs in facilities not meant for longer-term custody. *Id.* at 9.

138.     A UAC is a child who "has no lawful immigration status in the United States; has not attained 18 years of age; and with respect to whom there is no parent or legal guardian in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

139.     When challenged in July 2019 about Defendants' detention of children who did not qualify as UACs under the statute, Defendant McAleenan responded, "So are you suggesting that an unaccompanied child that has a parent somewhere in the U.S. is not unaccompanied?" The unlawful implication of his statement is that Defendants could permissibly detain children as UACs even when a parent or legal guardian in the United States was available to provide care and physical custody.

140.     On May 4, 2018, DHS Secretary Nielsen issued the 2018 Family Separation Memo directing Border Patrol officers to refer for prosecution adults in family units. 2018 DHS OIG Report at 32. This policy memorandum served as DHS's implementation of DOJ's Zero Tolerance policy. *Id*.

141.     Defendant Miller designed and supervised the implementation of numerous anti-immigrant policies, including the family separation and Zero Tolerance policies.

142.     Defendants Sessions, Nielsen, and Miller intended the Zero Tolerance announcement to further the widespread separations of Central American parents and children along the Southern border.

143.     Defendant Miller told CBP officials  in a July 2019 email, "My mantra has persistently been presenting aliens with multiple unsolvable dilemmas to impact their calculus for choosing to make the arduous journey to begin with."

144.     At another time, Defendant Miller declared, "I would be happy if not a single

refugee foot ever again touched American soil."

145.    In or around May 2018, Defendant Miller led a meeting with U.S. government officials, including Defendant Nielsen, at the White House discussing family separation. At the meeting, Defendant Miller asked for U.S. government officials to evidence their support for family separation by a show of hands.

146.    In one April 2018 White House statement, entitled "What You Need To Know About President Donald J. Trump's Efforts to End Catch and Release," the Trump administration admitted and celebrated that the family separation policy was a tool to prevent the release of families with children into the interior of the United States.

### C.    Defendants' Failure to Coordinate with Other Agencies Further Exacerbated the Effects of the Policy and Length of the Separations.

147.    Defendants developed and implemented the family separation policy to coerce *bona fide* asylum seekers like Plaintiffs into abandoning their claims and to torture Plaintiffs and other refugees so as to deter future migration to the United States.

148.    During the 2017 El Paso Initiative, while DOJ temporarily jailed parents on charges related to their entry, DHS scattered children into HHS shelters across the United States. Even then, parents received little or no information about where their children were, and the increase in separated children stressed programs that were responsible for housing these children.

149.    In November 2017, the Deputy Director of ORR expressed concern to senior DHS officials about the increase in separated children and the burden on the UAC program. According to a March 2020 HHS Inspector General report, CBP and ICE officials acknowledged this communication, but there was no direct response to the issue of family separations. Off. of the Inspector General, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy*, DEP'T OF HEALTH AND HUMAN SERVICES, at *16* (Mar. 2020),

https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf ("2020 HHS OIG Report").

150.    Defendant Nielsen admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with Defendant Sessions prior to the DOJ's April 2018 Zero Tolerance policy announcement.

151.    Defendants Nielsen and McAleenan failed to prepare or warn those responsible for the care of separated children that a substantial number of young, traumatized children would be entering ORR custody.  As a result, ORR facilities and foster families failed to provide necessary medical, mental health, and other services to separated children, exacerbating their trauma.

152.    The 2020 HHS OIG Report stated that there were "no procedures or systems" to "track separated families" between DHS and HHS.

153.    Neither DHS nor DOJ notified HHS in advance about the implementation of the Zero Tolerance policy or other family separation policies, which meant many HHS officials heard about the policy through the media. *Id.* at *i.*

154.    In an email between HHS officials in February 2017 regarding "unaccompanied children," officials state "DHS stressed told [sic] ORR that the overall intent of the actions is to serve a deterrent in the longer term, but ORR believes the immediate impact is certain to have capacity and budgetary impacts for the UAC program."

155.    The failure of Defendants Nielsen and McAleenan to warn the shelters regarding the increasing numbers of separated children entering ORR custody meant that there were too few case workers available to take children to medical and mental health appointments, even in cases where children needed specialized care with outside providers. *Id.* at 9.

156.    As a result, "facilities struggled to address the mental health needs of children who had experienced intense trauma, including separated children." *Id.*

157.    Furthermore, Defendants rebuffed congressional efforts to mitigate the effects of family separation. The House Committee on Oversight and Government Reform wrote Defendants Sessions and Nielsen on June 5, June 22, and August 2, 2018 asking them to produce information regarding each child separated from family under the policy. Defendants refused to respond.

