# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VIKY SARAI FLORES BENITEZ,
ANA DELMI BENITEZ ALVARADO,
JAVIN BENIGNO SANTOS GALVEZ,
and J.S.R., a minor,

     *Plaintiffs,*

       v.

STEPHEN MILLER, JEFFERSON B.
SESSIONS, KIRSTJEN NIELSEN, KEVIN
McALEENAN, and UNITED STATES OF
AMERICA,

     *Defendants.*

**Case No. 3:22-cv-00884 (JCH)**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT UNITED STATES'S MOTION TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND................................................................................................3

   A.  Viky and Ms. Benitez Alvarado's Flight from Persecution in El Salvador and
       Forcible Separation in the United States ................................................................3

   B.  Government Officials Kept Viky and Ms. Benitez Alvarado Separated and
       Incommunicado ......................................................................................................4

   C.  J.S.R and Mr. Santos Galvez's Flight from Persecution in Honduras and Forcible
       Separation in the United States...............................................................................4

   D.  Government Officials Kept J.S.R. and Mr. Santos Galvez Separated and
       Incommunicado ......................................................................................................5

   E.  The Family Separation Policy Was Created to Inflict Maximal Pain and Deter
       Asylum Seekers, Like Plaintiffs ............................................................................6

   F.  Judge Bolden's Decision Ordering Release and Reunification..........................10

   G.  The Predictable, Traumatic Effects of the Families' Prolonged Separations..................10

LEGAL STANDARD ........................................................................................................11

ARGUMENT ....................................................................................................................12

   I.   PLAINTIFFS' ALLEGATIONS ESTABLISH THE COURT'S JURISDICTION
       OVER THEIR FTCA CLAIMS................................................................................13

       A.  The Discretionary Function Exception Does Not Apply Because Federal
            Officials Engaged in Unconstitutional, Nondiscretionary Conduct ........................13

       B.  The Due Care Exception Does Not Apply Because No Statute or Regulation
            Mandated Separating Families, And Government Agents Did Not Act with
            Due Care ............................................................................................................26

       C.  The Misrepresentation Exception Is Inapplicable .................................................29

       D.  Plaintiffs Do Not Allege Direct Liability of the United States Government
            or "Systemic" Torts .............................................................................................31

       E.  Plaintiffs' Claims Satisfy the Private Analogue Inquiry .........................................33

       F.  The Independent Contractor Exception Is Inapplicable Because Plaintiffs'
            Claims Are Not Based on Detention at Noank......................................................38

   II.  PLAINTIFFS' FALSE IMPRISONMENT CLAIMS ARE COGNIZABLE UNDER
       TEXAS AND CONNECTICUT LAW ...................................................................39

   III.  PLAINTIFFS ARE NOT REQUIRED TO PROCEED UNDER THE *FLORES*
       AGREEMENT FOR TORTIOUS CONDUCT.......................................................40

   IV.  INDIVIDUAL DEFENDANTS CANNOT BE SUBSTITUTED FOR THE UNITED
       STATES GOVERNMENT UNDER THE WESTFALL ACT .........................................41

       A.  Plaintiffs' Claims Are Within the Westfall Act Exception for Statutory Actions....42

       B.  The Individual Defendants' Intentional Jus Cogens Violations Fall Outside
            Their Scope of Employment...............................................................................46

V.    SOVEREIGN IMMUNITY DOES NOT APPLY TO DEFENDANT UNITED
      STATES FOR VIOLATION OF *JUS COGENS* NORMS ...............................................49

      A.    Sovereign Immunity Does Not Apply Because Jus Cogens Violations
            Are Inherently Non-Sovereign Acts ........................................................49
      B.    Jus Cogens Norms Supersede Common Law Sovereign Immunity.......................51
      C.    The Government Has Impliedly Waived Sovereign Immunity..............................52

CONCLUSION ...........................................................................................................54

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.E.S.E. v. United States*, No. 21-CV-0569 RB-GBW, 2022 WL 4289930
(D.N.M. Sept. 16, 2022) ....................................................................................23, 41
*A.F.P. v. United States*, No. 1:21-CV-00780-DAD-EPG, 2022 WL 2704570
(E.D. Cal. July 12, 2022) ..............................................................................17, 18, 21
*A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543
(D. Ariz. Mar. 31, 2022) ........................................................................................*passim*
*A.P.F. v. United States,* 492 F. Supp. 3d 989 (D. Ariz. 2020)....................................19, 27, 30, 38
*Abebe–Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) ..................................................42
*Adams v. United States*, 420 F.3d 1049 (9th Cir. 2005) ..............................................31
*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*,
510 F.3d 1 (1st Cir. 2007)....................................................................................23, 24
*Air Shuttle Corp. v. United States,* 112 F.3d 532 (1st Cir. 1997)...............................37
*Akutowicz v. United States*, 859 F.2d 1122 (2d Cir. 1988).........................................37
*Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va. 2019) ..................*passim*
*Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) ...........................................44, 45, 46, 48
*Anson v. United States,* 294 F. Supp. 3d 144 (W.D.N.Y. 2018) ................................12
*Antonelli v. Crow*, No. 08-261-GFVT, 2012 WL 4215024 (E.D. Ky. Sept. 19, 2012)................22
*Arar v. Ashcroft,* 532 F.3d 157 (2d Cir. 2008), *vacated and superseded on reh'g*
*en banc on other grounds,* 585 F.3d 559 (2d Cir. 2008) ......................................53, 54
*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)........................................................................12
*B.A.D.J. v. United States*, No. CV-21-00215-PHX-SMB, 2022 WL 11631016
(D. Ariz. Sept. 30, 2022) ......................................................................................17, 38
*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)....................................................12, 32
*Berkovitz v. United States*, 486 U.S. 531 (1988)....................................................14, 15, 22
*Bhuiyan v. United States,* No. 14-CV-00013, 2017 WL 2837023
(D.N.Mar.I. June 30, 2017), *aff'd,* 772 F. App'x 564 (9th Cir. 2019).....................37
*Block v. Neal*, 460 U.S. 289 (1983) .............................................................................29
*Bultema v. United States*, 359 F.3d 379 (6th Cir. 2004).............................................22
*Butz v. Economou,* 438 U.S. 478 (1978) ......................................................................18
*C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191
(D. Ariz. Mar. 30, 2020)........................................................................................*passim*
*Cabello Barrueto v. Fernandez Larios*, 205 F. Supp. 2d 1325 (S.D. Fla. 2002) ....................42
*Cangemi v. United, States,* 13 F.4th 115 (2d Cir. 2021). .......................................12, 15
*Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) .....................................................42
*Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D.N.Y. 2002).....................42
*Clayton v. United States*, No. 18 CV 5867 (MKB)(LB), 2019 WL 9283977
(E.D.N.Y. Aug. 1, 2019), *report and recommendation adopted,*
No. 18CV5867MKBLB, 2020 WL 1545542 (E.D.N.Y. Mar. 31, 2020)..................26
*Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434 (9th Cir. 1986) ......................24
*Cooke v. United States*, 918 F.3d 77 (2d Cir. 2019)....................................................52
*Cosby v. Marshals Service*, 520 F. App'x 819 (11th Cir. 2013) ................................22
*Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000)...............................14, 15, 24

*D.J.C.V. v. U.S. Immigr. & Customs Enf't,* No. 18 CIV. 9115 (AKH),
2018 WL 10436675 (S.D.N.Y. Oct. 15, 2018) .......................................................25

*D.J.C.V. v. United States*, No. 20 CIV. 5747 (PAE), 2022 WL 1912254
(S.D.N.Y. June 3, 2022) ...................................................................................*passim*

*Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106 (D. Conn. 2010) .....................................16

*Doe I v. Nestle USA, Inc.,* 766 F.3d 1013 (9th Cir. 2014) ..........................................43

*Doe v. First Step Preschool, Inc.*, No. CV125009050S, 2013 WL 870264
(Conn. Super. Ct. Jan. 31, 2013) ......................................................................36

*Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004)...................................42

*E.C.B. v. United States*, Civ. No. 2:22-cv-00915-CDB (D. Ariz. Nov. 8, 2022) ........................32

*E.S.M. v. United States*, No. CV-21-00029-TUC-JAS, 2022 WL 11729644
(D. Ariz. Oct. 20, 2022) ...........................................................................17, 20, 38

*Eberle v. Adams*, 73 S.W.3d 322 (Tex. App. 2001) ..................................................35

*El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249 (D. Conn. 2008) .....................15, 16

*Elgamal v. United States*, No. CV-13-00867-PHX-DLR, 2015 WL 13648070
(D. Ariz. July 8, 2015), *aff'd sub nom. Elgamal v. Bernacke*, 714 F. App'x 741
(9th Cir. 2018) .......................................................................................37

*Esrey v. United States*, 707 Fed. App'x 749 (2d Cir. 2018) ........................................30

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) .................................48

*F.A.A. v. Cooper,* 566 U.S. 284 (2012) .............................................................52

*F.R. v. United States*, No. CV-21-00339-PHX-DLR, 2022 WL 2905040
(D. Ariz. July 22, 2022) .......................................................................32, 38

*Filartiga v. Pena–Irala*, 577 F. Supp. 860 (E.D.N.Y. 1984).....................................42, 43

*Firebaugh Canal Water Dist. v. United States*, 712 F.3d 1296 (9th Cir. 2013)......................34

*Flores v. Reno*, No. CV 85-4544-RJK (C.D. Cal. Jan. 17, 1997) ..................................8, 22

*Fuentes-Ortega v. United States,* No. CV-22-00449-PHX-DGC, 2022 WL 16924223
(D. Ariz. Nov. 14, 2022) ..............................................................................33

*Gandarillas-Zambrana v. BIA*, 44 F.3d 1251 (4th Cir. 1995)........................................24

*Gutierrez de Martinez v. Lamagno,* 515 U.S. 417 (1995). .........................................47

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)........................................................18

*Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552 (E.D. Va. 2006) ........................23

*Hatahley v. United States*, 351 U.S. 173 (1956).................................................28

*Hernandez v. United States,* 785 F.3d 117 (5th Cir. 2015), *vacated and remanded
on other grounds sub nom. Hernandez. v. Mesa*, 137 S. Ct. 2003 (2017)....................47, 50, 51

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996).........................................42

*In re Est. of Marcos Hum. Rts. Litig.,* 25 F.3d 1467 (9th Cir. 1994)..............................43

*In re S.K.H.*, 324 S.W.3d 156 (Tex. App. 2010)...................................................35

*In re XE Services Alien Tort Litigation*, 665 F. Supp. 2d 569 (E.D. Va. 2009) .....................42

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) ..........................................34

*J.S.R. by and through J.S.G v. Sessions*, 330 F. Supp. 3d 731 (D. Conn. 2018)...........2, 10, 15, 17

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491
(D.D.C. 2018) ....................................................................................22, 28

*Jesner v. Arab Bank*, *PLC*, 138 S. Ct. 1386 (2018)...............................................43

*Kadić v. Karadžić*, 70 F.3d 232 (2d Cir. 1995) ..................................................43

*Kashef v. BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019)........................................44, 49

*King v. United States,* 491 F. Supp. 2d 286 (D. Conn. 2007)...................................12, 15

*La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) ................................................12

*Lane v. Peña*, 518 U.S. 187 (1996) .............................................................52

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163 (1993). ..........................................................................11, 31

*Lee v. United States,* CV 19-08051-PCT-DLR (DMF), 2020 WL 6573258
  (D. Ariz. Sept. 18, 2020) ...................................................................31, 32

*Levin v. United States*, 568 U.S. 503 (2013) ................................................41

*Licea v. Curacao Drydock Co.*, 584 F. Supp. 2d 1355 (S.D. Fla.2008)........................42

*Lineberry v. United States*, No. 3:08-cv-0597-G, 2009 WL 763052
  (N.D. Tex. Mar. 23, 2009) ........................................................................22

*Liranzo v. United States*, 690 F. 3d 78 (2d Cir. 2012).........................................34, 37

*Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016) .....................................16, 18

*M.D.C.G. v. United States*, NO. 7:15–CV–552, 2016 WL 6638845
  (S.D. Tex. Sept. 13, 2016) ......................................................................36

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000)........................................52

*Martinez v. United States*, No. CV-13-00955-TUC-CKJ, 2018 WL 3359562
  (D. Ariz. July 10, 2018) .........................................................................36

*Mazur v. United States*, 957 F. Supp. 1041 (N.D. Ill. 1997) ..................................37

*McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10 (1963) ...................48

*McGowan v. United States*, 825 F.3d 118 (2d Cir. 2016) ......................................34

*Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322 (N.D. Ga. 2002) ................................42

*Miller Harness Co. v. United States*, 241 F.2d 781 (2d Cir. 1957)...............................30

*Ms. L. v. U.S Immigr. & Customs Enf't,* 302 F. Supp. 3d 1149 (S.D. Cal. 2018)............23, 24, 25

*Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018),
  modified, 330 F.R.D. 284 (S.D. Cal. 2019), and *enforcement granted in part,*
  *denied in part sub nom. Ms. L. v. U.S. Immigr. & Customs Enf't,*
  415 F. Supp. 3d 980 (S.D. Cal. 2020) ...........................................................28

*Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428 (S.D. Cal. July 10, 2018).................22

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804) .........................................48

*Myers & Myers, Inc. v. U.S. Postal Service*, 527 F.2d 1252 (2d Cir. 1975) ...................16, 18, 28

*Nahl v. Jaoude*, 968 F.3d 173 (2nd Cir. 2020) ................................................44

*Nunez Euceda v. United States*, No. 2:20-CV-10793-VAP-GJSx, 2021 WL 4895748
  (C.D. Cal. Apr. 27, 2021) .....................................................................17, 27, 38

*Omoniyi v. Dep't of Homeland Sec.*, No. 10 Civ. 1344 (DF), 2012 WL 892197
  (S.D.N.Y. Mar. 13 2012)..........................................................................37

*Patel v. United States*, 398 F. App'x 22 (5th Cir. 2010) .......................................22

*Peterson v. Martinez*, No. 3:19-CV-01447-WHO, 2020 WL 999832
  (N.D. Cal. Mar. 2, 2020).........................................................................24

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331
  (S.D.N.Y. 2005)..................................................................................43

*Prince v. Massachusetts*, 321 U.S. 158 (1944).................................................17

*Princz v. Fed. Rep. of Germany*, 26 F.3d 1166 (D.C. Cir. 1994)...............................43, 49

*R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015)........................................40

*Romero v. Dummond Co.,* 552 F.3d 1303 (11th Cir. 2008) ......................................43

*Sasso v. Milhollan,* 735 F. Supp. 1045 (S.D. Fla. 1990) ......................................24

*Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129 (2d Cir. 1998)............................11

*Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004) ................................................43, 45, 46

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984)...........................43

*Terbush v. United States*, 516 F.3d 1125 (9th Cir. 2008)........................................24

*Troxel v. Granville,* 530 U.S. 57 (2000)..............................................................17, 18

*United States. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ..............................................44

