## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VIKY SARAI FLORES BENITEZ, ANA DELMNI BENITEZ ALVARADO, JAVIN BENINGO SANTOS GALVEZ, and J.S.R., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHEN MILLER, JEFFERSON B. SESSIONS, KIRSTJEN NIELSEN, KEVIN McALEENAN, and UNITED STATES OF AMERICA,<br><br>Defendants. | Civ. No. 3:22-CV-884 (JCH) |

## BRIEF OF *AMICI CURIAE* DEAN ERWIN CHEMERINSKY AND PROFESSORS SUSAN BANDES, MARTIN FLAHERTY, ERIC M. FREEDMAN, AND BURT NEUBORNE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF *AMICI CURIAE* ...................................................................................1

PRELIMINARY STATEMENT ....................................................................................3

BACKGROUND ..........................................................................................................5

      A.     The Origins of Federal Sovereign Immunity ........................................5

      B.     Prominent Criticisms of Federal Sovereign Immunity ...........................8

      C.     Plaintiffs' Claims Under the Alien Tort Statute ....................................12

      D.     The Government's Invocation of Sovereign Immunity .........................13

ARGUMENT ..............................................................................................................13

I.      THE ANACHRONISTIC AND INCONSISTENT DOCTRINE OF SOVEREIGN
      IMMUNITY SHOULD NOT BE GIVEN CATEGORICAL EFFECT ..........................13

II.     THE UNITED STATES LACKS SOVEREIGN IMMUNITY IN FEDERAL COURT
     FOR *JUS COGENS* VIOLATIONS ....................................................................15

      A.     *Jus Cogens* Violations Are Not Sovereign Acts Under Customary
             International Law .................................................................................16

      B.     There Is No Conduct-Based Federal Sovereign Immunity at Common Law
             for *Jus Cogens* Violations ....................................................................18

      C.     The United States Has Impliedly Waived Sovereign Immunity for *Jus
             Cogens* Violations ...............................................................................21

CONCLUSION ..........................................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009)........................................................................................16

*Al Shimari v. CACI Premier Tech., Inc.*,
  368 F. Supp. 3d 935 (E.D. Va. 2019) ....................................................... *passim*

*Arar v. Ashcroft*,
  532 F.3d 157, 175 (2d Cir. 2008).................................................................................22

*Cohens v. Virginia*,
  19 U.S. (6 Wheat.) 264 (1821)........................................................................................6

*Czetwertynski v. United States*,
  514 F. Supp. 2d 592 (S.D.N.Y. 2007).......................................................................18

*D.J.C.V. v. U.S. Immigration & Customs Enf't*,
  No. 18 CIV. 9115 (AKH), 2018 WL 10436675 (S.D.N.Y. Oct. 15, 2018)...........................12

*D.J.C.V. v. United States*,
  No. 20 CIV. 5747 (PAE), 2022 WL 1912254 (S.D.N.Y. June 3, 2022) ...............................22

*Dep't of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999)........................................................................................22

*Donahue v. United States*,
  660 F.3d 523 (1st Cir. 2011)........................................................................................8

*FAA v. Cooper*,
  566 U.S. 284 (2012)........................................................................................22

*Filártiga v. Peña-Irala*,
  630 F.2d 876 (2d Cir. 1980)........................................................................................16

*Goldstar (Panama) S.A. v. United States*,
  967 F.2d 965 (4th Cir. 1992) ........................................................................................18

*Int'l Indus. Park, Inc. v. United States*,
  102 Fed. Cl. 111 (2011)........................................................................................23

*J.S.R. by and through J.S.G v. Sessions*,
  330 F. Supp. 3d 731 (D. Conn. 2018)........................................................................................3

## TABLE OF AUTHORITIES

**Page(s)**

*Kadic v. Karadzic,*
   70 F.3d 232 (2d Cir. 1995)........................................................................................23

*Kashef v. BNP Paribas S.A.,*
   925 F.3d 53 (2d Cir. 2019)...................................................................................16, 17

*Kimel v. Fla. Bd. of Regents,*
   528 U.S. 62 (2000).....................................................................................................17

*Lane v. Peña,*
   518 U.S. 187 (1996)...................................................................................................22

*Langford v. United States,*
   101 U.S. 341 (1879).....................................................................................................3

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.,*
   535 U.S. 613 (2002)...................................................................................................23

*Letelier v. Republic of Chile,*
   488 F. Supp. 665 (D.D.C. 1980)................................................................................17

*Licci by Licci v. Lebanese Canadian Bank, SAL,*
   834 F.3d 201 (2d Cir. 2016).......................................................................................18

*Liu v. Republic of China,*
   642 F. Supp. 297 (N.D. Cal. 1986)............................................................................17

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803)............................................................................ *passim*

*Matar v. Dichter,*
   563 F.3d 9 (2d Cir. 2009)......................................................................................19, 20

*Office of Personnel Mgmt. v. Richmond,*
   496 U.S. 414 (1990)...................................................................................................22

*Pullman Constr. Indus., Inc. v. United States,*
   23 F.3d 1166 (7th Cir. 1994)................................................................................15, 21

*Rosenberg v. Pasha,*
   577 F. App'x 22 (2d Cir. 2014) ...........................................................................19, 20

*Samantar v. Yousuf,*
   560 U.S. 305 (2010)...............................................................................................18, 20

*Siderman de Blake v. Republic of Argentina,*
   965 F.2d 699 (9th Cir. 1992) ...............................................................................16, 17

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
    101 F.3d 239 (2d Cir. 1996)..............................................................................24

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)........................................................................18, 20, 22, 23

*United States v. Beggerly*,
    524 U.S. 38 (1998).............................................................................................22

*United States v. Eckford*,
    73 U.S. (6 Wall.) 484 (1867) ...........................................................................23

*United States v. Kwai Fun Wong*,
    575 U.S. 402 (2015)..........................................................................................22

*United States v. Lee*,
    106 U.S. 196 (1882)...........................................................................3, 5, 7, 17

*Ware v. Hylton*,
    3 U.S. (3 Dall.) 199 (1796) ..............................................................................23

*Yousuf v. Samantar*,
    699 F.3d 763 (4th Cir. 2012) ................................................................ *passim*

**Statutes**

28 U.S.C. § 1605(a)(1)...............................................................................................23

28 U.S.C. § 2679(b)(1) ..............................................................................................25

**Other Authorities**

Adam Belsky, Mark Merva & Naomi Roht-Arriaza, *Implied Waiver under the
    FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms
    of International Law*,
    77 Calif. L. Rev. 365 (1989) .......................................................................14, 24

Akhil R. Amar, *Of Sovereignty and Federalism*,
    96 Yale L.J. 1425 (1987) ....................................................................... *passim*

Antonin Scalia, *Historical Anomalies in Administrative Law*,
    1985 Y.B. 103 (1985) (Supreme Court Historical Society)....................................5

Clark Byse, *Proposed Reforms in Federal Non-statutory Judicial Review:
    Sovereign Immunity, Indispensable Parties, Mandamus*,
    75 Harv. L. Rev. 1479 (1962) ...........................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 .................................................................24

