United States District Court
Southern District of Texas

**ENTERED**

September 15, 2021

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| NORA ISABEL LAM GALLEGOS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 5:14-CV-136 |
| | § | |
| UNITED STATES OF AMERICA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

This case arises from the tragic cross-border shooting and death of Guillermo Arevalo Pedraza ("Arevalo"), a Mexican national. (Dkt. 43 at 2.)[1] Plaintiff Nora Isabel Lam Gallegos[2] ("Plaintiff"), Arevalo's widow, initially filed this civil suit against the United States of America (the "United States"), various Border Patrol agents, and several supervisory government officials. (*See id.* at 4–11.) Over the course of more than six years, the defendants in this case were narrowed to just the United States and Christopher Boatwright ("Boatwright"), the Border Patrol agent who is alleged to have fired the fatal shots. (*Id.* at 7.)

Now pending are the United States' Motion to Dismiss (Dkt. 75) and Plaintiff's Motion to Deny Substitution (Dkt. 76). The two primary issues raised are: (1) whether Plaintiff can properly allege a cause of action under the Alien Tort Statute for money damages against the United States, a sovereign entity; and (2) whether Boatwright is entitled to immunity because he was acting in the scope of his employment at the time of the cross-border shooting. Having

---

[1] Page citations refer to the page numbers automatically generated by the Electronic Court Filing System (ECF). Similarly, attachment numbers refer to the numbers automatically generated by ECF, not to the exhibit numbers generated by Parties.

[2] Plaintiff Nora Isabel Lam Gallegos brings this action in her individual capacity, on behalf of the estate of Arevalo, and as next friend of Arevalo's minor children P.A.L. and M.A.L. (Dkt. 43 at 2.) For the sake of clarity, this Order refers to Plaintiff in the singular notwithstanding the multiple capacities under which she brings this action.

considered the relevant law and facts, the Court concludes that the Motion to Dismiss (Dkt. 75) should be granted and that the Motion to Deny Substitution (Dkt. 76) should be denied.

**Factual and Procedural History**

**A.    Factual Background[3]**

**1.    The Cross-Border Shooting**

On September 3, 2012, Arevalo and his family gathered for a picnic at a park near the Rio Grande River on the Mexican side of the border. (*Id.* at 12.) At the same time, Border Patrol Agents,[4] including Boatwright, were attempting to apprehend an individual trying to swim across the river to the Mexican side of the border.[5] (*Id.* at 13.) The Border Patrol Agents were piloting an airboat on the river and cut off the swimming individual's route. (*Id.* at 14.) At this point, the Border Patrol Agents began to harass the swimming individual using boat hooks and bursts of water, and people on the Mexican side of the border shouted at the Border Patrol Agents to stop before they killed the swimming individual. (*Id.*) The Border Patrol Agents, equipped with assault rifles and pistols, then indiscriminately opened fire on the people on the Mexican side "without warning or provocation."[6] (*Id.*) During the course of the shooting, the Border Patrol Agents were located "on the United States' side of the river." (*Id.* at 13.) Arevalo was struck and killed by two rounds fired by Boatwright. (*Id.* at 14.) The Border Patrol Agents then left the

---

[3] This section details the relevant course of events as described in Plaintiff's Amended Complaint (Dkt. 43) and is not reflective of any factual findings.

[4] The "Border Patrol Agents" refer to the specific agents that Plaintiff alleges were present at the time and place of the incident.

[5] The Amended Complaint (Dkt. 43) states that the swimming individual had already made it to the riverbank on the United States' side of the border but attempted to swim back to Mexico because he feared that the approaching Border Patrol Agents would detain him. (*Id.* at 13.)

[6] For informational purposes, Plaintiff asserts that no rocks were thrown from the Mexican side of the border, contradicting a statement issued by the Border Patrol claiming that the Border Patrol Agents had been subject to rock throwing by individuals on the Mexican side. (*See* Dkt. 43 at 14–15.)

scene in their airboat without further attempting to apprehend the swimming individual. (*Id.* at 15.)

### 2. The Rocking Policy

Plaintiff additionally alleges that the Border Patrol Agents were acting pursuant to the "Rocking Policy." (Dkt. 43 at 15.) The Rocking Policy allows Border Patrol agents to use deadly force in response to rock throwing or suspected rock throwing. (*Id.* at 15–16.) Under the policy, law enforcement officials deem rock throwing *per se* lethal force that justifies responsive lethal force. (*Id.*) Plaintiff also asserts that the Rocking Policy permits Border Patrol agents to falsely allege rock throwing incidents, even when no rocks are thrown, to retroactively justify lethal shootings. (*Id.* at 15–16, 36.)

According to Plaintiff, high-level government officials in the Department of Homeland Security (DHS) and United States Customs and Border Protection (CBP) have tacitly and explicitly approved the Rocking Policy.[7] (*Id.* at 16–25.) For example, these officials were made aware of multiple instances in which Border Patrol agents had used allegedly unlawful deadly force in response to purported rock throwing, but no disciplinary actions were taken against the agents. (*Id.* at 18–20.) Plaintiff specifically points to Sergio Hernandez's shooting as an example. (*Id.* at 25.) There, Plaintiff claims that a Border Patrol agent used deadly force against an "unarmed, unthreatening teenager" despite no rocks being thrown at the agent by Hernandez or anyone else. (*Id.* at 25–26.) A Department of Justice (DOJ) investigation into the Hernandez case

---

[7] These government officials were former defendants in this action. (*See* Dkt. 43 at 7–11.) They included Janet Napolitano (former Secretary of DHS), David V. Aguilar (former acting Commissioner of CBP), Alan Bersin (former Commissioner of CBP), Michael J. Fisher (former Chief of the Border Patrol), Michael C. Kostelnik (former Assistant Commissioner of CBP), Robert L. Harris (former Chief Patrol Agent of the Border Patrol's Laredo Sector), John Esquivel (former Deputy Chief Patrol Agent of the Border Patrol's Laredo Sector), Daniel Schaeffer (former Director of Marine Operations for the Border Patrol's Laredo Sector), and Ramiro Rodriguez (Supervisory Border Patrol Agent). (*Id.*) All have been dismissed at this point.

concluded that "the agent did not act inconsistently with [Border Patrol] policy or training regarding use of force." (*Id.* at 26–27.) The CBP's Commissioner at the time claimed that the "shooting was justified because someone else allegedly threw a rock at the agent." (*Id.* at 27.) Further, these high-level government officials approved the CBP's October 2010 "Use of Force" policy handbook without attempting to address the Rocking Policy. (*Id.*) Thus, as Plaintiff claims, when the Border Patrol Agents "opened fire on a beach full of picknickers on September 3, 2012, they did so knowing that [supervising officials] had for years known of, acquiesced in, and condoned other similar killings." (*Id.* at 18.)

Finally, Plaintiff points to numerous instances where the government of Mexico has expressed "its concern about the Rocking Policy to those responsible for its implementation and continuance." (*Id.* at 20.) Specifically, Plaintiff notes that Mexico, through its ambassador, wrote letters to United States government officials on four different occasions, each after a similar cross-border shooting event, to state its distress about and note the lack of accountability for those shootings. (*Id.* at 20–22.) Plaintiff attached these letters to her complaint. (*Id.*, Attachs. 1– 4.)

## B.    Procedural History

Plaintiff initially filed suit on August 27, 2014. (*See* Dkt. 1.) She alleged a variety of international law and constitutional claims against the then-defendants for her husband's death and requested compensatory and punitive damages. (*See id.* at 38–48, 55.) Specifically, Plaintiff asserted an international law claim against the United States through the Alien Tort Statute (ATS), 28 U.S.C. § 1350, for the United States' purported acts and omissions related to the

extrajudicial killing of Arevalo, an alleged violation of a *jus cogens* norm of international law.[8] (*Id.* at 10, 38–41.) Additionally, Plaintiff asserted a number of constitutional claims against the supervisory government officials and Border Patrol Agents pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[9] (*Id.* at 10, 41–48.) Plaintiff then filed an Amended Complaint (Dkt. 43) that added Boatwright to the international law claim but was otherwise largely similar. (*Id.* at 45.)

