## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| VIKY SARAI FLORES BENITEZ, | : | CIVIL CASE NO. |
| ANA DELMI BENITEZ ALVARADO, | : | 3:22-CV-00884 (JCH) |
| JAVIN BENIGNO SANTOS GALVEZ, | : |  |
| And J.S.R., a minor, | : |  |
|     Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| STEPHEN MILLER, JEFFERSON B. | : | AUGUST 17, 2023 |
| SESSIONS, KIRSTJEN NIELSEN, | : |  |
| KEVIN McALEENAN, and | : |  |
| UNITED STATES OF AMERICA, | : |  |
|     Defendants. | : |  |
|  | : |  |

**RULING ON DEFENDANT'S MOTION TO DISMISS (DOC. NO. 35)**

## I.      INTRODUCTION

Plaintiffs Viky Sarai Flores Benitez ("Ms. Flores Benitez"), Ana Benitez Alvarado ("Ms. Benitez Alvarado"), Javin Benigno Santos Galvez ("Mr. Santos Galvez"), and J.S.R. bring this action pursuant to the Alien Tort Statute ("ATS") and the Federal Tort Claims Act ("FTCA").  The plaintiffs alleged torture and inhumane treatment as well as several other causes of action arising out of the Trump Administration's now-rescinded Zero Tolerance Policy, which intentionally separated migrant children from their parents.

Before this court is the Motion to Dismiss ("Mot. to Dismiss") (Doc. No. 35) of defendants Stephen Miller, Jefferson B. Sessions, Kirstjen Nielsen, Kevin McAleenan, and the United States of America's (the "Government"), which the plaintiffs oppose. See Memorandum of Law in Opposition to Motion to Dismiss ("Pls.' Mem.) (Doc. No. 49).

1

For the reasons discussed below, the court grants in part and denies in part the Motion to Dismiss.

## II.     BACKGROUND[1]

### A.     Statutory and Regulatory Framework for Removal and Detention of Noncitizens

Noncitizens who are present in the United States "without being admitted or paroled" are "inadmissible" and subject to removal.  8 U.S.C. § 1182(a)(6)(A)(i).  A noncitizen who enters the United States "at any time or place other than as designated by immigration officers," or "eludes examination or inspection by immigration officers" is subject to criminal prosecution.  Id. § 1325(a).  Similarly, a noncitizen who reenters the country after being removed is also subject to criminal sanction, id. § 1326(a), and an earlier removal order is "reinstated from its original date", id. § 1231(a)(5).

However, a noncitizen may not be removed to a country from which they are seeking asylum due to a threat to the individual's life or freedom.  8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16–18.  As such, these noncitizens may be eligible for "withholding of removal," assuming they can establish a "reasonable fear" of persecution or torture.  8 C.F.R. §§ 208.31(a)–(b), (e), 241.8(e).  If an asylum officer determines that, following an interview, a noncitizen possess such a "reasonable fear", the officer must refer the case to an immigration judge, who considers the request for withholding of removal.  See 8 C.F.R. § 208.31(e).  While a noncitizen awaits removal

---

[1] Other than the section on the statutory and regulatory framework for removal of noncitizens, see, infra, Section II.A, the facts in this Section are drawn from the well-pleaded allegations in the Complaint.  See Complaint ("Compl.") (Doc. No. 1).  Because at the motion to dismiss stage the court must accept all factual allegations in the Complaint as true, "we describe the facts as alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and construing any ambiguities in the light most favorable to upholding the plaintiff's claim."  Sung Cho v. N.Y.C., 910 F.3d 639, 642 n.1 (2d Cir. 2018) (internal quotation marks and citations omitted).

or a decision regarding removal, the Government "shall arrange for appropriate places of detention. . . ."  8 U.S.C. § 1231(g)(1).

With respect to unaccompanied minors, the Department of Health and Human Services' ("HHS") Office of Refugee Resettlement ("ORR") is tasked with "the care and placement of unaccompanied alien children [("UAC")] who are in Federal custody by reason of their immigration status[.]"  6 U.S.C. § 279(b)(1)(A).  A UAC is defined as any child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) either has "no parent or legal guardian in the United States" or has "no parent or legal guardian in the United States [who] is available to provide care and physical custody."  Id. § 279(g)(2).

Pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child."  8 U.S.C. § 1232(b)(3).  Once transferred to ORR, the child "shall not [be] release[d] . . . upon their own recognizance."  6 U.S.C. § 279(2)(B).  In addition, ORR cannot place a child in a person's custody without first determining that "the proposed custodian is capable of providing for the child's physical and mental well-being," including by verifying the proposed "custodian's identity and relationship to the child, if any, as well as [making] an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  8 U.S.C. § 1232(c)(3)(A).

Beyond the aforementioned statutory framework, the United States is also bound by a 1996 settlement agreement, known as the <u>Flores</u> Settlement Agreement, which established "the minimum standards for the detention, housing, and release of non-citizen juveniles who are detained by the government, and obliges the government to pursue a general policy favoring release of such juveniles." <u>Flores v. Sessions</u>, 862 F.3d 863, 866 (9th Cir. 2017) (internal quotation marks and citation omitted). The <u>Flores</u> Settlement Agreement applies to accompanied and unaccompanied minors alike, <u>see</u> <u>Flores v. Lynch</u>, 828 F.3d 898, 905 (9th Cir. 2016), and demands that where detention is necessary, the United States transfer the child to "a non-secure, licensed facility" within "five days of arrest[.]" <u>Id.</u> at 902. The United States must also "make and record the prompt and continuous efforts on its part toward . . . the release of the minor" to specific potential guardians. <u>Flores v. Rosen</u>, 984 F.3d 720, 738 (9th Cir. 2020).

B.    "[T]he Human Tragedy"[2] of the Zero Tolerance Policy

Between March and November 2017, defendants Miller, Nielsen, and McAleenan, among other officials, initiated a family separation pilot program in El Paso, Texas. Compl. ¶¶ 102–03. Defendants Nielsen, McAleenan, and other officials then supervised the creation of a December 2017 policy memorandum, which called for parents to "be prosecuted for illegal entry . . . and the minors present with them [to] be placed in [HHS] custody" in an effort to substantially deter migrant families from traveling across the United States' southern border. <u>Id.</u> ¶ 104. As defendant Miller noted in a July 2019 email, "[m]y mantra has persistently been presenting aliens with

---

[2] This language is from the Biden Administration's Executive Order creating a task force to reunify families separated under the Zero Tolerance Policy and was cited in the Government's Memorandum of Law in Support of the Motion to Dismiss. <u>See</u> Def.'s Mem. at 1–2.

multiple unsolvable dilemmas to impact their calculus for choosing to make the arduous journey to begin with." Id. ¶ 143. At another juncture, defendant Miller averred, "I would be happy if not a single refugee foot ever again touched American soil." Id. ¶ 144.

On April 6, 2018, defendant Sessions issued a memorandum instituting a "Zero Tolerance" Policy for people unlawfully entering the United States. Id. ¶ 107. The Policy mandated the prosecution of all people who crossed the Southwest border for the misdemeanor offense of illegal entry. Id. Prior to the policy change, less than one-third of people apprehended crossing the border were criminally prosecuted. Id. ¶ 109. Furthermore, family separation had not been the norm, with parents only getting separated from their children "if the adult had a criminal history or an outstanding warrant, or if [Customs and Border Protection (CBP)] could not determine whether the adult was the child's parent or guardian." Id. ¶ 167.

On May 4, 2018, the Department of Homeland Security ("DHS")—under defendant Neilsen's leadership—instructed Border Patrol officers on how to implement the Zero Tolerance Policy. Id. ¶ 140. In practice, DHS referred parents to the Department of Justice ("DOJ") for prosecution, with DHS transferring the parent— without their child—to the custody of the U.S. Marshals. Id. ¶ 112. The prosecutions were swift—often concluding in forty-eight hours or less—but DHS refused to reunite families after parents were returned to the agency's custody. Id. ¶¶ 112–13. Instead, in the short period during which the parents were prosecuted, DHS classified the children as UACs and transferred them to the custody of ORR. Id. ¶¶ 113, 134, 136. "In some cases, DHS purposely transferred parents to another facility after DOJ completed a prosecution, in order to separate a family." Id. ¶ 116.

DHS officials balked at reunification and, in one May 10, 2018 email, ordered CBP "to prevent this from happening" and requested confirmation "that the expectation is that we are NOT to reunite the families and release." Id. ¶¶ 114–115. Indeed, DHS and HHS had "no procedures or systems" to "track separated families." Id. ¶ 152. Nor did DHS, and defendants Nielsen and McAleenan, in particular, warn ORR that many more traumatized children would be sent their way, leaving ORR facilities and foster families unable to provide the medical, mental health, and other services that these children desperately needed. Id. ¶ 151.

In February 2018, Immigration and Customs Enforcement ("ICE") as well as defendants Sessions, Nielsen, and McAleenan were sued in their official capacity over the Government's family separation policy. Id. ¶ 176; Ms. L. v. v. U.S Immigr. & Customs Enf't, 310 F. Supp. 3d 1133, 1137 (S.D. Cal. 2018) ("Ms. L. II"). On June 26, 2018, the Ms. L. II Court issued a preliminary injunction enjoining the Zero Tolerance Policy and mandating the commencement of reunification efforts. 310 F. Supp. 3d at 1149–50. Additionally, the Ms. L. II Court barred the Government from separating families "absent a determination that the parent is unfit or presents a danger to the child . . . ." Id. at 1149.

C.    Separation of Ms. Flores Benitez and Ms. Benitez Alvarado

In May 2018, Ms. Benitez Alvarado fled El Salvador with her then-fourteen-year-old daughter, Ms. Flores Benitez. Compl. ¶ 25. Prior to leaving, the two spent months in hiding after Ms. Benitez Alvarado's domestic partner was murdered by members of the  Mara Salvatrucha gang ("MS-13"). Id. Mother and daughter crossed the Rio Grande River on a raft, arriving in the United States around May 13, 2018. Id. ¶ 26. Shortly thereafter, the two were detained by CBP agents and confined in a facility

known as the <u>hielera</u> (or "icebox," in English). <u>Id.</u> ¶¶ 26–27. While in the facility, Ms. Benitez Alvarado and Ms. Flores Benitez were forced to sleep on the floor in frigid temperatures—with only aluminum blankets to keep them warm—and denied the opportunity to bathe. <u>Id.</u> ¶ 27. Despite being apprehended and detained together, on May 15, 2018, DHS processed Ms. Flores Benitez separately from her mother and classified her as an "unaccompanied juvenile", as required by the Zero Tolerance Policy. <u>Id.</u> ¶ 28.