158.    The House Committee wrote Defendant Nielsen again on December 19, 2018, asking her and DHS to "fully comply" with the previous communications. Defendant Nielsen did not respond.

159.    On February 5, 2019, the House Committee requested the legislative affairs officials of DHS, HHS, and DOJ to testify as to why the requested information was not produced. Even after their request for additional time was granted, the agencies still did not comply with the House Committee's requests.

160.    On February 26, 2019, the House Committee voted to issue subpoenas to the federal agencies, addressing then-Attorney General Barr and Defendant Nielsen for their role in the child separation policy.

161.    On April 23, 2019, Connecticut Senator Richard Blumenthal wrote Defendant McAleenan, urging him to "finally come clean about your role in developing and implementing the cruel policy of family separation" and requesting the release of an unredacted version of the 2018 Family Separation Memo.

162.    The House Committee on Oversight and Government Reform and Subcommittee on Civil Rights and Civil Liberties jointly wrote agencies about their failure to comply with the subpoenas and requested testimony in a non-compliance hearing. After further negotiations, the House Committee agreed to meet with agency officials instead. As of the House Committee's July 2019 report, "the Committee has received some – but not all – of the information required by the

subpoenas."

163.    Eventually, Defendant McAleenan stressed in congressional testimony and media interviews that CBP kept records on all of the separated children so that when the data was integrated from HHS and DHS, the families could be quickly reunited. However, due to Defendant's failure to warn relevant agencies about the separation policy, the reunification efforts were delayed.

164.    On June 13, 2018, DHS and HHS announced that they had a "central database" that contained information about separated families that could be accessed by both agencies. However, the 2018 DHS OIG Report found that no such database existed, and this lack of preparation further prolonged the separations and made the reunification process more difficult.

165.    Defendants also employed practices, other than the Zero Tolerance policy, to separate families entering the United States along the Southern border.

166.    In some cases, Defendants offered no reason or justification for the separation. At other times, when a family presented itself legally at a port of entry to apply for asylum, Defendants would claim that they were unsure that the adult traveling with the child was truly the parent and then separate the child, without taking any steps to verify parentage.

167.    Prior to the Zero Tolerance policy, CBP separated parents from the children only "if the adult had a criminal history or an outstanding warrant, or if CBP could not determine whether the adult was the child's parent or guardian." 2018 DHS OIG Report at 2. Under the Zero Tolerance policy, all parents were separated from their children because the children could not be held in criminal custody.

168.    Defendant McAleenan also testified that when the Zero Tolerance policy was implemented, he and the Chief Director of Border Patrol directed that this policy would exempt

parents traveling with children under five years old, so if parents in those circumstances were separated from their children, there had to be another reason why, such as a criminal history. Nevertheless, in CBP emails from May 2018, CBP officials confirmed that "all adults are amenable to prosecution – 100%."

> ### D. DHS Violated its Legal Obligations Regarding the Detention of Children by Separating Viky and J.S.R. from Their Parents.

169.    Defendants Miller, Sessions, Nielsen, and McAleenan, along with other officials conducted their discussions in secret, without consulting career technical experts in the government. They did so in order to avoid interference from those who did not share their objectives. Defendants also excluded individuals with technical expertise because they knew that widespread family separations were illegal and inhumane.

170.    Viky and J.S.R. were among more than 5,300 children that Defendants cruelly and purposefully separated from their parents. Defendants separated Plaintiffs and others in similar situations to deter noncitizens from seeking refuge in the United States.

171.    DHS also manufactured the conditions under which Viky and J.S.R. would be treated as unaccompanied minors by processing Viky separately from her mother—despite their joint arrival—and by prosecuting Mr. Santos Galvez for unlawful entry. In so doing, DHS illegally prolonged the detention of Viky and J.S.R.

172.    DHS, including its components ICE and CBP, has a long-standing legal obligation to ensure the prompt release of minors held in immigration custody. *See Flores v. Reno*, CV 85-4544-DMBAGR, No. 177 (C.D. Cal. July 24, 2015).

173.    The consent decree in the *Flores* class action litigation sharply limits the circumstances, duration, and manner of immigration detention of minor children. Among other things, the decree requires ICE to prioritize the prompt release of detained children, to hold

28

children in safe and sanitary conditions, and make continuous efforts to reunite children with family members while children are in the agency's custody.