*United States v. Gaubert*, 499 U.S. 315 (1991)................................................14, 15

*United States v. Olson*, 546 U.S. 43 (2005).............................................................34

*Van Dinh v. Reno*, 197 F. 3d 427 (10th Cir. 1999)..................................................24

*Vasquez v. Loza-Vega*, No. CV126013551, 2014 WL 783820
    (Conn. Super. Ct. Jan. 28, 2014) .......................................................................35

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994*)* .................................................22

*Welch v. United States,* 409 F.3d 646 (4th Cir. 2005)........................................26, 28

*Westfall v Erwin*, 484 U.S. 292 (1988).....................................................................48

*Wilbur P.G. v. United States,* No. 4:21-CV-04457-KAW, 2022 WL 3024319
    (N.D. Cal. May 10, 2022)............................................................................21, 27

*Williams v. McLaughlin*, No. FSTCV206046638S, 2021 WL 842006
    (Conn. Super. Ct. Feb. 10, 2021)........................................................................35

*Wilson v. Layne,* 526 U.S. 603 (1999).......................................................................18

*Witt v. Yale-New Haven Hosp*., 51 Conn. Supp. 155, 977 A.2d 779
    (Super. Ct. 2008) ...............................................................................................36

*Wiwa v. Royal Dutch Petroleum Co*., 626 F. Supp. 2d 377 (S.D.N.Y. 2009)............43

*Yousuf v. Samantar,* 699 F.3d 763 (4th Cir. 2012).........................................43, 47, 50

*Zadvydas v. Davis*, 533 U.S. 678 (2001). .............................................17, 18, 39, 40

**Statutes**

28 U.S.C. § 1350 .....................................................................................................43

28 U.S.C. § 2671 .....................................................................................................38

28 U.S.C. § 2674 .....................................................................................................33

28 U.S.C. § 2679 .........................................................................................42, 44, 47

28 U.S.C. § 2680 .................................................................................................26, 29

6 U.S.C. § 279 ...........................................................................................................7

8 U.S.C. § 1231 .......................................................................................................23

8 U.S.C. § 1232 .......................................................................................................27

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, 110 Stat. 3009 (1996) .....................................................24

**Other Authorities**

134 Cong. Rec. H4718-03, 1988 WL 179736 (June 27, 1988)....................................48

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,
    Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85............................49, 53

Erwin Chemerinsky, *Against Sovereign Immunity,* 53 STAN. L. REV. 1201 (2001) ....................52

Eval. & Inspect. Div., Off. of the Inspect. Gen., Dep't. of Just., *21-028, Review*

*of the Department of Justice's Planning and Implementation of its Zero Tolerance Policy and its Coordination with the Departments of Homeland Security and Health and Human Services* (Jan. 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf................................................................................................6, 27

Exec. Order No. 14011, 86 Fed. Reg. 8273...........................................................1, 9, 51

H.R. REP. NO. 100-700 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945..................46, 48

H.R. REP. NO. 109-79 (2005)...........................................................................................28

Off. of Inspec. Gen., Dep't. of Homeland Sec., *OIG-18-84, Special Review – Initial Observations Regarding Family Separation Issues under the Zero Tolerance Policy* (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf...................8

Stephen Satterfield, Note, *Still Crying Out for Clarification: The Scope of Liability Under the Alien Tort Statute After* Sosa, 77 GEO. WASH. L REV. 216 (2008) ...................45

William A. Fletcher, *International Human Rights in American Courts,* 93 VA. L. REV. 653 (2007)..................................................................................................................................45

## INTRODUCTION

On February 2, 2021, President Joseph R. Biden Jr. issued an Executive Order "condemn[ing] the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians (families), including through the use of the Zero-Tolerance Policy." Exec. Order No. 14011, 86 Fed. Reg. 8273 at § 1. On October 28, 2022, the government filed its motion to dismiss in this case defending the shameful operation of the Zero Tolerance Policy as the routine operation of government, and the torturous separation of children from their parents as the regrettable consequence of a series of unfortunate events. It is difficult to square President Biden's repudiation of deploying immigration laws to intentionally separate families of asylum-seekers with the government's effort to now evade responsibility for those very actions.

Rehearsing a litany of threadbare arguments that have been considered and rejected by courts across the country, the government attempts to obscure the basic facts of this case: In 2018, government agents followed the prescriptions of the Zero Tolerance Policy to forcibly separate fourteen-year-old Viky Sarai Flores Benitez from her mother, Ana Benitez Alvarado, and nine-year-old J.S.R. from his father, Javin Benigno Santos Galvez.[1] After these traumatic separations, government officials withheld information from the children and parents about their respective whereabouts and refused to allow them to communicate with each other. As Judge Bolden concluded, "the constitutional rights of J.S.R and V.F.B. have been violated, and [] irreparable harm has occurred as a result." *J.S.R. by and through J.S.G v. Sessions*, 330 F. Supp.

---

[1] Throughout this brief, Viky Sarai Flores Benitez and J.S.R. are referred to collectively as "Child Plaintiffs," and Ana Benitez Alvarado and Javin Benigno Santos Galvez are referred to collectively as "Adult Plaintiffs."

3d 731, 733 (D. Conn. 2018).[2] The government eventually reunified the two families, but only under a court order, and only after J.S.R. had been separated from his father for more than a month and Viky from her mother for two months.

Plaintiffs bring claims under the Federal Tort Claims Act ("FTCA") and the Alien Tort Statute ("ATS") against Defendants, who crafted and executed a family separation policy to unlawfully deter asylum seekers, including Plaintiffs, from entering the United States in order to seek protection from persecution. First, Plaintiffs seek damages under the FTCA for injuries caused to them by agents and officials of the United States during their unlawful detention and separation. Second, Plaintiffs sue Stephen Miller, Jefferson B. Sessions, Kirstjen Nielsen, and Kevin McAleenan ("Individual Defendants") for torture and inhumane treatment, alleging that these senior government officials acted under color of official authority to intentionally inflict physical and mental pain on Plaintiffs and coerce their forfeiture of a fundamental right.

The government credulously argues that federal officials were simply doing their jobs such that no one is liable to Plaintiffs for the devastating harm they endured. But the government separated these families pursuant to a coordinated government policy, for which the United States and Individual Defendants are liable under law. Accordingly, this Court should deny the government's Motion to Dismiss. First, Plaintiffs' claims clear all jurisdictional statutory exceptions to the FTCA. Second, Plaintiffs have properly and plausibly alleged all elements of intentional infliction of emotional distress, false imprisonment, negligent infliction of emotional distress, negligence, and abuse of process under the appropriate state law. Third, Individual Defendants are personally liable for torture and inhumane treatment because the ATS satisfies

---

[2] Child Plaintiff Viky was a minor during the 2018 proceeding. Since she was a minor, Viky's name was anonymized to protect her identity. Child Plaintiff J.S.R. was and remains a minor.

the "statutory action" exception to the Westfall Act, and because *jus cogens* violations can never be within the scope of government officials' employment. And finally, even if this Court substitutes the United States for Individual Plaintiffs, its sovereign immunity must yield to *jus cogens* norms, from which no derogation is permitted, especially in light of the unconscionable suffering Defendants intentionally inflicted on Plaintiffs.

## **FACTUAL BACKGROUND**

### A. Viky and Ms. Benitez Alvarado's Flight from Persecution in El Salvador and Forcible Separation in the United States

In May 2018, Ms. Benitez Alvarado fled El Salvador with her then fourteen-year-old daughter, Viky. Complaint ¶ 25, ECF 1 ("Compl."). Ms. Benitez Alvarado and Viky had spent months in hiding in El Salvador after Ms. Benitez Alvarado's domestic partner was murdered by the gang Mara Salvatrucha (MS-13). *Id*. Around May 13, 2018, Viky and Ms. Benitez Alvarado arrived in the United States, and Customs and Border Protection ("CBP") agents detained them shortly thereafter. *Id.* ¶ 26. While in detention, CBP officers forced Viky and Ms. Benitez Alvarado to sleep on the floor in frigid temperatures with only aluminum blankets and denied them the ability to bathe. *Id.* ¶ 27. Although Viky and Ms. Benitez Alvarado were detained together, Department of Homeland Security ("DHS") officials processed Viky separately and falsely classified her as an "unaccompanied juvenile." *Id.* ¶ 28.

On or around May 16, 2018, immigration agents told Ms. Benitez Alvarado that they were taking Viky to shower, but instead used this as an opportunity to separate the child from her mother. *Id*. ¶¶ 29-32. Immigration officials transferred Viky to the custody of the Office of Refugee Resettlement (ORR) at the Noank Community Support Services shelter in Groton, Connecticut ("Noank"), while they kept Ms. Benitez Alvarado detained in Texas. *Id.* ¶¶ 34, 45.

### B. Government Officials Kept Viky and Ms. Benitez Alvarado Separated and Incommunicado

While Ms. Benitez Alvarado was detained without Viky, she asked immigration officers about her daughter. *Id*. ¶ 32. They gave her conflicting information: some officers told her that they did not know her location, others said that Viky was in Houston. *Id.* Officials tormented Ms. Benitez Alvarado by laughing at her and insinuating that Viky was not her daughter. *Id*. ¶¶ 47-49. Ms. Benitez Alvarado was distraught about her separation from Viky and she had trouble eating and sleeping. *Id*. ¶ 33.

While Ms. Benitez Alvardo was in distress about the separation from her daughter, immigration officers attempted to coerce her to waive her right to seek asylum. *Id*. ¶¶ 50-55. DHS officers falsely told Ms. Benitez Alvarado that she would not see her daughter for months unless she signed paperwork agreeing to be deported. *Id*. ¶ 50. Ms. Benitez Alvarado signed because she wanted to be with her daughter again. *Id*. ¶ 52.

When Viky arrived at Noank, it was difficult for the shelter staff to interview her because she couldn't stop crying. *Id*. ¶ 35. For almost one month, no one could tell Viky where her mother was. *Id*. ¶ 37. Finally, Noank staff located Ms. Benitez Alvarado in ICE custody in Encinal, Texas. *Id*. ¶ 38. Viky's first contact with her mother was on June 21, 2018—*thirty-six days after Defendants separated mother and daughter. Id*. ¶ 39. That first phone call only lasted about ten minutes, and Ms. Benitez Alvarado was too distraught to communicate and sobbed into the phone. *Id*. ¶¶ 39, 54.

### C. J.S.R and Mr. Santos Galvez's Flight from Persecution in Honduras and Forcible Separation in the United States

In April 2018, Mr. Santos Galvez left Honduras with his then nine-year-old son, J.S.R., to find refuge from political prosecution. *Id*. ¶ 59. Their lives were in danger due to Mr. Santos Galvez's active involvement with the National Party of Honduras. *Id*. ¶ 58. On or about June 11,

2018, Mr. Santos Galvez and J.S.R. crossed the border into the United States from Mexico, and CBP arrested them. *Id*. ¶¶ 62-63. They were detained in a large, frigid, and windowless facility commonly known as a *hielera* (often translated as an "icebox"). *Id*. ¶ 64. Immigration officers gave them two aluminum blankets and one thin mattress topper. *Id*. ¶ 65. Mr. Santos Galvez gave the items to his child. *Id.* J.S.R. has memories of his father crying and constantly shaking in the *hielera*. *Id.* Mr. Santos Galvez's visible anguish terrified J.S.R. *Id.*

After three days in the *hielera*, immigration officers told Mr. Santos Galvez to leave his sleeping son and head outside. *Id*. ¶¶ 64, 66. The officers said that Mr. Santos Galvez would see his son shortly. *Id*. ¶ 66. Instead, they prevented Mr. Santos Galvez from returning, and told him that he would never see his son again. *Id*. ¶¶ 67, 85. Immigration officials then transferred J.S.R. to ORR custody at Noank on or around June 16, 2018, *id*. ¶ 71, while keeping Mr. Santos Galvez detained in Texas. *Id*. ¶ 85.

### D. Government Officials Kept J.S.R. and Mr. Santos Galvez Separated and Incommunicado

DHS officers told Mr. Santos Galvez that he would never see his son again, causing him to cry often, faint, and become physically sick. *Id*. ¶¶ 85-86. While being shuffled between multiple detention facilities in Texas, Mr. Santos Galvez repeatedly asked ICE officers if someone could tell him how J.S.R. was doing or where he was. *Id*. ¶¶ 90, 93. No one helped Mr. Santos Galvez or provided him with any information about J.S.R.'s location. *Id.*

Mr. Santos Galvez appeared in criminal court and admitted that he had entered the country without permission. *Id*. ¶ 87. He had previously entered the country and been deported in 2007. *Id*. ¶ 56. Immigration officers told him that he had come into the country without a son and that he would be deported, despite Mr. Santos Galvez's insistence that he had arrived with his

son. *Id*. ¶ 87. Only when Mr. Santos Galvez showed a card he had received upon arrest by CBP, listing his and J.S.R.'s possessions, did the officer admit that he was mistaken. *Id.* ¶ 89.

Once J.S.R. arrived at Noank, a legal services attorney attempted to locate Mr. Santos Galvez and facilitate communication between father and son but was unsuccessful. *Id*. ¶ 72. Eventually, Mr. Santos Galvez's attorneys were able to arrange a call between him and J.S.R. by phone, and then via videoconferencing on or about June 27, 2018. *Id*. ¶¶ 73, 94. During that call, father and son were not able to exchange many words because they were both sobbing. *Id*. During the call Mr. Santos Galvez was distressed to see that J.S.R.'s demeanor was dramatically different and he appeared sad and confused. *Id*. ¶ 94.

### E. The Family Separation Policy Was Created to Inflict Maximal Pain and Deter Asylum Seekers, Like Plaintiffs

*1. The Family Separation Policy Dramatically Changed Government Policies Towards Asylum Seekers on the Southern Border*

On April 6, 2018, Defendant Sessions issued a memorandum as Attorney General of the United States that created a "Zero Tolerance Policy" for those unlawfully entering the United States. *Id*. ¶¶ 107-108; *see also* Eval. & Inspect. Div., Off. of the Inspect. Gen., Dep't. of Just., *21-028, Review of the Department of Justice's Planning and Implementation of its Zero Tolerance Policy and its Coordination with the Departments of Homeland Security and Health and Human Services* at 1 (Jan. 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf. ("2021 OIG Report").[3] That policy ordered each U.S. Attorney's Office along the Southwest border to prosecute the misdemeanor offense of illegal entry into the United States "to the extent practicable." *Id*.

---

[3] The 2021 OIG Report is cited in the Complaint. *See* Compl. ¶¶ 102, 119-27.