David E. Engdahl, *Immunity and Accountability for Positive Governmental
Wrongs*, 44 U. Colo. L. Rev. 1 (1972)......................................................................................5

Edwin M. Borchard, *Government Liability in Tort*,
34 Yale L.J. 1 (1924) ................................................................................................................9

Eric M. Freedman, *Making Habeas Work: A Legal History* (N.Y.U. Press 2018)....................2, 5

Erwin Chemerinsky, *Against Sovereign Immunity*,
53 Stan. L. Rev. 1201 (2001) .......................................................................................... *passim*

Fed. R. Civ. P. 60(b) .......................................................................................................................22

George W. Pugh, *Historical Approach to the Doctrine of Sovereign Immunity*,
13 La. L. Rev. 476 (1953)...........................................................................................5, 8, 10, 15

International Covenant on Civil and Political Rights,
Dec. 16, 1966, 999 U.N.T.S. 171 ...........................................................................................24

James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First
Amendment Right to Pursue Judicial Claims Against the Government*,
91 Nw. U. L. Rev. 899 (1997) ....................................................................................5, 6, 7, 10

Kenneth C. Davis, *Sovereign Immunity Must Go*,
22 Admin. L. Rev. 383 (1970).................................................................................................8

Oliver W. Holmes, *The Path of the Law*,
10 Harv. L. Rev. 457 (1897) ....................................................................................................11

Richard W. Power, *New Wealth and New Harms—The Case for Broadened
Governmental Liability*,
23 Rutgers L. Rev. 449 (1969)...................................................................................................9

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S.
90..............................................................................................................................................16

Ryan Micallef, *Liability Laundering and Denial of Justice—Conflicts Between the
Alien Tort Statute and the Government Contractor Defense*,
71 Brook. L. Rev. 1375 (2006) ...............................................................................................14

Stacy Humes-Schulz, *Limiting Sovereign Immunity in the Age of Human Rights*,
21 Harv. Hum. Rts. J. 105 (2008) .....................................................................................13, 14

Susan A. Bandes, *Reinventing* Bivens*: The Self-Executing Constitution*,
68 S. Cal. L. Rev. 289 (1995) ...........................................................................................1, 7, 8

iv

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

United Nations Committee Against Torture, Convention Against Torture,
*Periodic Report of the United States of America* (Third, Fourth, and Fifth
Reports) (Aug. 12, 2013) ........................................................................................24

Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and
Judicial Independence,*
35 Geo. Wash. Int'l L. Rev. 521 (2003) ........................................................6, 7, 15

Vienna Convention on the Law of Treaties, May 23, 1969,
1155 U.N.T.S. 331 ...................................................................................................17

v

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* respectfully submit this brief in support of Plaintiffs. *Amici* are well-positioned to assist the Court in deciding issues raised in this case.

Erwin Chemerinsky is Dean and Jesse H. Choper Distinguished Professor of Law at University of California, Berkeley School of Law. He previously founded and served as Dean and Distinguished Professor of Law, and Raymond Pryke Professor of First Amendment Law, at University of California, Irvine School of Law, and taught for many years at Duke Law School and the USC Gould School of Law. In 2014 and 2017, National Jurist magazine named Dean Chemerinsky the most influential person in legal education in the United States. He is the author of eleven books, including leading casebooks and treatises on constitutional law and federal jurisdiction, and more than 200 law review articles, including the article *Against Sovereign Immunity*, 53 Stan. L. Rev. 1201 (2001), which is directly relevant to issues in this case.

Susan A. Bandes is Centennial Professor of Law Emeritus at DePaul University College of Law. Professor Bandes is widely known as a scholar in the areas of federal jurisdiction, criminal procedure, and civil rights. Her articles appear in, among others, the Yale, Stanford, University of Chicago, Michigan, and Southern California law reviews, as well as peer-reviewed journals including Law and Social Inquiry, Constitutional Commentary, and the Journal of Law, Culture and the Humanities. Professor Bandes criticized the doctrine of sovereign immunity in her article *Reinventing* Bivens*: The Self-Executing Constitution,* 68 S. Cal. L. Rev. 289 (1995).

Martin S. Flaherty is the Leitner Family Professor of Law and Founding Co-Director of the Leitner Center for International Law and Justice at Fordham Law School. He is also a

---

[1] *Amici* certify that no party or party's counsel authored this brief in whole or in part or made a monetary contribution intended to fund the preparation or submission of this brief. The court granted *amici*'s unopposed motion to file this brief. ECF No. 48.

Visiting Professor at Columbia Law School and at the School of International and Public Affairs at Princeton University. His primary areas of focus include constitutional law and history, foreign affairs, and international human rights. Besides teaching, Professor Flaherty has also led or participated in human rights missions throughout the world for the Leitner Center, Human Rights First, and the New York City Bar Association. He is former Chair of the Council on International Affairs and of the Committee on International Human Rights of the New York City Bar Association, and is a life member of the Council on Foreign Relations.

Eric M. Freedman is the Siggi B. Wilzig Distinguished Professor of Constitutional Rights at Hofstra University School of Law. His primary areas of academic focus include constitutional law and history, with a special emphasis on the history of the Revolutionary period, the First Amendment, and the separation of powers, including remedies for Presidential misconduct. Professor Freedman formerly chaired the New York City Bar Association's Committee on Civil Rights, and has served on its Executive Committee. In his recent book, *Making Habeas Work: A Legal History* (N.Y.U. Press 2018), Professor Freedman discussed the "powerful, if oft-misunderstood, maxim, 'the King can do no wrong,'" a concept examined in this brief.

Burt Neuborne is the Norman Dorsen Professor of Civil Liberties Emeritus and founding Legal Director of the Brennan Center for Justice at New York University School of Law. He has been one of the nation's foremost civil liberties lawyers for more than 50 years, serving as National Legal Director of the American Civil Liberties Union from 1981–86, as Special Counsel to the NOW Legal Defense and Education Fund from 1990–96, and as a member of the New York City Human Rights Commission from 1988–92. Professor Neuborne is a nationally recognized constitutional scholar and teacher, has argued numerous Supreme Court cases, and

has litigated hundreds of important constitutional cases in the state and federal courts. He is the author of seven books and dozens of law review articles on constitutional law and procedure.

## PRELIMINARY STATEMENT

This Court should hold that the United States government does not enjoy sovereign immunity from claims in federal court that it has violated *jus cogens* norms—in this case, by committing torture, persecution, and inhumane acts. The facts of this case make clear why sovereign immunity should not be available to shield the government from liability. Two children—fourteen-year-old Viky Sarai Flores Benitez and nine-year-old J.S.R.—were abruptly separated from their parents and kept in inhumane conditions for many weeks. This was not part of a custody battle. This was not because the children were at risk in their parents' care. It was a deliberate act of programmatic cruelty. As Judge Bolden has already concluded, "the constitutional rights of J.S.R and V.F.B. have been violated, and [] irreparable harm has occurred as a result." *J.S.R. by and through J.S.G v. Sessions*, 330 F. Supp. 3d 731, 733 (D. Conn. 2018). Just as clearly, the government's conduct also grossly violated international norms.