Further developments in this case became dependent on a similar cross-border shooting case filed in the Fifth Circuit, *Hernandez v. United States*.[10] *See Hernandez v. United States*, 757 F.3d 249 (5th Cir. 2014), *adhered to in part on reh'g en banc*, 785 F.3d 117 (5th Cir. 2015), *vacated and remanded sub nom. Hernandez v. Mesa*, 137 S.Ct. 2003 (2017). Indeed, the vast majority of Plaintiff's claims, specifically her *Bivens* claims, did not survive the lengthy appellate journey of the *Hernandez* case. *Hernandez* moved back and forth between the Fifth Circuit and the Supreme Court and involved almost identical *Bivens* claims to those raised by Plaintiff. *See id.* As a result, the Court stayed the instant case multiple times pending the higher court decisions. (*See* Dkt. 36, 47, 49, 54, 57.) On February 25, 2020, in a 5-4 decision, the Supreme Court held that a *Bivens* claim against federal officers does not extend to claims involving cross-border shootings. *Hernandez v. Mesa*, 140 S.Ct. 735, 737 (2020). The Supreme Court therefore affirmed the Fifth Circuit's previous *en banc* dismissal of the case on those grounds. *Id.* at 750.

---

[8] A *jus cogens* norm is a peremptory norm of international law, which is non-derogable and constitutes the highest level of international law. *Gisbert v. U.S. Atty. Gen.*, 988 F.2d 1437, 1448 n.22 (5th Cir. 1993), *amended*, 997 F.2d 1122 (5th Cir. 1993). For example, conduct such as genocide and torture are often categorized as *jus cogens* violations. *See Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012).

[9] *Bivens* created a private right of action for monetary damages against federal officers for constitutional violations. 403 U.S. at 390–91.

[10] The *Hernandez* case arose from the previously mentioned shooting of Sergio Hernandez.

After the Supreme Court's decision in *Hernandez*, Parties stipulated to the dismissal of Plaintiff's *Bivens* claims. (Dkt. 68 at 1–2.) The Court construed the stipulation (Dkt. 68) as a joint motion for leave to amend the Amended Complaint (Dkt. 43) and granted the construed motion. (Dkt. 69 at 2.) The removal of the *Bivens* claims from the Amended Complaint (Dkt. 43) resulted in the termination of nearly all the defendants in the case. (Dkt. 69 at 3.) Accordingly, only the United States and Boatwright remained as defendants, and Plaintiff's sole remaining claim against them was her international law claim.[11] (*Id.*)

Shortly after, the United States filed a Notice of Substitution (Dkt. 74), which substituted the United States for Boatwright under the Westfall Act, 28 U.S.C. § 2679. (*Id.* at 1.) After this substitution, the United States became the sole remaining defendant in the case. (*Id.* at 2.) That same day, the United States also filed its Motion to Dismiss (Dkt. 75). In response to these filings by the United States, Plaintiff filed her Motion to Deny Substitution (Dkt. 76) and her Response in Opposition (Dkt. 77) to the United States' Motion to Dismiss (Dkt. 75). Other responsive pleadings from Parties followed. (*See* Dkts. 78–80.) The issues having now been fully briefed by both Plaintiff and the United States, the Court finds that the pending motions are ripe for consideration.

## Discussion

### A.    The United States' Motion to Dismiss

In its Motion to Dismiss (Dkt. 75), the United States raises three arguments. First, it contends that the United States is the only remaining defendant because Boatwright has been

---

[11]  Plaintiff asserts, and the United States does not contest, that she has exhausted her administrative remedies. (*See* Dkt. 43 at 12.) The Court therefore assumes without holding that Plaintiff successfully exhausted her administrative remedies prior to filing the instant suit. *See Jesner v. Arab Bank, PLC*, 138 S.Ct. 1386, 1430–31 (2018) (Sotomayor, J., dissenting) (explaining that "[c]ourts also can dismiss ATS suits for a plaintiff's failure to exhaust remedies").

substituted out pursuant to the Westfall Act. (*Id.* at 9.) Second, the United States argues that the Court has no subject-matter jurisdiction over this case and should therefore dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1) because the United States has not waived its sovereign immunity. (*See id.* at 12.) Third, the United States asserts that Plaintiff has failed to state a claim for extrajudicial killing that is actionable under the ATS, so the Court should alternatively dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6). (*Id.* at 19.)

The Court addresses only the second of these arguments regarding its subject matter jurisdiction here. The Court will address the first argument in its consideration of the Motion to Deny Substitution (Dkt. 75) below. Further, the Court does not reach the third argument in this Order because where dismissal is proper on jurisdictional grounds, as here, and dismissal for failure to state a claim is also requested, "the court should dismiss only on the jurisdictional ground under [Rule 12(b)(1)], without reaching the question of failure to state a claim under [Rule 12(b)(6)]."[12] *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977); *see also Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (concluding that courts should address a Rule 12(b)(1) motion "before addressing any attack on the merits" because this "prevents a court without jurisdiction from prematurely dismissing a case with prejudice").

---

[12] Due to the nature of ATS claims and the arguments presented, the Court notes that this case may present a situation "[w]here the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action." *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981). For example, although the Supreme Court in *Sosa* was at pains to distinguish between jurisdiction and cause of action for ATS purposes, the ATS ultimately requires a court to determine what "cause of action [is] subject to jurisdiction." *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 713, 732 (2004). In those situations where the jurisdictional and merits question overlaps, "the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case under either Rule 12(b)(6) or Rule 56." *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004) (internal quotations omitted) (citing *Williamson*, 645 F.2d at 415). Because the Court determines that the United States is immune even assuming Plaintiff's factual allegations are true (i.e., a Rule 12(b)(6) standard), whether or not the standard from *Williamson* applies is irrelevant to this Order.

Accordingly, because the Court concludes it does not have subject matter jurisdiction over Plaintiff's ATS claim against the United States, it does not reach the question of whether Plaintiff has failed to state a claim for extrajudicial killing.

### 1.    Legal Standard

Federal Rule of Civil Procedure 12(b)(1) governs dismissal of a claim for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). Moreover, a district court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (citation omitted). The party asserting jurisdiction, Plaintiff in this case, has the burden of proof to show that jurisdiction is proper. *Alfonso v. United States*, 752 F.3d 622, 625 (5th Cir. 2014).

### 2.    Relevant Law and Authorities

Before reaching the substance of Parties' arguments, the Court provides a brief overview of the basic principles and laws undergirding the central legal authorities at issue: (1) the doctrine of sovereign immunity; and (2) the Alien Tort Statute.

### a.    Sovereign Immunity of the United States

"We begin with the fundamentals. The United States has sovereign immunity from any lawsuit, unless that sovereign immunity has been waived." *M.D.C.G. v. United States*, 956 F.3d 762, 768 (5th Cir. 2020). Sovereign immunity "deprives federal courts of subject matter

jurisdiction." *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006). Accordingly, "whether the [federal] government has waived its sovereign immunity goes to the court's subject matter jurisdiction." *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016). The basic rule requires that "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). Generally, even if such a waiver exists, it "will be strictly construed, in terms of its scope, in favor of the sovereign." *Id.*

In the context of international law claims against the United States, the Fifth Circuit has maintained the narrow scope of the basic rule. For example, the Fifth Circuit's initial panel opinion in *Hernandez* (the "Initial Panel Opinion"), reinstated *en banc* in relevant part, held that the ATS did not waive the United States' sovereign immunity. *See Hernandez v. United States*, 757 F.3d 249, 259 (5th Cir. 2014), *adhered to in part on reh'g en banc*, 785 F.3d 117 (5th Cir. 2015), *vacated and remanded sub nom. Hernandez v. Mesa*, 137 S.Ct. 2003 (2017). The Initial Panel Opinion emphasized that "[n]othing in the ATS indicates that Congress intended to waive the United States' sovereign immunity." *Id.* Instead, "any party asserting jurisdiction under the [ATS] must establish, independent of that statute, that the United States has consented to suit." *Id.* (citing *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011)).

Even where parties have pointed to treaties and international agreements to find a waiver of sovereign immunity, courts have recognized a variety of threshold restrictions. First, a treaty that has been signed, but not ratified, does not waive sovereign immunity because no congressional action has been taken. *Tobar*, 639 F.3d at 1196 (explaining that the Convention on the Law of the Sea does not waive the United States' sovereign immunity because it has not been ratified). Second, even if a treaty has been ratified, it will not waive sovereign immunity if it is

not self-executing because such treaties do not themselves "create obligations enforceable in the federal courts." *Id.* (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004)). Finally, even a self-executing treaty must still contain the requisite unequivocal expression of waiver to effectively waive the United States' sovereign immunity. *See id.*; *see also Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1093 (D.C. Cir. 1980) (noting that a treaty did not contain "specific language . . . waiving the sovereign immunity of the United States").

### b. The Alien Tort Statute

The Court turns next to the Alien Tort Statute. The ATS reads in whole, "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[13] 28 U.S.C. § 1350. Despite its brevity, or perhaps because of it, the ATS has engendered significant legal debate in the past few decades. However, the Supreme Court has addressed the scope of the ATS and the authority it provides to federal courts several times, and the Court's decision today requires no further analysis than has already been done by the high court.