On or about May 16, 2018, immigration officers told Ms. Benitez Alvarado that they were briefly taking her daughter to shower—her first opportunity to do so since being detained at the <u>hielera</u>—but this was merely a ruse to separate the two. <u>Id.</u> ¶¶ 30–32. Ms. Benitez Alvarado remained detained and distressed, in Texas, while her daughter was transferred to the custody of ORR at the Noank Community Support Services shelter in Groton, Connecticut. <u>Id.</u> ¶¶ 34, 45. When Ms. Benitez Alvarado asked about her daughter's whereabouts, immigration officers responded in different ways: some said that they did not know where she was or that she was in Houston, and others mocked her distress and insinuated that Ms. Flores Benitez was not her daughter. <u>Id.</u> ¶¶ 32, 47, 49.

Immigration officers attempted to capitalize on Ms. Benitez Alvarado's anguish over her daughter by coercing her into waiving her rights to seek asylum in the United States. <u>Id.</u> ¶ 50–53. After being told that she would be detained without her daughter for months if she did not sign away her rights, Ms. Benitez Alvarado finally relented and agreed to be deported. <u>Id.</u> ¶¶ 50–52.

In Connecticut, shelter staff were unable to interview Ms. Flores Benitez upon arrival because she could not stop crying. Id. ¶ 35. For nearly one month, no one was able to tell her where her mother was. Id. ¶ 37. On or about June 13, 2018, Noank staff finally tracked Ms. Benitez Alvarado down to a facility in Encinal, Texas. Id. ¶ 38. Eight days after that, Ms. Flores Benitez had her first contact with her mother—a ten-minute phone call during which both parent and child were too distraught to speak. Id. ¶ 39, 54.

### D.    Separation of J.S.R. and Mr. Santos Galvez

Around April 2018, Mr. Santos Galvez and his then-nine-year-old son J.S.R. fled Honduras. Id. ¶ 59. Their lives were in jeopardy as a result of Mr. Santos Galvez's efforts in support of the National Party of Honduras. Id. ¶ 58. The two traveled north for months and attempted to make a new life in Mexico, but ultimately felt unsafe there as well and set out for the United States. Id. ¶ 61–62. On June 11, 2018, nearly a month after their co-plaintiffs, Mr. Santos Galvez and his son crossed the Rio Grande on an inflatable raft. Id. ¶ 62. The two were arrested by immigration officers shortly after crossing the Southern border. Id. ¶ 63.

Much like their co-plaintiffs, Mr. Santos Galvez and his son were initially detained in the frigid cold hielera. Id. ¶ 64. Agents gave Mr. Santos Galvez two aluminum blankets and a mattress topper for him to share with his son, but he gave everything to J.S.R. Id. ¶ 65. To this day, J.S.R. has memories of his father shivering and sobbing in the windowless facility. Id. After three days, immigration officers made Mr. Santos Galvez step outside the facility while J.S.R. was asleep. Id. ¶ 66. Mr. Santos Galvez did not want to leave his son behind, but he was assured that he would see J.S.R. again shortly. Id. However, once outside, officers kept him from returning to the hielera and

told Mr. Santos Galvez that he had seen his son for the final time. Id. ¶ 67. Mr. Santos Galvez continued to be detained in different facilities throughout Texas, but four days later—on approximately June 16, 2018—J.S.R. was transferred to the custody of ORR at the Noank Community Support Services in Groton. Id. ¶ 68, 71, 85, 90, 93.

Following the separation, Mr. Santos Galvez admitted to entering the country without permission—after previously being deported in 2007—in criminal court. Id. ¶ 56, 87. Shortly thereafter, at the Port Isabel Service Detention Center in Los Fresnos, Texas, an immigration officer told Mr. Santos Galvez that he had entered the United States alone and would be deported. Id. ¶ 87. Mr. Santos Galvez protested that he had arrived with his son, but the officer was emphatic that the documentation suggested otherwise. Id. It was only when Mr. Santos Galvez showed the officer a card given to J.S.R. listing the boy's possessions at the time of his arrest—a card that Mr. Santos Galvez had kept hidden in case officers tried to deny his relationship to his son—that the officer conceded an error had been made. Id. ¶ 89. Still, officers would not tell Mr. Santos Galvez where his son was or how he was doing. Id. ¶ 90.

At the same time in Connecticut, a legal services attorney tried in vain to help J.S.R. locate his father. Id. ¶ 72. On June 27, 2018, Mr. Santos Galvez's attorneys tracked down J.S.R. and arranged a brief video call between the father and son. Id. ¶¶ 73, 94. Mr. Santos Galvez was relieved to finally see his son, but heartbroken over the dramatic transformation in J.S.R.'s demeanor as a result of their time apart. Id. ¶ 94.

E.    Reunification of the Plaintiffs

On July 2, 2018, Ms. Flores Benitez and J.S.R. filed Petitions for Habeas Corpus in the District of Connecticut. Id. ¶ 95; J.S.R. by & through J.S.G. v. Sessions, 330 F. Supp. 3d 731, 736 (D. Conn. 2018). The Complaint of each child plaintiff sought

release from detention as well as reunification with their parents.  Compl. ¶ 95; J.S.R., 330 F. Supp. 3d at 733.  On July 13, 2018, following briefing and an evidentiary hearing, Judge Victor A. Bolden of the District of Connecticut concluded that "the constitutional rights of J.S.R. and V.F.B. have been violated, and that irreparable harm has occurred as a result[.]"  Compl. ¶ 96; J.S.R., 330 F. Supp. 3d at 733.  Accordingly, Judge Bolden granted, in part, the motion for a preliminary injunction and ordered the Government to provide "relief directed towards the effects of the constitutional violation suffered by these minor children, namely trauma or more precisely, Post-Traumatic Stress Disorder ("PTSD")[.]"  J.S.R., 330 F. Supp. 3d at 733.  Soon afterwards, both children were released from DHS custody and reunited with their parents.  Compl. ¶ 98.

        F.    Procedural History

        On July 13, 2022, the plaintiffs filed the Complaint.  See Compl.  The plaintiffs bring two claims.  Id. ¶¶ 200–39.  In Claim One, the plaintiffs contend that the conduct of the individual defendants amounts to torture and inhumane treatment pursuant to the ATS.  Id. ¶¶ 200–14; 28 U.S.C. § 1350.  In Claim Two, the plaintiffs assert five different FTCA causes of action under either Texas and/or Connecticut law, including (1) intentional infliction of emotional distress, (2) false imprisonment, (3) negligent infliction of emotional distress, (4) negligence, and (5) abuse of process.  Compl. ¶¶ 215–239.

        On October 28, 2022, the Government moved to dismiss the action in its entirety for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Rule 12(b)(6).  See Mot. to Dismiss; Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem.") (Doc. No. 35–1); Reply Memorandum in Support of Motion to Dismiss ("Def.'s Reply") (Doc. No. 57).  The plaintiffs oppose the Government's Motion, see Pls.'s Mem., and, on December 19, 2022, they were joined in

their opposition—with consent of this court—by <u>amici curiae</u>.  <u>See</u> <u>Amicus Curiae</u> in

Support of Plaintiff's Opposition to Motion to Dismiss ("<u>Amicus</u> Brief") (Doc. No. 50).

The court held oral argument on the Motion on August 3, 2023.  <u>See</u> Notice (ECF No.

81).

## III.    STANDARD OF REVIEW

### A.    <u>Rule 12(b)(1)</u>

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed

for lack of subject matter jurisdiction . . . when the district court lacks the statutory or

constitutional power to adjudicate it."  <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d

Cir. 2000).  The plaintiff bears the burden of proving the existence of subject matter

jurisdiction.  <u>Makarova</u>, 201 F.3d at 113.  In determining whether the plaintiff has met

this burden, the court must accept as true all factual allegations in a complaint and draw

all reasonable inferences in favor of the plaintiff.  <u>See</u> <u>Carter v. HealthPort Techs., LLC</u>,

822 F.3d 47, 57 (2d Cir. 2016); <u>Aurecchione v. Schoolman Transp. Sys., Inc.</u>, 426 F.3d

635, 638 (2d Cir. 2005).  The court may also rely on evidence outside a complaint in

deciding a Rule 12(b)(1) motion.  <u>Makarova</u>, 201 F.3d at 113.

### B.    <u>Rule 12(b)(6)</u>

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)

("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662,

678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."  <u>Id.</u>  Reviewing a motion to

dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual

11

allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor.  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal, 556 U.S. at 678.

## IV.   DISCUSSION

The Government has moved to dismiss the Complaint in its entirety based on the plaintiffs' lack of subject matter jurisdiction and failure to state a claim.  See Def.'s Mem. at 2.  This court begins its analysis with the plaintiffs' ATS claims, before turning to the FTCA claims.

### A.   ATS Claims

In moving to dismiss, the Government argues that the individual defendants must be substituted for the United States pursuant to the Westfall Act, 28 U.S.C. § 2679, and that the ATS claims are then barred by sovereign immunity.  Def.'s Mem. at 13–15.  The plaintiffs counter that their claims under the ATS are subject to the statutory actions exception to the Westfall Act.  Pls.' Mem. at 42–49.  In the alternative, the plaintiffs aver that sovereign immunity does not bar their claims under the ATS.  Pls.' Mem. at 49–54.

The ATS, also known as the Alien Tort Claims Act, provides, "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Enacted as part of the Judiciary Act of 1789, see Sosa v. Alvarez-Machain, 542 U.S. 692, 712 (2004), the ATS is solely a jurisdictional statute and creates "no new causes of action," id. at 724; see also Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 116 (2013) ("[The ATS] does not directly regulate conduct or afford relief.  It instead allows federal courts to recognize certain causes of action based on sufficiently definite norms

of international law."); <u>Nahl v. Jaoude</u>, 968 F.3d 173, 179 (2d Cir. 2020) ("The ATS is a jurisdictional statute, creating no new cause of action in its own right but empowering courts to hear cases brought by foreign nationals based on violations of international law.").  Instead, the "very limited category" of claims available under the ATS are "defined by the law of nations and recognized at common law."  <u>Sosa</u>, 542 U.S. at 712.