174.    Aware of these legal obligations, DHS officials in December 2017 emails discuss "a legislative fix to Flores and the Trafficking in Victims Protection Reauthorization Act (TVPRA)."

175.    Defendants knowingly violated the *Flores* consent decree in multiple ways. They failed to hold Viky and J.S.R. in safe and sanitary conditions, failed to reunite and make efforts to reunite Vicky and J.S.R. with their parents, and failed to promptly release Viky and J.S.R from detention. Defendants' actions in this case prolonged Viky's and J.S.R.'s time in detention.

176.    In February 2018, Defendants Sessions, Nielsen, and McAleenan were sued in their official capacity in a class action habeas petition challenging the government's family separation practice. That lawsuit is known as the *Ms. L* litigation.

> ### E.    Defendants Ignored the Well-Known Physical and Mental Health Trauma that Results from Family Separation.

177.    Separating a young child from a parent—particularly when the child has no information about the parent's whereabouts or the possibility of reunification—is a traumatic event in the child's life.

178.    Substantial research establishes that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays, and long-term trauma. Recent studies confirm that a traumatic separation can cause memory impairments and interfere with the normal production of cortisol, a hormone produced in response to stress.

179.    Defendants repeatedly and deliberately ignored warnings that separating families would violate civil and constitutional rights and cause both children and parents physical and psychological harm.

180.    In March 2017, the American Academy of Pediatrics ("AAP") issued a statement that family separation would cause children trauma, urging policymakers "to always be mindful that these are vulnerable, scared children."

181.    In December 2017, immigrant rights organizations filed a complaint with DHS, citing the traumatic impact family separation has on those subjected to it as well as the interference it inflicts on accessing the immigration legal system.

182.    Neither DHS nor any other government agency conducted any study of the medical or psychological effect the separations could have on children or parents.

183.    In January 2018, Defendant Nielsen received a letter from the Children's Defense Fund, on behalf of more than 200 organizations with expertise in child welfare, juvenile justice, and child health, development, and safety. The letter implored Nielsen to "reverse course" given that increasing family separations "will have significant and long-lasting consequences for the safety, health, development, and well-being of children."

184.    Also in early 2018, Congress responded to growing alarm about family separations. Concerned members of Congress condemned the policy as "unconscionable" and asserted that the "reported justification of this practice as a deterrent to family migration suggests a lack of understanding about the violence many families are fleeing in their home countries." More pointedly, they concluded that the pretext of deterrence is "not a legally sufficient basis for separating families."

185.    Defendants ignored these objections and proceeded with its unconscionably cruel and inhumane actions.

186.    As the President of the American Academy of Pediatrics wrote to Defendant Nielsen by letter dated March 1, 2018, the real life harm of separating child from parent can be

severe: "[f]ear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."

187.    Two months later, the American Academy of Pediatrics repeated its concerns in a public statement opposing the policy: "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."

188.    As the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment concluded, harms like those experienced by the Plaintiffs can "amount to torture if they are intentionally imposed, encouraged or tolerated by States . . . for the purpose of deterring, intimidating, or punishing migrants or their families [or] coercing them into withdrawing their requests for asylum."

189.    The trauma caused by the government's inhumane actions will have a devastating and lasting impact on the Plaintiffs' psychological well-being.

## V.   PLAINTIFFS CONTINUE TO SUFFER FROM THEIR UNLAWFUL FORCED SEPARATION.

190.    Viky continues to experience the effects of her separation. Some evenings, as she tries to fall asleep, Viky remembers parts of the experience of being separated from her mother and cries. When a teacher raised immigration issues at school, Viky burst into tears in her classroom. She regularly visits with a school counselor to talk about these feelings.

191.    Ms. Benitez Alvarado also suffers ongoing challenges related to the separation.

When Viky goes to school, Ms. Benitez Alvarado has found herself frightened that authorities will steal her daughter away again. When she sees law enforcement officers or cars that remind her of DHS vehicles, she feels afraid that she will be carted to detention again.

192.   To date, J.S.R. is terrified of law enforcement officers. When he sees an officer, including local police, he becomes anxious, holds Mr. Santos Galvez tightly, and expresses fear of being separated from his father again. For example, shortly after reunification, when J.S.R saw a police officer in a store, he wrapped himself tightly around his father and threatened to bite the officer if they tried to separate them again.

193.   Shortly after his release from immigration custody, Mr. Santos Galvez had nightmares about being in detention and being forcibly separated from his child again. Mr. Santos Galvez's haunting nightmares occurred so frequently that he would sometimes wake up believing that he was back in detention and separated from his child.