On May 4, 2018, at the urging of Defendant Sessions, DHS, under the leadership of Defendant Nielsen, created a new policy that referred adults entering the United States unlawfully for prosecution regardless of the adult's connection to a family unit. Compl. ¶ 140; Def. U.S.'s Mem. Supp. Mot. Dismiss 7, ECF 35-1 ("Gov't. Mem."); 2021 OIG Report at 10. Under this policy, DHS referred parents detained for illegal entry to the Department of Justice (DOJ) and transferred the parent—without their accompanying child—to the custody of the U.S. Marshals. Compl. ¶ 112. DOJ would rapidly prosecute adults, often in forty-eight hours or less, because parents often pled guilty and received a sentence of time served. *Id.* DOJ would then return the parent to DHS custody. *Id.*

However, DHS would not reunite the parent and child once the parent had been returned to DHS custody. *Id.* ¶ 113. Instead, during the brief period when the parent was in DOJ custody, DHS would classify the child as Unaccompanied Alien Child (UAC) and transfer them to the custody of the ORR, which often meant moving them across the country. *Id.* ¶¶ 113, 134, 136; 2021 OIG Report at 6. A UAC is a child who "has no lawful immigration status in the United States . . . and with respect to whom there is no parent or legal guardian in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2); Compl. ¶ 138. The government erroneously classified separated children as UACs even when their parents were available to provide care and physical custody. Compl. ¶ 139. DHS officials admitted that they wanted to prevent children from being reunited with their parents even after the parents were returned to DHS custody. *Id.* ¶¶ 114-116.

As the government transferred children away from their parents, no procedures or systems tracked separations for eventual reunification. *Id.* ¶¶ 132, 152. This failure prolonged the separations and made the reunification process more difficult. *Id.* ¶ 164. Defendants Nielsen and

7

McAleenan also did not warn ORR facilities about the massive influx of young, traumatized

children. *Id.* ¶ 151. Because of a surge in separated and distraught children, ORR facilities were

unable to meet the medical, mental health, and other needs of the children in their care. *Id.*

The new DHS and DOJ policies fundamentally changed U.S.-Mexico border policy. *Id.* ¶

109. Previously, asylum seekers, including families with children, had not been systematically

referred for criminal prosecution for unlawful entry. *Id.* Prior to enactment of the Zero Tolerance

Policy, CBP separated parents from children "only if the adult had a criminal history or an

outstanding warrant, or if CBP could not determine that the adult was the child's parent or

guardian." Off. of Inspec. Gen., Dep't. of Homeland Sec., *OIG-18-84, Special Review – Initial*

*Observations Regarding Family Separation Issues under the Zero Tolerance Policy* at 3 (Sept.

27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf;[4]

Compl. ¶ 167. Under the new Zero Tolerance Policy, all parents were separated from their

children. Compl. ¶ 167.

Furthermore, under the *Flores* Agreement, *see* Stipulated Settlement Agreement, *Flores*

*v. Reno*, No. CV 85-4544-RJK (C.D. Cal. Jan. 17, 1997) ("*Flores* Agreement"),[5] the government

is required to prioritize the prompt release of detained children and make continuous efforts to

reunite them with family members. Compl. ¶¶ 172-73. Under the family separation policy, the

government prolonged Child Plaintiffs' detention by separating them from their parents and

treating them as UACs. *Id.* ¶ 171.

Viky and J.S.R. were two of more than 5,300 children that Defendants cruelly and

purposefully separated from their parents during the U.S. government's implementation of its

---

[4] This Report is cited in the Complaint. *See* ¶¶ 136-37, 140, 167.
[5] The *Flore*s Agreement is available at
https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf.

Zero Tolerance Policy. *Id*. ¶ 170. The separations triggered media attention, legal action, and government investigations, *id*. ¶¶ 157-63, 176, which eventually led to a June 20, 2018 Executive Order in which President Trump directed DHS to curtail family separations. *See* 2021 OIG Report at 77. As the government concedes, President Biden has recognized that the Zero Tolerance Policy was a "human tragedy that occurred when *our immigration laws were used* to *intentionally* separate children from their parents or legal guardians (families)." Exec. Order No. 14011, 86 Fed. Reg. 8273 at § 1 (emphasis added); Gov't. Mem. 1-2.

    2. *Individual Defendants Created and Implemented the Family Separation Policy for the Purpose of Deterring Asylum Seekers*

The family separation policy was created for the purpose of discouraging asylum seekers—specifically from Central America—from entering the United States. Compl. ¶¶ 2, 12, 99-100, 104, 122. 143-44, 154. Policymakers and senior officials were aware that the policy would lead to the separation of children from their parents. *Id*. ¶¶ 104, 119, 123-127, 131, 134. The officials were also repeatedly warned about the emotional harm created by forcible family separation, but forged ahead regardless. *Id*. ¶¶ 179-189.

As set forth in detail in the Complaint, each Individual Defendant was central to the development and implementation of the family separation policy, hosting several meetings on its desired maximally punitive effect. *Id*. ¶¶ 99, 106, 117, 143. Defendant Miller designed and implemented the family separation policy and Zero Tolerance Policy to present noncitizens with "unsolvable dilemmas" with the end goal of dissuading them from seeking asylum altogether. *Id*. ¶¶ 141-44. Defendant Sessions required the DOJ to criminally prosecute the misdemeanor offense of criminal entry, recognizing that it would lead to the separation of families. *Id*. ¶¶ 107-08, 119. Defendant Nielsen issued the memo that directed CBP to refer for prosecution adults in

family units. *Id.* ¶ 140; Gov't. Mem. at 7; 2021 OIG Report at 10. Defendant McAleenan confirmed that CBP would be carrying out the family separation policy. Compl. ¶¶ 123, 133-135.

### F. Judge Bolden's Decision Ordering Release and Reunification

On July 2, 2018, Child Plaintiffs filed habeas petitions seeking release from detention and reunification with their parents. *Id.* ¶ 95. In an opinion dated July 13, 2018, Judge Victor Bolden concluded that J.S.R. and Viky's constitutional rights had been violated and that "irreparable harm ha[d] occurred as a result." *J.S.R.,* 330 F. Supp. 3d at 733; Compl. ¶ 8. Moreover, Judge Bolden ordered the government to redress "the effects of the constitutional violation suffered" by Child Plaintiffs, "namely trauma or more precisely, Post-Traumatic Stress Disorder." *Id.* The families were released and reunited shortly thereafter. Compl. ¶ 98.

### G. The Predictable, Traumatic Effects of the Families' Prolonged Separations

The separations irreparably harmed Plaintiffs' physical and emotional well-being. In July 2018, Dr. Andrés Martin, a child psychiatrist, diagnosed the Child Plaintiffs with Post-Traumatic Stress Disorder ("PTSD"). *Id.* ¶¶ 41, 74. Dr. Martin concluded that immigration officers caused J.S.R.'s PTSD when they forcibly separated him from his father. *Id*. ¶ 74. While at Noank, a pediatric clinician found that J.S.R. needed an evaluation for depression "due to trauma from travel and separation." *Id*. ¶ 83. He was not sleeping at night because he felt that he needed to remain vigilant. *Id*. ¶ 84. In Viky's case, the separation exacerbated the PTSD created by her prior exposure to violence. *Id*. ¶ 41. During her time at Noank, she experienced depression, hopelessness, and sleeplessness, among other symptoms. *Id*. ¶ 44.

Adult Plaintiffs also experienced emotional and physical distress from the continuing separation. Ms. Benitez Alvarado, on the verge of what she thought was a mental breakdown, felt extreme sadness, difficulty breathing, and tightness in her chest. *Id.* ¶ 53. Meanwhile, Mr.

10

Santos Galvez fell into a serious depression, coupled with loss of appetite and a golf ball-sized growth on his armpit. *Id.* ¶ 91.

Dr. Martin predicted long-lasting physical and mental health consequences for J.S.R. and Viky, including "lifelong anxiety disorders, mood disorders, including depression; and physical illness stemming from trauma and stress." *Id.* ¶¶ 43, 79. His assessment has proven correct, as the Child Plaintiffs continue to experience the effects of their separation. *Id.* ¶¶ 190-195. J.S.R. is terrified of law enforcement officers and struggles with separation anxiety when Mr. Santos Galvez is not around him. *Id.* ¶¶ 192, 194-195. Viky cries when she remembers being separated from her mother; she once burst into tears when a teacher at school discussed immigration issues. *Id.* ¶ 190.

Adult Plaintiffs also continue to suffer from the separation from their children. Mr. Santos Galvez has nightmares about his detention and separation from J.S.R.; he also has trouble spending time apart from J.S.R. *Id.* ¶¶ 193-194. Ms. Benitez Alvarado fears that authorities will take her daughter away, and when she sees law enforcement officers, she is afraid of being detained again. *Id.* ¶ 191.

## LEGAL STANDARD

When adjudicating a defendant's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court must accept as true all material factual allegations in the complaint. *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir. 1998); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993). In the context of the FTCA, Plaintiffs bear the *initial* burden of showing that their claims fall within that statute's waiver of sovereign immunity and the *initial* burden of showing that their claims are not barred by the discretionary function exception. *Cangemi v. United, States,* 13 F.4th 115,

130 (2d Cir. 2021). The government bears the *ultimate* burden of establishing the applicability of the exception. *See Anson v. United States,* 294 F. Supp. 3d 144, 158 (W.D.N.Y. 2018) ("This Court agrees with what appears to be the prevailing view in this Circuit that the Government bears the burden of establishing the applicability of the discretionary function exception."); *accord King v. United States,* 491 F. Supp. 2d 286, 296 (D. Conn. 2007) (Kravitz, J.).

On a motion to dismiss under Rule 12(b)(6), all plausible allegations made in the complaint must be taken as true and all reasonable inferences must be drawn in the plaintiffs' favor. *See La Liberte v. Reid*, 966 F.3d 79, 85 (2d Cir. 2020). The complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 87 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The facial plausibility standard is met where the allegations of the complaint allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## **ARGUMENT**

High-ranking government officials fashioned the Zero Tolerance Policy with one goal in mind: to create conditions so horrific for asylum seekers from Central America that they would risk their families' lives in their countries of origin rather than seek refuge in the United States. The method they devised to achieve this goal was to orchestrate the use of federal criminal and immigration powers in order to forcibly separate parents from children. Such separations, government officials posited, would cause so much anguish for immigrant families in the United States that the *in terrorem* effects would reverberate among asylum seekers thousands of miles away. Despite Plaintiffs' detailed allegations of the purpose, design, and operation of this savage policy, the government claims that while "human tragedy" may have come to pass, federal officials were merely performing their ordinary discretionary functions, acting with reasonable and due care in executing the law, and undertaking uniquely governmental functions. For these

12

reasons among others, the government claims FTCA exceptions apply so as to exempt it from liability. It further claims that with respect to Plaintiffs' ATS claims, the Individual Defendants are immune under the Westfall Act and sovereign immunity protects the government from liability. As a result of these arguments—which have been made to and rejected by numerous other courts across the country—the government contends that *no one* is responsible for the suffering Plaintiffs endured.

In fact, neither the discretionary function exception nor the due care exception nor any other jurisdictional barrier precludes Plaintiffs' claims under the FTCA.  Because government officials acted unconstitutionally, without discretion, and without any policy basis, the discretionary function exception does not apply. Because no statute or regulation mandated the forcible separation of Plaintiffs, and government officials acted with utter disregard for Plaintiffs, the due care exception is inapplicable. And because Plaintiffs have stated claims for the tortious conduct of government officials for which private law analogues plainly exist under state law, their FTCA claims may proceed. Finally, Plaintiffs' claims for torture and inhumane treatment under the ATS are properly brought against the Individual Defendants because the ATS satisfies the "statutory action" exception to Westfall Act and *jus cogens* violations necessarily fall outside the scope of legitimate official conduct.  In the event that the Court allows substitution under the Westfall Act, sovereign immunity does not protect the government in light of the *jus cogens* violations that occurred here.

I.    **PLAINTIFFS' ALLEGATIONS ESTABLISH THE COURT'S JURISDICTION OVER THEIR FTCA CLAIMS**

A.  **The Discretionary Function Exception Does Not Apply Because Federal Officials Engaged in Unconstitutional, Nondiscretionary Conduct**

Federal agents separated Viky from Ms. Benitez Alvarado, and J.S.R. from Mr. Santos Galvez not because of a coincidental "confluence of discretionary decisions by immigration and

13

law enforcement officials," Gov't. Mem. 15, but because of a systematic, unconstitutional scheme operating exactly as it was designed to work. The government attempts to disaggregate the constitutive elements of the Zero Tolerance Policy into a series of mundane events, from apprehension to detention to misclassification to separation, to argue that each phase of immigration enforcement under the policy is protected from suit by the discretionary function exception (DFE) to the FTCA. However, as Plaintiffs allege, these actions were not the result of discrete and independent "policy decisions," *id.*, but rather interlocking steps of an integrated, unlawful scheme—concocted and implemented by federal employees to "discourage Central Americans from seeking asylum in the United States." Compl. ¶ 99; *see also id.* ¶¶ 107-17. Because federal officials acted unconstitutionally and without discretion, the DFE does not apply. Numerous district courts around the country have rejected the government's invocation of the DFE in its efforts to evade responsibility for separating families, and this Court should reject it as well.

Under the Supreme Court's familiar *Berkovitz/Gaubert* test, the DFE bars claims under the FTCA where "(1) the acts alleged to be negligent [or wrongful] . . . [are] discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation and (2) the judgment or choice in question [is] . . . grounded in considerations of public policy or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991) and *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988) (internal quotation marks omitted)). The DFE does not apply if Plaintiffs show that "*either* (1) the United States' allegedly tortious act (or failure to act) was inconsistent with a 'specific mandatory directive' – *i.e.*, a 'federal statute, regulation, or policy [that] specifically prescribes a course of action for [the federal government] to follow,'

14

*Berkovitz*, 486 U.S. at 536, 544; *or* (2) the allegedly tortious 'judgment or choice in question' is not 'grounded in considerations of public policy or susceptible to policy analysis,' *Coulthurst*, 214 F.3d at 109." *Cangemi v. United States,* 13 F.4th 115, 130 (2d Cir. 2021) (internal citations shortened). The government bears the burden of proving that both requirements are met, *see King,* 491 F. Supp. 2d 286 at 296, and cannot do so here.

First, federal officials' actions pursuant to the Zero Tolerance Policy to treat Adult Plaintiffs as amenable to prosecution, misclassify Child Plaintiffs as UACs, detain the families in horrendous conditions, and forcibly separate the Adult and Child Plaintiffs were unconstitutional. Because federal officials lack discretion to violate the Constitution, the first part of the *Berkovitz/Gaubert test* cannot be met. Second, even assuming, *arguendo,* that federal agents possess the discretion to act unconstitutionally, federal officials' tortious acts were done pursuant to the Zero Tolerance Policy, which prescribed their conduct, and in violation of the "specific mandatory directive[s]" of the *Flores* Agreement. *Berkovitz*, 486 U.S. at 544. As such, these were nondiscretionary acts. And even if there were judgments or choices to be made under the Zero Tolerance Policy, they were not grounded in public policy such that the second step of the DFE test is not satisfied either.