Federal sovereign immunity—a creature of federal common law that is not based in the Constitution or any federal statute—is a vestige of England's feudal system that derives from the idea that "the king could do no wrong." This notion that the federal government is a sovereign that can "do no wrong" is fundamentally incompatible with the Constitution's organizing principle of popular sovereignty. Under our system of government, "the *people* … are the sovereign." *United States v. Lee*, 106 U.S. 196, 208–09 (1882). Immunity for the federal government in federal court based on an anachronistic, monarchical maxim does not "have any place in our system of government," where "[w]e have no king" and where it is obvious that "wrong may be done by the governing power." *Langford v. United States*, 101 U.S. 341, 342–43

(1879). Federal sovereign immunity also violates the Supremacy Clause in cases involving constitutional or statutory claims by elevating a common-law rule above the Constitution and federal statutes, and frustrates the constitutional imperative of ensuring government accountability. For these reasons, *amici* and other scholars have proposed abolishing or substantially narrowing the scope of domestic federal sovereign immunity.

While the concept of federal sovereign immunity rests on shaky ground, the Court need not abolish the defense entirely to reach the correct result here. It need only recognize—as the Eastern District of Virginia did recently in *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va. 2019)—that the government is not entitled to sovereign immunity from the type of claims raised by Plaintiffs: claims in federal court under the Alien Tort Statute ("ATS") arising from violations of *jus cogens* norms. Federal sovereign immunity is unavailable for ATS claims based on *jus cogens* violations for several reasons. First, because no country has the sovereign right to violate *jus cogens* norms under customary international law, such violations should not be treated as sovereign acts at all. Second, because Plaintiffs' *jus cogens* claims under the ATS are based in common law, common law likewise supplies the source of any immunity asserted against those claims. Under relevant common-law principles, there is no conduct-based immunity for *jus cogens* violations. Third, even if it enjoys the benefit of sovereign immunity generally, the United States has impliedly waived any immunity for *jus cogens* violations by accepting the law of nations and by signing international human rights treaties requiring it to provide effective remedies for *jus cogens* violations. For these reasons, it does not matter that the ATS contains no express waiver of sovereign immunity, which is the sole argument the United States relies on in asserting sovereign immunity.

For these reasons, the Court should hold that the United States is not entitled to domestic sovereign immunity for *jus cogens* violations and deny the United States' motion to dismiss Plaintiffs' ATS claims of torture and inhumane treatment on that ground.

## BACKGROUND

### A.        The Origins of Federal Sovereign Immunity

The doctrine of federal sovereign immunity has its roots in England's feudal system, in which "[t]he king, who stood at the apex of the feudal pyramid" and could not be coerced in his own court, was immune from suit. David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 2–3 (1972); *see Lee*, 106 U.S. at 206 (identifying "the absurdity of the king's sending a writ to himself to command the king to appear in the king's court" as a basis of English sovereign immunity). This "personal immunity of the king" subsequently transformed into "the immunity of the Crown." George W. Pugh, *Historical Approach to the Doctrine of Sovereign Immunity*, 13 La. L. Rev. 476, 478 (1953).

Even in English law, however, absolute sovereign immunity—the idea that the "king could do no wrong"[2]—was recognized as so harsh that consistent work-arounds were developed to provide remedies that would not otherwise exist under a strict interpretation of the doctrine. *See id.* at 479–80. Such work-arounds included permitting suits against the government official who had actually committed the wrong, and the "petition of right," which allowed subjects to petition the king for the ability to sue the Crown in the king's courts. *See* James E. Pfander,

---

[2] The phrase "the king can do no wrong" has many possible meanings, including that "when a wrong occurs, someone else must have done it" or "that a remedy must exist, because the King cannot do a wrong, as would occur if a harm went unremedied." Chemerinsky, *supra*, at 1201 n.1; *see* Freedman, *supra*, at 80 (interpreting phrase to mean that "the King 'could not lawfully do or command something legally wrong, and so wrongs could not be done on his behalf. If, therefore a … servant of the crown … claimed to be acting under the king's authority, [the] defense ... fell away if the command was one which the king could not lawfully have given.'").

5

*Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 Nw. U. L. Rev. 899, 900–08 (1997). "As a result of these procedures for obtaining redress, although the formal immunity of the Crown was deeply rooted in the common law … it operated primarily as merely a matter of formalism." *Al Shimari,* 368 F. Supp. 3d at 946.[3]

While the sovereign immunity of the United States government "is firmly established" in federal decisional law, Chemerinsky, *supra*, at 1204, the doctrine is not rooted in the Constitution. Indeed, "[t]he text of the Constitution is silent about sovereign immunity. Not one clause of the first seven articles even remotely hints at the idea of governmental immunity from suits" and "[n]o constitutional amendment has bestowed sovereign immunity on the federal government." *Id.* at 1205; *see also* Pfander, *supra*, at 981 ("Obviously the text of the Constitution says nothing about the government's immunity from suit ….."); Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 Geo. Wash. Int'l L. Rev. 521, 542 (2003) ("At the time of the Constitution's adoption, the federal government's immunity from suit was a question—not a settled constitutional fact.").[4] Instead, it is widely agreed that "federal sovereign immunity is a creature of federal common law rather than any statute or the Constitution." *Al Shimari*, 368 F. Supp. 3d at 952 n.7.

---

[3] Then-Judge Antonin Scalia observed that "[a]t the time of *Marbury v. Madison*, there *was* no doctrine of domestic sovereign immunity, *as there never had been in English law*." Antonin Scalia, *Historical Anomalies in Administrative Law*, 1985 Y.B. 103, 104 (1985) (Supreme Court Historical Society).

[4] While the Eleventh Amendment might be interpreted to provide some form of sovereign immunity to state governments in federal court, it says nothing about immunity for the federal government. *See generally* Chemerinsky, *supra*, at 1205–10.

6

The incorporation of the English concept of sovereign immunity into federal common law did not happen immediately after the Founding. Rather, "[t]he first clear reference to the sovereign immunity of the United States in an opinion for the entire [Supreme] Court" appeared in 1821, "when the concept of federal sovereign immunity was discussed in dicta" in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821), and "the first time sovereign immunity was invoked by the Supreme Court 'as a basis to deny relief' occurred in 1846." *Al Shimari*, 368 F. Supp. 3d at 946 (quoting Jackson, *supra*, at 523 n.5). Although sovereign immunity originally "was more about the mode for obtaining redress than a ban on redress of injury caused by the sovereign and his agents," Jackson, *supra*, at 542, the doctrine was "selective[ly] borrow[ed]" when being incorporated into United States law, as *amicus* Bandes has noted. Bandes, *supra*, at 343.