The seminal Supreme Court case on the ATS is *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). In *Sosa*, the Supreme Court provided instruction on how a federal court should approach claims brought pursuant to the ATS. The *Sosa* Court began by finding that the statute is "jurisdictional" and does not grant courts the authority to create "a new cause of action for torts in violation of international law." *Id.* at 713. Thus, when faced with an international law claim brought pursuant to the ATS, a court should first screen out any causes of action that are not comparatively specific, universal, and obligatory as those that were recognized when the ATS was enacted (e.g., violations of safe conduct, infringement of the rights of ambassadors, and

---

[13] For purposes of this Order, a "law of nations" claim and an "international law" claim refer to the same type of claim.

piracy). *See id.* at 715, 732. Put another way, a federal court only has jurisdiction under the ATS over those causes of action that satisfy the "specific, universal, and obligatory" criteria set out in *Sosa*. *Id.*

More recently, a number of Supreme Court justices have recognized that *Sosa* required federal courts to take a second step in this screening process. *Sosa* noted that even if an international law claim was found to be sufficiently specific, universal, and obligatory, a court might still dispose of the action due to "case-specific deference to the political branches." *Id.* at 733 n.21. This second step was made explicit by Justice Kennedy's plurality opinion, Justice Alito's concurring opinion, and Justice Sotomayor's dissenting opinion in *Jesner v. Arab Bank, PLC*. *See* 138 S.Ct. 1386, 1399 (2018) (plurality opinion); *id.* at 1409 (Alito, J., concurring); *id.* at 1419 (Sotomayor, J., dissenting); *see also Nestle USA, Inc. v. Doe*, No. 19-416, 2021 WL 2459254, at *4 (U.S. June 17, 2021) (plurality opinion); *id.* at *10 (Sotomayor, J., concurring). All three opinions from *Jesner*, totaling eight justices, explained that the second step of *Sosa*'s analytical framework required a court to exercise its judicial discretion to determine whether there was another reason to limit relief, such as deference to the political branches. *See Jesner*, 138 S.Ct. at 1399, 1409, 1419. *Sosa* suggested that such discretion to limit relief may need to be exercised in situations where judicial proceedings heavily impact foreign policy considerations. *Sosa*, 542 U.S. at 733 n.21. Moreover, the majority opinion in *Jesner* indicated that both "foreign-policy and separation-of-powers concerns" may require this exercise of discretion. *See Jesner*, 138 S.Ct. at 1403. And, in fact, the majority in *Jesner* determined that the foreign policy concerns created by allowing ATS suits against foreign corporations were sufficient for the

Supreme Court to preclude ATS suits against foreign corporations entirely.[14] *Id.* at 1407.

The through line of the Supreme Court's decisions on the ATS is that a court should exercise "great caution in adapting the law of nations to private rights." *See Sosa*, 542 U.S. at 728; *see also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116–17 (2013) (repeating the mantra of caution from *Sosa* regarding foreign policy concerns, "which are implicated in any case arising under the ATS"). Nothing in the instant case dissuades the Court that such caution is required here as well.

### 3. Analysis

The Court now turns to the arguments raised in the pleadings. At base, the Initial Panel Opinion in *Hernandez* means that the United States is correct that its sovereign immunity must be explicitly waived and that the ATS does not effect such a waiver. (Dkt. 75 at 13–15.) In response to the United States' invocation of sovereign immunity, Plaintiff counters with a three-step argument. First, she contends that the explicit waiver requirement is "only a canon of statutory construction" and disputes "the fundamental premise that an express waiver of sovereign immunity is necessary." (Dkt. 77 at 11.) Second, she argues that if the requirement is only a canon of construction, then it can be outweighed by other canons of construction such as the *Charming Betsy* canon, which requires a court to construe federal law to not conflict with international law. (*Id.* (citing *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804)).)

---

[14] Neither *Sosa* nor *Jesner* made clear whether the second step of *Sosa*'s test is a jurisdictional matter. However, the Court assumes without holding that a failure to satisfy the second step is a jurisdictional bar on a plaintiff's ATS claim. Indeed, if subject matter jurisdiction concerns whether a court "lacks the statutory or constitutional power to adjudicate the case," it would make sense that *Sosa*'s second step, which focuses on whether a federal court is the appropriate venue to adjudicate an international law claim, would be jurisdictional. *Cf. Home Builders Ass'n of Mississippi, Inc.*, 143 F.3d at 1010. This conclusion is bolstered by the fact that other claims-barring doctrines like the "political question doctrine," which requires a similar inquiry on whether a claim is better left to another branch of government, are deemed jurisdictional matters. *See Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

Third, she cites to international law for the assertion that the United States has no sovereign immunity for the violation of a *jus cogens* norm. (*Id.* at 12.) However, the Court need not reach the third step's application of international law because Plaintiff's argument falls apart in the first two steps, and Plaintiff therefore fails to demonstrate why the basic rule of sovereign immunity should be abrogated in this instance.

Moreover, even if Plaintiff's ATS claim was not jurisdictionally barred by sovereign immunity, the *Sosa* two-step test would still bar the Court's jurisdiction. Specifically, the Court's analysis under the second step dictates judicial deference to the political branches and, accordingly, dismissal of Plaintiff's claim. The Court notes that the United States appears to have addressed the issue of whether extrajudicial killing, the purported violation of international law, satisfied the first step of *Sosa*'s test in the 12(b)(6) portion of its Motion to Dismiss (Dkt. 75), rather than the 12(b)(1) portion. (*See id.* at 19–21.) However, as explained above, the *Sosa* test determines whether an ATS claim should be screened out of federal court as a *jurisdictional* matter.[15] Therefore, notwithstanding Parties' relative lack of briefing on the *Sosa* test, Supreme Court precedent and the Court's duty to inquire into its own subject matter jurisdiction warrant discussion of the *Sosa* test in this Order.

### a. Sovereign Immunity Bars Jurisdiction

#### i. Explicit Waiver Requirement

On the first step of her sovereign immunity argument, Plaintiff confuses the basic rule requiring an explicit waiver of sovereign immunity with the canon of construction that applies when such a waiver already exists.

---

[15] Thus, whether extrajudicial killing is a violation of a norm that confers jurisdiction on the Court under the ATS, and whether Plaintiff's specific allegations fit within the definition of an extrajudicial killing are two different inquiries. The first implicates the Court's jurisdiction, and the second asks whether Plaintiff has failed to state a claim of extrajudicial killing.

For example, Plaintiff primarily cites to the Supreme Court's decision in *Richlin Security Service Co. v. Chertoff* for her argument that the explicit waiver requirement is only a canon of statutory construction. (Dkt. 77 at 11.) There, the Supreme Court was discussing the scope of relief offered by the Equal Access to Justice Act (EAJA), which allows a prevailing party to recover attorney's fees in a case brought by or against the federal government. *See Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 573, 576 (2008). Because it "renders the United States liable for attorney's fees," EAJA "amounts to a partial waiver of sovereign immunity." *Ardestani v. I.N.S.*, 502 U.S. 129, 130 (1991). The narrow question presented in *Richlin* was whether EAJA, as a matter of statutory interpretation, allowed a prevailing party to "recover fees for paralegal services at the market rate for such services or only at their cost to the party's attorney." *Richlin*, 553 U.S. at 573. The issue of sovereign immunity only arose because the Government, in arguing for recovery at the attorney's cost, asserted that the right to recover paralegal fees must be read narrowly "in light of the statutory canon requiring strict construction of waivers of sovereign immunity." *Id.* at 589. The Government in *Richlin* did not suggest that EAJA was not a waiver of sovereign immunity; of that, there was no doubt. *See id.* The only question was to what extent the waiver-related canon applied to narrow the interpretation of the statutory language at issue. *See id.* In answering that question, the Supreme Court explained that the canon of construction related to sovereign immunity did not "displace[] the other traditional tools of statutory construction." *Id.* It did not, as Plaintiff contends, hold that the rule requiring an express waiver was itself subject to these "tools of statutory construction."

Additionally, the distinction between the rule and the canon of construction related to the rule is apparent from Plaintiff's own citations. As the United States notes, the multitude of cases cited by Plaintiff on this issue refer to the scope of *already existing waivers* of sovereign

immunity.[16] (Dkt. 78 at 9.) *See United States v. $4,480,466.16 in Funds Seized from Bank of Am. Acct. Ending in 2653*, 942 F.3d 655, 663 (5th Cir. 2019) ("A waiver of sovereign immunity cannot be implied but must be unequivocally expressed, and any waiver will be strictly construed, *in terms of its scope*, in favor of the sovereign." (emphasis added) (internal quotations omitted)), *cert. denied sub nom. Retail Ready Career Ctr., Inc. v. United States*, 141 S. Ct. 112 (2020). Where no waiver exists, the canon of construction is inapposite.