      1.  Statutory Exception to Westfall Act is Not Satisfied

Passed in the wake of the U.S. Supreme Court's decision in <u>Westfall v. Erwin</u>, 484 U.S. 292 (1988), the Federal Employees Liability and Tort Compensation Act (commonly known as the "Westfall Act") "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties."  <u>Osborn v. Haley</u>, 549 U.S. 225, 229 (2007); 28 U.S.C. § 2679(b)(1). However, the Westfall Act preserves claims against federal officers "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized."  28 U.S.C. § 2679(b)(2)(B).

Both the D.C. Circuit and the Ninth Circuit Courts of Appeals have determined that the statutory exception to the Westfall Act is not satisfied by claims brought pursuant to the ATS, as "any claim brought under the ATS alleges a violation of the law of nations and the common law, not of the ATS itself."  <u>Ali v. Rumsfeld</u>, 649 F.3d 762, 778 (D.C. Cir. 2011); <u>Alvarez-Machain v. United States</u>, 331 F.3d 604, 631–32 (9th Cir. 2003) ("[A] claim under the [ATS] is based on a violation of international law, not of the [ATS] itself.") (internal quotation marks and citation omitted), <u>rev'd on other grounds sub nom. Sosa</u>, 542 U.S. 692.  To reach this conclusion, both Circuit Courts relied on the U.S. Supreme Court's opinion in <u>United States v. Smith</u>, 499 U.S. 160 (1991).  <u>See Ali</u>,

649 F.3d at 775–76; Alvarez-Machain, 331 F.3d at 631–32.  In Smith, the Government attempted to substitute itself as the defendant, pursuant to the recently enacted Westfall Act, in a negligence suit brought against a U.S. military physician.  499 U.S. at 162–163. The case did not involve the ATS, but rather centered on the Gonzalez Act, which, like the Westfall Act, was a grant of immunity to federal employees for torts committed within the scope of their work.  Id.  The plaintiffs argued that the Gonzalez Act authorized their claim and that, because the Gonzalez Act allowed negligence suits against military doctors in certain situations, such negligence claims were in fact a violation of the statute.  Id. at 174.  The Supreme Court rejected that contention, holding that "[n]othing in the Gonzalez Act imposes any obligations or duties of care upon military physicians.  Consequently, a physician allegedly committing malpractice under state or foreign law does not 'violate' the Gonzalez Act."  Id. at 174.  Because the Court determined that the Gonzalez Act was not violated, it concluded that the statutory exception to the Westfall Act was not satisfied.  Id.

Based on this reasoning in Smith as well as the fact that the ATS is purely jurisdictional, both the D.C. Circuit and the Ninth Circuit concluded that nothing in the statute "imposes any obligations or duties of care upon" the defendants.  Id.; Ali, 649 F.3d at 776; Alvarez-Machain, 331 F.3d at 632.  This determination was further buttressed by the Supreme Court's later acknowledgement in Kiobel that the ATS "does not directly regulate conduct or afford relief."  569 U.S. at 116.  For these reasons, the D.C. Circuit and the Ninth Circuit concluded that the Westfall exception does not apply to claims brought under the ATS and that the United States should be substituted for

the individual defendants.  See Ali, 649 F.3d at 776–78; Alvarez-Machain, 331 F.3d at 631–32.

In arguing against such a conclusion here, the plaintiffs ask the court to side with the position of the Ali dissent, see Pls.' Mem. at 44, which posits that Smith was inapposite, as the ATS "is a statute enabling the federal courts to impose liability—not limit liability.  Because [the ATS] expressly incorporates the 'law of nations,' it is a statute that can be violated."  Ali, 649 F.3d at 790 (Edwards, J., dissenting). Notwithstanding the fact that the Gonzalez Act and the ATS have different purposes, this court agrees with the majority opinions in Alvarez-Machain and Ali that the reasoning in Smith prevents the Westfall Act exception from applying here because the ATS does not explicitly incorporate the law of nations.  Alvarez- Machain, 331 F.3d at 632; Ali, 649 F.3d at 776–78.  Rather the plaintiffs' ATS claims in this case allege a violation of the law of nations or a treaty of the United States, not the ATS.  See also Nahl, 968 F.3d at 179 (reiterating that the ATS is purely a "jurisdictional statute, creating no new cause of action in its own right but empowering courts to hear cases brought by foreign nationals based on violations of international law.").  Accordingly, the statutory exception to the Westfall Act is not satisfied and the United States is properly substituted for the individual defendants in the ATS claims.

2.  Claims Do Not Fall Outside the Defendants' Scope of Employment

The plaintiffs also contest the substitution of the United States in place of the individual defendants by arguing that "the Westfall Act does not permit substitution

of government officials who commit intentional <u>jus cogens</u> violations."[3]  Pls.' Mem. at 46.

In response, the Government avers that alleged violations of <u>jus cogens</u> norms "do not

<u>per se</u> fall outside the scope of employment under the Westfall Act."  Def.'s Reply at 12.

The Westfall Act affords federal employees "absolute immunity from common-law

tort claims arising out of acts they undertake in the course of their official duties."

<u>Osborn v. Haley</u>, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)).  According

to the Supreme Court, "[w]hen a federal employee is sued for wrongful or negligent

conduct, the [Westfall] Act empowers the Attorney General to certify that the employee

'was acting within the scope of his office or employment at the time of the incident out of

which the claim arose.'"  <u>Id.</u> at 229–30 (quoting § 2679(d)(1)–(2)).  In the instant case,

the Attorney General[4] certified that the individual defendants were acting within the

scope of their employment, <u>see</u> Notice of Substitution (Doc. No. 34), which the plaintiffs

challenged, <u>see</u> Response to Defendants' Notice of Substitution (Doc. No. 38); Pls.'

Mem. at 46–49.

"[T]he 'certification constitutes <u>prima facie</u> evidence that the employee was acting

within the scope of his employment."  <u>Carroll v. Trump</u>, 49 F.4th 759, 765 (2d Cir. 2022)

(quoting <u>Wuterich v. Murtha</u>, 562 F.3d 375, 381–83 (D.C. Cir. 2009)).  However, the

district court conducts a <u>de novo</u> review where a plaintiff challenges the certification by

_____

[3] "A <u>jus cogens</u> norm, also known as a peremptory norm of international law, is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."  <u>Kashef v. BNP Paribas S.A.</u>, 925 F.3d 53, 61 (2d Cir. 2019) (internal quotation marks and citation omitted).

[4] Pursuant to 28 C.F.R. § 15.4, the Attorney General's certification authority has been delegated to the Chief of the Civil Division of the United States Attorney's Office for the District of Connecticut.

alleging "with particularity facts relevant to the scope-of-employment issue." McHugh v. Univ. of Vermont, 966 F.2d 67, 74 (2d Cir. 1992), abrogated on other grounds by Osborn, 549 U.S. 225; see also Freitas v. Cooper, 2014 WL 494525, at *2 (S.D.N.Y. Feb. 5, 2014) (same).  Although the court is obligated to view the alleged conduct in the light most favorable to the plaintiffs, it must make its own factual findings regarding the scope of the individual defendants' employment. Bello v. United States, 93 F. App'x 288, 289–90 (2d Cir. 2004) (citing McHugh, 966 F.2d at 74–75).  The court's assessment of whether an employee was acting within the scope of his or her employment is governed by "the respondeat superior law of the state in which the alleged tort occurred." Carroll v. Trump, 49 F.4th at 772.

In opposing certification, the plaintiffs failed to assert what state's respondeat superior law controlled the court's analysis and offered no particular facts relevant to the scope of employment inquiry. See Pls.' Opp. at 46–49.  That changed on August 1, 2023, when, shortly before oral argument on the Government's Motion to Dismiss, the plaintiffs filed a Notice of Supplemental Authority positing that the law of the District of Columbia provides the relevant framework, as that is where the individual defendants were when creating the Zero Tolerance Policy.[5] See Notice of Supplemental Authority re: Motion to Dismiss ("Notice of Suppl. Auth.")  at 2 (Doc. No. 83).  On the other hand,

---

[5] The court notes the timing of the plaintiffs' assertion that the law of the District of Columbia governs, as it appears only after the D.C. Court of Appeals' recent pronouncement that, "whether an employee was acting within the scope of employment is ordinarily a fact-intensive question for the factfinder, and as such is not subject to determination as a matter of law in resolving a motion to dismiss or a motion for summary judgment." Trump v. Carroll, 292 A.3d 220, 230 (D.C. 2023).  Notwithstanding the D.C. Court of Appeals' position regarding scope-of-employment determinations being ill-suited to resolution on a Motion to Dismiss, when a district court reviews the Attorney General's certification, "the plaintiff has no right to a jury trial." Osborn, 549 U.S. at 252.  Under the Westfall Act, "a judge, not a jury is 'the appropriate trier of any facts essential to certification.'" Saleh v. Bush, 848 F.3d 880, 892 n.11 (9th Cir. 2017) (quoting Osborn, 549 U.S. at 252).

in its Reply in Support of the Motion to Dismiss, the Government contends that either

Texas or Connecticut law governs, as that is where the family separation that the

plaintiffs' challenge took place.  See Def.'s Reply at 11–14.  Regardless of which law is

applied, plaintiffs' argument against substitution fails.

The District of Columbia generally adheres to the scope of employment inquiry

set forth in the Restatement (Second) of Agency § 228(1)–(2).[6]  Trump v. Carroll, 292

A.3d at 228.  Section 228 makes clear that:

(1) Conduct of a servant is within the scope of employment if, but only if:
    (a) it is of the kind [the person] is employed to perform;
    (b) it occurs substantially within the authorized time and space limits;
    (c) it is actuated, at least in part, by a purpose to serve the master, and
    (d) if force is intentionally used by the servant against another, the use of
    force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in
kind from that authorized, far beyond the authorized time or space limits, or too
little actuated by a purpose to serve the master.