194.   Since being reunited, Mr. Santos Galvez and J.S.R. have difficulty spending time apart and often fear being put through the same experience again. This happens even in innocuous settings.

195.   Not long ago, Mr. Santos Galvez let his child go on a sleepover with friends. Hours after dropping him off, J.S.R., crying and in distress, called Mr. Santos Galvez, also in distress, to pick him up. This is the second time an incident of this nature has happened to the father and son.

## VI.   PLAINTIFFS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES UNDER THE FEDERAL TORT CLAIMS ACT.

196.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

197.   Pursuant to 28 U.S.C. § 2675(a), on December 7, 2018, the Plaintiffs filed FTCA administrative claims with DHS, ICE, CBP, DOJ, and HHS for the tortious actions alleged here.

198.   As of the filing of this complaint, DHS, ICE, CBP, DOJ, and HHS have not responded to Plaintiffs' claims. The agency's failure to dispose of the claim within six months of filing "shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." 28 U.S.C. § 2675(a); 28 C.F.R. §§ 14.2(c), 14.9(b).

199.   Plaintiffs have administratively exhausted their claims under the FTCA.

## CLAIMS

### FIRST CLAIM
### Alien Tort Statute – 28 U.S.C. § 1350
### (Against Defendants Miller, Sessions, Nielsen, and McAleenan)

200.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

201.   The Alien Tort Statute (ATS) provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

202.   Torture and inhumane treatment violate the law of nations or a treaty of the United States.

### Torture

203.   Under the Alien Tort Statute, "torture means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1). This includes "act[s] specifically intended to inflict severe physical or mental pain or suffering . . . for the purpose of . . . punishment, intimidation,

coercion, or any reason based on discrimination of any kind." *Id.* § 2441(d)(1)(A).

204.    "[S]evere mental pain or suffering" means "prolonged mental harm caused by or resulting from," among other things, "the intentional infliction or threatened infliction of severe physical pain or suffering," or "threatened" harm to the victims or third persons. 18 U.S.C. § 2340(2) (definitions applicable to *id.* § 2340A (Anti-Torture Statute)); *id.* § 2441(d)(2)(D) (incorporating definition from *id.* § 2340(2)).

205.    Deliberate torture perpetrated under color of official authority violates universally accepted norms of customary international law.

206.    Defendants intentionally inflicted severe physical or mental pain or suffering on Plaintiffs and did so to intimidate and coerce them to forfeit their fundamental rights.

207.    The acts against Plaintiffs constitute torture.

**Inhumane Treatment**

208.    Defendants' acts against Plaintiffs constitute inhumane treatment under the Alien Tort Statute.

209.    Cruel, unhuman or degrading treatment is a universally accepted norm of customary international law. Cruel, inhumane, or degrading treatment constitutes acts that inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of torture or do not have the same purposes as torture. The difference between torture and inhumane treatment is the intensity of the suffering.

210.    Through their acts and omissions, Defendants have intentionally caused Plaintiffs great suffering, and serious injury to body and to their mental and physical health.

211.    The Westfall Act provides for the substitution of the United States as a party in suits against individual federal officials for "the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1).

212.    Substitution is not proper, however, for "a violation of a statute of the United States under which such action against an individual is otherwise authorized." *Id*. § 2679(b)(2).

213.    The Supreme Court has described the Alien Tort Statute as jurisdictional only and creating no new cause of action. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004); *see also Nahl v. Jaoude*, 968 F.3d 173, 179 (2d Cir. 2020) (repeating description but holding on other grounds that "financing terrorism" is not cognizable tort under ATS).

214.    Notwithstanding this description, for reasons set forth by former Chief Judge Harry Edwards in his comprehensive and detailed dissent in *Ali v. Rumsfeld*, 649 F.3d 762, 778-93 (D.C.Cir. 2011), the ATS "is 'statutory authority' sufficient to satisfy the Westfall Act exception." *Id.* at 792.

### SECOND CLAIM
### Federal Tort Claims Act - 28 U.S.C. § 1346(b)
### (Against Defendant United States)

215.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

### Intentional Infliction of Emotional Distress

216.    Under Connecticut law, intentional infliction of emotional distress exists where (1) the defendant intended to inflict emotional distress, or the defendant knew or should have known that emotional distress was likely a result of the conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress was severe.

217.    Under Texas law, a claim for intentional infliction of emotional distress exists

where (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress was severe.