### 1. Plaintiffs Sufficiently Allege Government Agents' Separation of Plaintiffs was Unconstitutional Such That the Discretionary Function Exception Does Not Apply

As Judge Bolden has already found, the forcible separation of Adult and Child Plaintiffs was unconstitutional. *See J.S.R.*, 330 F. Supp. 3d at 741. Because unconstitutional conduct is not within the range of "permissible" conduct covered by the DFE, *see Gaubert*, 499 U.S. at 325; *Berkovitz*, 486 U.S. 531 at 537; *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 275 (D. Conn. 2008), the DFE is inapplicable to Plaintiffs' well-pled allegations.

15

As the Second Circuit has long held, "a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority." *Myers & Myers, Inc. v. U.S. Postal Service*, 527 F.2d 1252, 1261 (2d Cir. 1975). Despite the government's characterization that *Myers & Myers* concerned only the Postal Service's violations of its own regulations, *see* Gov't. Mem. 28, the Second Circuit explicitly stated that the claim being considered was "that the Postal Service lacked discretion to act in disregard of its own applicable regulations *and of the Constitution*." *Myers & Myers*, 527 F.2d at 1261 (emphasis added). The majority of other circuits similarly have held plausibly alleged unconstitutional conduct to be outside the DFE's veil of protection. *See Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) (holding that the DFE "does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription" and noting that "[a]t least seven circuits, including the First, Second, Third, Fourth, Fifth, Eighth, and Ninth, have either held or stated in dictum that the discretionary-function exception does not shield government officials from FTCA liability when they exceed the scope of their constitutional authority.")

Likewise, judges of this Court have repeatedly held that unconstitutional conduct does not fall under the DFE. *See, e.g., Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 120 (D. Conn. 2010) (Underhill, J.) ("The plaintiffs are correct that the government does not have discretion to violate the Constitution."). The government mistakenly characterizes this Court's holding that "ICE officials do not have discretion to violate the constitution," *El Badrawi*, 579 F. Supp. 2d at 268, as "dicta," Gov't. Mem. 29. In fact, this Court specifically held that "Government agents never have the discretion to violate the Constitution," and so "[t]he discretionary functions exception does not bar El Badrawi's FTCA claims." *El Badrawi*, 579 F. Supp. 2d at 275. In accord with Second Circuit precedent, decisions by this Court and Judge Underhill, and a

16

supermajority of district courts addressing FTCA family separation lawsuits,[6] this Court should reject the government's contention that unconstitutional conduct is permissible under the DFE.

Judge Bolden considered the forcible separation of Plaintiffs in 2018 and noted that the parties agreed that "a constitutional violation occurred when the Government separated children from their parents—both on the basis of substantive due process, as the separation deprived the children of their right to family integrity, and procedural due process, as J.S.R. and [Viky] were given no notice and no fair opportunity for a hearing before being separated from their parents." *J.S.R.*, 330 F. Supp. 3d at 741. The Due Process Clause of the Fifth Amendment applies to noncitizens "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The substantive interest in family integrity "is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville,* 530 U.S. 57, 65 (2000) (examining deep tradition of judicially recognized liberty interests in family integrity since the 1920s); *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

---

[6] *See, e.g., C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020), *motion to certify appeal denied,* No. CV-19-05217-PHX-SRB, 2020 WL 5232560 (D. Ariz. July 6, 2020) ("Plaintiffs have plausibly alleged that the government's separation of their families violated their constitutional rights, which is not shielded by the discretionary function exception."); *Nunez Euceda v. United States*, No. 2:20-CV-10793-VAP-GJSx, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021) ("Contrary to Defendant's arguments, the discretionary function does not shield conduct that violates the constitution."); *E.S.M. v. United States*, No. CV-21-00029-TUC-JAS, 2022 WL 11729644, at *4 (D. Ariz. Oct. 20, 2022) ("So, although immigration-detention decisions are subject to some discretion, the Government and its agents still do not enjoy the discretion to violate the Constitution."); *B.A.D.J. v. United States*, No. CV-21-00215-PHX-SMB, 2022 WL 11631016, at *3 (D. Ariz. Sept. 30, 2022) (holding that "if plaintiffs plausibly allege constitutional violations, then the discretionary function exception is inapplicable"); *A.F.P. v. United States*, No. 1:21-CV-00780-DAD-EPG , 2022 WL 2704570, at *12 (E.D. Cal. July 12, 2022) (finding that "plaintiffs have plausibly alleged that the government's separation of a father and son" violated constitutional rights such that the DFE is inapplicable).

Relying on non-FTCA cases, the government erroneously argues that Plaintiffs must

meet a heightened standard, foreign to the FTCA, in order to establish that the DFE does not

apply.[7] It posits that Plaintiffs must show "a specific, clearly established constitutional directive,

accompanied by plausible assertions" in order for the DFE to be inapplicable. Gov't. Mem. 27.

But neither the Second Circuit, this Court in *El Badrawi*, nor any other circuit to have held

unconstitutional conduct outside of the DFE has imposed such a qualified immunity-style,

heightened pleading standard. *See Myers & Myers*, 527 F.2d at 1261; *Loumiet*, 828 F.3d at 943

(collecting cases). Moreover, other courts addressing family separation lawsuits have rejected the

government's attempt to import qualified immunity decisions to the FTCA context. *See, e.g.,*

*A.F.P.*, at *13 ("The government appears to invite the court to expand the discretionary function

exception test to incorporate the doctrine of qualified immunity and limit FTCA jurisdiction,"

but "cited no caselaw that supports their argument for such an expansion of the exception, and

the qualified immunity decisions they cite do not pertain to FTCA claims."). And even if such a

heightened standard did apply, the constitutional rights at issue—procedural and substantive due

process, including the right to family integrity—are clearly established constitutional rights. *See*

*generally Zadvydas*, 533 U.S. at 693*; Troxel,* 530 U.S. at 65.

Plaintiffs unquestionably have pled constitutional violations. Akin to the plaintiffs in

*C.M.*, Plaintiffs here "[do] more than simply label the government's conduct as unconstitutional"

by actually "cit[ing] a court order declaring [the] conduct [to be] so egregious, outrageous,

brutal, and offensive." 2020 WL 1698191, at *4 (internal quotation marks omitted); *see also*

*D.J.C.V. v. United States*, No. 20 CIV. 5747 (PAE), 2022 WL 1912254, at *15 (S.D.N.Y. June 3,

---

[7] The government cites to *Harlow v. Fitzgerald,* 457 U.S. 800 (1982) and *Wilson v. Layne,* 526 U.S. 603 (1999), Gov't. Mem. 26, both of which concern qualified immunity under *Bivens. Butz v. Economou,* 438 U.S. 478 (1978), Gov't. Mem. 27, also concerns qualified immunity. Plaintiffs do not plead any *Bivens* claims and any suggestion that the DFE would apply to unconstitutional conduct is mere dicta.

2022) (finding "well-pled procedural and substantive due process violations" and collecting nine cases where district courts have "upheld as viable constitutional challenges to the Zero Tolerance policy along these lines.")

> 2. *Government Officials' Decisions to Refer for Prosecution, Misclassify the Child Plaintiffs, and Detain Were Not Discretionary Under the Zero Tolerance Policy*

Even if this Court were to find that unconstitutional conduct can fall within the DFE, the actions of federal agents in devising and enacting the Zero Tolerance Policy on Plaintiffs neither involved discretionary judgment nor were grounded in public policy. The government erroneously, and cynically, recasts the carefully orchestrated Zero Tolerance Policy as a constellation of independently made, discretionary choices. In fact, the Zero Tolerance Policy did not allow for discretion by any individual agents along the chain from apprehension to family separation. The government's revisionist account notwithstanding, it cannot meet either part of the *Berkovitz/Gaubert* test.

> a. *The Zero Tolerance Policy Granted Government Officials No Discretion*

The Zero Tolerance Policy dictated every aspect of government agents' separation of Plaintiffs and cannot be broken down into a series of routine steps for detention and prosecution. The government argues it has discretion in typical criminal charging, immigration detention, and UAC classification decisions, Gov't. Mem. 19-22. But Plaintiffs do not challenge these aspects of the federal authority in isolation, but instead as the constitutive steps of an integrated scheme to deter asylum claims like Plaintiffs'. Compl. ¶¶ 11-12, 99, 106, 117, 121-122, 147, 170-171. As multiple courts have found when rejecting the government's DFE arguments in the family separation context, the Zero Tolerance Policy must be examined in its entirety. *See, e.g., A.P.F. v. United States,* 492 F. Supp. 3d 989, 996 (D. Ariz. 2020) ("The Court rejects the United States'

re-categorization of Plaintiffs' factual allegations as standalone claims."); *C.M.*, 2020 WL 1698191, at *4 ("To the extent the United States asks the Court to parse the Complaint to assess whether claims with respect to individual factual allegations are barred, the Court declines to do so."); *E.S.M.*, 2022 WL 11729644, at *4 ("On first glance, there is caselaw to support [the government's] blanket assertion that the DFE will always apply to immigration detention and prosecution decisions, but further investigation reveals that is not the case."). Even Defendant McAleenan understood that the policy in question was specifically meant to "avoid piecemeal enforcement of immigration law," contradicting the government's characterization here. Compl. ¶ 135.

The government implausibly argues its use of discretion in implementing earlier steps of the Zero Tolerance Policy creates an inexorable chain reaction, such that later steps are "as a result" brought within the domain of the DFE. Gov't. Mem. 24. By the government's account, the decisions to (1) treat all adult asylum-seekers, such as Adult Plaintiffs, as amenable for prosecution and (2) detain adult immigrants, are purely discretionary, and by happenstance render the children unaccompanied, such that the government has no choice but to separate children from their parents under the *Flores* Agreement. Gov't. Mem. 23. But the very design of the Zero Tolerance Policy was to *direct* federal agents' conduct as to create the conditions that required family separation. Compl. ¶¶ 99-117. The government claims that because of *Flores,* its hands were tied when in fact the government *intentionally tied its own hands*.

In addition, the government's attempt to recast the Zero Tolerance Policy's criminal charging procedure as a routine instance of prosecutorial discretion is unavailing. Gov't. Mem. 19-20. Because the Zero Tolerance Policy was "prescribed by the Trump Administration, the front-line employees tasked with implementing the policy did not reasonably have any element

of choice," *Wilbur P.G. v. United States,* No. 4:21-CV-04457-KAW, 2022 WL 3024319, at *4 (N.D. Cal. May 10, 2022), such that the *Berkovitz/Gaubert* test is not met. Plaintiffs are not raising claims to challenge the Attorney General or the Executive Branch's "broad discretion" writ large, but instead challenge actions taken under a directive that prescribed how officers should act in order to effectuate the separation of Adult and Child Plaintiffs.

The government's claim that it had discretion to erroneously misclassify Viky and J.S.R. as UACs is also without merit. *See* Gov't. Mem. 22-24. Like the decisions to refer adults for prosecution and to detain them separate from their children, the UAC classification here was an inextricable part of the Zero Tolerance Policy. Moreover, Plaintiffs also plausibly allege that Viky and J.S.R. were misclassified as UACs without a determination that their parents were unable to provide care and physical custody—or any other semblance of appropriate process. *See, e.g.,* Compl. ¶¶ 28, 87-89 (alleging that an "officer insisted that all the documentation indicated that [Mr. Santos Galvez] had come alone."). The government asserts without support that it had made a determination that Plaintiffs would be unable to provide care and physical custody as a result of being detained. Gov't. Mem. 22. Such a determination is a disputed question of fact unrelated to the Court's jurisdiction. *See A.F.P. v. United States,* 2022 WL 2704570, at *13 ("To the extent that the government invites the court to engage in analyzing the truth of each alleged fact and evaluating which fact could or could not prove a claim, the court declines to do so."). The government further argues that Viky and J.S.R. were UACs under the definitions of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), Gov't. Mem. 22, but Child Plaintiffs "are not true unaccompanied minors within the meaning of the statute; they were rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants." *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d

21

491, 495 n.2 (D.D.C. 2018) (citing *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, ECF No. 101, at 2-3 (S.D. Cal. July 10, 2018)).

The government's claim of unrestricted discretion in immigrant detention, Gov't. Mem. 20, ignores its mandatory obligations under the *Flores* Agreement to maintain certain conditions for the detention of immigrants, particularly immigrant children. Compl. ¶¶ 172-175. Plaintiffs plausibly allege that DHS, ICE, and CBP agents have a "long-standing legal obligation" to hold minor children in "safe and sanitary conditions, and make continuous efforts to reunite children with family members." *See* Compl. ¶¶ 172-173. The *Flores* Agreement explicitly charges that the government "shall hold minors in facilities that are safe and sanitary" and "will provide access to toilets and sinks," "drinking water and food," "medical assistance," "adequate temperature control and ventilation," "adequate supervision," and "contact with family members." *Flores* Agreement ¶ 12.A. Instead, agents subjected Plaintiffs to a *hielera* and forced Plaintiffs to sleep on the floor, with minimal weather protection, while denying Plaintiffs the ability to clean themselves or a respite from 24/7 lighting. Compl. ¶¶ 27, 64-65. In arguing the application of the DFE to these claims, the government never mentions, much less disputes the application of the "specific mandatory directive[s]" of the *Flores* Agreement. *See Berkowitz,* 486 U.S. at 544. Instead, the government relies on garden-variety conditions of confinement cases ungoverned by the *Flores* Agreement. *See* Gov't. Mem. 25.[8]

---

[8] The government cites to *Bultema v. United States*, 359 F.3d 379 (6th Cir. 2004) (addressing claims brought by a federal prisoner who fell from a bunk bed); *Cosby v. Marshals Service*, 520 F. App'x 819 (11th Cir. 2013) (addressing claims brought by federal prisoner alleging failure by the Bureau of Prisons (BOP) to follow doctor's instructions and provide appropriate medical care); *Patel v. United States*, 398 F. App'x 22, 28 (5th Cir. 2010) (finding that the plaintiff's complaint did not "demonstrate that the actions of the BOP officials rise to the level of deliberate indifference" in a suit involving BOP officials); *Antonelli v. Crow*, No. 08-261-GFVT, 2012 WL 4215024 (E.D. Ky. Sept. 19, 2012) (the DFE considerations where plaintiff had invoked the language of 18 U.S.C. § 4202 to allege unsuitable prison conditions); *Lineberry v. United States*, No. 3:08-cv-0597-G, 2009 WL 763052 (N.D. Tex. Mar. 23, 2009) (addressing claims brought by federal prisoner alleging injury as result of BOP actions); *Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994*)* (addressing BOP regulations on telephone systems to assess the propriety of a

Similar to other family separation lawsuits, Plaintiffs here explicitly argue that the *Flores* Agreement requires specific conduct by the government. Compl. ¶¶ 172-175; *see A.E.S.E. v. United States*, No. 21-CV-0569 RB-GBW, 2022 WL 4289930, at *13 (D.N.M. Sept. 16, 2022) (holding that "Plaintiffs' claims are not barred by the discretionary function exception" based in part on the *Flores* Agreement's mandates); *A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543, at *3 (D. Ariz. Mar. 31, 2022) ("[T]he government acknowledges it has entered into a consent decree (the '*Flores* Agreement') which 'sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [Immigration and Naturalization Service].'") (internal citation omitted). Ultimately, the government may be correct that abstract claims regarding conditions-of-confinement—when such conditions are the result of "discretionary decisions susceptible to policy considerations" and not subject to legal or judicial mandates—are barred by the DFE, but those are not the claims in front of this Court. Gov't. Mem. 25.