Even after federal sovereign immunity had become "a familiar doctrine of the common law," *The Siren*, 74 U.S. (7 Wall.) 152, 153–54 (1868), the Supreme Court continued to express skepticism about the wholesale adoption of federal sovereign immunity in the context of the American republican government. *See, e.g.*, *Lee*, 106 U.S. at 206 (holding that there is "no person in this government who exercises supreme executive power, or performs the public duties of a sovereign," and it is therefore "difficult to see on what solid foundation of principle exemption from liability to suit rests"). Nonetheless, by the late nineteenth century the "general doctrine" of federal sovereign immunity from *Cohens* had become entrenched—*sub silentio*—in federal common law, even though "the Supreme Court had never engaged in a detailed discussion of the doctrine or explained the reasons for it, but rather had implicitly incorporated it into American law." *Al Shimari*, 368 F. Supp. 3d at 951 (citing *Lee*, 106 U.S. at 207). Despite these "murky beginnings," federal sovereign immunity is now a well-established doctrine that

7

has come to be understood as a prohibition on claims against the United States government

absent a waiver of this immunity. *Id.*; *see* Chemerinsky, *supra*, at 1204; Pfander, *supra*, at 899.[5]

## B.      Prominent Criticisms of Federal Sovereign Immunity

Given its incorporation into our legal system through decisional law and its distortion of

the English law on which it was based, "there is a long history of criticism of the notion that the

federal government should be immune from suit." *Al Shimari*, 368 F. Supp. 3d at 953. As *amicus*

Dean Chemerinsky has explained, the very concept of federal sovereign immunity

> is inconsistent with a central maxim of American government: no one, not even the
> government, is above the law. The effect of sovereign immunity is to place the
> government above the law and to ensure that some individuals who have suffered
> egregious harms will be unable to receive redress for their injuries. The judicial role
> of enforcing and upholding the Constitution is rendered illusory when the
> government has complete immunity to suit. Moreover, sovereign immunity
> undermines the basic principle, announced in *Marbury v. Madison*, that "[t]he very
> essence of civil liberty certainly consists in the right of every individual to claim
> the protection of the laws, whenever he receives an injury."

Chemerinsky, *supra*, at 1202 (footnotes omitted). Similarly, *amicus* Professor Bandes has noted

the irony that, "in freeing ourselves from the shackles of monarchy, we traded a system in which

the King was accountable for one in which the government was above the law."  Bandes, *supra*,

at 344; *see also* Pugh, *supra*, at 476 (criticizing "the very bases of this unwanted and unjust

concept").

Many commentators have urged that the doctrine be considerably narrowed, or even

abolished, due to its analytical incoherence and its incompatibility with our Constitution and

system of government. *See, e.g.*, Chemerinsky, *supra*, at 1201 ("Sovereign immunity is an

---

[5] As the court in *Al Shimari* explained, "[i]t was not inevitable that sovereign immunity would
develop in this way," as many other countries whose legal systems evolved from English
common law—including the United Kingdom, Ireland, Canada, and Australia—no longer
recognize sovereign immunity as a bar to suing the government in tort. 368 F. Supp. 3d at 953.

anachronistic relic and the entire doctrine should be eliminated from American law."); Kenneth C. Davis, *Sovereign Immunity Must Go*, 22 Admin. L. Rev. 383, 383–84 (1970) (proposing to "abolish nearly all of what is left of sovereign immunity" because it interferes with proper judicial analysis, causes substantive injustice, and results in final determinations without the safeguards necessary for procedural justice); *see also Donahue v. United States*, 660 F.3d 523, 526 (1st Cir. 2011) (Torruella, J., concerning the denial of *en banc* review) (describing federal sovereign immunity as "an anachronistic judicially invented legal theory that has no validity or place in American law" and "cannot be sustained in the face of our constitutional structure").

Commentators have identified several ways in which domestic sovereign immunity violates basic constitutional principles. First, federal sovereign immunity is inconsistent with the Constitution's organizing idea of popular sovereignty. *See* Edwin M. Borchard, *Government Liability in Tort*, 34 Yale L.J. 1, 4–5 (1924) (arguing that federal sovereign immunity makes little sense because "sovereignty resides in the American electorate or the people"). To the extent "the People of the United States" have delegated limited "sovereign" powers to various organs of government, such "sovereign" powers are not plenary. Akhil R. Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1427 (1987). That delegation of power should be "no broader than effective governmental operation requires." Richard W. Power, *New Wealth and New Harms—The Case for Broadened Governmental Liability*, 23 Rutgers L. Rev. 449, 488 (1969). When the government transgresses the limits of its delegation, "it ceases to act in the name of the sovereign, and surrenders any derivative 'sovereign' immunity it might otherwise possess." Amar, *supra*, at 1427. By allowing the federal government to invoke sovereign immunity for acts exceeding its delegated authority, "the [Supreme] Court has misinterpreted the Federalist

Constitution's text, warped its unifying structure, and betrayed the intellectual history of the American Revolution that gave it birth." *Id.* at 1466.

Second, federal sovereign immunity is incompatible with the Supremacy Clause. Allowing the government to invoke sovereign immunity to evade liability for a federal constitutional or statutory claim is tantamount to allowing a common-law doctrine to "reign supreme over the Constitution and federal law" in direct contravention of the Supremacy Clause, and "frustrates the supremacy of federal law by preventing the enforcement of the Constitution and federal statutes." Chemerinsky, *supra*, at 1211–12.

Third, federal sovereign immunity is inconsistent with the Constitution due to its departure from the principle of ensuring government accountability, which "is inherent in the structure of the Constitution and embodied in many specific constitutional provisions." *Id.* at 1213; *see* Amar, *supra*, at 1425 (arguing that government accountability is embodied in the first words of the Constitution, "We the People"); Pugh, *supra*, at 492. In *Marbury v. Madison*, the Supreme Court emphasized the need for government accountability and redress, holding that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." 5 U.S. (1 Cranch) 137, 163 (1803). This basic principle is frustrated if sovereign immunity shields the federal government from liability even when it violates the Constitution or laws of the United States. *See* Chemerinsky, *supra*, at 1213–14. As one commentator observed, "a literal application of the sovereign immunity doctrine often would have left the citizen remediless against harsh and illegal acts of his

government." Clark Byse, *Proposed Reforms in Federal Non-statutory Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus*, 75 Harv. L. Rev. 1479, 1484 (1962).[6]

Commentators have also questioned the main rationales offered for maintaining a doctrine so incompatible with our system of government. *Amicus* Dean Chemerinsky rejects the idea that permitting suits against the federal government would impose an undue financial burden on taxpayers—a "concern [that] underlies all of the [Supreme] Court's sovereign immunity decisions"—because the underlying assumption "that protecting the government treasury is more important than the benefits of liability in terms of ensuring compensation and deterrence" is "unsupportable" as a "value choice." Chemerinsky, *supra*, at 1217. With respect to the separation of powers concern that federal sovereign immunity "is necessary to protect the government from undue interference by the judiciary," *amicus* Dean Chemerinsky has argued that "[t]here is no evidence offered that suits against the government would prevent effective governance," and "[i]n fact, the evidence is to the contrary." *Id.* at 1217–18.