Because Plaintiff's argument rests on the assumption that no waiver is needed, she does not, and indeed cannot, identify the required unequivocal expression of a waiver in statutory text. Nonetheless, the Court addresses two of Plaintiff's arguments that implicate the existence of a waiver of sovereign immunity. First, Plaintiff cites to the Universal Declaration of Human Rights (UDHR) and International Covenant on Civil and Political Rights (ICCPR) in arguing that "the United States has bound itself to non-immunity." (Dkt. 77 at 17.) Neither the UDHR nor the ICCPR contain an explicit and unequivocal waiver of the United States' sovereign immunity. In fact, the Supreme Court in *Sosa* made clear that neither of these international agreements "create obligations enforceable in the federal courts." *Sosa*, 542 U.S. at 734–35 (quoting language that the UDHR is "a statement of principles" and explaining that the ICCPR "was not self-executing").[17]

Second, Plaintiff argues that the drafters of the ATS intended for the statute to be a

---

[16] For example, Plaintiff cites to *Richard v. United States*, 677 F.3d 1141 (Fed. Cir. 2012) and *Weldon v. United States*, 70 F.3d 1 (2d Cir. 1995). Both cases involve the scope of already existing waivers. *See Richard*, 677 F.3d at 1144 (regarding a waiver of sovereign immunity under the Tucker Act); *Weldon*, 70 F.3d at 3–4 (explaining that the scope of the FTCA's waiver of sovereign immunity extends to a court's jurisdiction to hear allegations of the United States' fraud on the court arising from the FTCA claim).

[17] Plaintiff's citation to the United Nations' Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law fails for the same reason. (*See* Dkt. 77 at 18.)

waiver of the United States' sovereign immunity. (Dkt. 77 at 19.) As the Fifth Circuit's Initial Panel Opinion in *Hernandez* makes clear, "[n]othing in the ATS indicates that Congress intended to waive the United States' sovereign immunity." *Hernandez*, 757 F.3d at 259. Irrespective of this clear denial of her argument, Plaintiff's understanding of the drafter's intent is unpersuasive. Plaintiff notes, for example, that the ATS was meant to address the apparent lack of remedy when a New York constable entered a Dutch ambassador's residence in violation of international law. (*Id.* at 19–20.) She therefore asserts that Congress "enacted the ATS to allow non-U.S. citizens a tort claim to recover damages for such official conduct." (*Id.* at 20.) Whatever inferences should be drawn from the historical events motivating the ATS, the actions of a *state* law enforcement officer cannot be interpreted so broadly as to imply the abrogation of the *federal* government's sovereign immunity.

In addition, Plaintiff cites to *Sosa* for its conclusions on the drafters' intent regarding the ATS. (*Id.*) For example, *Sosa* notes that Congress could not have intended for the statute to "l[ie] fallow indefinitely." *Sosa*, 542 U.S. at 719. However, this and other similar conclusions were only meant to highlight that there were at least some international law claims cognizable under the ATS's grant of jurisdiction. *See id.* at 720 (finding that offenses against ambassadors, violations of safe conduct, and piracy were "[u]ppermost in the legislative mind" when the ATS was drafted). *Sosa*'s conclusion that the ATS "was intended to have practical effect the moment it became law" was not an invitation to read a waiver of sovereign immunity into the statute. *Id.* at 724. Certainly, the Supreme Court in *Sosa* would have been well aware that such a waiver cannot be implied, and Plaintiff's reading of *Sosa*'s historical analysis would do exactly that. *See Lane*, 518 U.S. at 192.

### ii. *Charming Betsy* Canon

The collapse of the second step in Plaintiff's argument against sovereign immunity follows from the collapse of the first. As stated above, without an explicit waiver of sovereign immunity, there can be no discussion as to the scope of the waiver, and the *Charming Betsy* canon is therefore inapplicable to explain why the waiver should conform to international law.

However, this conclusion that the *Charming Betsy* canon of statutory construction requires something to construct exposes an even more fundamental flaw in Plaintiff's argument. Chief Justice Marshall, in pronouncing the namesake opinion of the canon, limited the canon's reach to "act[s] of Congress." *See* 6 U.S. at 118; *see also Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1152 (7th Cir. 2001) (noting that the *Charming Betsy* canon "has traditionally justified a narrow interpretation of ambiguous *legislation* to avoid violations of international law" (emphasis added)). The rule requiring waiver of the United States' sovereign immunity is not an act of Congress.[18] In contrast, waivers of sovereign immunity are, as required, laid out in statutes (e.g., FTCA, EAJA, etc.). Thus, it makes sense that a canon of construction limited to acts of Congress would be used to interpret those statutory waivers, not the non-statutory waiver requirement itself. Sovereign immunity therefore applies to the United States in this case, and the Court lacks subject matter jurisdiction.

**b.    The *Sosa* Two-Step Test Bars Jurisdiction**

Even if the Court concluded that the United States' sovereign immunity did not preclude Plaintiff's ATS claim, Supreme Court precedent on the ATS still serves as a jurisdictional bar.[19]

---

[18] The sovereign immunity of the United States is instead a common law doctrine derived from English common law. *See United States v. Thompson*, 98 U.S. 486, 488–89 (1878) (describing the English origins of the doctrine of sovereign immunity).

[19] Although the Court's sovereign immunity finding is sufficient to dismiss Plaintiff's ATS claim against the United States, the Court finds it prudent to address this alternative jurisdictional bar. Indeed, Judge Haynes's concurrence in the first *en banc* decision in *Hernandez* provided substantial credit to Plaintiff's sovereign immunity argument. *See Hernandez*, 785 F.3d at 142

The question presented here is whether the purported norm against extrajudicial killing satisfies the *Sosa* two-step test.[20] The Court concludes that it does not.

The first step asks whether extrajudicial killing is a violation of a norm of international law that is sufficiently specific, universal, and obligatory. *See Sosa*, 542 U.S. at 715, 732. Although the Fifth Circuit has not ruled on this issue, at least two other circuit courts have determined that extrajudicial killing is a cause of action for which a federal court has jurisdiction over pursuant to the ATS. *See Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1338, 1344–45 (11th Cir. 2011) (recognizing extrajudicial killing as cognizable under the ATS); *see also In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994) (describing the "prohibition against summary execution" as "universal, definable, and obligatory"); *but see Jesner*, 138 S.Ct. at 1412–13 (Gorsuch, J., concurring) (concluding that the ATS was only meant to cover, at most, causes of action derived from international law that existed at the time of the statute's adoption or those that Congress has explicitly authorized). Because these opinions raise "sufficient doubt" as to whether extrajudicial killing satisfies *Sosa's* first step, and because Plaintiff's ATS claim should be dismissed on the second step regardless,

---

(Haynes, J., concurring). The Court finds that Judge Haynes's concurrence at least warrants discussion of an alternative reason for dismissal on jurisdictional grounds.

[20] The Court also notes that the preclusion of sovereign immunity for *jus cogens* violations may also be a purported norm susceptible to the first step of the *Sosa* test. In other words, the Court could also determine whether the norm precluding sovereign immunity for *jus cogens* violations is itself sufficiently specific, universal, and obligatory in international law to apply in ATS claims. In fact, a split Supreme Court in *Jesner* disagreed about whether the first step of the *Sosa* test applies to only substantive norms (e.g., extrajudicial killing) or whether it also applies to issues of who may be held liable for international law violations (e.g., sovereign immunity). *See Jesner*, 138 S.Ct. at 1420 (Sotomayor, J., dissenting) (discussing the difference between substantive international law norms and mechanisms of enforcing international law norms, i.e., determining what kind of entity may be held liable). Because there is no clear Supreme Court or Fifth Circuit precedent to resolve this dispute, the Court declines to take up the issue, especially in the absence of party briefing. Moreover, as will be discussed below, the second step of the *Sosa* test precludes jurisdiction regardless.

the Court now turns to *Sosa*'s second step. *See Jesner*, 138 S.Ct. at 1402 (dismissing an ATS claim on the second step of *Sosa* without deciding the first because "sufficient doubt" was raised as to whether the relevant norm was specific, universal, and obligatory).

At base, the second step of *Sosa* asks "whether the Judiciary must defer to Congress." *See Jesner*, 138 S.Ct. at 1402. Foreign policy concerns and, by extension, separation of powers issues are the primary motivators for judicial deference. *See Jesner*, 138 S.Ct. at 1403. Plaintiff's suit implicates both, and their implication is sufficient for the Court to exercise judicial discretion and limit the relief available to Plaintiff in federal court.