Rest. (2d) of Agency § 228.  The District of Columbia does depart from the Restatement

"by authorizing victims of intentional torts that do not involve the use of force to prove

that the tortious conduct was of the kind the employee was authorized to perform on a

narrow theory of foreseeability—that the conduct was 'incidental to' the conduct

authorized."  Trump v. Carroll, 292 A.3d at 231 (quoting Rest. (2d) of Agency § 229(1)).

In the District of Columbia, cases have focused on whether tortious conduct was an

"outgrowth of a job-related controversy," id. at 232 (internal quotation marks and citation

---

[6] This is true of Connecticut as well, where the scope-of-employment test also derives from the
Restatement (Second) of Agency § 228.  See Harp v. King, 266 Conn. 747, 782–83 (2003) (citing section
228 of the Restatement (Second) in setting forth the three-part test for respondeat superior).  As such, the
court only analyzes the respondeat superior law of the District of Columbia and Texas.

omitted), with precedent demanding that there be "some relationship or nexus between the tortious conduct and the employee's responsibilities for it", id.

For an employee to have acted within the scope of employment under Texas law, the employee's action must be: (1) "within the scope of the employee's general authority"; (2) "in furtherance of the employer's business"; and (3) done "for the accomplishment of the object for which the employee was hired."  Minyard Food Stores, Inc. v. Goodman, 80 S.W.3d 573, 577 (Tex. 2002).  The conduct at issue "must be of the same general nature as that authorized or incidental to the conduct authorized."  Id. (internal quotation and citation omitted).  "Conduct falls outside the scope of employment when it occurs 'within an independent course of conduct not intended by the employee to serve any purposes of the employer.'"  Garza v. Harrison, 574 S.W.3d 389, 400 (Tex. 2019) (emphasis in original) (citing Alexander v. Walker, 435 S.W.3d 789, 792 (Tex. 2014)).  The inquiry in Texas is "fundamentally objective" and asks: "Is there a connection between the employee's job duties and the alleged tortious conduct?"  Laverie v. Wetherbe, 517 S.W.3d 748, 753 (Tex. 2017).  Accordingly, under Texas law, "even intentionally wrongful or assaultive acts do not necessarily take an employee's conduct outside of the scope of employment."  Lam Gallegos v. United States, No. 5:14-cv-136, slip. op. at 26 (DS) (S.D. Tex. Sept. 15, 2021).

Here, the plaintiffs offer no particularized facts undermining the prima facie evidence that the individual defendants were acting within the scope of their employment.  See Pls.' Opp. at 46–49; see also Def.'s Reply at 11 ("[T]here is no real dispute that the alleged actions of the four individual defendants were performed on the job, in furtherance of official government business.").  Instead, the plaintiffs' sole basis

for challenging the substitution is a categorical argument that the Westfall Act "does not permit substitution of government officials who commit intentional jus cogens violations." Pls.' Opp. at 46.

This same argument was raised and rejected by courts applying the respondeat superior law of the District of Columbia and Texas in analyzing the propriety of Westfall Act substitution.  See, e.g., Ali v. Rumsfeld, 649 F.3d at 774–775; Lam Gallegos, slip. op. at 34–35.  Citing prior precedent, the Ali Court, for example, emphasized that the seriousness of the crimes alleged "'do not alter our conclusion that the defendants' conduct was incidental to authorized conduct.'"  Id. at 775 (quoting Rasul v. Myers, 512 F.3d 644, 659–60 (D.C. Cir.), vacated, 555 U.S. 1083 (2018)); see also Saleh, 848 F.3d at 893–94 (applying District of Columbia scope of employment law and concluding that the Westfall Act immunity applied even when a jus cogens violation was assumed); Schneider v. Kissinger, 310 F. Supp. 2d 251, 265 (D.D.C. 2004) (clarifying that, in the Westfall Act context, "[d]efining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines who may be held liable for that conduct, an employee or his boss."). Similarly, in Texas, the Lam Gallegos Court emphasized that whether the alleged tortious conduct amounted to a jus cogens violation did not alter the conclusion that the individual defendant's action was within the scope of his employment under Texas law. Lam Gallegos, slip. op. at 35; see also id. at 34 ("[A] jus cogens categorization is an indication of an act's wrongfulness, not evidence of the actor's employment status.").

Similar to their arguments regarding whether the ATS satisfies the statutory exception to the Westfall Act, the plaintiffs cite no precedent adopting their view that the

Westfall Act prohibits substitution in cases involving alleged intentional <u>jus cogens</u> violations.  Ultimately, this court agrees with the numerous courts that have determined that allegations of <u>jus cogens</u> violations do not <u>per se</u> prevent substitution under the Westfall Act.  Thus, the court concludes that the individual defendants were acting within the scope of their employment and declines to disturb the Attorney General's certification.

### 3.   Sovereign Immunity Bars ATS Claims Against the United States

The plaintiffs argue that, even if the United States is substituted for the individual defendants, the ATS claims are not barred by sovereign immunity.  Pls.' Mem. at 49–54. The Government counters that the ATS does not impliedly waive sovereign immunity, <u>see</u> Def.'s Mem. at 14, even when violations of <u>jus cogens</u> norms are alleged, see Def.'s Reply at 2.

Despite the "murky beginnings" of the doctrine of federal sovereign immunity, <u>Amicus</u> Brief at 7, it is now "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983).  "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . and will not be implied[.]" <u>Lane v. Pena</u>, 518 U.S. 187, 192 (1996).  Moreover, any waiver "is to be strictly construed, in terms of its scope, in favor of the sovereign." <u>Dep't of the Army v. Blue Fox, Inc.</u>, 525 U.S. 255, 261 (1999).

The ATS provides the jurisdictional basis for the plaintiffs' claims, <u>see</u>, <u>supra</u>, Section IV.A.1, but it does not include an express waiver of sovereign immunity.  <u>See</u> 28 U.S.C. § 1350.  In light of Congress's failure to explicitly waive sovereign immunity,

"almost every court to consider the question has held[ that] the United States is immune from suit [pursuant to] the ATS, even for alleged violations of jus cogens norms, as the Complaint here articulates."  D.J.C.V. v. United States, 605 F. Supp. 3d 571, 609 (S.D.N.Y. 2022) (collecting cases); but see Al Shimari v. CACI Premier Tech., Inc., 368 F. Supp. 3d 935, 958–968 (E.D. Va. 2019) (determining that the United States does not retain sovereign immunity for alleged violations of jus cogens norms of international law); C.D.A. v. United States, 2023 WL 2666064 (E.D. Pa. March 28, 2023) (same).  As the Government points out, every federal Circuit Court of Appeals that has addressed the issue has concluded that the ATS does not waive sovereign immunity.  See Def.'s Mem. at 14; Quintero Perez v. United States, 8 F.4th 1095, 1100–1101 (9th Cir. 2021); Hernandez v. United States, 757 F.3d 249, 258–59 (5th Cir. 2014), adhered to in relevant part on reh'g en banc, 785 F.3d 117 (5th Cir. 2015); Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968–69 (4th Cir. 1992); Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207 (D.C. Cir. 1985).  Indeed, the Second Circuit has expressed agreement with its "sister circuits" that have held that the ATS does not waive sovereign immunity. Arar v. Ashcroft, 532 F.3d 157, 175 n.12 (2d Cir. 2008) ("Several Courts of Appeals have held that neither the [Torture Victim Prevention Act (TVPA)] nor the Alien Tort Claims Act establishes the United States's consent to be sued under the cause of action created by the TVPA.  . . .  We agree with our sister circuits.") vacated and superseded on other grounds on reh'g en banc, 585 F.3d 559 (2d Cir. 2009).

    The plaintiffs argue that the Second Circuit's view in Arar is only relevant to causes of action created by the TVPA—which is appended to a statutory note to the ATS—and that the Arar Court "said nothing about whether the ATS . . . waives

sovereign immunity for a cause of action under the ATS. . . ."  Pls.' Mem. at 53–54.

However, the plaintiffs fail to reconcile that claim with the fact that none of the cases to

which the Second Circuit cites—including Goldstar, Sanchez-Espinoza, and Koohi v.

United States, 976 F.2d 1328, 1332 n.4 (9th Cir. 1992)—make any mention of the

TVPA.  Instead, each Circuit Court case with which the Second Circuit "agree[s]", Arar,

532 F.3d at 175 n.12, holds that the ATS does not amount to a waiver of sovereign

immunity.

Regardless of this court's view on the well-founded and persuasive criticisms of

sovereign immunity recounted by amici, see Amicus Brief at 8–12, it is not within the

District Court's discretion "to abolish the defense entirely", id. at 4.  As such, this court is

bound by the doctrine as it currently exists.  And, like the Arar Court, this court agrees

with each of the Circuit Courts that have addressed this issue and concludes that the

United States has not consented to suits brought pursuant to the ATS—even when

violations of jus cogens norms are alleged.  As another court in this Circuit has

suggested, plaintiffs' best "recourse on this point is to the elected branches."  D.J.C.V.,

605 F. Supp. 3d at 609.

B.      Subject Matter Jurisdiction for FTCA Claims

In moving to dismiss the plaintiffs' FTCA claims, the Government asserts that

sovereign immunity bars money damages in these circumstances.  Def.'s Mem. at 15–

40.  In particular, the Government avers that some or all of the plaintiffs' claims are

barred by the application of exceptions to the FTCA's waiver of sovereign immunity,

including the discretionary function exception, due care exception, misrepresentation

exception, and independent contractor exception.  Id. at 15–32, 37–40.  The

Government also contends that the intentional infliction of emotional distress claim is

barred because it impermissibly alleges a "systemic" tort claim against the United States, and that both the intentional infliction of emotional distress and the negligent infliction of emotional distress claims fail because there is no private person analogue, as required by the FTCA.  Id. at 32–36.  The plaintiffs counter that none of the exceptions raised preclude their claims under the FTCA, and that they have satisfied all statutory requirements.  See Pls.' Mem. at 13.

The FTCA provides a limited waiver of sovereign immunity, allowing "for a tort suit against the United States under specified circumstances."  Cooke v. United States, 918 F.3d 77, 81 (2d Cir. 2019) (internal quotation marks and citation omitted).  These specified circumstances include several jurisdictional requirements, id., as well as a host of exceptions to the waiver that preserve sovereign immunity in certain situations, see 28 U.S.C. § 2680.  The court will consider each of the Government's arguments, in turn, regarding the plaintiffs' failure to meet jurisdictional requirements of the FTCA as well as the applicability of exceptions to the limited waiver of sovereign immunity.