218.     Defendant United States intentionally caused Plaintiffs severe emotional distress by carrying out a policy designed to cause suffering by separating the parents from their minor children, resulting in emotional distress that led to diagnoses of PTSD for the children and ongoing trauma for the parents. Defendant's conduct was extreme and outrageous and caused the Plaintiffs' severe emotional distress.

219.     Defendant's conduct constitutes intentional infliction of emotional distress under Texas and Connecticut law.

220.     Under the FTCA, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**False Imprisonment**

221.     Under Connecticut law, false imprisonment is the unlawful restraint by one person of the physical liberty of another.

222.     A false imprisonment claim under Texas law requires a claimant to show: (1) willful detention, (2) without consent, and (3) without authority of law.

223.     DHS employees detained and imprisoned Plaintiffs when they were picked up at the Southern border and placed in detention facilities in Texas and Connecticut. Plaintiffs at no point consented to or agreed to their detention for purposes of deterrence.

224.     DHS employees unlawfully used their authority to detain Plaintiffs for the illegal purpose of general deterrence, and unlawfully detained J.S.R. and Viky in violation of the *Flores* consent decree.

225.     Defendant's conduct constitutes false imprisonment under Texas and Connecticut law.

226.     Under the FTCA, the United States is liable to Plaintiffs for false imprisonment.

**Negligent Infliction of Emotional Distress**

227.     Under Connecticut law, a claim for negligent infliction of emotional distress exists where (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

228.     In Connecticut, DHS and HHS employees enforced the Zero Tolerance policy by forcibly transferring and detaining Viky and J.S.R. away from their parents. The Plaintiffs' distress and the illness, including PTSD, was the foreseeable consequence of the actions of DHS and HHS employees.

229.     The conduct of federal agents and employees conduct constitutes negligent infliction of emotional distress under Connecticut law.

230.     Under the FTCA, the United States is liable to Plaintiffs for negligent infliction of emotional distress.

**Negligence**

231.     Under Connecticut and Texas Law, negligence exists where (1) the Defendant owed the Plaintiff a legal duty; (2) the Defendant breached that duty; and (3) the Defendant's breach proximately caused damages to the Plaintiff.

232.     DHS, DOJ, and HHS officials and employees exercised control and had custody over Plaintiffs. As such, they had a duty to Plaintiffs to act with ordinary care so as to not cause

harm or injury to Plaintiffs. DHS officials and employees also had legal duties to Plaintiffs under the *Flores* consent decree. By engaging in the acts herein, Defendants breached their duty of care to Plaintiffs. As a result, Plaintiffs suffered substantial damages.

233.    Defendant's conduct constitutes negligence under Texas and Connecticut law.

234.    Under the FTCA, the United States is liable to Plaintiffs for negligence.

### Abuse of Process

235.    Under Connecticut law, abuse of process requires that (1) the defendant instituted an action against the plaintiff and (2) defendant used the proceedings primarily to accomplish a purpose other than that for which they were designed.

236.    Under Texas law, an abuse of process is committed when (1) the defendant made an illegal, improper, or perverted use of legal process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) there is damage to the plaintiff as a result of such illegal act.

237.    Federal officials and employees abused criminal prosecution, civil detention, and removal procedures in order to effectuate the ulterior motives of coercing Plaintiffs into abandoning their asylum claims and of deterring other people from seeking asylum in the United States. Defendants' actions caused serious emotional damage to Plaintiffs by separating Viky and J.S.R. from Ms. Benitez Alvarado and Mr. Santos Galvez, respectively.

238.    Defendants' conduct constitutes abuse of process under Texas and Connecticut law.

239.    Under the FTCA, the United States is liable to Plaintiffs for abuse of process.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

      a.       Award Plaintiffs compensatory and punitive damages in an amount to be proven at trial;

      b.       Award attorneys' fees and costs; and

      c.       Grant such other relief as the Court deems just and equitable.

July 13, 2022
New Haven, Connecticut

Respectfully submitted,

/s/ Michael Wishnie
Amanda Gómez Feliz, Law Student Intern[*]
Sajia Hanif, Law Student Intern
Cyerra Haywood, Law Student Intern
Juan Fernando Luna, Law Student Intern[*]
Gabriela Monico, Law Student Intern[*]
Angela Remus, Law Graduate
Tanveer Singh, Law Student Intern[*]
Michael J. Wishnie (ct27221)
JEROME N. FRANK LEGAL SVCS. ORG.
Yale Law School
127 Wall Street
New Haven, CT 06511
203-432-4800
michael.wishnie@ylsclinic.org

*Counsel for Plaintiffs*

---

[*] Motion for law student appearance forthcoming