Finally, the government's reliance on 8 U.S.C. § 1231(g)(1) to demonstrate discretionary action is misplaced. *See* Gov't. Mem. 20. That statute provides that the "Attorney General shall arrange for appropriate places of detention for aliens detained pending removal," but it does not provide an explicit grant of discretion. 8 U.S.C. § 1231(g)(1). *See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 20 (1st Cir. 2007) ("[S]ection 1231(g) fails to 'specify' that individualized transfer decisions are in the Attorney General's discretion. This is in stark contrast to other sections of the INA."). As noted in *Ms. L. v. U.S Immigr. & Customs Enf't,* 302 F. Supp. 3d 1149, 1160–61 (S.D. Cal. 2018), "[t]he *Aguilar*

---

prior preliminary injunction); *Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 558-59 (E.D. Va. 2006) (dismissing plaintiff's FTCA claim regarding BOP's provision of telephone services "most importantly" because plaintiff had not adequately alleged a state tort violation).

court's analysis of these statutes is faithful to statutory text and persuasive." The government relies on caselaw that predates the 1996 amendments to the INA that added § 1231, and interprets a prior statute, not § 1231(g)(1).[9] *See generally* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996); *see also Ms. L.*, 302 F. Supp 3d at 1160-61 (reasoning that the government's reliance on *Committee of Central American Refugees v. I.N.S.* is misplaced in light of the analysis in *Aguilar*). While the government cites to one case post-1996, *Van Dinh v. Reno*, 197 F. 3d 427 (10th Cir. 1999), which finds the Attorney General maintains an unbridled discretionary authority to transfer noncitizens, this view is the "minority" across circuits. *Aguilar*, 510 F.3d at 20-21.

> *b.   The Government's Actions Were Not Grounded in Policy Analysis*

Even if government agents' actions were discretionary, the government has failed to identify a legitimate policy objective that would be advanced by family separation. The *Berkovitz/Gaubert* test only shields conduct "grounded in considerations of public policy or susceptible to policy analysis." *Coulthurst*, 214 F.3d at 109. There "must be some support in the record" that actions taken are susceptible to policy analysis, and it is "not sufficient for the government merely to waive [sic] the flag of policy as a cover for anything and everything it does that is discretionary in nature." *Terbush v. United States*, 516 F.3d 1125, 1134 (9th Cir. 2008). The decisions Plaintiffs challenge here must be shown to be "actually susceptible to [policy] analysis" as applied to Plaintiffs, not in the abstract notion of criminal charging decisions and immigration detention. *Peterson v. Martinez*, No. 3:19-CV-01447-WHO, 2020 WL 999832, at *8 (N.D. Cal. Mar. 2, 2020) (internal citations omitted).

---

[9] The government cites to *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434 (9th Cir. 1986); *Gandarillas-Zambrana v. BIA*, 44 F.3d 1251 (4th Cir. 1995); and *Sasso v. Milhollan*, 735 F. Supp. 1045 (S.D. Fla. 1990), Gov't.Br. 20. These three cases concern former 8 U.S.C. § 1252(c), not § 1231(g)(1).

The tortious conduct challenged by Plaintiffs is not the government's prosecutorial and detention decisions, but rather the government's practice of separating families. The government rarely, if ever, has a permissible policy consideration in cleaving family integrity: "Except in the most dreadful circumstances, a court should not countenance the cruelty of the separation of a parent and child by the government." *D.J.C.V. v. U.S. Immigr. & Customs Enf't,* No. 18 CIV. 9115 (AKH), 2018 WL 10436675, at *1 (S.D.N.Y. Oct. 15, 2018); *see also Ms. L,* 302 F. Supp. 3d at 1167 ("These allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective.") (internal citations and quotation marks omitted).

In sum, the government offers only post-hoc rationalizations for the actions of its officers in forcibly separating Viky from Ms. Benitez Alvarado and J.S.R. from Mr. Santos Galvez. The government argues that a routine discretionary decision to refer Mr. Benitez Alvarado and Mr. Santos Galvez for prosecution led to the family separation, Gov't. Mem. 19-20, in spite of Plaintiffs' well-pled allegations that such referrals were manufactured pretenses to deter *bona fide* asylum seekers like Plaintiffs from seeking refuge in the United States. *See* Compl. ¶¶ 99-117. As noted in the Complaint, a 2021 DOJ OIG Report suggested that the DOJ understood the Zero Tolerance Policy to require referring arriving asylum-seekers for prosecution for the purpose of separating family units "even over objections of U.S. attorneys." Compl. ¶¶ 118-121. Taken together, Plaintiffs have sufficiently alleged unconstitutional conduct that renders the DFE inapplicable, and the government has failed to meet its burden under the *Berkovitz/Gaubert* test since the Zero Tolerance Policy neither was a discretionary act nor had a legitimate policy objective.

**B. The Due Care Exception Does Not Apply Because No Statute or Regulation Mandated Separating Families, And Government Agents Did Not Act with Due Care**

The due care exception (DCE) to the FTCA is inapplicable because in enacting the forcible separation of Plaintiffs, government agents were not reasonably executing the mandates of a statute or regulation. The DCE bars claims "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). District courts in the Second Circuit generally apply a two-prong test set forth in *Welch v. United States,* 409 F.3d 646 (4th Cir. 2005), to determine whether the DCE applies. *See, e.g., D.J.C.V.*, 2022 WL 1912254, at *10; *Clayton v. United States*, No. 18 CV 5867 (MKB)(LB), 2019 WL 9283977, at *12 (E.D.N.Y. Aug. 1, 2019), *report and recommendation adopted*, No. 18CV5867MKBLB, 2020 WL 1545542 (E.D.N.Y. Mar. 31, 2020). First, the government must show that the "statute or regulation in question specifically proscribes a course of action." *Welch*, 409 F.3d at 652, because the DCE applies only when a "specific action is mandated." *Id.* Second, if a statutory or regulatory mandate exists, the government must show that it "exercised due care in following the dictates of that statute or regulation." *Id.* The government cannot satisfy either factor of the test – as multiple district courts adjudicating family separation cases have concluded.

*1. No Statute or Regulation Mandated Plaintiffs' Separation*

The government can point to no "statute or regulation" proscribing family separation, and therefore fails to satisfy the first prong of *Welch*. As the government concedes, Gov't. Mem. 29-30, the plain language of the FTCA provides that the DCE may apply only where a claim is based in the "execution of a statute or regulation." 28 USC § 2680(a). No statute or regulation mandated the actions of forcibly removing the Child Plaintiffs from their parents' custody and the prolonged detention that followed.

26

Plaintiffs were separated pursuant to the Zero Tolerance Policy, which is not a statute or regulation. As numerous other courts have found in evaluating government DCE arguments in the family separation context, this fact alone is determinative. *See D.J.C.V.*, 2022 WL 1912254, at \*18 (DCE inapplicable because no statute or regulation mandated family separation); *A.I.I.L.*, 2022 WL 992543, at \*5 (same); *A.P.F.,* 492 F. Supp. 3d at 995-996 (same); *C.M.*, 2020 WL 1698191, at \*3 (same); *Nunez Euceda*, 2021 WL 4895748, at \*4 (same), *Wilbur P.G.*, 2022 WL 3024319, at \*5 (same).

The very fact that DOJ enacted the Zero Tolerance Policy suggests that there was no statute or regulation prescribing the government's conduct. The policy radically changed DHS's practice of not referring adults in immigrant family units for criminal prosecution. *See* Compl. ¶¶ 109, 140. Had the Plaintiffs' separation been required by statute or regulation, there would have been no need for the Zero Tolerance Policy or the Executive Order by which President Trump directed DHS to curtail family separations in June 2018. *See* 2021 OIG Report at 77.

The government's argument that it was acting pursuant to the TVPRA, 8 U.S.C. § 1232(b)(3), Gov't. Mem. 30-31, fails when Plaintiffs' separation is viewed in the context of the Zero Tolerance Policy rather than in isolation. Section 1232(b)(3) requires the government to transfer an unaccompanied child to ORR custody "not later than 72 hours after determining that such child is an unaccompanied alien child." While the government argues that Viky and J.S.R. were required to be transferred to ORR custody after "the Government determined that the parents were unable to provide care and physical custody," Gov't. Mem. 30, it was the government's own actions, pursuant to the Zero Tolerance Policy, that, by design, rendered the parents "unable to provide care and physical custody." The Child Plaintiffs were not in fact unaccompanied children.

Other courts addressing family separation matters have found that the TVPRA does not contemplate the designation of children such as Child Plaintiffs as UACs. *See e.g., Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 495 n.2 (children "rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants" in separating families "are not true unaccompanied minors"); *Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1139 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), and *enforcement granted in part, denied in part sub nom. Ms. L. v. U.S. Immigr. & Customs Enf't,* 415 F. Supp. 3d 980 (S.D. Cal. 2020) ("true 'unaccompanied alien children'" are distinct from "migrant children detained with their parents at the border and who were thereafter separated from their parents."). Rather, as Congress has made clear, "[c]hildren who are apprehended by DHS while in the company of their parents are not in fact 'unaccompanied;' and if their welfare is not at issue, they should not be placed in ORR custody." H.R. REP. NO. 109-79, at 38 (2005). The government cannot hide behind the DCE by claiming that it was following the requirements of 8 U.S.C. § 1232(b)(3).

### 2. The Government Has Not Established That It Exercised "Due Care"

Even if the government met the first prong of *Welch*, which it does not, it must also show that it acted with "due care." *Welch,* 409 F.3d at 652. Due care "implies at least some minimal concern for the rights of others." *Myers & Myers*, 527 F.2d at 1262 (quoting *Hatahley v. United States*, 351 U.S. 173, 181 (1956)). The government does not even attempt to argue that its forcible and prolonged separation of Plaintiffs was done with due care. Nor can it, given the government's recognition that the Zero Tolerance Policy was a "human tragedy." Gov't. Mem. 11.

Here, the government did not act with even minimal concern for others in separating Plaintiffs and sending Child Plaintiffs thousands of miles away from their parents. The

government separated Plaintiffs without any indication of why they were being separated, where they were going, how long they would be separated, or if they would ever be reunited. Compl. ¶¶ 30-33, 66-67, 85-90. DHS officers told Mr. Santos Galvez that he would never see his son J.S.R. again, *id.* ¶ 85, and taunted and mocked Ms. Benitez Alvarado as she dealt with the devastating news of Viky being taken away from her. *Id.* ¶ 47. After the separation, the government did not make meaningful efforts to facilitate communication between parents and children. Compl. ¶¶ 39, 54, 93-94. Having failed to exhibit "minimal concern" for Plaintiffs, the government agents' misconduct is not now protected by the DCE.

### C.  The Misrepresentation Exception Is Inapplicable

The FTCA's "misrepresentation" exception, 28 U.S.C. § 2680(h), does not apply because Plaintiffs do not assert a cause of action for misrepresentation and any allegations of deceit in the Complaint are not essential to Plaintiffs' claims. The government characterizes Plaintiffs' IIED, negligence, and abuse of process claims as partly grounded in alleged government misrepresentations, Gov't. Mem. 32. But in fact, Plaintiffs' IIED and negligence claims are based on the harms suffered by Plaintiffs due to the government's prolonged separation of parents and children, not any deceitful actions they may have taken. *See* Compl. ¶¶ 36, 37-38. Similarly, Plaintiffs' claims for abuse of process are based on the government's misuse of immigration processes to deter Plaintiffs and others from seeking asylum, not lies by government officials. *Id.* ¶ 38. Coercion and deceit are not the substance of the Plaintiffs' claims.

The Supreme Court has recognized that the misrepresentation exception applies where injuries are "*wholly attributable* to reliance on the Government's negligent misstatements." *Block v. Neal*, 460 U.S. 289, 297 (1983) (emphasis added). Here, Plaintiffs' claims are

substantially based on the government's forcible separation of parents and children, which caused Plaintiffs' severe emotional distress.

The cases cited by the government to support their application of the misrepresentation exception are inapposite. Gov't. Mem 32. In *Miller Harness Co. v. United States*, 241 F.2d 781, 783 (2d Cir. 1957), the court held that the misrepresentation exception applied to a claim arising from the sale of government surplus goods in which the buyer alleged a government official told him certain items would be included but in fact were not. As the court concluded, "[n]o amount of characterization in the complaint can alter the fact that the case is solidly set upon a charge of innocent or wilful [sic] misrepresentation." *Id.* Here, Plaintiffs' claims are not based on government officials inducing Plaintiffs to act based on misrepresented facts. Similarly, in *Esrey v. United States*, 707 Fed. App'x 749, 750 (2d Cir. 2018), plaintiffs claimed that they were injured when the IRS took steps to conceal information from them. The court found that the claim was barred by the misrepresentation exception because the concealment was "essential" to plaintiffs' claims. *Id.* In this case, Plaintiffs' claims are not based on concealed facts, and the allegations of deceit are not "essential" to Plaintiffs' claims.

Other courts have found that the misrepresentation exception did not bar plaintiffs' claims in family separation cases with similar facts. *See D.J.C.V.,* 2022 WL 1912254, at *18 (declining to apply DCE because plaintiffs' claims centered on separation, not misrepresentation); *A.I.I.L.,* 2022 WL 992543, at *5 (because "the misstatements allegedly made by government officials are not essential to the claims asserted . . . the misrepresentation exception does not bar Plaintiffs' claims"); *A.P.F.*, 492 F. Supp. 3d at 997 (mention of misrepresentation in two out of over five hundred paragraphs in complaint is "insufficient to prove that the misrepresentation exception applies").

### D. Plaintiffs Do Not Allege Direct Liability of the United States Government or "Systemic" Torts

The government misconstrues the Complaint to mean that Plaintiffs seek to sue the United States government as an entity for IIED, Gov't. Mem. 32, when in fact, Plaintiffs sue based on the misconduct of federal officials. Plaintiffs' reference to "Defendant United States" in a single paragraph of the Complaint, Compl. ¶ 218, does not convert the claim into one against the United States (and is in fact an accurate statement of the party liable under the FTCA for the tortious acts of its employees). Plaintiffs have incorporated every allegation made throughout the Complaint into their IIED claim, *see id.* ¶ 215, and Plaintiffs' allegations are clearly made based on misconduct by individual employees of the federal government. *See id.* ¶¶ 27-32, 47-55, 65-70, 85-93 (discussing tortious acts and harms perpetrated by individual employees of the federal government). As the Court must consider Plaintiffs' allegations in the light most favorable to Plaintiffs, Plaintiffs have not asserted a direct liability or "systemic" claim. *See Leatherman*, 507 at 164.