For each of these reasons, numerous commentators have urged the repudiation or narrowing of federal sovereign immunity in federal courts. *See id.* at 1223 (noting that sovereign immunity, like "[s]lavery, enforced racial segregation, and the subjugation of women," despite its deep roots in tradition, is a repugnant doctrine and should be repudiated). As Justice Holmes remarked in another context,

> [i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

---

[6] The right-to-petition clause in the First Amendment is also inconsistent with the notion of sovereign immunity, because "the Petition Clause guarantees the right of individuals to pursue judicial remedies for government misconduct." Pfander, *supra*, at 901.

14049362

Oliver W. Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897).

    **C.**    **Plaintiffs' Claims Under the Alien Tort Statute**

    In the instant case, Plaintiffs Ana Delmi Benitez Alvarado ("Benitez Alvarado") and her daughter, Viky Sarai Flores Benitez ("Benitez") fled El Salvador and entered the United States on May 13, 2018, seeking refuge after the murder of Benitez Alvarado's husband by the vicious criminal gang MS-13. ECF No. 1 (Compl.) ¶¶ 25-26. Upon arriving near Rio Grande City, Texas, officials confined Benitez and Benitez Alvarado in a *hielera* or icebox. *Id.* ¶ 27. Officials forced them to sleep on the floor with aluminum blankets and denied them the ability to bathe. *Id.* On May 16, 2018, immigration officials used deception to separate Benitez and Benitez Alvarado, offering Benitez a shower and instead transporting her from Texas to an Office of Refugee Resettlement ("ORR") facility in Groton, Connecticut. *Id.* ¶¶ 30–34.

    Plaintiffs Javin Benigno Santos Galvez ("Santos Galvez") and his then nine-year-old son, J.S.R., fled Honduras in April 2018 when Santos Galvez's life was put in danger as a result of his political activity. *Id.* ¶¶ 58–59. Initially, they settled in Mexico, but on June 11, 2018, they arrived in the United States by crossing the Rio Grande River. *Id.* ¶¶ 60–62. Like their fellow plaintiffs, Santos Galvez and J.S.R. were arrested by CBP officers and detained in a *hielera* with two aluminum blankets and a single thin mattress topper. *Id.* ¶¶ 63–65. Later, Santos Galvez was removed from the *hielera* while J.S.R. slept, and immigration agents told Santos Galvez that he would never see his son again and threatened to tase him when he cried out for his son. *Id.* ¶¶ 66–67. J.S.R. was then detained in a cage with other young children for four days, crying for his father frequently without being told whether he would see his father again, until he was transferred to ORR custody in Groton, Connecticut on June 16, 2018. *Id.* ¶¶ 68–71.

These family separations were effected intentionally as part of a federal-executive-branch policy meant to deter Central Americans from seeking asylum in the United States. *Id.* ¶¶ 99–117. Separation caused a great deal of distress in all Plaintiffs, as detailed extensively in the Complaint. *Id.* ¶¶ 40–55, 74–92. Plaintiffs remained separated from each other until an order by Judge Bolden of the United States District Court for the District of Connecticut on July 13, 2018, ordering, among other things, reunification of the families. *Id.* ¶¶ 96-98. Plaintiffs then brought this lawsuit on July 13, 2022.

### D.   The Government's Invocation of Sovereign Immunity

On October 28, 2022, the United States filed a motion to dismiss contending, *inter alia*, that Plaintiffs' ATS claims are barred by federal sovereign immunity. *See* ECF No. 35–1 ("Def. Br.") at 13–15. In their opposition, Plaintiffs argue that "[s]overeign immunity does not apply in this context for three independent reasons: 1) violations of *jus cogens* norms are inherently non-sovereign acts; 2) peremptory *jus cogens* norms are incorporated into federal common law and supersede sovereign immunity; and 3) the United States has impliedly waived sovereign immunity." ECF No. 49 at 49.

## ARGUMENT

## I.   THE ANACHRONISTIC AND INCONSISTENT DOCTRINE OF SOVEREIGN IMMUNITY SHOULD NOT BE GIVEN CATEGORICAL EFFECT

Given federal sovereign immunity's "murky origins" and inconsistency with the Constitution, it "should not be viewed as an unbending rule, but instead should be approached with an eye toward the purpose of immunity"—that is, "to ensure comity between states" and to "promote international peace and equity." Stacy Humes-Schulz, *Limiting Sovereign Immunity in the Age of Human Rights*, 21 Harv. Hum. Rts. J. 105, 107–08 (2008). Where sovereign immunity is deployed only to insulate the federal government from liability for its conduct within its own

13

courts and where no concerns of comity or international peace and equity are implicated by the assertion of sovereign immunity, the doctrine has no place.

The public order of the international community requires that certain norms receive absolute protection. Adam Belsky, Mark Merva & Naomi Roht-Arriaza, *Implied Waiver under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law*, 77 Calif. L. Rev. 365, 387 (1989). *Jus cogens* norms are the most fundamental of those norms. As "the body of those general rules of law whose non-observance may affect the very essence of the legal system … to such an extent that the subjects of law may not, under pain of absolute nullity, depart from them," *jus cogens* norms represent the fundamental duties incident to international life, and should be recognized as an essential component of the modern law definition of sovereignty. *Id.* at 392. Federal sovereign immunity should be "adapted to the functions and purposes of the twenty-first century legal order and the shift toward individual rights," Humes-Schulz, *supra*, at 108, and should not be given categorical effect where it would undercut principles of international peace and equity by precluding liability in a case (such as this) involving alleged violations of *jus cogens* norms.

For all of the reasons set forth above in the commentaries and criticisms of the general doctrine of federal sovereign immunity, *see supra* at 3–10, this Court should not reflexively accept the United States government's blanket assertion of immunity. For starters, holding that sovereign immunity does not apply to Plaintiffs' ATS claims is entirely consistent with a recognition that the federal government's sovereignty is limited to the powers delegated to it by "the people." *See* Amar, *supra*, at 1427. Torture, persecution, and inhumane acts can never be permissible official acts. *See* Humes-Schulz, *supra*, at 107; *see also* Ryan Micallef, *Liability Laundering and Denial of Justice—Conflicts Between the Alien Tort Statute and the Government*

14

*Contractor Defense*, 71 Brook. L. Rev. 1375, 1420 (2006). Relatedly, denying a remedy for the grievous injuries alleged by Plaintiffs based on the government's categorical assertion of sovereign immunity would undermine the principle of ensuring government accountability, and would frustrate the bedrock "right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury*, 5 U.S. at 162; *see* Amar, *supra*, at 1425; Chemerinsky, *supra*, at 1213–14; Pugh, *supra*, at 492.