The Court recognizes first that there are relevant distinctions between the situation here and the epitomal foreign policy concerns raised in *Sosa* and *Jesner*. In both cases, the Supreme Court referenced or dealt with ATS suits against foreign entities. *Sosa*, 542 U.S. at 733 n.21 (explaining the foreign policy concerns that arose from the litigation involving suit against "corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa"); *Jesner*, 138 S.Ct. at 1406–07 (explaining the foreign policy concerns inherent in allowing suit against foreign corporations). The Supreme Court noted that suits against foreign entities may, for example, raise diplomatic tensions between the United States and the entity's country of origin. *Id.* Here, Plaintiff might argue the opposite: that holding the United States accountable for its purported violations of international law will *aid* diplomatic ties between the United States and, in this case, Mexico, as evidenced by the letters from the Mexican ambassador. (*See* Dkt. 77 at 8.) However, the Court believes that the correspondence from Mexico supports, rather than undermines, the need for judicial deference and caution. Where there has already been communication between government officials of both countries, the Court is loath to interject with its own findings on what will or will not be better for the

foreign policy interests of the United States.

The foreign policy concerns here are further laid bare by the Supreme Court's decision in *Hernandez v. Mesa*. As discussed above, *Hernandez* only dealt with the *Bivens* claims that arose from a similar cross-border shooting incident. Even so, the *Hernandez* decision is also instructive in the ATS context due to the similar judicial caution required for *Bivens* claims and the decision's extensive citation to *Jesner*.[21] Thus, the *Hernandez* Court determined that:

> A cross-border shooting is by definition an international incident; it involves an event that occurs simultaneously in two countries and affects both countries' interests. Such an incident may lead to a disagreement between those countries, as happened in this case.

*Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020). The *Hernandez* Court further concluded that "[b]oth the United States and Mexico have legitimate and important interests that may be affected by the way in which this matter is handled." *Id.* at 745. That much is clear here as well where Plaintiff cites extensively to the United States' determinations regarding the Rocking Policy and the Border Patrol agents that have acted pursuant to it and to Mexico's reactions to those determinations. (Dkt. 43 at 16–27.) The *Hernandez* Court goes on to reference the various diplomatic actions that have been taken pursuant to cross-border shooting incidents to further show why judicial interference is not needed and, in fact, discouraged. *Id.* Because this reasoning applies equally to the instant case, the Court concludes that "[i]t is not [the Court's] task to arbitrate between [the United States and Mexico]" and additionally abrogate the longstanding doctrine of sovereign immunity in doing so. *See id.*

Finally, *Hernandez* emphasizes the resulting separation of powers issues that arise when

---

[21] Any doubt as to the relevance of the *Hernandez* decision is further dispelled by the *Hernandez* and *Jesner* Courts' identical citation to *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017) for its holding that Congress, not the Judiciary, is in the best position to decide whether a damages remedy should be provided through a legal action. *Hernandez*, 140 S.Ct. at 750; *Jesner*, 138 S.Ct. at 1402; *see also Nestle USA, Inc.*, 2021 WL 2459254, at *4–5 (plurality opinion) (citing *Hernandez* to caution against judicially created causes of action in an ATS case).

a court fashions a damages remedy, the remedy requested by Plaintiff under the ATS, without considering "the delicate web of international relations." *Id.* at 749. Namely, "Congress, which has authority in the field of foreign affairs . . . [has left] the resolution of extraterritorial claims brought by foreign nationals to executive officials and the diplomatic process." *Id.* at 749–50. Prompted by the Supreme Court's clear mandate to exercise caution and deference when faced with circumstances of international import, the Court must decline Plaintiff's clarion call to upset the governmental balance of power in the United States.[22] Thus, notwithstanding Plaintiff's failure to identify an explicit waiver of sovereign immunity, the Court concludes that it should exercise "case-specific deference to the political branches" and dismiss Plaintiff's ATS claim. *See Sosa*, 542 U.S. at 733 n.21.

**B.      Plaintiff's Motion to Deny Substitution**

The Court now turns to Plaintiff's Motion to Deny Substitution (Dkt. 76). As an initial note, Plaintiff's only remaining claim is the international law claim she asserts against both Boatwright and the United States. (Dkt. 69 at 3.) Thus, if the Court deems the United States' substitution for Boatwright proper, no case remains given that the Court has already determined that the United States is immune from that claim. Because the Court determines that the substitution is proper and that the Motion to Deny Substitution (Dkt. 76) should be denied, the instant suit should be dismissed.

---

[22] This mandate of caution is further buttressed by Judge Haynes's concurrence in the first *en banc* decision in *Hernandez*. *See Hernandez*, 785 F.3d at 142 (Haynes, J., concurring). As noted previously, despite giving substantial credit to the sovereign immunity argument Plaintiff now forwards, Judge Haynes explained that "it is best to leave [issues related to international diplomacy and sovereign immunity] to the Supreme Court or at least to a court more appropriately positioned to address these intricate issues" because it is an "area of great delicacy." *Id.* As a lower court, and therefore not a "more appropriately positioned" court, the Court is therefore obliged to exercise similar, if not more, caution when deciding controversies related to claims brought pursuant to the ATS.

On May 22, 2020, the United States filed a Notice of Substitution (Dkt. 74), which stated that the United States was substituting for Boatwright as a defendant pursuant to 28 U.S.C. § 2679(d)(1). (*Id.* at 2.) Appended to this notice (Dkt. 74) is a Certification of Scope of Employment (Dkt. 74, Attach. 1) signed by C. Salvatore D'Alessio, Jr., the Acting Director of the Torts Branch of the Civil Division of the U.S. Department of Justice.[23] (*Id.* at 1.) The certification (Dkt. 74, Attach. 1) states that "Boatwright was acting within the scope of his federal office or employment at the time of the incident out of which the plaintiffs' claims arose." (*Id.* at 1.)

Plaintiff subsequently filed the pending Motion to Deny Substitution (Dkt. 76). The motion (Dkt. 76) first recognizes that the scope of employment determination is governed by the law of the state in which the alleged misconduct occurred, i.e., Texas law.[24] (*See* Dkt. 76, Attach. 1 at 4.) Notwithstanding this choice of law requirement, Plaintiff argues that the scope of employment inquiry must conform to international law pursuant to the *Charming Betsy* canon. (*Id.* at 4–5 (citing *Charming Betsy*, 6 U.S. at 118).) For this reason, Plaintiff argues that the certification (Dkt. 74, Attach. 1) is improper because international law bars Boatwright's extrajudicial killing, a violation of a *jus cogens* norm, from being within the scope of his employment. (Dkt. 76, Attach. 1 at 5–10.) Specifically, Plaintiff again asserts that a sovereign

---

[23] "[A]ny Director of the Torts Branch, Civil Division, Department of Justice is authorized to make the statutory certification that the Federal employee was acting within the scope of his office or employment with the Federal Government at the time of the incident out of which the suit arose." 28 C.F.R. § 15.4(a).

[24] Plaintiff, in fact, states that the scope of employment determination is governed by the law of the state "in which the person was employed" rather than where the misconduct occurred. (Dkt. 76, Attach. 1 at 4.) The Court notes that this is not a correct statement of the law. However, Parties appear to agree that Texas is the applicable state law for the scope of employment determination. (Dkt. 76, Attach. 1 at 4; Dkt. 79 at 9.) Additionally, the Amended Complaint (Dkt. 43) states that Boatwright was "on the United States' side of the river" at the time of Arevalo's death. (*Id.* at 13.) Accordingly, Plaintiff's misstatement of the law is of no consequence to the issue at hand.

nation has no legal ability to authorize a *jus cogens* violation because "[i]nternational law does not recognize an act that violates *jus cogens* as a sovereign act." (*Id.* at 7–8 (citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 718 (9th Cir. 1992)).) Thus, a federal employee's conduct that violates a *jus cogens* norm cannot be within the scope of employment as a matter of law. (*Id.*)

In response, the United States puts forth two reasons why the certification (Dkt. 74, Attach. 1) and subsequent substitution are proper. First, the United States argues that under Texas law, Boatwright was acting within the scope of his employment at the time of the incident. (Dkt. 79 at 9–17.) Second, it asserts that international law does not dictate the scope of employment determination, even where the relevant incident involves alleged violations of *jus cogens* norms. (*Id.* at 17–18.) Rather, the Government contends that the Westfall Act's scope of employment inquiry is a separate inquiry from deciding whether the federal employee violated a *jus cogens* norm. (*Id.*) The Westfall Act's provision of immunity to federal employees therefore operates "even when such immunity is inconsistent with principles of international law." (*Id.* at 18 (citing *Saleh v. Bush*, 848 F.3d 880, 893 (9th Cir. 2017)).)