1.   Discretionary Function Exception Does Not Apply

The discretionary function exception to the FTCA's waiver of sovereign immunity applies to "[a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This exception is "a form of retained sovereign immunity[,]" meaning that "the waiver of federal sovereign immunity does not encompass actions based upon the

24

performance of, or failure to perform, discretionary functions." In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 190 (2d Cir. 2008).

Under the two-pronged test articulated by the U.S. Supreme Court, a function is discretionary and sovereign immunity bars suit where the acts: (1) involve an "element of judgment or choice" that is not compelled by statute, regulation, or policy, and (2) are based on "considerations of public policy" or "susceptible to policy analysis." United States v. Gaubert, 499 U.S. 315, 322–23, 325 (1991); Berkovitz v. United States, 486 U.S. 531, 536–37 (1988); accord Cangemi v. United States, 13 F.4th 115, 130 (2d Cir. 2021). In light of the fact that the plaintiffs have the initial burden of showing that their FTCA claims against the United States fall within the ambit of the statute's limited waiver of sovereign immunity, the plaintiffs also have the initial burden of demonstrating that their claims are not barred as a result of the discretionary function exception. Cangemi, 13 F.4th at 130. Plaintiffs can meet this burden and avoid dismissal by alleging facts "showing that either (1) the United States' allegedly tortious act . . . was inconsistent with a specific mandatory directive – i.e., a federal statute, regulation, or policy [that] specifically prescribes a course of action for [the federal government] to follow, or (2) the allegedly tortious judgment or choice in question is not grounded in considerations of public policy or susceptible to policy analysis[.]" Id. (emphasis original) (internal quotation marks and citations omitted). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 325. Critically, it is axiomatic that a government official does not have discretion "to behave unconstitutionally or outside the scope of his

delegated authority." Myers & Myers, Inc. v. U.S. Postal Serv., 527 F.2d 1252, 1261 (2d Cir. 1975).

Here, the plaintiffs allege that the Government separated Ms. Flores Benitez from Ms. Benitez Alvarado and J.S.R. from Mr. Santos Galvez pursuant to the Zero Tolerance Policy and in contravention of their Fifth Amendment due process rights. Pls.' Mem. at 15–19. Such conduct is not subject to the discretionary function exception if plaintiffs plausibly allege that it violated their constitutional rights. The Government argues against this conclusion by suggesting that, in Myers & Myers, the exception did not apply because the Postal Service exceeded its regulatory authority by not following its own regulations, rather than because of a constitutional violation. Def.'s Mem. at 28–29. However, the Myers & Myers Court was clear that the Exception did not apply to the claim at issue, which was "that the Postal Service lacked discretion to act in disregard of its own applicable regulations and of the Constitution." 527 F.2d at 1261. Moreover, assessing that unconstitutional conduct is outside the scope of the discretionary function exception is in accordance with the conclusions of other Circuits. See Loumiet v. United States, 828 F.3d 935, 943 (D.C. Cir. 2016) (holding that the discretionary function exception "does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription", and adding that "[a]t least seven circuits, including the First, Second, Third, Fourth, Fifth, Eighth, and Ninth, have either held or stated in dictum that the discretionary-function exception does not shield government officials from FTCA liability when they exceed the scope of their constitutional authority."). It also comports with the determinations of other courts in this Circuit. See, e.g., Huntress v. United States, 2019 WL 1434572, at

*5 (S.D.N.Y. Mar. 29, 2019) ("The Court thus agrees with Plaintiffs that the discretionary function exception does not shield official conduct that is . . . unconstitutional. . . ."), aff'd, 810 F. App'x 74 (2d Cir. 2020) (summary order), cert. denied, --- U.S. ----, 141 S. Ct. 1056 (2021); El Badrawi v. Dep't of Homeland Sec., 579 F. Supp. 2d 249, 274–275 (D. Conn. 2008) (determining that the Government's assertion that FTCA claims were barred by the discretionary function exception was "easily dispensed with" as "Government agents never have the discretion to violate the Constitution.").

In this case, the plaintiffs allege both procedural and substantive due process violations.[7]  Pls.' Mem. at 18.  Beginning with the procedural due process claim, courts analyze such claims by evaluating "(1) whether plaintiffs possessed a protected liberty or property interest, and, if so, (2) what process plaintiffs were due before they could be deprived of that interest."  Adams v. Suozzi, 517 F.3d 124, 127 (2d Cir.2008) (internal quotations omitted).  The parental interest in determining the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests. . . ."  Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion); see also, e.g., Quilloin v. Walcott, 434 U.S. 246, 255 (1978) ("We have little doubt that the Due Process Clause would be

---

[7] The court notes that the plaintiffs' immigration status does not affect their entitlement to due process: "the Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent."  Velasco Lopez v. Decker, 978 F.3d 842, 850 (2d Cir. 2020) (citing Zadvydas v. Davis, 533 U.S. 678, 693 (2001)).

Additionally, the Second Circuit has recognized that parents may assert both procedural and substantive due process claims in challenging the removal of their children.  See Southerland v. City of New York, 680 F.3d 127, 142 (2d Cir. 2012).  In such cases, the parents' substantive due process claim will survive only where removal of their child "would have been prohibited by the Constitution even had the [parents] been given all the procedural protections to which they were entitled."  Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999).  In recognizing a parent's ability to bring both claims, the Second Circuit acknowledged that, "while a procedural due process claim challenges the procedure by which a removal is effected, a substantive due process claim challenges the 'fact of [the] removal' itself."  Southerland, 680 F.3d at 142 (quoting Bruker v. City of New York, 92 F. Supp.2d 257, 266–67 (S.D.N.Y. 2000)).

offended [i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.") (internal quotation marks omitted); Stanley v. Illinois, 405 U.S. 645, 651 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" (citation omitted)); Prince v. Massachusetts, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents. . . ."); Southerland v. City of New York, 680 F.3d 127, 142 (2d Cir. 2012) ("The Fourteenth Amendment imposes a requirement that[,] except in emergency circumstances, judicial process must be accorded both parent and child before removal of the child from his or her parent's custody may be effected."); Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999) (collecting cases).

Here, the plaintiff children and their parents allege that they were separated for more than a month without any due process or opportunity to challenge the separation. Compl. ¶¶ 3–4, 26–55, 64–94. Rather than receive a meaningful opportunity to be heard about the separation, see Mathews v. Eldridge, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks and citation omitted)), Ms. Benitez Alvarado and Mr. Santos Galvez were mocked, and their inquiries about their children were ignored. See id. ¶¶ 32, 47, 90, 93.

Based on the pleadings, the court concludes that the plaintiffs have plausibly alleged a procedural due process violation based on the lack of a hearing preceding the intentional separation of the parent plaintiffs from their children, as well as the lack of an emergency justifying such action.  See Tenenbaum, 193 F.3d at 593 (setting forth the "general rule" that, "before parents may be deprived of the care, custody or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them."); J.S.R., 330 F. Supp. 3d at 733 ("[T]he parties agree that a constitutional violation occurred when the Government separated children from their parents . . . as J.S.R. and [Ms. Flores Benitez] were given no notice and no fair opportunity for a hearing before being separated from their parents.").

With regard to the substantive due process claims, plaintiffs must allege governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005) (internal quotation marks omitted).  Because "[s]ubstantive due process is an outer limit on the legitimacy of governmental action[,] . . . [s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."  Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999).  Thus, while the Second Circuit has noted that "malicious and sadistic" government action that is "designed for no legitimate government purpose[ ] unquestionably shock[s] the conscience," Velez, 401 F.3d at 94 (internal quotation marks omitted), it has also cautioned that the protections of due process are not implicated by state conduct that "merely offend[s] some fastidious squeamishness or

29

private sentimentalism," <u>Smith v. Half Hollow Hills Cent. Sch. Dist.</u>, 298 F.3d 168, 173 (2d Cir. 2002) (internal quotation marks and citation omitted).  Instead, the state action must "fairly be viewed as so brutal and offensive to human dignity as to shock the conscience."  <u>Id.</u> (internal quotation marks omitted).

Based on the pleadings, the court concludes that the plaintiffs have satisfied their burden of alleging a substantive due process violation.  The Complaint is replete with allegations that the Government intentionally separated the plaintiff parents from their minor children to inflict psychological and physical harm and to dissuade the plaintiffs and others from lawfully seeking asylum in the United States.  <u>See, e.g.</u>, Compl. ¶¶ 11–12, 25–55, 56–94, 179.  Indeed, the Complaint details each parent's painful decision to flee their homelands to escape gang violence and political persecution, respectively, and to seek asylum, only to have their children taken from them upon reaching the nation in which they sought safe haven.  <u>See, e.g.</u>, <u>id.</u> ¶¶ 25–55, 56–94.  Accepting as true the "human tragedy"—as President Biden has described the intentional separation of children from their legal guardians, <u>see</u> Exec. Order 14011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 2, 2021)—alleged by the plaintiffs, the Government's conduct does not "merely offend", but rather "shocks the conscience."  As one district court eloquently noted when denying a Motion to Dismiss similar substantive due process claims:

> For Plaintiffs, the government actors responsible for the care and custody of migrant children have, in fact, become their persecutors. . . .  These allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective[.]  Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency.

Ms. L. v. U.S. Immigr. & Customs Enf't, 302 F. Supp. 3d 1149, 1166–67 (S.D. Cal. 2018) ("Ms. L. I) (internal quotation marks and citation omitted).  In reaching this conclusion about plausibly alleged due process claims, this court joins a host of others in this district and beyond.  See, e.g., J.S.R., 330 F. Supp. 3d at 741–42; D.J.C.V., 605 F. Supp. 3d at 594–95 (collecting cases); K.O. by & through E.O. v. United States, --- F. Supp. 3d ----, 2023 WL 131411, at *9 (D. Mass. Jan. 9, 2023); W.S.R. v. Sessions, 318 F. Supp. 3d 1116, 1124–26 (N.D. Ill. 2018); M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 118–21 (D.D.C. 2018).