The government's references to *Adams v. United States,* 420 F.3d 1049 (9th Cir. 2005)), and *Lee v. United States,* CV 19-08051-PCT-DLR (DMF), 2020 WL 6573258 (D. Ariz. Sept. 18, 2020), Gov't. Mem. 33, are inapposite because neither case discusses "systemic" claims and the pleadings and circumstances of both cases are substantially different from the present case. *Adams* merely holds that under the FTCA a corporation cannot be an "employee" of the U.S. Government. 420 F.3d at 1054-1055. That is not a question at issue here.[10] In *Lee,* the court dismissed plaintiff's claims for failing to satisfy the *Twombly* standard because the allegations were "too vague and conclusory" and, among other things, had not "set forth the alleged acts or

---

[10] Similarly, *Lee* explicitly notes that *Adams* is "not directly on point" because "[p]laintiff has not attempted to sue the Government under the FTCA for the alleged negligent acts of a private corporation or any other 'corporate entity.'" 2020 WL 6573258, at *7.

omissions of specific federal employees." *Lee,* 2020 WL 657328 at *5-6 (citing *Twombly,* 550 U.S. at 555)*.* Unlike *Lee*, Plaintiffs' allegations identify numerous government employees whose tortious conduct harmed Plaintiffs. *See* Compl. ¶¶ 27-32, 47-55, 65-70, 85-93.

The government's selective reliance on recent family separation cases is also unavailing. Gov't. Mem. 33-34. The entirety of the court's order in *F.R. v. United States* demonstrates that the court still had subject-matter jurisdiction over allegations about individual employees' conduct. *F.R. v. United States*, No. CV-21-00339-PHX-DLR, 2022 WL 2905040, at *4 (D. Ariz. July 22, 2022) ("The Court has subject-matter jurisdiction to the extent the complaint alleges tortious misconduct by individual government employees."). Here too, Plaintiffs allege tortious conduct by individual employees of the federal government. *See* Compl. ¶¶ 27-32, 47-55, 65-70, 85-93. Additionally, the court in *F.R.* recognized that "[a]ny potential deficiencies in the factual allegations in the identification of the individual employees" should be raised in a 12(b)(6) motion. *F.R.*, 2022 WL 2905040 at *4. The government makes the same mistake here, Gov't. Mem. 34 (asking the Court to dismiss the claim "for lack of subject matter jurisdiction"), and so any issues as to the Plaintiffs' factual allegations in identifying individual employees when asserting their IIED claim are not properly before this Court.

The two cases cited by the government in their notice of supplemental authority are also unhelpful to their argument. Def. U.S.'s Notice of Supp. Authority, 1-2, ECF 41. In both cases, the court disagreed with the government's assertion that plaintiffs' claims were barred as institutional torts claims. *See E.C.B. v. United States,* Civ. No. 2:22-cv-00915-CDB, slip op. at 9 (D. Ariz. Nov. 8, 2022) (holding complaint "can plausibly be read to present claims predicated on the tortious misconduct of individual government employees . . . and, accordingly, the Court has subject-matter jurisdiction" over the claims); *Fuentes-Ortega v. United States,* No. CV-22-

00449-PHX-DGC, 2022 WL 16924223 at *5 (D. Ariz. Nov. 14, 2022) (rejecting the government's institutional tort argument because the complaint "ma[d]e specific allegations regarding individual federal employees and officers" and the court "ha[d] subject matter jurisdiction over these allegations").[11] Again, because a proper reading of Plaintiffs' Complaint demonstrates that Plaintiffs' allegations are made against individual employees of the federal government, they have not alleged any systematic torts.

### E.  Plaintiffs' Claims Satisfy the Private Analogue Inquiry

The government erroneously contends that it cannot be held liable under the FTCA for Plaintiffs' intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) claims because "only the federal government has the authority to enforce federal law and make determinations concerning the detention of noncitizens [and] [a]ccordingly, such decisions have no private person analogue." Gov't. Mem. 35. Thus the government advances the long-discredited theory that uniquely governmental actions cannot have a private analogue. *Id.* Under the FTCA, the United States is liable when a private person would be liable under similar circumstances. *See* 28 U.S.C. § 2674 (allowing for tort recovery against the United States "in the same manner and to the same extent as a private individual under like circumstances"). Plaintiffs have identified private party claims analogous to their own and therefore such claims can proceed, as many other district courts have held.

The Supreme Court has rejected the proposition that "uniquely governmental" activity may not have private analogues. In *Indian Towing Co. v. United States*, which concerned the government's alleged negligence in operating a lighthouse, the Court found a private analogue in a general duty of private citizens to perform "good Samaritan" tasks carefully. 350 U.S. 61, 64-

---

[11] The court in *Fuentes-Ortega* granted the government's motion to dismiss only to the extent that the amended complaint alleged misconduct of government agencies. *Id.*

65 (1955). "[A]ll Government activity is inescapably 'uniquely governmental' in that it is performed by the Government." *Id.* at 67. Yet the Court made clear that the requirement that a claim address "*like* circumstances" does not mean "under the *same* circumstances." *Id.* at 64 (emphasis added). Rather than requiring an exact fit, courts must look "further afield" to find analogous torts relating to the government activity at issue. *United States v. Olson*, 546 U.S. 43, 46 (2005). *See also Firebaugh Canal Water Dist. v. United States*, 712 F.3d 1296, 1303 (9th Cir. 2013) (private analogue need not be "exactly on point;" it need only be "appropriate").

The Second Circuit has also rejected the "uniquely governmental" conduct theory, including in the immigration context. In *Liranzo v. United States*, the government argued that citizenship and immigration matters, including plaintiff's detention pending his deportation, were uniquely federal government functions, and, therefore no private analogue existed. 690 F. 3d 78, 94 (2d Cir. 2012). But the court found that just because "immigration detentions are 'uniquely governmental' does not mean they have no private analogue for present purposes." *Id.* at 94. Rather, the relevant inquiry is whether "'[p]rivate individuals . . . may create a relationship with third parties that is similar to the relationship between'" a governmental actor and a citizen. *Id.* (quoting *Olson,* 546 U.S. at 47). Applying that approach, the court found a private analogue in state tort law for claims of false arrest and imprisonment. *Id.* at 94-95.[12]

Plaintiffs similarly have identified private analogues under the necessary state tort law for their IIED and NIED claims. Connecticut courts have found that private individuals can

---

[12] The government cites *McGowan v. United States*, 825 F.3d 118, 127 (2d Cir. 2016) to argue that "the federal government's detention decisions are decisions that no private actor is empowered to make." Gov't. Mem. 36. *McGowan* involved "wrongful confinement," a claim for prisoners subjected to punitive segregation, and the court merely held that there is no private analogue for wrongful confinement. *McGowan*, 825 F.3d at 126. In the present case, private individuals can create a relationship similar to the federal government's relationship with Plaintiffs that causes analogous harms. *See Olson,* 546 U.S. at 47. The government's further reliance on out of circuit cases for this point are similarly unavailing. Gov't. Mem. 36.

intentionally inflict emotional distress on a parent by separating them from their children or instilling a fear of separation, which presents an appropriate private analog to Plaintiffs' claims. In *Williams v. McLaughlin*, the court denied a motion to strike an IIED claim where defendants hid the plaintiff's children from him for ten days, causing him emotional distress. No. FSTCV206046638S, 2021 WL 842006, at *3 (Conn. Super. Ct. Feb. 10, 2021). In *Vasquez v. Loza-Vega*, No. CV126013551, 2014 WL 783820, at *8 (Conn. Super. Ct. Jan. 28, 2014), the court found that the plaintiff sufficiently stated an IIED claim where the defendant engaged in an elaborate scheme to suggest that plaintiff endangered the welfare of his children for purposes of removing his custody rights. In both cases, the court recognized a claim for IIED under Connecticut law where private parties engaged in behavior that led to or could have led to the separation of a parent from their child.

Texas courts have also recognized claims for IIED under similar circumstances. In *In re S.K.H.*, a Texas appellate court affirmed a mother's judgment for IIED against her parents based on their taking her child and concealing the child's whereabouts from the mother on a number of occasions. 324 S.W.3d 156, 158 (Tex. App. 2010). Similarly, in *Eberle v. Adams*, the court affirmed a judgment of IIED against individuals whom the plaintiff alleged had assisted his child's mother when she fled with their child. 73 S.W.3d 322, 337 (Tex. App. 2001). In the present case, government officials perpetuated a policy that cruelly separated fourteen-year-old Viky and nine-year-old J.S.R. from their parents. This separation caused severe emotional harm to the parents and children. Because there are analogous situations under Connecticut and Texas law, these claims must survive.[13]

---

[13] Courts across the country have allowed FTCA IIED claims to proceed in circumstances involving non-consensual family separation. In *Martinez v. United States*, the court recognized the viability of plaintiffs' IIED claims where CBP's interrogation of the father caused emotional distress by "separating the family, questioning and threatening

Private individuals can also negligently inflict emotional distress on a parent by harming their child under Connecticut law, which creates an analogue to Plaintiffs' NIED claims. *In Doe v. First Step Preschool, Inc*., No. CV125009050S, 2013 WL 870264, at *13-14 (Conn. Super. Ct. Jan. 31, 2013), the court found that plaintiffs' claim for negligent infliction of emotional distress could proceed where they "suffered serious and permanent injuries resulting in physical manifestations" after the defendant preschool failed to take adequate steps to protect their child from abuse by a classmate. *See also Witt v. Yale-New Haven Hosp*., 51 Conn. Supp. 155, 168-169, 977 A.2d 779, 788 (Super. Ct. 2008) (concluding that NIED claim of patient and husband could proceed because it was reasonable that "the level of fear or anxiety created by the loss of the only opportunity to potentially conceive a child with one's spouse could likely result in emotional distress severe enough that it might result in illness or bodily harm"). In the present case, both Adult and Child Plaintiffs were harmed by the government's cruel and forceful separation from their loved one. There were physical manifestations of the harms suffered by Plaintiffs, including migraines, chest pain, weakness, lack of appetite, and a ball-sized growth. Compl. ¶¶ 53, 55, 91, 190-195. Because a private person can negligently inflict emotional distress on a parent by harming their child, Plaintiffs' NIED claims satisfy the broad private analog requirement.

The government erroneously relies on an array of mostly out-of-circuit cases involving agency *adjudication* of immigration and naturalization applications to claim that there is no private analogue for harms caused during the course of the government's *detention and*

---

incarceration, verbal abuse, offering to release the children if Mr. Martinez confessed" and "threaten[ing] to separate his family . . . ensur[ing] that Mr. Martinez watched the agents transport his family to another location; and isolat[ing] him in a windowless cell." No. CV-13-00955-TUC-CKJ, 2018 WL 3359562, at *11-12 (D. Ariz. July 10, 2018); *see also M.D.C.G. v. United States*, NO. 7:15–CV–552, 2016 WL 6638845, at *11-12 (S.D. Tex. Sept. 13, 2016) (allowing an IIED claim to proceed when plaintiffs alleged that a mother and her minor daughter were separated for three days and another minor was not permitted to be with her family for a month).

*separation* of Plaintiffs. Gov't. Mem. 35-36.[14] Its reliance on *Akutowicz v. United States*, 859

F.2d 1122 (2d Cir. 1988) is similarly misplaced. Gov't. Mem. 36. In *Akutowicz,* a plaintiff

challenged an allegedly negligent revocation of citizenship. The court explained that, "neither

party has raised the issue whether, nor are we convinced that, any analogous private cause of

action exists." *Id.* at 1126. Here, Plaintiffs have clearly raised analogous tort actions for IIED and

NIED. Moreover, the government ignores that in *Liranzo*, the Second Circuit subsequently

recognized that the application of *Akutowicz* is limited to conduct where there could *never* be a

private analogy, unlike the false arrest claim at issue in *Liranzo*. "A private individual cannot . . .

cause injury to another's citizenship. But a private person is of course capable of falsely arresting

another," *Liranzo*, 690 F. 3d at 96. Here, private analogues for IIED and NIED can and do exist.

 Finally, the government's argument that Plaintiffs' harms "stem from the government's

decisions to enforce federal criminal and immigration laws," Gov't. Mem. 35, once more

attempts to disaggregate an intentional scheme to forcibly separate families into the seemingly

routine operation of government. Plaintiffs do not challenge the government's prosecution or

immigration enforcement authority separate from the Zero Tolerance Policy.[15] Because a private

---

[14] *See Bhuiyan v. United States,* No. 14-CV-00013, 2017 WL 2837023, at *4 (D. N. Mar. I. June 30, 2017), *aff'd,*
772 F. App'x 564 (9th Cir. 2019) (negligent approval of I-360 application); *Elgamal v. United States*, No. CV-13-
00867-PHX-DLR, 2015 WL 13648070, at *2 (D. Ariz. July 8, 2015), *aff'd sub nom. Elgamal v. Bernacke*, 714 F.
App'x 741 (9th Cir. 2018) (negligent denial of motion for reconsideration of I-485 applications); *Omoniyi v. Dep't
of Homeland Sec.*, No. 10 Civ. 1344 (DF), 2012 WL 892197, at *9 (S.D.N.Y. Mar. 13 2012) (negligence or
intentional misconduct in the process of final determination on application for naturalization). The government's
citation language to *Mazur v. United States*, 957 F. Supp. 1041, 1043 (N.D. Ill. 1997), Gov't. Mem. 35, concerns a
visa lottery application (not naturalization, as the government states), misstates the holding and misquotes the case.
The language quoted refers only to the government's position in that case; the court did not even address the private
analogue argument because it found the plaintiff's action to be time-barred. 957 F. Supp. at 1043.

[15] The government's citation to *Air Shuttle Corp. v. United States,* 112 F.3d 532, 537 (1st Cir. 1997) is inapposite.
At issue there was not the "decision to take enforcement action," as the government claims, Gov't. Mem. 35, but an
alleged failure to enforce a federal regulation. 112 F.3d at 536-537.

analogue exists for IIED and NIED resulting from that policy, the Court should reject the government's motion to dismiss those claims.[16]

### F. The Independent Contractor Exception Is Inapplicable Because Plaintiffs' Claims Are Not Based on Detention at Noank

The government's invocation of the independent contractor exception is a red herring because Plaintiffs' claims only concern direct government official conduct. The FTCA waiver of sovereign immunity contains an exception for acts performed by independent contractors. 28 U.S.C. § 2671. Here, Plaintiffs' third and fourth claims under the FTCA—NIED and negligence —are not barred by the exception since the alleged tortious conduct was not performed by independent contractors.

Although the Child Plaintiffs were physically held at Noank while they were in ORR legal custody, their claims are not based on their treatment by personnel at Noank. The government argues that allegations of "a harmful act or failure to act by Noank . . . are barred by the independent contractor exclusion," Gov't. Mem. 37, but Plaintiffs make no such allegations. In fact, Noank is not listed across the claims. Compl. ¶¶ 227-234. Plaintiffs do not dispute that J.S.R. and Viky were held at Noank, but it was the Zero Tolerance Policy that was the direct and proximate cause of the Child Plaintiffs' transfer to ORR and the harms they sustained thereafter. *Id*. ¶¶ 2, 147-156. Therefore, Plaintiffs' claims are properly brought against the government officials who designed and implemented the policy.