Narrowing the scope of federal sovereign immunity in this context will not lead to confrontations with the Executive Branch. As a general matter, "the increased role of courts in the administration of justice against the government should give both courage and comfort in knowing that the likelihood of defiance of judgments have diminished over years." Jackson, *supra*, at 609. And unlike "a governmental body's right to avoid litigation in another sovereign's courts," the United States has no principled reason to avoid being haled into federal court— indeed, the United States "is no stranger to litigation in its own courts," and the "United States Code is riddled with statutes authorizing relief against the United States and its agencies." *Pullman Constr. Indus., Inc. v. United States*, 23 F.3d 1166, 1168 (7th Cir. 1994). Therefore, "[w]here there is room for interpretation …, the abstract idea of sovereign immunity … or the fear of confrontation and noncompliance … should not restrain the courts from interpreting their jurisdiction so as to fulfill the promise of *Marbury* that the law provide remedies to address violations of legal rights." Jackson, *supra*, at 609.

## II. THE UNITED STATES LACKS SOVEREIGN IMMUNITY IN FEDERAL COURT FOR *JUS COGENS* VIOLATIONS

The Court should conclude that the United States lacks sovereign immunity for the *jus cogens* violations asserted in this case for several reasons. First, acts violating *jus cogens* are not—and cannot be—sovereign in nature. Second, there is no conduct-based immunity for *jus*

15

*cogens* violations under federal common law. Third, even if the United States were presumptively immune, it has impliedly waived sovereign immunity for *jus cogens* violations through its membership in the community of nations and its accession to various international treaties, which obligate it to provide a remedy for such violations.

### A. *Jus Cogens* Violations Are Not Sovereign Acts Under Customary International Law

Plaintiffs assert claims under the ATS for torture (Count IV), persecution (Count V), and inhumane acts (Count VI). All of these claims involve conduct that violates *jus cogens* norms. As the Second Circuit has recognized, "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights," i.e., *jus cogens. See Filártiga v. Peña-Irala*, 630 F.2d 876, 878 (2d Cir. 1980); *accord Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992). Under international law, persecution and inhumane acts violate *jus cogens* as well. Rome Statute of the International Criminal Court art. 7(1)(h), (k), July 17, 1998, 2187 U.N.T.S. 90; *see Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 199 n.7 (2d Cir. 2009) (discussing the Charter of the International Military Tribunal at Nuremberg). Persecution is the intentional and severe deprivation of fundamental rights based on a protected characteristic, such as nationality, ethnicity, or race. Rome Statute of the International Criminal Court art. 7(2)(g). Inhumane acts are "acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health." *Id.* art. 7(1)(k).

"A *jus cogens* norm … is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 61 (2d Cir. 2019) (citation omitted). "[T]hese norms may not be violated, irrespective of the consent or practice of a given State." *Id.* (citation omitted). *Jus*

16

*cogens* norms "enjoy the highest status within international law," *id.* at 61, and their supremacy "extends over all rules of international law," including sovereign immunity and any conflicting international treaties. *Siderman de Blake*, 965 F.2d at 715–16; Vienna Convention on the Law of Treaties art. 64, May 23, 1969, 1155 U.N.T.S. 331. Because *jus cogens* norms are non-derogable, they "abrogate[] traditional notions of state sovereignty" and, as a result, "states do not have the sovereign right to violate human rights." *Al Shimari*, 368 F. Supp. 3d at 966 (citations omitted). This is analogous to the principle that state sovereign immunity is abrogated by congressional actions taken under the Fourteenth Amendment. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000) ("[T]he Eleventh Amendment … [is] necessarily limited by the enforcement provisions of §5 of the Fourteenth Amendment."). Similarly, federal sovereign immunity is limited by *jus cogens* norms under customary international law.

"The United States … may not claim immunity for *jus cogens* violations because when government agents commit such violations, their actions are not sovereign in nature." *Al Shimari*, 368 F. Supp. 3d at 966.[7] As the *Al Shimari* court put it, federal sovereign immunity is potentially available to the government "only if the acts of authorizing or engaging in such violations fall within the sphere of authority that has been legitimately delegated by the People," and under principles of international law, "the People as sovereign are bound by the nonderogability of *jus*

---

[7] By the same logic, for purposes of act-of-state deference (in general and when applying the ATS), courts in the Second Circuit are prohibited "from deeming valid violations of non-derogable *jus cogens* norms." *Kashef*, 925 F.3d at 62; *cf. Liu v. Republic of China,* 642 F. Supp. 297, 305 (N.D. Cal. 1986) (holding that political assassination by a foreign government cannot be viewed as sovereign act); *Letelier v. Republic of Chile,* 488 F. Supp. 665, 673 (D.D.C. 1980) (same). The same principle should apply to *jus cogens* violations—they are not sovereign acts. A similar parallel exists between *United States v. Lee*'s recognition that military officers who unconstitutionally seized property could not claim to be the sovereign because the sovereign cannot authorize an unconstitutional act, 106 U.S. at 208–09, and the principle that the United States cannot claim to be acting as a sovereign when it commits acts that cannot, under *jus cogens*, be committed by a sovereign.

*cogens* norms, which means that the People may not legitimately delegate to the government the power to engage in *jus cogens* violations." *Id.* at 967–68; *see* Amar, *supra*, at 1437. In this case, the United States separated two parents from their young children using threats and deception, violating multiple *jus cogens* norms. The government "has no sovereign power to immunize itself from liability for such violations." *Al Shimari*, 368 F. Supp. 3d at 968.

### B.    There Is No Conduct-Based Federal Sovereign Immunity at Common Law for *Jus Cogens* Violations

The ATS "confers jurisdiction over … violations of the law of nations, *i.e.*, customary international law." *Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 212 (2d Cir. 2016); *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004). "Any party asserting jurisdiction under the Alien Tort Statute must establish, independent of that statute, that the United States has consented to suit." *Czetwertynski v. United States*, 514 F. Supp. 2d 592, 596 (S.D.N.Y. 2007) (quoting *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992)). Because *jus cogens* claims are derived from customary international law incorporated into federal common law, *Al Shimari*, 368 F. Supp. 3d at 959—and not from a federal statute or single international treaty—courts must look to federal common law to determine the existence and scope of any asserted immunity to *jus cogens* claims.

With respect to this common law analysis, the Fourth Circuit's decision in *Yousuf v. Samantar* is instructive. In *Samantar v. Yousuf*, 560 U.S. 305, 308 (2010), the Supreme Court held that the Foreign Sovereign Immunities Act ("FSIA") confers immunity on foreign heads of state ("status-based immunity"), but does not apply to individual foreign officials, whose "conduct-based immunity" is instead determined under the common law. *Id.* at 322. On remand, the Fourth Circuit affirmed the distinction "between status-based immunity afforded to sitting heads-of-state and conduct-based immunity available to other foreign officials." *Yousuf*, 699

18

F.3d at 774. The Fourth Circuit then analyzed common-law principles of sovereign immunity for *jus cogens* violations and concluded that, "under international and domestic law, officials from other countries" cannot assert "official immunity for *jus cogens* violations, even if the acts were performed in [their] official capacity." *Id.* at 777. Because "*jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign," conduct-based immunity cannot extend to actions that violate *jus cogens* norms. *Id.* at 776. The same logic applies here: there is no support in the common law for federal sovereign immunity for *jus cogens* violations.