### 1. Legal Standard

The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly referred to as the Westfall Act, "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). The Westfall Act provides this immunity by substituting the United States as a defendant when a federal employee has been sued. *See* 28 U.S.C. § 2679(d)(1). Thus, an injured party is typically restricted to an action against the United States under the Federal Tort Claims Act (FTCA), which provides a limited waiver of the United

States' sovereign immunity. *Palmer v. Flaggman*, 93 F.3d 196, 199–200 (5th Cir. 1996).

More specifically, the Westfall Act states that "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim in a United States district court shall be deemed an action against the United States . . . and the United States shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(1); *see Bolton v. United States*, 946 F.3d 256, 259 (5th Cir. 2019) (stating that substitution occurs "by operation of law" upon the Attorney General's certification). However, the Attorney General's certification is judicially reviewable for the purpose of substituting the United States as the defendant. *Bolton*, 946 F.3d at 260 (citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995)).

The plaintiff has the burden to show that the defendant employee's conduct was not within the scope of his employment. *Id.* To fulfill this burden, "the plaintiff must allege . . . specific facts that, taken as true, would establish that the defendant's actions exceeded the scope of his employment."[25] *Id.* (quoting *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013)). Moreover, the scope of employment question is determined by "the law of the state in which the alleged misconduct occurred." *Id.* (quoting *Palmer*, 93 F.3d at 199).

### 2. Boatwright's Scope of Employment under Texas Law

Because the alleged misconduct occurred in Texas, the Court first turns to Texas law to determine whether Boatwright was acting within the scope of his employment.

---

[25] The Fifth Circuit has held that "in resolving whether a government employee was acting within the scope of his employment under the FTCA . . . a 12(b)(6) or summary judgment standard . . . should be applied." *M.D.C.G. v. United States*, 956 F.3d 762, 769 (5th Cir. 2020). Because the Court determines that Plaintiff's Motion to Deny Substitution (Dkt. 76) can be denied even assuming all the facts in her Amended Complaint (Dkt. 43) are true, the Court applies a 12(b)(6) standard. *See id.* (using a 12(b)(6) standard for the scope of employment inquiry and accepting the allegations contained in the complaint as true and viewing the facts in the light most favorable to the plaintiffs).

### a. Texas Law on the Scope of Employment

To find that an employee acted within the scope of employment under Texas law, the employee's action must be: (1) within the scope of the employee's general authority; (2) in furtherance of the employer's business; and (3) done for the accomplishment of the object for which the employee was hired. *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). Further, "the conduct must be of the same general nature as that authorized or incidental to the conduct authorized." *Id.* "Conduct falls outside the scope of employment when it occurs 'within an independent course of conduct not intended by the employee to serve *any* purposes of the employer.'" *Garza v. Harrison*, 574 S.W.3d 389, 400 (Tex. 2019) (emphasis in original) (citing *Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014)).[26]

Furthermore, the scope of employment inquiry is "fundamentally objective" and asks: "Is there a connection between the employee's job duties and the alleged tortious conduct?" *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017) (holding that the subjective intent of the employee is irrelevant as long as the objective connection exists). Accordingly, in Texas, "an employer may be vicariously liable for intentional torts . . . 'when the act, although not specifically authorized by the employer, is closely connected with the employee's authorized

---

[26] The Court recognizes that *Garza v. Harrison*, and a number of the other Texas state cases cited in this Order, dealt with the Texas Tort Claims Act (TTCA). The TTCA, similar to the FTCA and Westfall Act, provides a limited waiver of governmental immunity and requires the substitution of the government if the government employee was acting within the scope of his employment at the time of the alleged tortious conduct. *See Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017). The Texas Supreme Court has noted multiple times that the "scope of employment" inquiry in the TTCA is akin to the "traditional scope-of-employment analysis in *respondeat superior* cases." *See id.* at 753 ("We presume the Legislature knew of our longstanding approach to the scope-of-employment analysis and see nothing in the Tort Claims Act compelling a different approach."); *see also Garza*, 574 S.W.3d at 404–05 (same). The Court therefore views the Texas court decisions on the scope of employment inquiry in the TTCA as highly persuasive for this Court's own scope of employment inquiry under the Westfall Act, absent any indication to the contrary.

duties.'" *M.D.C.G. v. United States*, 956 F.3d 762, 769 (5th Cir. 2020) (citation omitted). Thus, "a government employee is discharging generally assigned job duties if the employee was doing his job at the time of the alleged tort." *Garza*, 574 S.W.3d at 401.

Moreover, the scope of employment inquiry is only concerned with "whether the general conduct was within the scope of employment instead of whether the specific act was somehow wrongful." *Fink v. Anderson*, 477 S.W.3d 460, 470 (Tex. App. 2015) (collecting decisions by Texas appellate courts using this analytical framework); *see, e.g., Garza*, 574 S.W.3d at 401 (considering a police officer's "attempt[] to arrest a suspect for a crime committed in plain view" as the relevant conduct for a scope of employment inquiry rather than the officer's alleged use of excessive force); *Lopez v. Serna*, 414 S.W.3d 890, 894 (Tex. App. 2013) ("That is, an employee's scope of authority extends to job duties to which the official has been assigned, even if the official errs in completing the task."). Thus, even intentionally wrongful or assaultive acts do not necessarily take an employee's conduct outside of the scope of employment. *See Medina v. Herrera*, 927 S.W.2d 597, 601 (Tex. 1996) (explaining that a security guard using more force than is necessary to protect an employer's property may still be within the scope of employment); *see also Brisco v. City of Lancaster, Texas*, 2020 WL 6162042, at *2 (N.D. Tex. Oct. 21, 2020) (concluding that the wrongfulness of a police officer's "unnecessary and unwarranted force" when arresting a suspect did not remove his conduct from the scope of employment). While "serious criminal activity" almost never falls within the scope of employment, "even criminal acts can be in the course and scope and impute liability *if the acts are foreseeable considering the employee's duties*." *Ross v. Marshall*, 426 F.3d 745, 764–65 (5th Cir. 2005) (emphasis in original) (citing *Williams v. United States*, 71 F.3d 502, 506 n.10 (5th Cir. 1995)) (analyzing Texas *respondeat superior* law).

b.    **Analysis**

Starting at the central "fundamentally objective" question, the Court finds a connection between Boatwright's job duties and the tragic shooting of Arevalo. *See Laverie*, 517 S.W.3d at 753. Specifically, Boatwright's use of deadly force in the course of interdicting an individual attempting to unlawfully enter the United States fell within the scope of his general authority. The United States contends, and Plaintiff does not dispute, that Boatwright was "on duty, patrolling the U.S./Mexico border, on a government-issued vehicle, alongside a government co-worker, [and] in the course of thwarting an unlawful entry in the United States" at or around the time of the shooting. (Dkt. 79 at 13.) Apprehending individuals who attempt to unlawfully enter the United States is one of the primary responsibilities of the U.S. Border Patrol. *See* 6 U.S.C. § 211(e)(3)(A). Further, Border Patrol agents, in conducting their enforcement activities, are authorized to use deadly force in certain circumstances. *See* 8 U.S.C. § 1357(a); 8 C.F.R. § 287.8(a)(2). Certainly, the regulatory framework delimits deadly force authority to situations where the Border Patrol agent has "reasonable grounds to believe such force is necessary" to protect himself or others from imminent death or serious injury. *See id.* However, as stated in the previous section, Texas law instructs the Court to determine whether Boatwright's general conduct was within the scope of his employment, rather than to evaluate whether that conduct was "wrongful." *See Fink*, 477 S.W.3d at 470. Scrutinizing whether Boatwright's use of deadly force was "reasonable," or characterizing his conduct as "grossly excessive" as Plaintiff does, would be doing just that. (*See* Dkt. 43 at 14.) Thus, Boatwright's use of deadly force in the course of apprehending an individual attempting to unlawfully enter the United States was "of

the same general nature as that authorized or incidental to the conduct authorized."[27] *See Minyard*, 80 S.W.3d at 577.

The Court also acknowledges, but ultimately rejects, the argument that Boatwright was no longer acting in his capacity as a Border Patrol agent the moment he used deadly force. *See Harris Cty. v. Gibbons*, 150 S.W.3d 877, 882 (Tex. App. 2004) ("[W]hen determining the status of an officer, we must ask 'in what capacity was the officer acting at the time he committed the acts for which the complaint was made?'" (citation omitted)). Put differently, the Court must determine whether Boatwright's attempted apprehension of the swimming individual and his use of deadly force should be considered as distinct courses of conduct. If so, his use of deadly force should be properly construed as an "independent course of conduct not intended by the employee to serve *any* purposes of the employer." *See Garza*, 574 S.W.3d at 389. The Court concludes that Boatwright was acting in his capacity as a Border Patrol agent at the time of the shooting.