In arguing for the applicability of the discretionary function exception, the Government posits that this court should only assess whether the exception is inapplicable if there is a showing "that the government official's discretion was cabined by a specific, clearly established constitutional directive, accompanied by plausible assertions that the specific directive was violated." Def.'s Mem. at 26–27.  This assertion calls on the court to impose a standard deriving from a distinct area of the law—qualified immunity.  See D.J.C.V., 605 F. Supp. 3d at 597; K.O., 2023 WL 131411, at *9–*10.  However, as other courts who have rejected this line of argument have observed, the doctrine of qualified immunity is inapposite.  See, e.g., D.J.C.V., 605 F. Supp. 3d at 597.  Notably, the plaintiffs' claims allege FTCA violations by the United States, not by individual defendants.  Unlike individual officers, "qualified immunity will not immunize the United States from liability." Castro v. United States, 34 F.3d 106, 111 (2d Cir. 1994); see also Farag v. United States, 587 F. Supp. 2d 436, 452 (E.D.N.Y. 2008) ("The United States . . . may not assert qualified immunity as a defense to plaintiffs' FTCA claim.").  Indeed, the text of the FTCA clearly contemplates that the

United States is liable "to the same extent as a private individual", see 28 U.S.C. §

2674, not to the same extent as an individual government official.  As such, the court

rejects the Government's invitation to subject plaintiffs' FTCA claims against the United

States to an inapt qualified immunity-like standard.


       2.  Due Care Exception Does Not Apply

      The due care exception to the FTCA's waiver of sovereign immunity applies to

"[a]ny claim based upon an act or omission of an employee of the Government,

exercising due care, in the execution of a statute or regulation, whether or not such

statute or regulation be valid[.]"  28 U.S.C. § 2680(a).  In the absence of a specific

analysis prescribed by the Second Circuit, district courts in this Circuit apply the two-

part inquiry laid out in Crumpton v. Stone, 59 F.3d 1400 (D.C. Cir. 1995) and adopted in

Welch v. United States, 409 F.3d 646, 652 (4th Cir. 2005).  See, e.g., Clayton v. United

States, 2020 WL 1545542, at *4 (E.D.N.Y. Mar. 31, 2020); Nwozuzu v. United States,

2015 WL 4865772, at *5 (S.D.N.Y. Aug. 12, 2015), aff'd, 712 F. App'x 31 (2d Cir. 2017)

(summary order).  "First, we determine whether the statute or regulation in question

specifically [prescribes] a course of action for an officer to follow."  Welch v. United

States, 409 F.3d at 652 (citing Crumpton, 59 F.3d at 1403).  "Second, if a specific action

is mandated, we inquire as to whether the officer exercised due care in following the

dictates of that statute or regulation."  Id.  "If due care was exercised, sovereign

immunity has not been waived."  Id.  "Exercising due care 'implies at least some minimal

concern for the rights of others.'"  Nwozuzu, 712 F. App'x at 32 (quoting Myers & Myers,

527 F.2d at 1262).

Numerous courts evaluating similar FTCA claims have determined that the due care exception does not shield the Government from liability for family separation under the Zero Tolerance Policy, as the exception only applies to action taken pursuant to statutes and regulations, rather than Executive Order.  See, e.g., D.J.C.V., 605 F. Supp. 3d at 597–98; A.I.I.L. v Sessions, 2022 WL 992543, at *5 (D. Ariz. Mar. 31, 2022) ("Because none of the statutory provisions cited by the government expressly mandate enforcement of a family separation policy, the due care exception does not apply."); Nunez Euceda v. United States, 2021 WL 4895748, at *3–*4 (C.D. Cal. Apr. 27, 2021) ("Defendant fails to cite any statute or regulation that required Plaintiff and his children to be separated upon their arrival to the United States.  . . .  [S]uch actions [pursuant to executive policy] are not shielded by the due care exception."); A.P.F. v. United States, 492 F. Supp. 3d 989, 995–96 (D. Ariz. July 27, 2020) ("The United States cites no statute or regulation requiring the detention of individuals who are 'amenable to prosecution' in facilities different from those who are not 'amenable to prosecution,' or any statute more generally requiring the separation of Plaintiffs upon their entry into the country.  Nor could it: the family separations were conducted pursuant to executive policy . . . [and] are not shielded by the due care exception." (internal citations omitted)); C.M. v. United States, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2020) ("[F]amily separation was established by executive policy—not by a statute or regulation—which is not covered by the due care exception.").

The Government attempts to avoid such a conclusion here by arguing that it is required by the TVPRA to "transfer the custody" of an unaccompanied child to ORR "not later than 72 hours after determining that such child is an unaccompanied alien child."

Def.'s Mem. at 30–31 (quoting 8 U.S.C. § 1232(b)(3)).  However, this argument has been considered and rejected by other courts.  See, e.g., A.I.I.L., 2022 WL 992543, at *4–*5.  Indeed, this argument is unavailing, at least in part, due to the fact that the TVPRA specifically contemplates the transfer of "unaccompanied" minors, unlike the child plaintiffs in this case who arrived in the United States with their parents.  Compl. ¶¶ 26–28, 62–65; see also, e.g., Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't, 319 F. Supp. 3d 491, 495 n.2 (D.D.C. 2018) (emphasizing that children "rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants" are "not true unaccompanied minors within the meaning of the statute").  As such, this court agrees with the countless district courts that have considered this issue and concluded that the due care exception does not apply to bar the plaintiff's FTCA claims as the Government's alleged action was not prescribed by any statute or regulation.

### 3.  Misrepresentation Exception Does Not Apply

The misrepresentation exception to the FTCA's waiver of sovereign immunity applies to "[a]ny claim arising out of . . . misrepresentation."  28 U.S.C. § 2680(h).  "This [E]xception 'applies to claims arising out of negligent, as well as intentional, misrepresentation.'"  Dorking Genetics v. United States, 76 F.3d 1261, 1264 (2d Cir. 1996) (quoting Block v. Neal, 460 U.S. 289, 295 (1983)).  Moreover, the exception not only prohibits "claims of negligence in the misrepresentation, but in the conduct underlying the misrepresentation."  Id.  In assessing whether the misrepresentation exception applies, "a court looks 'not to the theory upon which the plaintiff elects to proceed, but rather to the substance of the claim.'"  Sabir v. Williams, 2020 WL 3489522, at *6 (D. Conn. June 26, 2020) (quoting Dorking Genetics, 76 F.3d at 1265).

The Government argues that the plaintiffs' intentional infliction of emotional distress, negligence, and abuse of process claims are barred by the misrepresentation exception due to seven "incidents of deceit that form the basis for their tort claims." Def.'s Mem. at 31–32.  In particular, the Government highlights the various false statements immigration officers made to the plaintiffs either to effectuate the separation or to demoralize the plaintiffs about the possibility of a future reunion. Id. at 31.  While these misrepresentations contributed to the injuries alleged by the plaintiffs, they were not the sole—or even the main—cause. See Block, 460 U.S. at 297 (emphasizing that the misrepresentation exception "relieves the Government of tort liability for pecuniary injuries which are wholly attributable to reliance on the Government's negligent misstatements" (emphasis added)).  Instead, the "substance" of the plaintiffs' relevant FTCA claims are based on the separation of parent and child, rather than the misrepresentations by government officials that exacerbated that fundamental harm.

Additionally, a number of courts in this Circuit and beyond have declined to dismiss similar FTCA claims in family separation cases on the basis of the misrepresentation exception. See, e.g., D.J.C.V., 605 F. Supp. 3d at 598 (concluding that the misrepresentation exception is "not grounds to dismiss plaintiffs' FTCA claims for lack of subject matter jurisdiction" because "[t]he heart of plaintiffs' FTCA claims . . . is not the officials' alleged coercion, but their separation"); A.I.I.L., 2022 WL 992543, at *5 (determining that the misrepresentation exception did not apply because "the misstatements allegedly made by government officials are not essential to the claims asserted"); A.P.F., 492 F. Supp. 3d at 997 (noting that the misrepresentation exception did not deprive the court of jurisdiction over plaintiffs' intentional infliction of emotional

distress and negligence claims where the Complaint included allegations that the Government attempted to compel the plaintiffs to forsake their asylum claims because the "factual allegations . . . are insufficient to prove that the misrepresentation exception applies"). Thus, for the foregoing reasons, the court concludes that the misrepresentation exception does not apply to shield the Government from liability for the intentional infliction of emotional distress, negligence, and abuse of process claims.

### 4. Independent Contractor Exception Does Not Apply

The FTCA waives sovereign immunity for torts committed by "any employee of the Government", but explicitly excludes acts or omissions by independent contractors. United States v. Orleans, 425 U.S. 807, 813 (1976); 28 U.S.C. § 2671 ("As used [in the FTCA] the term 'Federal agency' . . . does not include any contractor with the United States"). "Thus, as a general rule, sovereign immunity precludes suits against the United States for injuries caused by its independent contractors." Roditis v. United States, 122 F.3d 108, 111 (2d Cir.1997).

In the Instant Motion, the Government argues that the plaintiffs' negligent infliction of emotional distress and negligence claims are barred by the independent contractor exception. Def.'s Mem. at 37. In support of this argument, the Government asserts that the negligent infliction of emotional distress claim pertains only to the minor plaintiffs and alleges that, "DHS and HHS employees enforced the Zero Tolerance policy by forcibly transferring and detaining Viky and J.S.R. away from their parents." Compl. ¶ 228; Def.'s Mem. at 37. Similarly, the Government notes that the plaintiff's negligence claim "broadly alleges breach of the duty of care owed to persons who have been taken into custody." Def.'s Mem. at 37.

36

The plaintiffs, on the other hand, do not dispute that any claims against personnel at Noank or related to the minor plaintiffs' treatment at that shelter would be barred by the independent contractor exception.  See Pls.' Mem. at 38.  As the plaintiffs make clear, however, there are no such allegations.  See id.  Instead, the plaintiffs' negligent infliction of emotional distress and negligence claims assert that the Zero Tolerance Policy was the direct and proximate cause of the family separation and the harms the minor children endured thereafter.  See id.; Compl. ¶¶ 2, 5–6, 11, 147–156, 227–234.  Like the plaintiffs in A.P.F. and A.F.P. v. United States, the plaintiffs here "trace the harm they suffered to their forced separation pursuant to the government's policy."  A.F.P. v. United States, 2022 WL 2704570, at *17 (E.D. Cal. 2022); A.P.F., 492 F. Supp. 3d at 998; Compl. ¶¶ 2, 5–6, 11, 147–156, 227–234.