---

[16] District courts presented with similar claims related to family separation caused by the Zero Tolerance Policy have recognized a private analogue. *See D.J.C.V.*, 2022 WL 1912254, at *20-21 (recognizing the existence of a private analogue for emotional distress and negligence because such claims could lie against private individuals); *C.M.,* 2020 WL 1698191, *2 (same, for IIED and negligence); *A.I.I.L.*, 2022 WL 992543, at *5-8 (same, for IIED, negligence, and loss of consortium); *A.P.F. v. United States,* 492 F. Supp. 3d 989, 994-995 (D. Ariz. 2020) (same); *B.A.D.J.*, 2022 WL 11631016, at *4-5 (same); *F.R.*, 2022 WL 2905040, at *3 (same); *Nunez Euceda*, 2021 WL 4895748, at *4 (same, for IIED, negligence, and NIED); *E.S.M. v. United States*, 2022 WL 11729644 at *3 (acknowledging existence of private analog under state tort law).

Other courts hearing family separation cases have declined to dismiss claims based on the independent contractor exception. *See, e.g.*, *A.P.F.*, 492 F. Supp. at 998 ("Plaintiffs' causes of action—IIED, negligence, and loss of child's consortium—arise from the government's separation of Plaintiff families . . . . To the extent the United States argues that the contractors caused Plaintiffs' harm, and not the government, this raises a fact-intensive issue inappropriate for resolution at this [motion to dismiss] stage.").

## II.    PLAINTIFFS' FALSE IMPRISONMENT CLAIMS ARE COGNIZABLE UNDER TEXAS AND CONNECTICUT LAW

The government falsely imprisoned Plaintiffs in Connecticut and Texas because it lacked the lawful authority to detain and separate the families under the unconstitutional Zero Tolerance Policy. The government argues that it had legal authority to detain Plaintiffs because their arrest was supported by probable cause, Gov't. Mem. 40-41, but this is beside the point. Even assuming that Plaintiffs' initial arrest was lawful, probable cause is insufficient to justify their lengthy detention, which is the basis of their false imprisonment claim. That detention was unlawful because it violated due process.

The government's Zero Tolerance Policy was explicit in its goal of deterring future asylum seekers from finding refuge in this country by forcibly separating and detaining parents and children. *See* Compl. ¶¶ 104, 106, 154, 184. General deterrence is an improper and unconstitutional basis for detaining asylum-seekers such as Plaintiffs. As the Supreme Court has explained in the immigration context, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Accordingly, the Supreme Court has narrowly identified two interests—preventing flight and especial danger to the community—that can, under certain circumstances, justify the detention of noncitizens awaiting immigration

proceedings. *Id.* at 690-691. General deterrence, however, is an impermissible basis for the detention of asylum seekers pending their immigration proceedings. *See R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 190 (D.D.C. 2015) (preliminarily enjoining use of detention of asylum-seekers to deter mass migration because it likely violates due process). Nowhere in its brief does the government defend the detention of Plaintiffs to deter future migration, and nor could it.

Furthermore, the *en masse* detention and separation of asylum-seeking families like Plaintiffs without individual consideration also violated due process. In addition to requiring "special justifications" for the deprivation of liberty—deterrence not among them—immigration detention requires "strong procedural protections" to ensure that detention is serving a legitimate goal. *Zadvydas*, 533 U.S. at 690-91. As a result, immigration detention generally requires an individualized determination of flight risk and danger to the community. *Id.* No government official considered, let alone determined, whether Plaintiffs presented a flight risk or a danger to the community that required their detention. Rather, Plaintiffs and families like them were deprived of their liberty and separated from each other *en masse* as a general deterrent to others.

## III.   PLAINTIFFS ARE NOT REQUIRED TO PROCEED UNDER THE *FLORES* AGREEMENT FOR TORTIOUS CONDUCT

The *Flores* Agreement does not foreclose the ability of Plaintiffs to bring FTCA lawsuits against government officials for injury, as the government erroneously argues. Gov't Mem. 41. While the government is correct that an individual "may" bring suit to enforce their rights under the *Flores* Agreement, *id.,* nothing in the Agreement makes such a suit the exclusive remedy available to Plaintiffs. In any event, Plaintiffs do not seek to enforce the consent decree, but instead to recover for the injuries inflicted upon them by federal agents, and point to the government's obligations under the *Flores* Agreement in relation to their state tort claims. For example, Plaintiffs reference the consent decree to support the third element of their false

imprisonment claim—that detention was without the authority of law. Compl. ¶¶ 222, 224.

Similarly, Plaintiffs reference the *Flores* Agreement to describe the government's legal duty as

an element of their negligence claim. *See id.* ¶¶ 231-232.

Other courts presiding over family separation cases have recognized that claims

involving the *Flores* Agreement can proceed as FTCA claims. *See, e.g., C.M.*, 2020 WL

1698191, at *2-3; *A.E.S.E.*, 2022 WL 4289930, at *13-14; *A.I.I.L*, 2022 WL 992543, at *3-4.

The government's position that the *Flores* Agreement is the exclusive remedy for the tortious

conduct of United States' employees is unfounded and would radically alter the landscape of

FTCA jurisprudence. *See, e.g., Levin v. United States*, 568 U.S. 503, 509 (2013) (finding that

FTCA is the exclusive vehicle for remedy of torts committed by federal employees).

## IV.   INDIVIDUAL DEFENDANTS CANNOT BE SUBSTITUTED FOR THE UNITED STATES GOVERNMENT UNDER THE WESTFALL ACT

The government's substitution of itself for the Individual Defendants, *see* Notice of

Substitution, ECF 34, is improper because the Westfall Act does not insulate government

officials from individual liability for the *jus cogens* violations of torture and inhumane treatment.

Plaintiffs challenge that substitution, and the scope of employment certifications submitted by

the government, *id.*; Certification of Scope of Employment for Individual Defendants, ECF 34-

1–34-4, for two reasons.

First, Plaintiffs' claims under the ATS, 28 U.S.C. § 1350, fall within the Westfall Act's

exception to substitution for authorized statutory actions. Tellingly, the government's motion to

dismiss fails completely to address the Westfall Act "statutory action" exception, which was set

out explicitly in the first filing in this case. *Compare* Compl. ¶ 214 ("for reasons set forth by

former Chief Judge Harry Edwards in his comprehensive and detailed dissent in *Ali v. Rumsfeld,*

649 F.3d 762, 778-93 (D.C. Cir. 2011), the ATS 'is "statutory authority" sufficient to satisfy the

Westfall Act exception.'"), *with* Gov't. Mem. 13-15 (no mention of Westfall Act exception or *Ali v. Rumsfeld* in motion to dismiss ATS claims).

Second, violations of *jus cogens* norms, as Plaintiffs allege here, are not legitimate official acts and therefore necessarily fall outside of the Individual Defendants' scope of employment; Defendants Miller, Sessions, Nielsen, and McAleenan were not authorized to engage in torture or inhumane treatment and thus are not insulated from individual liability.

Holding Defendants Miller, Sessions, Nielsen, and McAleenan to account for their intentional acts of extraordinary cruelty is important to Plaintiffs' vindication of their rights. While no amount of money will ever compensate Plaintiffs for the harms they have suffered, the availability of punitive damages under the ATS—which are unavailable on Plaintiffs' FTCA claims—as well as the opprobrium of a judgment against the individuals, is appropriate here given the repugnant conduct of senior government officials.[17]

### A.  Plaintiffs' Claims Are Within the Westfall Act Exception for Statutory Actions

While the Westfall Act generally substitutes the United States for negligent or wrongful acts of federal employees, it specifically excludes all civil actions "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B). The government's motion nowhere addresses this exception, Gov't. Mem. 13-15, even though Plaintiffs were explicit in raising it in the very complaint the government now attacks. Compl. ¶¶ 211-214. In fact, this Westfall Act exception

---

[17] *See In re XE Services Alien Tort Litigation*, 665 F. Supp. 2d 569, 595-96 (E.D. Va. 2009) ("[C]ourts have consistently awarded punitive damages for ATS claims. Thus, punitive damages, if proven, are available for plaintiffs' ATS claims.") (citing *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009); *Abebe–Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996); *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996); *Licea v. Curacao Drydock Co.*, 584 F. Supp. 2d 1355 (S.D. Fla.2008); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004); *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D.N.Y. 2002); *Cabello Barrueto v. Fernandez Larios*, 205 F. Supp. 2d 1325 (S.D. Fla. 2002); *Mehinovic v. Vuckovic*,198 F.Supp.2d 1322 (N.D. Ga. 2002); *Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995); *Filartiga v. Pena–Irala*, 577 F. Supp. 860 (E.D.N.Y. 1984)).

applies here because the ATS is a federal statute that authorizes recovery for *jus cogens* violations such as torture and inhumane treatment, the claims brought against Individual Defendants.

The ATS incorporates the substantive law of nations and thereby provides a cause of action for a narrow class of international norms today. The statute provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In determining whether a claim is cognizable under the ATS, the Supreme Court has held that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" familiar at the time of the statute's enactment. *Sosa v. Alvarez-Machain,* 542 U.S. 692, 725 (2004). "Actionable violations …must be of a norm that is specific, universal, and obligatory." *Id.* at 732 (quoting *In re Est. of Marcos Hum. Rts. Litig.,* 25 F.3d 1467, 1475 (9th Cir. 1994).

Caselaw establishes overwhelmingly that torture and inhumane treatment are sufficiently "specific, universal, and obligatory" to confer jurisdiction under the ATS. As the Second Circuit stated in *Filartiga v. Pena-Irala,* "the torturer has become like the pirate and slave trader before him *hostis humani generis,* an enemy of all mankind." 630 F.2d 876, 890 (2d Cir. 1980).[18] Similarly, the Second Circuit has recognized, crimes against humanity—which include inhumane

---

[18] Other cases recognizing that torture satisfies the *Sosa* norm for ATS jurisdiction include: *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401 (2018) (Kennedy, J., plurality); *Kadić v. Karadžić*, 70 F.3d 232, 243 (2d Cir. 1995); *Doe I v. Nestle USA, Inc.,* 766 F.3d 1013, 1019 (9th Cir. 2014); *Yousuf v. Samantar,* 699 F.3d 763, 775-76 (4th Cir. 2012); *Romero v. Dummond Co.,* 552 F.3d 1303, 1315 (11th Cir. 2008); *Princz v. Fed. Rep. of Germany*, 26 F.3d 1166, 1173 (D.C. Cir. 1994); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984); *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 385 (S.D.N.Y. 2009); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 334 n. 2 (S.D.N.Y. 2005); *Al Shimari v. CACI Premier Tech., Inc*., 368 F. Supp. 3d 935 (E.D. Va. 2019).

treatment— "now have fairly precise definitions and [have] achieved universal condemnation" so as to give rise to universal jurisdiction under customary international law. *United States v. Yousef*, 327 F.3d 56, 106 (2d Cir. 2003). Because torture and crimes against humanity give rise to universal jurisdiction, they have achieved *jus cogens* status. This status reserved for norms that are "accepted and recognized by the international community of states . . . from which no derogation is permitted." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 61 (2d Cir. 2019). As such, torture and inhumane treatment are actionable under the ATS.

Because the ATS authorizes suits for torture and inhumane treatment, Plaintiffs' case is "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized," thereby satisfying the statutory exception to the Westfall Act 28 U.S.C. § 2679(b)(2)(B).

A panel of the D.C. Circuit reached the contrary conclusion, holding that the ATS is "a jurisdictional statute only" such that a claim under it does not allege "'a violation of a statute of the United States,'" *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011), but that interpretation is erroneous and not binding on this Court.[19] Moreover, as former Chief Judge Harry T. Edwards explained in dissent, *Ali*'s interpretation of *Sosa* is "strikingly incomplete." *Id.* at 779 (Edwards, J. dissenting). In fact, Judge Edwards' comprehensive and persuasive dissent in *Ali*, in which he concluded that ATS claims fit the Westfall Act's exception for statutory actions, has the better side of this argument and should be adopted by this Court.

---

[19] In *Nahl v. Jaoude*, the Second Circuit repeated the common refrain that "[t]he ATS is a jurisdictional statute, creating no new cause of action in its own right," but this does not resolve the Westfall Act question. 968 F.3d 173, 179 (2nd Cir. 2020); *see also* Compl. ¶ 213 (noting *Nahl* dicta). *Nahl* did not involve the Westfall Act at all, and instead applied one of *Sosa*'s prudential considerations to decline to recognize financial terrorism as actionable under the ATS.

As Judge Edwards explained, while *Sosa* states that the ATS is "a jurisdictional statute creating no new causes of action," it also recognized that the common law at the time of enactment of the ATS provided causes of action for a small number of international law violations, and that federal courts could recognize additional, actionable violations of international law. *Id.* at 779-780 (discussing *Sosa,* 542 U.S. at 729-731). Section 1350 is an "'interactive' jurisdictional statute." *Id.* at 788 (quoting Stephen Satterfield, Note, *Still Crying Out for Clarification: The Scope of Liability Under the Alien Tort Statute After* Sosa, 77 GEO. WASH. L REV. 216, 221-22 (2008)). And because "the law of nations [] is a part of the law of the land," *id.* (quoting *Sosa,* 542 U.S. at 730 (internal citation omitted)), *Sosa* "necessarily implies that the federal common law of customary international law is federal law in the supremacy-clause sense." *Id.* at 788-89 (quoting William A. Fletcher, *International Human Rights in American Courts,* 93 VA. L. REV. 653, 665 (2007)). As such, the ATS did not "merely serve[] as a jurisdictional vehicle for violations of the law of nations," but instead "itself *incorporates* the law of nations," including causes of action for violations of definite and accepted principles under international law, so as to constitute a "statute" for purposes of the Westfall Act exception. *Id.* (emphasis in original).

To conclude otherwise, Judge Edwards notes, would create the anomaly that "despite the fact that torture has long been illegal under United States law . . . *a United States official* who tortures a foreign national in a foreign country is not subject to suit in an action brought under section 1350, whereas a *foreign official* who tortures a foreign national in a foreign country may be sued under section 1350." *Id.* at 789 (emphasis in original). The result is even more perverse here, where the government seeks to insulate from suit *United States officials* torturing noncitizens *in the United States.* Moreover, a review of the legislative history shows that in

45

enacting the Westfall Act, Congress sought only to immunize federal officials from "routine acts or omissions," and not "clear violations of the laws of nations, such as torture." *Id.* (quoting H.R. REP. NO. 100-700 at 6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945 at 5950).