Two post-*Samantar* decisions in the Second Circuit reached a different conclusion about the availability of conduct-based foreign official immunity in cases involving claims of *jus cogens* violations, but both are distinguishable because they turn on "absolute deference" to Executive Branch intervention and foreign relations policy concerns that are irrelevant in the context of domestic federal sovereign immunity. In *Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009), the Second Circuit upheld the immunity of a former Israeli official from claims of *jus cogens* violations, reasoning that "in the common-law context, we defer to the Executive's determination of the scope of immunity," and basing its ruling on the fact that the State Department had filed a Statement of Interest urging dismissal on immunity grounds. *Id.* at 10, 14–15; *see also Rosenberg v. Pasha*, 577 F. App'x 22, 23–24 (2d Cir. 2014) (summary order) (denying *jus cogens* claims against foreign defendant based on *Matar*).

Although *Matar* and *Rosenberg* affirmed dismissal of *jus cogens* claims on sovereign immunity grounds, their rationales turn on considerations relevant only in the *foreign* sovereign immunity context. As the *Matar* court acknowledged, "foreign sovereigns have no absolute right to immunity in American courts," but immunity is instead extended "as a matter of comity" because such cases "typically raise[] questions of policy rather than of law." *Matar*, 563 F.3d at

19

13 (citations, quotation marks, and alterations omitted); *see also Samantar*, 560 U.S. at 311 (explaining that foreign sovereign immunity is "a matter of grace and comity"). In *Rosenberg* and *Matar*, the Second Circuit's common-law analysis hinged on absolute deference to Statements of Interest filed by the State Department advocating for dismissal based on foreign sovereign immunity. *See Rosenberg*, 577 F. App'x at 24; *Matar*, 563 F.3d at 11. Consequently, *Matar*'s common-law holding is limited by its reasoning that, "in the common-law context, we defer to the Executive's determination of the scope of immunity." *Matar*, 563 F.3d at 15. In *Yousuf*, by contrast, the State Department argued that the former foreign official defendant was not entitled to sovereign immunity, which the Fourth Circuit deemed "not controlling" before undertaking its own analysis of the scope of common-law immunity. *See Yousuf*, 699 F.3d at 769–78. For this reason, *Yousuf* offers a more relevant framework for assessing common-law immunity for *jus cogens* violations in the absence of "Executive determinations."

The policy considerations underpinning *foreign* sovereign immunity that drove the decisions in *Matar* and *Rosenberg* are irrelevant in the context of *jus cogens* claims against the United States in domestic courts, which is the issue in this case. In particular, the common-law practice of deference to the Executive Branch's determination of sovereign immunity is inapposite for claims that the Executive Branch's own officials violated *jus cogens* norms, rendering the "traditional rule of deference to such Executive determinations" a nonstarter. *Matar*, 563 F.3d at 15. More generally, considerations of comity and respect for foreign sovereigns—the bases for foreign sovereign immunity in *Matar* and *Rosenberg*—are not at issue in claims of domestic sovereign immunity, which do not implicate international relations concerns. *See Sosa*, 542 U.S. at 761 (Breyer, J., concurring) ("These comity concerns normally

20

do not arise (or at least are mitigated) if the conduct in question takes place in the country that provides the cause of action or if that conduct involves that country's own national ….").

To the contrary, suits against the federal government—particularly in cases such as this, involving egregious government misconduct—raise fundamental accountability and governance concerns that call for judicial intervention, rather than abstention. The barrier to suit should consequently be lower here than in the foreign sovereign immunity context. Further, the federal government is haled into American courts all the time, so allowing this type of suit would be only a minor imposition on the federal government. *See Pullman Constr. Indus.*, 23 F.3d at 1168 (holding that denial of the United States' sovereign immunity is not subject to immediate review under the collateral order doctrine, unlike the denial of foreign sovereign immunity, which is grounded in "a governmental body's right to avoid litigation in another sovereign's courts").

In sum, to determine whether the United States possesses sovereign immunity for *jus cogens* claims, the Court must look to federal common law. And, for the reasons set forth in the common-law analysis in *Yousuf*—namely, that *jus cogens* violations are not legitimate official acts and therefore do not merit conduct-based immunity—the common law does not provide any basis for the United States' assertion of sovereign immunity for *jus cogens* violations.

### C.   The United States Has Impliedly Waived Sovereign Immunity for *Jus Cogens* Violations

Because the United States does not enjoy sovereign immunity for alleged violations of *jus cogens* norms, Plaintiffs should not be required to demonstrate that the United States has waived any such immunity in order to proceed with their case. But if they were so required, the United States has impliedly waived sovereign immunity for *jus cogens* claims, if it were entitled to such immunity at all, "by holding itself out as a member of the international community

because the respect and enforcement of *jus cogens* norms are fundamental to the existence of a functioning community of nations." *Al Shimari*, 386 F. Supp. 3d at 964.

While the ATS itself "does not waive sovereign immunity," Def. Br. at 14, because the ATS confers jurisdiction over claims that arise under the common law, which incorporates *jus cogens* norms, the Court must look to the common law for any waiver of immunity, not to the statute itself. For this reason, the cases cited by the United States for the proposition that there is no express waiver in the text of the ATS, *see* Def. Br. at 14, are inapposite.[8]

As a general matter, the United States can waive its sovereign immunity impliedly through its conduct. While the Supreme Court has said, in dicta, that a waiver of sovereign immunity must be express, *see, e.g.*, *Lane v. Peña*, 518 U.S. 187, 192 (1996),[9] many Supreme

---

[8] In addition to being irrelevant to this case, the only Second Circuit decision cited by Defendant for this proposition, *Arar v. Ashcroft*, 532 F.3d 157, 175 (2d Cir. 2008), *vacated and superseded on reh'g en banc on other grounds*, 585 F.3d 559 (2d Cir. 2009), was vacated and its discussion of sovereign immunity (which was limited to one paragraph in a footnote) was dicta because the court rejected the plaintiffs' claim on the merits.

Additionally, the recent district court decision cited by Defendant was wrongly decided because it relied on inapposite cases like *Arar v. Ashcroft* to find ATS claims barred by sovereign immunity. (*See* Def. Br. at 15 (citing *D.J.C.V. v. United States*, No. 20 CIV. 5747 (PAE), 2022 WL 1912254, at *54–56 (S.D.N.Y. June 3, 2022)). Contrary to what the *D.J.C.V.* court stated, the issue in this case is not whether "the ATS waives sovereign immunity," *id.* at *56. *Amici* do not "ask the Court to make new law." *Id. Amici* simply ask the Court to interpret the ATS as it has always been interpreted: as a statute that provides jurisdiction for claims of violations of the law of nations—claims where the source of substantive rights and immunities, if any, is the common law. *See Sosa*, 542 U.S. at 712; *Yousuf*, 699 F.3d at 777.