Plaintiff raises this issue by explaining that "Boatwright was not arresting, apprehending, or detaining Mr. Arevalo," and neither Arevalo nor anyone on the Mexican side of the river was interfering with the arrest of the swimming individual at the time of the incident. (Dkt. 80 at 9–10.) The Court first notes that the regulation authorizing use of deadly force contains no limitation that deadly force may only be used against someone a Border Patrol agent is arresting, apprehending, or detaining. *See* 8 C.F.R. § 287.8(a)(2). In fact, it contains no direct limitation as to who may be targeted by deadly force. *See id.* Thus, Boatwright's use of deadly force against

---

[27] Plaintiff argues primarily that Boatwright's conduct cannot and should not be considered "incidental" to the conduct authorized based on the lack of causal connection between the attempted arrest of the swimming individual and Arevalo's death. (Dkt. 80 at 9–11.) The Court believes these arguments are better characterized as claims that Boatwright's actions fell within an "independent course of conduct" outside the scope of his employment, which the Court addresses shortly. Regardless, because the Court concludes that Boatwright's actions were not within an independent course of conduct, it also concludes that his actions were at least incidental to the conduct authorized.

someone who was not the swimming individual does not automatically demonstrate an independent course of conduct.

The next question is whether Boatwright was no longer "doing his job at the time of the alleged tort." *See Garza*, 574 S.W.3d at 401. In *M.D.C.G. v. United States*, the Fifth Circuit was faced with the same general issue as in the instant case: whether a Border Patrol agent fell within the scope of his employment under Texas law for purposes of the Westfall Act. 956 F.3d 762, 768–69 (5th Cir. 2020). There, a Border Patrol agent detained three unauthorized aliens for an extended period of time, drove them to a remote location, and then physically and sexually assaulted them. *Id.* at 766. The Fifth Circuit recognized that a Border Patrol agent "had the authority to detain suspected unauthorized aliens and use force in effectuating an arrest." *Id.* at 770 (citing 8 C.F.R. § 287.8). However, the *M.D.C.G.* court concluded that this "authority is light years from asserting that [the Border Patrol agent's conduct] w[as] done in furtherance of these authorized duties." *Id.* at 769–70 ("When [the Border Patrol agent] drove [his victims] away from the duty station, took them to a remote location, placed tape over their mouths and wrists, and began to physically and sexually assault them, it is needless to say further that he was not working to advance his employer's business.").

The Court determines that *M.D.C.G.* is distinguishable and that Boatwright's conduct was in furtherance of at least some purpose of his employer for two reasons. First, an employee's conduct can be "so connected with and immediately arising out of authorized employment tasks as to merge the task and the assaultive conduct into one indivisible tort imputed to the employer." *Id.* at 770 (citing *Buck v. Blum*, 130 S.W.3d 285, 289 (Tex. App. 2004)); *see also Houston Transit Co. v. Felder*, 208 S.W.2d 880, 882 (Tex. 1948) (holding that even if an employee's isolated act would not be imputed to the employer, the employer can still be held

liable where the act is "so connected with and immediately grows out of another act of the servant imputable to the master"). For example, in *Durand v. Moore*, a bouncer at a nightclub physically assaulted an individual waiting in line after merely having a discussion with him regarding why the bouncer had given preferential treatment to certain customers. 879 S.W.2d 196, 200 (Tex. App. 1994). The *Durand* court concluded that the bouncer acted within the scope of his employment based on his general authority to use force, even if his conduct had been an "overzealous enforcement of the criteria and procedures used to select waiting customers for admittance into the club." *See id.*; *see also G.T. Mgmt., Inc. v. Gonzalez*, 106 S.W.3d 880, 884 (Tex. App. 2003) (concluding that "the bouncers were authorized to use force, and their assault of [the plaintiff] was incidental to their use of that force" where the bouncers injured the plaintiff because they suspected him of having thrown a bottle, which the plaintiff denied).

Here, the Court concludes that Boatwright's shooting of Arevalo was sufficiently connected to and immediately arising out of his authorized employment task of apprehending the swimming individual to constitute an indivisible course of conduct. Unlike in *M.D.C.G.*, where the Fifth Circuit noted the geographic and temporal distance between the Border Patrol agent's initial detention and eventual assault on the unauthorized aliens, the events at issue here denote both immediacy and proximity. *See M.D.C.G.*, 956 F.3d 762. Moreover, Plaintiff's Amended Complaint (Dkt. 43) indicates that directly preceding the shooting, "the families on the Mexican side of the river began to shout at the Agents to stop before they killed the [swimming individual]." (*Id.* at 14.) Apparently in response to this vocal protest, the Border Patrol Agents then indiscriminately fired into the crowd.[28] (*See* Dkt. 43 at 14 (describing the shooting as

---

[28] To the extent that Plaintiff argues there was no connection between Arevalo's death and the attempted arrest of the swimming individual, the Court disagrees. (*See* Dkt. 80 at 8–12.) As alleged, the attempted apprehension of the swimming individual gave rise to the vocal protests

"spraying rounds across the river, over the border, and into Mexico"); *see also* Dkt. 80 at 7.) Considering all these details, the Court sees little difference, at least in kind, between the "overzealous enforcement" in *Durand* and Boatwright's alleged unreasonable use of deadly force. Like in *Durand* and the other excessive force cases cited above, the degree of force—or the use of force at all—was allegedly unwarranted against the victim of that force. However, because the use of force was generally authorized and the defendant was generally conducting himself as an employee at the time and place of the incident, the particular use of allegedly wrongful force was, as here, within the scope of the defendant's employment.[29]

Second, Plaintiff's own allegations alleviate any remaining doubts as to Boatwright's capacity as a Border Patrol agent at the time of the incident. Plaintiff's description of the Rocking Policy makes clear that the United States—through supervisory government officials at DHS and CBP—authorized Border Patrol agents to: (1) use deadly force in response to rock throwing, even when unwarranted; and (2) "falsely assert that persons whom they shoot and kill were throwing rocks." (Dkt. 43 at 36.) Moreover, Plaintiff describes Sergio Hernandez's shooting as an instance where these government officials were aware of and assented to a Border Patrol agent killing an "unarmed, unthreatening teenager" where no rocks had been thrown at the agent. (*Id.* at 25–26.) Taking these claims as true, the Court must conclude that Boatwright's

---

by people on the Mexican side of the river, which in turn gave rise to the indiscriminate shooting by Boatwright and, subsequently, Arevalo's death. To be clear, the Court's determination of this connection is not, as Plaintiff contends, an indication that "[indiscriminate shooting] is a normal method of accomplishing an arrest and is expected to occur during an arrest." (*See id.* at 7.) It is only an indication that Boatwright's acts, however heinous they are alleged to have been, fell within the scope of his employment.

[29] The fact that the Border Patrol Agents did not complete their apprehension of the swimming individual after the shooting also does not persuade the Court that the connection between the attempted arrest and the shooting is lacking. (*See* Dkt. 80 at 10.) Plaintiff cites no case law, and the Court can find none, that indicates that a law enforcement officer must complete their authorized course of conduct for a tortious act to be found within the scope of employment.

conduct was either "closely connected with [his] authorized duties," or at least "foreseeable considering his duties," and therefore not his own independent course of conduct.[30] *See Ross*, 426 F.3d at 765; *M.D.C.G.*, 956 F.3d at 769; *see also Alexander*, 435 S.W.3d at 792 (concluding that law enforcement officers' conduct fell within the scope of their employment because the plaintiff's "tort claims against the officers [were] identical to the tort claims she brought against [the county] in federal court, which were based on principles of vicarious liability").

Finally, taking as true that the United States authorized the Rocking Policy, the Court must also conclude that Boatwright's conduct pursuant to that policy was in furtherance of Border Patrol business and done for the accomplishment of the object for which he was hired. *See Minyard*, 80 S.W.3d at 577. According to Plaintiff, when the Border Patrol Agents "opened fire on a beach full of picknickers on September 3, 2012, they did so knowing that [supervising officials] had for years known of, acquiesced in, and condoned other similar killings." (*Id.* at 18.) Therefore, under Texas law, Boatwright's conduct was within the scope of his employment.

### 3.  Boatwright's Scope of Employment under International Law

Having determined that Boatwright acted within the scope of his employment under Texas law, the Court now addresses whether international law affects that determination. It does not.

Plaintiff argues that the *Charming Betsy* canon requires the Court to construe the Westfall Act's provision of immunity to federal employees so as not to conflict with international law.