Accordingly, the plaintiffs' negligent infliction of emotional distress and negligence claims are not barred by the independent contractor exception, as the harms allegedly suffered by the plaintiffs were directly and proximately cause by the Government's forcible separation of parent and child under the Zero Tolerance Policy.

5.  No Direct, Institutional, or Systemic Tort Liability

The FTCA waives sovereign immunity for the tortious acts of individual government employees and agents, but not for the actions or omissions of the entire government or an agency as a whole.  See 28 U.S.C. § 2671 (defining "employees" within the FTCA as "persons acting on behalf of federal agency" (emphasis added)); see also, e.g., Lee v. United States, 2020 WL 6573258, at *6 (D. Ariz. Sept. 18, 2020) (highlighting that the FTCA does not apply to "generalized theories of negligence asserted against the staff and employees of federal institutions as a whole").

Here, the Government cites one paragraph of the Complaint to assert that the plaintiffs' intentional infliction of emotional distress claim impermissibly alleges tortious conduct by the Government writ large.  Def.'s Mem. at 32.  "Defendant United States intentionally caused Plaintiffs severe emotional distress by carrying out a policy designed to cause suffering by separating the parents from their minor children, resulting in emotional distress that led to diagnoses of PTSD for the children and ongoing trauma for the parents."  Compl. ¶ 218.  Despite the reference to "Defendant United States", the plaintiffs' intentional infliction of emotional distress claim incorporates the preceding allegations in the Complaint, see Compl. ¶ 215, which make clear that the claim is rooted in the alleged wrongdoing of individual government employees, see, e.g., id. ¶ 11 ("Defendants Miller, Sessions, Nielsen, and McAleenan, along with other U.S. [G]overnment officials who planned, ordered, and orchestrated [Ms. Flores Benitez] and J.S.R.'s forcible separation from their parents pursuant to the family separation policy, intentionally inflicted severe psychological and physical harm on the Plaintiffs.").

In light of the obligation to "draw[ ] all reasonable inferences in the plaintiff's favor, and constru[e] any ambiguities in the light most favorable to upholding the plaintiff's claim",  Sung Cho, 910 F.3d at 642 n.1 (internal quotation marks and citation omitted), the court has little trouble concluding that the plaintiffs' intentional infliction of emotional distress claim alleges tortious conduct by individual government employees. Moreover, any factual deficiencies in the pleading must be raised in a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), and the Government's failure to do so

here means it is not before this court.[8]  See Def.'s Mem. at 40–41.  Thus, the court has

subject matter jurisdiction over the plaintiffs' intentional infliction of emotional distress

claim to the extent it alleges wrongdoing by individual government employees.  See,

e.g., F.R. v. United States, 2022 WL 2905040, at *4 (D. Ariz. July 22, 2022).

      6.  Private Analogue Requirement is Satisfied

Under the FTCA, the Government "shall be liable . . . in the same manner and to

the same extent as a private individual under like circumstances[.]"  28 U.S.C. § 2674.

This requires that "a plaintiff's cause of action . . . be comparable to a cause of action

against a private citizen recognized in the jurisdiction where the tort occurred . . . and

[that] his[ or her] allegations, taken as true, . . . satisfy the necessary elements of that

comparable state cause of action."  Chen v. United States, 854 F.2d 622, 626 (2d Cir.

1988) (internal quotation marks and citation omitted).  Rather than demanding an exact

match, this private analogue requirement "asks whether a private person would be

responsible for similar negligence under the laws of the State where the acts occurred."

McGowan v. United States, 825 F.3d 118, 125 (2d Cir. 2016) (internal quotation marks

and citation omitted).

In the Instant Motion, the Government argues that there is no private analogue

because the alleged harm stems from immigration detention and other law enforcement

decisions that only the Government has the authority to make.  See Def.'s Mem. at 35.

The plaintiffs, on the other hand, argue that this characterization of their claims is too

narrow, as they "do not challenge the government's prosecution or immigration

---

[8] The Government does move to dismiss under Rule 12(b)(6), but it does not raise this argument as a reason that the Complaint fails to state a claim upon which relief can be granted.  See Def.'s Mem. at 40–41.

enforcement authority separate from the Zero Tolerance Policy."  Pls.' Mem. at 37.  The plaintiffs also assert that the fact that it was a uniquely governmental act to separate children from their parents during an immigration proceeding does not mean that no private analogue exists.  Pls.' Mem. at 34.  Instead, in such circumstances, the court must "'look further afield' . . . for a private analogue."  Liranzo v. United States, 690 F.3d 78, 94 (2d Cir. 2012) (quoting United States v. Olson, 546 U.S. 43, 46 (2005)).  Indeed, the "proper analogy" is whether "'[p]rivate individuals . . . may create a relationship with third parties that is similar to the relationship between'" a governmental actor and a separated family unit.  Id. (quoting Olson, 546 at 47).

Here, the court agrees with the plaintiffs' characterization of the harms alleged as well as their assertion that they have identified the requisite private analogue to the intentional infliction of emotional distress claim, but not for the negligent infliction of emotional distress claim.

a.  Intentional Infliction of Emotional Distress

Under Connecticut law, intentional infliction of emotional distress has four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  Watts v. Chittenden, 301 Conn. 575, 586 (2011) (internal quotation marks and citation omitted).  To rise to the level of extreme and outrageous, a defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community." <u>Appleton v. Bd. of Educ.</u>, 254 Conn. 205, 210–11 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." <u>Id.</u> at 211 (internal quotation marks and citation omitted). Rather, the conduct must be "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." <u>DeLaurentis v. City of New Haven</u>, 220 Conn. 225, 267 (1991) (internal quotation marks and citation omitted).

Similarly, intentional infliction of emotional distress under Texas law also has four elements: "(1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe." <u>Hersh v. Tatum</u>, 526 S.W.3d 462, 468 (Tex. 2017) (citation omitted). As in Connecticut, to qualify as "extreme and outrageous", conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id.</u> (internal quotation marks and citation omitted). Also like Connecticut, conduct that is only "insensitive or rude is not extreme and outrageous, nor are 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" <u>Kroger Texas Ltd. v. Suberu</u>, 216 S.W.3d 788, 796 (2006) (quoting <u>GTE Sw., Inc. v. Bruce</u>, 998 S.W.2d 605, 612 (Tex.1999).

Here, the Complaint clearly sets forth the necessary allegations, including that the Government forcibly separated parent from child with the intention of inflicting immense psychological and physical harm on the plaintiffs and coercing the plaintiffs

into abandoning their asylum claims.  See Compl. ¶¶ 12–13.  Such alleged conduct, if

true, goes "beyond all possible bounds of decency" and is a human tragedy that no

civilized society should tolerate.  Plaintiffs also allege that the defendants "repeatedly

and deliberately ignored warnings that separating families would . . . cause both

children and parents physical and psychological harm", id. ¶ 179, including that the Zero

Tolerance Policy would have "significant and long-lasting consequences for the safety,

health, development, and well-being of children."  Id. ¶ 183.  The American Academy of

Pediatrics specifically warned Defendant Nielsen of the severity of the harms flowing

from family separation: "[f]ear and stress, particularly prolonged exposure to serious

stress without the buffering protection afforded by stable, responsible relationship . . .

can harm the developing brain and harm short-and long-term health."  Id. ¶ 186.  Lastly,

the Complaint alleges that the forcible separation caused the plaintiffs' severe emotional

distress.  See, e.g., id. ¶ 6, 10, 41–44, 53–55, 79–84, 91–94.

Not only do the allegations in the Complaint satisfy the elements of intentional

infliction of emotional distress in Connecticut and Texas, but also—as the plaintiffs point

out—courts in both states have recognized analogous claims where private parties

separated parents from their children, kept them from speaking with one another, and

did so in a manner causing extreme distress.  See Pls.' Mem. 35.  In Williams v.

McLaughlin, for example, a Connecticut court denied a Motion to Strike an intentional

infliction of emotional distress claim where it was alleged that the defendants hid minor

children from their father for ten days.  See 2021 WL 842006, at *3 (Conn. Super. Ct.

Feb. 10, 2021); see also D.J.C.V., 650 F. Supp. 3d at 601 (allowing intentional infliction

of emotional distress claim under nearly identical New York common law to proceed

based on the existence of a private analogue in a family separation case); A.P.F., 492 F. Supp. 3d at 994–995 (determining that there was a private analogue for an intentional infliction of emotional distress claim under Arizona law in a family separation case).  And the State of Texas—for more than a century—has recognized "that a father has a tort cause of action when someone entices away or harbors his minor child." Silcott v. Oglesby, 721 S.W.2d 290, 292 (Tex. 1986) (citing Gulf C. & S.F. Ry. Co. v. Redeker, 2 S.W. 527, 528 (Tex. 1886)).  Here, the allegations clearly set forth that the children were induced to leave their guardians without their parent's consent, see Compl. ¶¶ 30–33, 66, which would render the defendants liable under Texas law if the Government were a private person, id.  Relying on this tort, federal courts in Texas have found a private analogue for suits alleging intentional infliction of emotional distress rooted in family separation pursuant to the Zero Tolerance Policy.  See D.A. v. United States, --- F. Supp. 3d ----, 2023 WL 2619167, at *10–*11 (W.D. Tex. Mar. 23, 2023); C.M. on behalf of D.V. v. United States, 2023 WL 3261612, at *18–*20 (W.D. Tex. May 4, 2023).  Accordingly, because a private individual could be held liable for separating a parent from a child in a way designed to induce severe distress, the Government's Motion to Dismiss based on the lack of a private analogue is denied as to the intentional infliction of emotional distress claim.

b.  Negligent Infliction of Emotional Distress

Under Connecticut law, the essential elements of a claim for negligent infliction of emotional distress are (1) conduct by the defendant that "created an unreasonable risk of causing the plaintiff emotional distress", that was (2) foreseeable, (3) "severe enough that it might result in illness or bodily harm", and (4) caused by the defendant's conduct.

Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003).  In particular, there are two types of negligent infliction of emotional distress claims: direct emotional distress and bystander emotional distress.  Marsala v. Yale-New Haven Hosp., Inc., 166 Conn. App. 432, 444 (2016).  The distinction between the two types of claims "turns on whether the duty breached was owed directly to the plaintiff (direct) or to a third party (bystander)." Id. at 445.  In bystander cases, the Connecticut Supreme Court has held that the plaintiff must prove that:

> (1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious, beyond that which would be anticipated in a disinterested witness and which is not the result of an abnormal response.