As Judge Edwards further concluded, 28 U.S.C. § 1350 differs from an ordinary jurisdictional statute, such as 28 U.S.C. § 1331, because it allows enforcement of the law of nations on its own, without the need for any other statute to supply a cause of action. *Id.* at 790-791. It is clear that if Congress were to repeal § 1350, "federal courts would have no authority today to recognize common law causes of action for violations of customary international law, such as torture." *Id.* at 791. "In other words, it is section 1350, not international law, that gives federal courts the authority to enforce 'international norms that a federal court c[an] properly recognize as within the common law enforceable *without further statutory authority." Id.* (quoting *Sosa,* 542 U.S. at 729) (emphasis added). Thus § 1350 "is 'statutory authority' sufficient to satisfy the Westfall Act exception*." Id.*

Section 1350 thus is far more than a mere jurisdictional vehicle. As set forth in Judge Edwards's detailed dissent in *Ali*, it meets the requirements of the Westfall Act statutory exception.  As such, the United States may not substitute itself for the Individual Defendants, and Defendants Miller, Sessions, Nielsen, and McAleenan can be sued in their individual capacities for subjecting Plaintiffs to torture and inhumane treatment.

### B.  The Individual Defendants' Intentional *Jus Cogens* Violations Fall Outside Their Scope of Employment

The Individual Defendants are also personally liable for the harm they caused Plaintiffs because the Westfall Act does not permit substitution of government officials who commit intentional *jus cogens* violations. The Act provides that a suit against the U.S. government is the exclusive remedy in a civil action for money damages for injury resulting from a "negligent or

wrongful act or omission of any employee of the Government *while acting within the scope of his office or employment.*" 28 U.S.C. § 2679(b)(1) (emphasis added). Because the *jus cogens* violations of torture and inhumane treatment can never be authorized as official acts, they cannot fall within the scope of office or employment.[20]

As explained below with regard to the government's claim of sovereign immunity, because *jus cogens* norms are nonderogable, violations of such norms are non-sovereign acts. *See infra* Sec. V.A. If, as Plaintiffs allege, the Individual Defendants committed acts of torture and inhumane treatment, by virtue of their status as *jus cogens* norms, such violations could not have been authorized as official acts. The Fourth Circuit has reached a similar conclusion with respect to conduct-based immunity claims of foreign officials: "Unlike private acts that do not come within the scope of foreign official immunity, *jus cogens* violations may well be committed under color of law and, in that sense, constitute acts performed in the course of the foreign official's employment by the Sovereign. However, as a matter of international *and domestic law, jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign." *Yousuf,* 699 F.3d at 775-76 (emphasis added).

This principle applies with equal force to claims of domestic immunity by individual officials. "Indeed, given Plaintiffs' argument that *jus cogens* violations are not legitimate official acts, Plaintiffs may have had a strong basis for raising such a challenge [to scope-of-employment certifications]." *Hernandez v. United States,* 785 F.3d 117, 142 (5th Cir. 2015) (Haynes, Southwick, and Higginson, Js., concurring), *vacated and remanded on other grounds sub nom. Hernandez. v. Mesa,* 137 S. Ct. 2003 (2017).

---

[20] Scope-of-employment certifications under the Westfall Act are reviewable by this Court. *See Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 420 (1995).

The legislative history of the Westfall Act supports the view that it does not immunize federal employees from liability for intentional *jus cogens* violations. Congress passed the Westfall Act in order to override the Supreme Court's decision in *Westfall v Erwin*, 484 U.S. 292 (1988). *Ali,* 649 F.3d at 789. That case held that an individual federal employee could be personally liable for a state-law tort. 484 U.S. at 295. Congress disagreed and passed the Westfall Act to overrule the Court's expansion of federal employee liability. 649 F.3d at 789. In passing the Westfall Act, members of Congress expressed that it excluded intentional violations of *jus cogens* norms. The House Report on the Westfall Act stated that "[i]f an employee is accused of egregious misconduct, rather than mere negligence or poor judgment, then the United States may not be substituted as the defendant." H.R. REP. NO. 100-700, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949; *see id.* at 3, 5946-47 (noting that claims subject to Westfall Act would include "suits for clerical negligence" and recommending that Congress pass the statute to announce "standards governing . . . state-law tort action[s]"); 134 Cong. Rec. H4718-03, 1988 WL 179736 (June 27, 1988) (statement of Rep. Frank) ("we are not talking about intentional acts of harming people"); *see also Ali,* 649 F.3d at 789 (Edwards, J., dissenting) (reviewing legislative history).

The long-settled principle that statutes should be construed consistent with international law also instructs that the Westfall Act excludes intentional violations of international norms. *See Murray v. Schooner Charming Betsy,* 6 U.S. 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *see also F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 166 (2004); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21 (1963). International law, including the Convention Against torture, requires that states hold perpetrators accountable for human rights

48

violations, including through redress to victims. *See* Convention Against Torture and Other

Cruel, Inhuman or Degrading Treatment or Punishment, art. 14(1), Dec. 10, 1984, S. Treaty Doc.

No. 100-20, 1465 U.N.T.S. 85 ("CAT") ("Each State Party shall ensure in its legal system that

the victim of an act of torture obtains redress and has an enforceable right to fair and adequate

compensation . . . ."). Construing the Westfall Act consistent with international law therefore

compels the conclusion that suit against the Individual Defendants is not precluded.

V.    **SOVEREIGN IMMUNITY DOES NOT APPLY TO DEFENDANT UNITED STATES FOR VIOLATION OF *JUS COGENS* NORMS**

Even if the Court permits substitution of the United States for the Individual Defendants,

the United States is liable for the ATS violations alleged by Plaintiffs. Sovereign immunity does

not apply in this context for three independent reasons: 1) violations of *jus cogens* norms are

inherently non-sovereign acts; 2) peremptory *jus cogens* norms are incorporated into federal

common law and supersede sovereign immunity; and 3) the United States has impliedly waived

sovereign immunity.

A.    **Sovereign Immunity Does Not Apply Because *Jus Cogens* Violations Are Inherently Non-Sovereign Acts**

Violations of the prohibitions on torture and inhumane treatment cannot be described as

sovereign acts and therefore sovereign immunity may not attach. "The United States also may

not claim immunity for *jus cogens* violations because when government agents commit such

violations, their actions are not sovereign in nature." *Al Shimari,* 368 F. Supp. 3d at 966. Under

international law, *jus cogens* norms cannot be violated, "irrespective of the consent or practice of

a given State." *Kashef*, 925 F.3d at 61 (internal citations omitted). When a state violates the

peremptory norms of the community of nations, that state is "in effect overriding the collective

will of the entire international community [and] the state cannot be performing a sovereign act

entitled to immunity." *Princz*, 26 F.3d at 1182 (Wald, J., dissenting)*.*

49

As Judge Brinkema persuasively explained in her opinion in *Al Shimari*, in the American constitutional system the People are sovereign, not the king, and "the People as sovereign are bound by the nonderogability of *jus cogens* norms, which means that the People may not legitimately delegate to the government the power to engage in *jus cogens* violations. Accordingly, the federal government, bounded by its status as a limited government of delegated powers, has no sovereign power to immunize itself from liability for such violations." *Al Shimari,* 368 F. Supp. 3d at 968. Nonderogability of first-order *jus cogens* norms is incompatible not only with the common law principle of sovereign immunity, but with sovereignty itself.[21]

The government quotes at length from the concurring opinion of Judge Jones in *Hernandez v. United States* to suggest that recognizing the United States as amenable to suit under the ATS "has no valid foundation in the American constitutional structure." Gov't. Mem. 14-15 (citing *Hernandez,* 785 F.3d at 128-29 (Jones, J., concurring)). But the government ignores the concurring opinion of three other judges of the Fifth Circuit, which provides that "it seems logical that cognizable *jus cogens* norms may preclude a sovereign immunity defense," and that "if there is a category of torts (violations of the law of nations, for example) that change the ordinary rules of sovereign immunity because these acts cannot be authorized by the sovereign, then a country either would lack any such immunity to waive or would not be permitted to substitute for one of its officers." *Hernandez,* 785 F.3d at 140-41 (Haynes, Southwick, and Higginson, Js., concurring). As this concurring opinion observes, *Sosa* "[l]eft

---

[21] The Fourth Circuit has similarly observed in the context of foreign sovereign immunity: "Unlike private acts that do not come within the scope of foreign official immunity, *jus cogens* violations may well be committed under color of law and, in that sense, constitute acts performed in the course of the foreign official's employment by the Sovereign. However, as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign." *Yousuf*, 699 F.3d at 775-76.

unaddressed [] the question of whether any such common law torts would make the sovereign immunity of the United States unavailable." *Id.* at 140.

The government's actions in concocting the family separation policy, violently separating Plaintiffs, and terrorizing Plaintiffs violate *jus cogens* norms, are not sovereign in nature, and therefore cannot retain the protections of sovereign immunity. The government's own account of the Zero Tolerance Policy as worthy of "condemn[ation]" for the "human tragedy" it caused all but validates the view that forcible family separation is outside the bounds of permissible conduct of a sovereign government. Gov't. Mem. 1-2, 10-11 (citing Exec. Order No. 14011, 86 Fed. Reg. 8273 at § 1).

### B.  *Jus Cogens* Norms Supersede Common Law Sovereign Immunity

As Judge Brinkema described, "[*j*]*us cogens* norms 'enjoy the highest status within international law,' and their supremacy 'extends over all rules of international law.'" *Al Shimari,* 368 F. Supp. 3d at 962 (internal quotation marks and citations omitted). By virtue of their pinnacle status, *jus cogens* norms "prevail over and invalidate international agreements and other rules of international law in conflict with them." *Id* (internal quotation marks and citations omitted). Thus, Judge Brinkema concludes, "[b]ecause the concept that a sovereign may claim immunity from suit itself is a principle of international law, the peremptory status of *jus cogens* norms means that when sovereign immunity and *jus cogens* norms conflict, the sovereign immunity principle must give way." *Id.* at 963 (internal quotation marks and citations omitted).

Here, the *jus cogens* norms on torture and inhumane treatment conflict with the concept of sovereign immunity because these norms not only prohibit such conduct, but also include "necessarily a rule requiring an effective means to redress that violation." *Id.* at 963. Federal sovereign immunity has no grounding in the constitution or in statute. *See* Erwin Chemerinsky,

*Against Sovereign Immunity,* 53 STAN. L. REV. 1201, 1205 (2001). As a creature purely of common law, sovereign immunity is subordinate to nonderogable *jus cogens* norms that "abrogate[] traditional notions of state sovereignty." *Al Shimari*, 368 F. Supp. 3d at 966 (internal quotation marks and citations omitted).

### C.  The Government Has Impliedly Waived Sovereign Immunity

By holding itself out as a member of the community of nations, accepting the law of nations, and ratifying the Convention Against Torture, the United States has impliedly waived sovereign immunity for *just cogens* claims of torture and inhumane treatment under the ATS. The government cannot simultaneously undertake obligations to abide by *jus cogens* norms and claim to self-immunize for violations of those norms.

As an initial matter, the question of whether the government has waived sovereign immunity for ATS violations is to be answered by reference to the common law, not the ATS. This is because, as discussed above, the ATS incorporates the common law. *See supra* Sec. IV.A. Just as this is true for substantive rights, so too, is it the case for immunities. As such, the government's citation to cases requiring an express waiver of sovereign immunity in the statutory text are inapposite, as those are all cases in which the plaintiffs' substantive rights derive from statute, not common law. *See* Gov't. Mem. 13; *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000); *Lane v. Peña,* 518 U.S. 187, 192 (1996); *Cooke v. United States,* 918 F.3d 77, 81 (2d Cir. 2019); *F.A.A. v. Cooper,* 566 U.S. 284, 299 (2012).

Under the common law, *jus cogens* norms confer a right to be free from states violating those norms. *See Al Shimari,* 368 F. Supp. 3d at 958. "This right, which is created by international law, is binding on the federal government and enforceable in the federal courts, and the basic axiom that where there is a right, there must be a remedy leads to the conclusion that

52

the government has waived its sovereign immunity with respect to alleged *jus cogens* violations." *Id.* "[B]y joining the community of nations and accepting the law of nations, the federal government has impliedly waived any right to claim sovereign immunity with respect to *jus cogens* violations when sued for such violations in an American court." *Id.* at 959.

Moreover, the United States's ratification of the Convention Against Torture is further evidence that it has waived sovereign immunity in this context. Under the CAT, each state must "ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation." CAT art. 14(1). While the Torture Victim Protection Act ("TVPA") provides a cause of action in federal court against foreign officials, the United States has never explained how it complies with the redress requirements of the CAT with regard to torture by U.S. officials. *See Al Shimari,* 368 F. Supp. 3d at 960-61. If, as the government argues, the Westfall Act substitutes the United States for the Individual Defendants, then it follows that by ratifying the CAT and committing to the provision of an adequate civil remedy for victims of torture, the federal government impliedly waived sovereign immunity for torture claims. *See id.* On the other hand, if government officials such as Individual Defendants are subject to liability, then no waiver of sovereign immunity need be implied.

Finally, while other circuits have held that the ATS does not waive sovereign immunity, Gov't. Mem. 14 (citing cases), the government incorrectly states that the Second Circuit has done so. The case cited for this proposition, *Arar v. Ashcroft,* 532 F.3d 157, 175 (2d Cir. 2008), *vacated and superseded on reh'g en banc on other grounds,* 585 F.3d 559 (2d Cir. 2008), concerned the TVPA, not the ATS. In a footnote, the *Arar* court expressed its agreement with those circuit courts that have held that "neither the TVPA nor the Alien Tort Claims Act [as the ATS is also known] establishes the United States's consent to be sued *under the cause of action*

*created by the TVPA.*" *Arar,* 532 F.3d at 175 n.12 (emphasis added). The court thus said nothing about whether the ATS—or the common law that it incorporates—waives sovereign immunity for a cause of action *under the ATS,* and even if footnote 12 could be construed as such, it is dicta. This Court therefore may consider the issue in the first instance.

In sum, the United States has recognized the nonderogable nature of *jus cogens* norms by and participating in the community of nations, incorporating the law of nations into domestic law, and ratifying international agreements. Plaintiffs therefore urge the Court to reject the government's appeals to sovereign immunity—a principle that has no place in context of the torture and inhumane treatment to which government officials subjected Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the government's motion to dismiss in its entirety.

Dated: December 12, 2022

/s/ Muneer I. Ahmad
Muneer I. Ahmad, ct28109
Kirby Tyrrell, phv206703
Michael J. Wishnie, ct27221
Amanda E. Gómez Feliz, Law Student Intern
Juan Fernando Luna León, Law Student Intern
Gabriela Monico, Law Student Intern
Fernando Rojas, Law Student Intern
Tanveer Singh, Law Student Intern
Jerome N. Frank Legal Services Organization
P.O. Box 902020
New Haven, CT 06520-9090
muneer.ahmad@ylsclinics.org
kirby.tyrrell@ylsclinics.org
Phone: (203) 432-4716
Fax: (203) 432-1426

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on December 12, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,


<u>/s/ Muneer I. Ahmad</u>
Muneer I. Ahmad, ct28109
Jerome N. Frank Legal Services Organization
P.O. Box 902020
New Haven, CT 06520-9090
muneer.ahmad@ylsclinics.org
Phone: (203) 432-4716
Fax: (203) 432-1426