[9] Cases stating that a waiver of sovereign immunity "must be unequivocally expressed in statutory text," *Lane*, 518 U.S. at 192, are inapposite, because they address claims in which the statute is the source of the substantive right at issue and require an express waiver for such *statutory* claims. *See, e.g., id.* (Rehabilitation Act); *FAA v. Cooper*, 566 U.S. 284 (2012) (Privacy Act); *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999) (Administrative Procedure Act). The ATS, by contrast, neither gives rise to a federal duty, expressly waiving sovereign immunity like substantive federal statutes, nor affirmatively grants immunity, like the FSIA or the Westfall Act. Rather, the ATS provides jurisdiction for claims of violations of the law of nations—claims where the source of substantive rights and immunities, if any, is the common law. *See Sosa*, 542 U.S. at 712; *Yousuf*, 699 F.3d at 777.

Court decisions rely on an assumption that a waiver of federal sovereign immunity can be implicit. *See, e.g.*, *United States v. Kwai Fun Wong*, 575 U.S. 402, 406–12 (2015) (holding that time-bar limitations on sovereign-immunity waivers may be subject to equitable tolling even absent affirmative congressional authority indicating an intent to allow such tolling); *United States v. Beggerly*, 524 U.S. 38, 42–48 (1998) (indicating that sovereign immunity would not always bar an independent action brought under Fed. R. Civ. P. 60(b) in the same court in which the government had previously consented to suit, implying that the government can waive its immunity through litigation conduct); *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 422–23 (1990) (suggesting that, in some circumstances, estoppel may support suits against the government even absent an explicit waiver of sovereign immunity); *see also Al Shimari*, 368 F. Supp. 3d at 951 n.6 (discussing numerous examples of implied waiver of sovereign immunity). These decisions accord "with the settled rule in a variety of other contexts that governments may impliedly waive sovereign immunity." *Al Shimari*, 368 F. Supp. 3d at 951 n.6.[10]

By accepting the law of nations, the United States has waived immunity for *jus cogens* violations. It is a "settled proposition that federal common law incorporates international law." *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995). This is because, as the Supreme Court has long recognized, "the United States had been bound to receive the law of nations upon declaring its independence." *Al Shimari*, 368 F. Supp. 3d at 958 (quotation marks omitted) (citing, *inter*

---

[10] *See also* 28 U.S.C. § 1605(a)(1) (foreign state may waive its immunity "by implication"); *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002) (the act of removing a lawsuit against a state to federal court operates as a waiver of state sovereign immunity); *United States v. Eckford*, 73 U.S. (6 Wall.) 484, 491 (1867) (holding that a defendant sued by the government may plead a counterclaim as an offset against the government's claim even absent a statutory waiver of sovereign immunity); *Int'l Indus. Park, Inc. v. United States*, 102 Fed. Cl. 111, 113–14 (2011) (holding that the Army Corps of Engineers waived sovereign immunity with respect to a fee award by entering into a contract that included a fee-shifting provision), *aff'd*, 496 F. App'x 85 (Fed. Cir. 2013).

*alia*, *Ware v. Hylton*, 3 U.S. (3 Dall.) 199 (1796)). And "as international law has evolved to

incorporate *jus cogens* norms, so too has federal common law." *Id.* at 959 (citation omitted).

Indeed, the Supreme Court has indicated that federal common law provides a cause of action for

"claim[s] based on the present-day law of nations," so long as they "rest on a norm of

international character accepted by the civilized world and defined with specificity comparable

to the features of the 18th-century paradigms [the Court] ha[s] recognized." *Sosa*, 542 U.S. at

725. *Jus cogens* norms meet that standard.

Under international law (and thus federal common law), *jus cogens* norms "confer an

unquestionable right on each individual to be free from states violating those norms." *Al Shimari*,

368 F. Supp. 3d at 958. And it is a "basic and universally embraced" principle under our law that

"where there is a right, there should be a remedy." *Id.* (quoting Amar, *supra*, at 1485–86)

(alteration adopted); *see also Marbury*, 5 U.S. at 163. "Accordingly, by … accepting the law of

nations, the federal government has impliedly waived any right to claim sovereign immunity

with respect to *jus cogens* violations when sued for such violations in an American court." *Al

Shimari*, 368 F. Supp. 3d at 959.[11]

The United States has also signed treaties requiring it to submit to suit for *jus cogens*

violations. "Almost all international human rights declarations and treaties, including those that

are binding on the United States, impose an obligation on the State to provide compensation for

violations of rights that occur." *Al Shimari*, 368 F. Supp. 3d at 960 (citation and quotation marks

omitted). For instance, the Convention Against Torture—which the United States ratified in

---

[11] The Second Circuit has expressed support (in the foreign sovereign immunity context) for the notion that "every nation impliedly waives its traditional sovereign immunity for violations of [*jus cogens*] by the very act of holding itself out as a state." *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242 (2d Cir. 1996) (citing Belsky, *supra*, at 365).

1994—requires each state to "ensure in its legal systems that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 14(1), Dec. 10, 1984, 1465 U.N.T.S. 85.[12] The United States has assured the United Nations Committee Against Torture that it complies with that mandate. *See Al Shimari*, 368 F. Supp. 3d at 960 (citing United Nations Committee Against Torture, Convention Against Torture, *Periodic Report of the United States of America* (Third, Fourth, and Fifth Reports) (Aug. 12, 2013) ¶ 147, at 53).

To satisfy its treaty obligations, the United States is therefore constrained to consent to suit by victims such as Plaintiffs, who were tortured or subjected to other crimes against humanity by federal personnel. This would be especially true if the Court were to determine that such victims cannot sue their torturers or persecutors directly because of the Westfall Act. *See Al Shimari*, 368 F. Supp. 3d at 961 (discussing 28 U.S.C. § 2679(b)(1)). In that scenario, suing the federal government would be these victims' only option. Thus, "by ratifying the Convention Against Torture and assuring the Committee Against Torture that an adequate civil remedy exists for such victims, the United States has impliedly waived its sovereign immunity with respect to such claims."[13] *Id.*

---

[12] Likewise, the International Covenant on Civil and Political Rights, which the United States ratified in 1992, provides that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." International Covenant on Civil and Political Rights art. 7, Dec. 16, 1966, 999 U.N.T.S. 171.

[13] The United States also impliedly waived immunity to "effectuate the international enforcement structure created by the Convention Against Torture." *Al Shimari*, 368 F. Supp. 3d at 962.

14049362

## **CONCLUSION**

For all of the foregoing reasons, *amici curiae* respectfully urge the Court to hold that there is no federal sovereign immunity in federal court for *jus cogens* claims under the ATS and deny the United States' motion to dismiss Plaintiffs' ATS claims on that ground.

Dated: December 19, 2022

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP
Harry Sandick (Fed. Bar. No. ct30279)
Andrew I. Haddad (of counsel)
Newton Portorreal, Jr. (of counsel)
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

*Counsel for Amici Curiae Dean Erwin Chemerinsky and Professors Susan Bandes, Martin Flaherty, Eric M. Freedman, and Burt Neuborne*

26

14049362