---

[30] To be sure, Plaintiff is correct that she is entitled to plead in the alternative that Boatwright was, or was not, working in the course and scope of his employment. (Dkt. 76, Attach. 1 at 5 n.3.) *See* Fed. R. Civ. P. 8(d)(2). However, Plaintiff does not make any alternative *factual* statements as to whether the government officials knew about or authorized the Rocking Policy. Plaintiff's pleadings are consistent in their claim that Boatwright's supervisors both knew of and condoned the Border Patrol shootings of individuals who threw rocks and the false assertions by Border Patrol agents to justify shootings of individuals even when rocks had not actually been thrown. (*See, e.g.*, Dkts. 43, 77.)

(Dkt. 80 at 12.) Specifically, Plaintiff states that the Westfall Act cannot provide immunity to federal employees that have committed *jus cogens* violations because according to international law, "[a] sovereign has no legal ability to authorize the employee to engage in that conduct." (Dkt. 76 at 8.) In other words, the government employee's act that would normally be attributed to the sovereign is no longer a "sovereign act." (*Id.*) In response, the United States contends that the Westfall Act's provision of immunity controls regardless of international law and cites a number of federal court cases to that effect. (Dkt. 79 at 18.)

As an initial note, Plaintiff's invocation of the *Charming Betsy* canon is somewhat more persuasive in the context of the Westfall Act than in the context of sovereign immunity because the Westfall Act is an "act of Congress" that is amenable to construction. However, Plaintiff's argument still fails for three reasons: (1) Boatwright's immunity is effective because it derives from the United States' own sovereign immunity, which is also effective; (2) the alleged *jus cogens* nature of Boatwright's conduct does not otherwise undermine the Westfall Act's scope of employment inquiry; and (3) *Sosa*'s second step precludes Plaintiff's ATS claim against Boatwright in the same way it precludes Plaintiff's ATS claim against the United States.

First, it would be nonsensical to provide immunity to the United States but not to Boatwright for the same alleged conduct, especially where Boatwright's Westfall Act immunity derives from the same principles of sovereign immunity. As noted by the Fourth Circuit in *Yousuf v. Samantar*, a case cited by Plaintiff, international law provides that "any act performed by an individual as an act of the State enjoys the immunity which the State enjoys."[31] 699 F.3d

---

[31] Indeed, the Supreme Court in *United States v. Smith* explained that Congress intended for the immunity provided to federal employees acting within the scope of their employment to be co-extensive with the United States' own sovereign immunity, at least for purposes of the FTCA. *See* 499 U.S. 160, 165, 175 (1991) (concluding that the Westfall Act immunizes federal

763, 774 (4th Cir. 2012). The Court has already determined that the United States retains sovereign immunity from Plaintiff's ATS claim. Accordingly, Boatwright, acting within his official capacity, "enjoys" that immunity as well.[32]

Second, having determined that Boatwright's alleged *jus cogens* violation does not *per se* abrogate Westfall Act immunity, the Court also determines that the alleged *jus cogens* nature of Boatwright's conduct does not otherwise take his conduct out of the scope of his employment. This is because a *jus cogens* categorization is an indication of an act's wrongfulness, not evidence of the actor's employment status. *See, e.g., Yousuf*, 699 F.3d at 775 (describing *jus cogens* violations as "atrocities"). This distinction has been laid out persuasively by a number of federal courts. *See, e.g., Saleh v. Bush*, 848 F.3d 880, 893–94 (9th Cir. 2017) (holding that Westfall Act immunity applied even where the *jus cogens* violation was assumed); *Ali v. Rumsfeld*, 649 F.3d 762, 774–75 (D.C. Cir. 2011) (explaining that Westfall Act immunity was only concerned with whether a federal employee was acting within the scope of his employment, not whether the employee had committed "serious criminal conduct," like in the case of a *jus cogens* violation); *see also Schneider v. Kissinger*, 310 F.Supp.2d 251, 265 (D.D.C. 2004) (In the Westfall Act context, "[d]efining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held liable for that conduct, an employee or his boss.").

employees when an FTCA exception precludes recovery against the United States as a matter of sovereign immunity).

[32] The Court recognizes Plaintiff's argument that Boatwright could not have acted in his "official capacity" because he committed a *jus cogens* violation. However, because that argument is premised off the assumption that his act was not sovereign in nature, the Court's conclusion that the United States retains its sovereign immunity precludes that prerequisite assumption. The Court would otherwise have to find that the alleged conduct was sovereign in nature for the United States but not sovereign in nature for Boatwright, who was acting in his capacity as an employee of the United States. The Court declines to do so.

Plaintiff makes a throwaway argument that further elucidates this distinction. Without much explanation, Plaintiff contends that "Texas law on scope of employment . . . must be construed to conform to international law." (Dkt. 76, Attach. 1 at 5.) Even assuming this was true, Plaintiff would receive no benefit. In fact, as explained above, Texas law very clearly draws the distinction between the wrongfulness of the alleged tortious conduct and whether that conduct was in the scope of the tortfeasor's employment. *Fink*, 477 S.W.3d at 470. Moreover, at base, Plaintiff's *jus cogens* argument is that Boatwright's conduct was not within the scope of his employment with the United States because the United States "ha[d] no legal ability to authorize [him] to engage in that conduct." (*Id.* at 8.) Texas law again provides no benefit because it allows an employer to be held vicariously liable for its employees' foreseeable criminal acts, which the employer presumably has no legal ability to authorize. *See Ross*, 426 F.3d at 764–65. Thus, whether Boatwright's conduct constituted a *jus cogens* violation does not change the Court's conclusion that his conduct fell within the scope of his employment under the Westfall Act and that his substitution was therefore proper.[33]

Finally, and third, even if the Court were to find that international law precluded Boatwright's Westfall Act immunity, *Sosa*'s second step blocks Plaintiff's claim. Plaintiff's ATS claim against Boatwright implicates the same foreign policy and separation of powers concerns

---

[33] For the sake of judicial completeness, the Court notes that the Supreme Court of Texas explicitly declined to consider whether "a peace officer acting beyond his or her official power to act could ever be doing so in an official capacity." *Garza*, 574 S.W.3d at 403. The Court recognizes some similarity between that question and the "sovereign act" distinction raised by Plaintiff's sovereign immunity arguments. However, the *Garza* court declined to answer the question because the officer "was carrying out general duties of a peace officer pursuant to an express legislative grant of authority," the same conclusion reached by the Court with regard to Boatwright. *See id.* at 404. Given that, and the Court's evaluation of Texas law on the scope of employment in general, this off-hand contemplation in *Garza* does nothing to persuade the Court that international law, as argued by Plaintiff, changes how Texas courts would view Boatwright's conduct.

that her ATS claim against the United States raises. In fact, the Supreme Court's decision in *Hernandez* is likely even more analogous to her claim against Boatwright because *Hernandez* also dealt with claims against an individual officer. *See Hernandez*, 140 S.Ct. at 740. Thus, all of the reasons that required judicial deference and caution in relation to an ATS claim against the United States in this particular case also apply to the ATS claim against Boatwright. Moreover, the Attorney General's certification (Dkt. 74, Attach. 1) and the Court's own conclusion that Boatwright acted within the scope of his employment with the United States at the time of the incident is ample indication that the same foreign policy concerns flow from both Plaintiff's claim against Boatwright and her claims against the United States.

### 4. Request for Discovery

Finally, Plaintiff requests discovery on the scope of employment issue. (Dkt. 80 at 12.) A plaintiff has a right to limited discovery on the scope of employment inquiry under the Westfall Act where "she alleges facts that plausibly suggest [the government employee] acted outside the scope of [his] employment." *White v. United States*, 419 F.App'x 439, 443 (5th Cir. 2011). Here, because the Court concludes that Boatwright was acting within the scope of his employment even assuming all of Plaintiff's pleaded facts are true, no discovery is necessary.

<u>Conclusion</u>

For the foregoing reasons, the United States' Motion to Dismiss (Dkt. 75) is hereby GRANTED and Plaintiff's Motion to Deny Substitution (Dkt. 76) is hereby DENIED.[34] Plaintiff's claims against Defendant United States of America are further DISMISSED WITHOUT PREJUDICE for lack of jurisdiction. A separate Judgment will be entered.

---

[34] As stated above, the United States' substitution to replace Boatwright occurred by operation of law; the Court need not mandate the substitution itself. Because the Court denies the Motion to Deny Substitution (Dkt. 76), the United States is the only remaining defendant, and its dismissal therefore dismisses the entire case.

The Clerk of Court is hereby DIRECTED to TERMINATE this case.

IT IS SO ORDERED.

SIGNED this 15th day of September, 2021.

_____
Diana Saldaña
United States District Judge