Clohessy v. Bachelor, 237 Conn. 31, 56 (1996).

Here, plaintiffs assert that there is a private analogue because individuals can negligently inflict emotional distress on a parent by means of harm to the child at daycare.  See Pls.' Mem. at 36.  In support of this position, the plaintiffs cite Doe v. First Step Preschool, Inc., 2013 WL 870264 (Conn. Super. Ct. Jan. 31, 2013).  Doe, however, does not stand for this proposition.  In Doe, a preschool-aged child was left unattended in a bathroom at daycare, and a classmate entered the restroom and engaged in inappropriate sexual behavior.  Id. at *1.  Thereafter, the plaintiff parents were told that their "child could not return to the defendant's daycare."  Id. at *13.  While it is true that the Doe Court did not strike the negligent infliction of emotional distress claim, it assessed that the parent's alleged emotional distress arose not from the harm

to their child, but "from the questioning they underwent regarding their parenting and being forced to send their other child away for a period of time following the incident." Id.  In Doe, the court recognized the parents' emotional distress arising out of fear of harm to themselves, not their child.  Id. ("Their apprehension, however, appears to be apprehension of harm to themselves, not their child.").  This is a type of direct negligent infliction of emotional distress claim, and it is decidedly not a case acknowledging that, as plaintiffs claim, "a private person can negligently inflict emotional distress on a parent by harming their child."  Pls.' Mem. at 36.

The plaintiffs' citation to Witt v. Yale-New Haven Hosp., 51 Conn. Supp. 155 (Conn. Super. Ct. 2008), is similarly unavailing.  That case centered on Carolyn Witt, who agreed to have ovarian tissue removed and frozen—prior to beginning chemotherapy—in the hopes that future medical advances would allow doctors to use that genetic material to enable a pregnancy.  Id. at 157.  Nearly seven years later, the Witts heard of a successful pregnancy born out of removed and frozen ovarian tissue, and they reached out to Yale-New Haven Hospital about recreating the feat themselves. Id.  However, a hospital employee informed the couple that Carolyn Witt's ovarian tissue had been discarded.  Id.  In Witt, as in Doe, the negligent infliction of emotional distress claim survives because it alleges a direct negligent infliction of emotional distress theory, rather than a bystander theory.  See id. at 175 ("[I]n cases in which an ART practitioner engages in negligent or reckless conduct, the tissue or embryo is not the primary victim at all.  The victims are the parents who have been deprived of the potential to conceive a child together."); id. at 176 ("The aspiring parents are the primary victims in a case such as this. . . .  This case does not involve a secondary victim. . . .").

45

As such, <u>Witt</u> too fails to stand for the proposition that, as plaintiffs claim, "a private person can negligently inflict emotional distress on a parent by harming their child." Pls.' Mem. at 36.

The plaintiffs' argument in support of a private analogue for their negligent infliction of emotional distress claim focuses only on the aforementioned bystander theory, offering no cases or analogues for a direct negligent infliction of emotional distress theory.  Moreover, a direct theory on behalf of the parents is undermined by the allegations in the Complaint, which is pled under Connecticut law and complains only of the harms against the minors: "<u>In Connecticut</u>, DHS and HHS employees enforced the Zero Tolerance policy <u>by forcibly transferring and detaining Viky and J.S.R. away from their parents</u>.  The Plaintiffs' distress and the illness, including PTSD, was the foreseeable consequence of the actions of DHS and HHS employees."  Compl. ¶ 228 (emphasis added).  This is critical because, as the Government points out, liability under the FTCA arises "in accordance with the law of the place where the act or omission occurred."  <u>See</u> 28 U.S.C. § 1346(b)(1); Def.'s Mem. at 37 n.6.  Thus, because the plaintiff parents were not forcibly transferred to and detained "[i]n Connecticut," Compl. ¶ 228, the court cannot construe the Complaint as alleging a direct negligent infliction of emotional distress theory on behalf of the parents.

In light of the fact that the plaintiffs bear the burden of proving subject matter jurisdiction and that the United States' waiver of immunity under the FTCA "is to be strictly construed . . .in favor of the sovereign", <u>Dep't of the Army</u>, 525 U.S. at 261, the Government's Motion to Dismiss based on the lack of a private analogue is granted as to the negligent infliction of emotional distress claim as pled.

C.    Failure to State a Claim for Certain FTCA Claims

In addition to challenging subject matter jurisdiction, the Government also asserts that the plaintiffs failed to state a claim upon which relief can be granted for two of their FTCA claims.  Def.'s Mem. at 40–41.  First, the Government argues that the plaintiffs' false imprisonment claims fail—under both Connecticut and Texas law—because there was probable cause for the underlying arrest.  Id. at 40.  The plaintiffs counter that, even if there was probable cause for the initial arrest, the lengthy detention was unlawful as a result of due process violations.  Pls.' Mem. at 39.  Second, the Government avers that, to the extent that plaintiffs' negligence claim is rooted in alleged violation of the Flores Settlement Agreement, the Agreement is the exclusive remedy for the claims and there "is no FTCA remedy for damages for the Government's breach of its obligations under the Consent Decree."  Def.'s Mem. at 41.  The plaintiffs, on the other hand, contend that the Flores Settlement Agreement does not prohibit FTCA claims.  Pls.' Mem. at 40–41.

1.    False Imprisonment Claim

In Connecticut, "[f]alse imprisonment . . . is the unlawful restraint by one person of the physical liberty of another."  Green v. Donroe, 186 Conn. 265, 267 (1982).  "It is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest."  Petaway v. City of New Haven Police Dep't, 541 F. Supp. 2d 504, 512 (D. Conn. 2008).  Under Connecticut law, "probable cause exists when an officer has knowledge of sufficient facts and circumstances to warrant a reasonable officer in believing that the arrestee has committed or is committing an arrestable offense."  El Badrawi, 579 F. Supp. 2d 276.

In Texas, the "elements of false imprisonment are: (1) willful detention; (2) without consent; and (3) without authority of law."  Wal-Mart Stores, Inc. v. Rodriguez,

47

92 S.W.3d 502, 506 (Tex. 2002) (internal quotation marks and citation omitted).  Legal authority for the imprisonment "is met either by the procurement of an arrest warrant or by the showing of existence of probable cause."  Wal-Mart Stores, Inc. v. Odem, 929 S.W.2d 513, 519 (Tex. App. 1996).  Under Texas law, probable cause to arrest exists if "the facts and circumstances within the arresting officer's knowledge and of which [the officer] has reasonably trustworthy information are sufficient to warrant a prudent [individual] in believing that the person arrested had committed or was committing an offense."  Amador v. State, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

Here, the Complaint notes that the plaintiffs, who are foreign nationals, crossed the border into the United States without immigration status.  See Compl. ¶¶ 26, 62–63.  The plaintiffs, separately, crossed the Rio Grande by raft, and were arrested by law enforcement shortly thereafter.  See Compl. ¶¶ 26, 62–63.  These facts, as alleged by the plaintiffs, are sufficient for a reasonable arresting officer to believe that the plaintiffs had committed or were committing an arrestable offense.  Indeed, the plaintiffs concede as much in their opposition to the Instant Motion.  Pls.' Mem. at 39.

Instead, plaintiffs posit that, "[e]ven assuming that [their arrest] was lawful, probable cause is insufficient to justify their lengthy detention, which is the basis of their false imprisonment claim."  Id.  Notably, however, the plaintiffs cite no caselaw for the proposition that probable cause for the arrest does not negate their false imprisonment claim.  The argument they put forward appears better suited to their abuse of process claim, where the ulterior motives of the defendant is explicitly relevant.[9]  See Larobina v.

---

[9] The abuse of process claim is not the subject of the Government's Rule 12(b)(6) Motion to Dismiss.

McDonald, 274 Conn. 394, 403–404 (2005); Moore v. Bushman, 559 S.W.3d 645, 653 (Tex. App. 2018).

Because the plaintiffs have failed to plead facts sufficient to assert false imprisonment, the Government's Motion to Dismiss is granted as to this claim.  See also Barry v. United States, --- F. Supp. 3d ----, 2023 WL 2996101 (S.D. Tex. Mar. 31, 2023) (concluding that the "undisputed fact defeats the cause of action for false imprisonment" where "the United States possessed the legal authority to detain the unaccompanied minor").

2.   Negligence Properly Rooted in Alleged Violation of Flores Agreement

The Government contends that there is no FTCA remedy for any breach of its obligations under the Flores Settlement Agreement.  Def.'s Mem. at 41.  Accordingly, the Government asserts that the plaintiffs' negligence claim, to the extent it relies upon non-compliance with the Flores Settlement Agreement, must be dismissed.  Id.

This argument ignores that plaintiffs are not seeking to recover monetary damages for violations of the Flores Settlement Agreement.  Rather, the plaintiffs reference the standards delineated in the Consent Decree to support the duty element of their negligence claim under the FTCA.  See Compl. ¶ 232; Pls.' Mem. 41.  Courts across the country considering similar cases have allowed negligence claims relying, at least in part, on violation of the standards delineated in the Flores Consent Decree. See, e.g., A.E.S.E. v. United States, 2022 WL 4289930, at *9–*15 (D.N.M. Sept. 16, 2022).

Thus, the Motion to Dismiss is denied with respect to the plaintiffs' negligence claim.

V.    **CONCLUSION**

For the reasons stated above, the court grants in part and denies in part the Government's Motion to Dismiss (Doc. No. 35).  The ATS claims as well as the negligent infliction of emotional distress claims are dismissed without prejudice for lack of subject matter jurisdiction.  Additionally, the false imprisonment claim is dismissed without prejudice for failure to state a claim upon which relief can be granted.  The Motion to Dismiss is otherwise denied.  If the plaintiffs choose to amend their Complaint consistent with this Ruling, the court grants them leave to do so within 21 days.

The parties are no longer limited to general discovery and should proceed expeditiously with fact discovery.

**SO ORDERED.**

Dated at New Haven, Connecticut this 17th day of August 2023.

/s/ Janet. C Hall
_____
Janet C. Hall
United States District Judge