## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| VIKY SARAI FLORES BENITEZ,<br>ANA DELMI BENITEZ ALVARADO,<br>JAVIN BENIGNO SANTOS GALVEZ,<br>and J.S.R., a minor,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>*Defendant.* | **No. 3:22-cv-00884-JCH**<br><br>**AMENDED COMPLAINT** |

## INTRODUCTION[*]

1.      In summer 2018, employees of the United States government ("Defendant") cruelly separated fourteen-year-old Viky Sarai Flores Benitez from her mother, Ana Benitez Alvarado, and nine-year-old J.S.R. from his father, Javin Benigno Santos Galvez, in an attempt to coerce the two families to abandon their asylum claims and to deter others fleeing violence and danger in Central America from seeking refuge in the United States. Defendant then sent both children thousands of miles away to Connecticut while incarcerating each parent in Texas and preventing communications between parent and child.

---

[*] In this Amended Complaint, Plaintiffs remove claims under the Alien Tort Statute against individual Defendants Stephen Miller, Jefferson B. Sessions, Kirstjen Nielsen, and Kevin McAleenan, and the false imprisonment claim against the United States, based on the Court's Ruling, ECF No. 86.  Plaintiffs reserve their right to appeal the dismissals in that ruling but are submitting this Complaint in conformity with the Court's ruling. Plaintiffs replead the negligent infliction of emotional distress claims of Viky Sarai Flores Benitez and J.S.R.

2.     With force and deceit, Defendant caused extraordinary trauma, in violation of U.S. and international law prohibitions against torture. Plaintiffs are among the thousands of asylum-seeking families whom the government irreparably traumatized pursuant to its unconscionable family separation policy — a policy that Defendant, including senior officials at the White House, Department of Justice (DOJ), and Department of Homeland Security (DHS) crafted, issued, and executed to unlawfully deter asylum seekers from entering the United States.

3.     Days after arresting Viky and her mother and detaining them in a freezing, windowless cell, Defendant used the ruse of permitting Viky her first shower to snatch her away. Immigration officials told Ms. Benitez Alvarado that adults could not accompany their children to the showers, and that they would bring Viky back when she had finished. This was a lie. Instead, Defendant took Viky from her mother. Viky did not see her mother again until a judge of this court ordered their reunification two months later.

4.     Defendant also arrested Mr. Santos Galvez and his son J.S.R. soon after they crossed the Southern border and detained them for several days in harsh conditions. Late one night, immigration officials woke Mr. Santos Galvez and ordered him to step outside. Mr. Santos Galvez tried to rouse his young son, but Defendant prevented him from doing so and immediately hustled the father away. The next morning, a terrified J.S.R. woke up alone in a cage, without any idea where his father was or why he had left. Defendant held J.S.R. for more than a month without allowing him to communicate with his father or any other relative.

5.     After tearing Viky and J.S.R. away from their parents and forcibly transporting both children to a residential shelter in Connecticut, DHS agents withheld information from the distraught children and parents about their respective whereabouts, keeping them confused, terrified, and alone without any ability to communicate with each other.

6.      Shortly after arriving in Connecticut, a child psychiatrist diagnosed both Viky and J.S.R. with severe Post-Traumatic Stress Disorder (PTSD) resulting from Defendant's forcible separation from their parents.

7.      Viky and J.S.R. were plaintiffs in emergency federal habeas petitions in 2018 seeking to reunite with their respective parents in freedom.

8.      In a July 13, 2018 opinion, Judge Victor Bolden concluded that "the constitutional rights of J.S.R. and [Viky] have been violated, and that irreparable harm has occurred as a result." *J.S.R. by and through J.S.G. v. Sessions,* 330 F.Supp. 3d 731, 733 (D. Conn. 2018). The Court went on to order the government to redress "the effects of the constitutional violation suffered by these minor children, namely trauma or more precisely, Post-Traumatic Stress Disorder," including by reunifying the families. *Id.*

9.      Since reuniting with their parents, Viky and J.S.R. have continued to experience severe emotional trauma as a result of being forcibly separated from their parents. Viky suffers from bouts of fear, melancholy, and anxiety, which sometimes cause her to cry before falling asleep or while at school. Even now, at age fourteen, J.S.R. fears being taken from his father again. J.S.R. becomes anxious when away from his father, and to this day he is frightened of law enforcement officers.

10.     The parents of J.S.R. and Viky, Ms. Benitez Alvarado and Mr. Santos Galvez, have also continued to experience emotional trauma as a result of being forcibly separated from their children. Following release from immigration custody, Ms. Benitez Alvarado began experiencing intense migraines and difficulty sleeping, which have impaired her ability to work and to perform daily household tasks. Even when she sends her daughter to school, she is fearful she might not see her again. When Ms. Benitez Alvarado sees law enforcement officials or vehicles, she fears

she will be re-detained apart from her daughter. Mr. Santos Galvez has nightmares about being forcibly separated from his son. He still has difficulty being apart from J.S.R. because he is frightened of being separated from him again.

11.     U.S. government officials who planned, ordered, and orchestrated Viky and J.S.R.'s forcible separation from their parents pursuant to the family separation policy, intentionally inflicted severe psychological and physical harm on the Plaintiffs.

12.     Defendant maliciously used these tactics to coerce the Plaintiffs into abandoning their asylum claims and to deter other migrants from seeking refuge in the United States, a right protected under domestic and international law. The United States is liable under the Federal Tort Claims Act for the injuries caused by its employees and officials.

13.     These two families can never be made whole. However, justice requires redress for the suffering inflicted by the unlawful, cruel, and tortious conduct of the U.S. government.

### JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

15.     Venue is proper under 28 U.S.C. §§ 1402(b), 1391(e)(1) because Plaintiffs reside in the District of Connecticut, a substantial part of the events, acts, or omissions giving rise to the claims occurred in this District, and no real property is involved in this action.

### PARTIES

16.     Plaintiff Viky Sarai Flores Benitez ("Viky"), now nineteen years old, was fourteen years old at the time of the events described in this Complaint. She was separated from her mother, Plaintiff Ana Benitez Alvarado, on or about May 16, 2018. Viky is from El Salvador and now resides in New Haven, Connecticut.

17.     Plaintiff Ana Delmi Benitez Alvarado ("Ms. Benitez Alvarado") is thirty-eight

years old and is from El Salvador. She was separated from her daughter, Viky, on or about May 16, 2018. Ms. Benitez Alvarado resides in New Haven, Connecticut.

18.     Plaintiff J.S.R., now fourteen years old, was nine years old at the time of the events described in this Complaint. He was separated from his father, Plaintiff Javin Benigno Santos Galvez, in June 2018. J.S.R. is from Honduras and now resides in New Haven, Connecticut.

19.     Plaintiff Javin Benigno Santos Galvez ("Mr. Santos Galvez") is thirty-six years old and is from Honduras. He was separated from his son, Plaintiff J.S.R., in June 2018. Mr. Santos Galvez resides in New Haven, Connecticut.

20.     Defendant United States of America is sued under the Federal Tort Claims Act for the tortious acts of its employees, including employees of DOJ, DHS, U.S. Department of Health and Human Services (HHS), and DHS agencies Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE).

## STATEMENT OF FACTS

### I.   DEFENDANT FORCIBLY SEPARATED VIKY FROM MS. BENITEZ ALVARADO.

#### A.   *Viky and Ms. Benitez Alvarado Fled Death Threats in El Salvador and Immigration Agents Forcefully Separated Them in the United States.*

21.     Ms. Benitez Alvarado fled El Salvador in May 2018, with her then-fourteen-year-old daughter, Viky. The two had spent months in hiding, prompted by the murder of Ms. Benitez Alvarado's domestic partner—a man she referred to as her husband and Viky's father figure—by the gang Mara Salvatrucha (MS-13).

22.     Viky and Ms. Benitez Alvarado arrived in the United States on or around May 13, 2018 after crossing the Rio Grande on a raft. CBP agents detained them shortly thereafter, in or around Rio Grande City, Texas.

23.     Immigration officials initially confined Viky and Ms. Benitez Alvarado in a *hielera*

5

(often translated as "icebox"), a facility designed to temporarily hold noncitizens near the Southern border, but where Defendants held Viky and Ms. Benitez Alvarado for days. Defendants forced them to sleep on the floor with aluminum blankets in frigid temperatures and denied them the ability to bathe.

24.     Although immigration officials apprehended Viky with her mother and detained them together, on or around May 15, 2018, DHS processed Viky separately from her mother. At that time, Defendants falsely classified Viky as an "unaccompanied juvenile," pursuant to the "Zero Tolerance directive to prosecute all eligible subjects."

25.     Shortly thereafter, on or around May 16, immigration officials interviewed Ms. Benitez Alvarado. These officers told her that Viky would remain in the United States while Ms. Benitez Alvarado would be deported to El Salvador.

26.     That same day, immigration officials told Ms. Benitez Alvarado and her daughter that they were taking Viky to shower—the first opportunity she had had to do so since Defendants incarcerated the pair in the *hielera*—and that adults could not accompany children to the showers.

27.     The agents falsely told both Ms. Benitez Alvarado and her daughter that Viky would return after showering.

28.     Instead, immigration officials used this falsehood to effectuate the separation of mother and daughter. When Viky did not return, Ms. Benitez Alvarado asked immigration officers about her daughter. The officers gave her conflicting information: that they did not know where Viky was and that she was in Houston.

29.     Upon realizing that the officers had deceived her and separated her from her daughter, Ms. Benitez Alvarado was distraught. She cried and had trouble sleeping and eating.

30.     Upon being separated from her mother, Viky was frightened and anxious and could

not stop crying. She repeatedly asked government agents about the whereabouts of her mother. Each time, officers told Viky that they would go and look for her mother in a room used to hold adults, and each time they subsequently told Viky her mother was not there. Eventually, government agents told Viky her mother was detained.

> **B.    Defendant United States Transferred Viky Thousands of Miles from her Mother, to a Shelter in Connecticut, Causing Her Severe Emotional Distress.**

31.    DHS transferred Viky to the custody of the Office of Refugee Resettlement (ORR), a unit of (HHS), which in turn placed her at the Noank Community Support Services shelter in Groton, Connecticut on or around May 16, 2018.

32.    After her traumatic separation from her mother and the long journey from Texas to Connecticut, the fourteen-year-old arrived at the shelter in the late evening. Shelter staff then interviewed her at length, beginning about 9:15 p.m. Shelter intake reports state that Viky had difficulty completing the interview because she couldn't stop crying. She was concerned about her mother. Viky did not know where her mother was or when she would be able to see or even speak to her again.

33.    Upon Viky's arrival at the Noank shelter, HHS and DHS employees failed to advise shelter staff shelter where Viky's mother was detained or how Viky could communicate with her mother. As a result, the Noank staff were unable to share this information with Viky.

34.    Around *five days* after her arrival and intake interview in Connecticut, a mental health clinician met with Viky. The staff member reported that Viky was "still concerned about the whereabouts of her mother." The clinician "encouraged [Viky] to practice coping skills to help manage her emotions in regards to the separation from her mother." Aside from "coping skills," no one at the shelter was able to address the obvious underlying reason for her distress, namely,

the forced separation from her mother by government officials.

35.     Five days after Viky's arrival, DHS and HHS employees still had not advised Noank staff of the location of Viky's mother or how parent and child could communicate.

36.     The clinician met with Viky three more times over the next three weeks. No one could tell Viky where her mother was. During this time, Viky grew increasingly worried and anxious. The shelter assisted Viky in contacting relatives in El Salvador, who also had no information about her mother's whereabouts.

37.     Upon information and belief, Noank staff made repeated efforts to locate Viky's mother, but DHS and HHS employees failed to provide this information to shelter staff.

38.     On or around June 13, 2018—almost one month after Viky was separated from her mother—shelter staff finally located Ms. Benitez Alvarado in ICE custody in Encinal, Texas.

39.     According to ORR records, Viky's first contact with her mother was on June 21, 2018—*thirty-six days after Defendant separated mother and daughter*. Their first phone call lasted only about ten minutes, during which time both Viky and Ms. Flores-Benitez were too distraught to communicate and instead sobbed into the phone. Afterwards, Viky did not know when she would next be able to speak with her mother.

40.     The negligent failure of DHS and HHS employees to provide Noank shelter staff with information regarding the location of Viky's mother and the means for mother and daughter to communicate caused substantial emotional distress to Viky.

41.     On July 1, 2018, Dr. Andrés Martin, M.D., M.P.H., a child psychiatrist retained by undersigned counsel in connection with federal habeas litigation, met with Viky to conduct a mental health evaluation. Dr. Martin diagnosed her with PTSD.

42.     Dr. Martin attributed her condition to "chronic and latent trauma that stemmed from

[Viky's] prior exposure to violence," including the recent death of her father figure, exacerbated by "being forcibly separated from her mother soon after she entered this country."

43.     On the Child PTSD Symptom Scale, Viky scored twenty-one out of a possible twenty-five – well above the cut-off of the fifteen necessary for a diagnosis of PTSD.

44.     Dr. Martin recommended immediate reunification of Viky with her mother to mitigate the lasting traumatic effects of their separation, as well as appropriate trauma-informed psychotherapeutic interventions.

45.     Because of the initial separation in Texas and continued isolation in Connecticut, both inflicted upon her by U.S. government employees,Viky experienced traumatic symptoms including depression, hopelessness, sleeplessness, tearfulness, and an inability to answer questions coherently.

### C.     Defendant Tormented Ms. Benitez Alvarado.

46.     DHS detained Ms. Benitez Alvarado in La Salle County Regional Detention Center in Encinal, Texas, and at another facility in Pearsall, Texas.

47.     The day after DHS officials separated Ms. Benitez Alvarado from her daughter, agents took her to a place called the "dog house," named for its terrible conditions. She cried when taken there without her daughter.

48.     Two immigration officers taunted and mocked Ms. Benitez Alvarado.

49.     Ms. Benitez Alvarado tried to tell these officers that she and her daughter could not return to El Salvador for fear of being murdered. The officers responded, "Your lives don't matter," or words to that effect. An officer told Ms. Benitez Alvarado that because she had no male partner, her reason for coming to the United States must be only economic, not fear-based.

50.     The two officers repeatedly laughed at Ms. Benitez Alvarado. When she asked

about her daughter, they said "maybe you stole your daughter," or words to that effect, insinuating that she may have traveled with an unrelated child to obtain a speedier release from detention.

51.     Two male DHS officers attempted to coerce Ms. Benitez Alvarado into signing paperwork agreeing to be deported. One officer falsely stated that if she pursued an asylum case, she would be in detention for eight to ten more months without her daughter.

52.     At the time, Defendant was forcing Ms. Benitez Alvarado to sleep on the floor of her holding cell. Ms. Benitez Alvarado felt that almost a year without her daughter and in those conditions would cause her to die.

53.     The DHS officer told Ms. Benitez Alvarado that if she signed the paper, she would be released from detention, so she signed even though she did not want to. All Ms. Benitez Alvarado could think about was to be reunited with her daughter.

54.     Ms. Benitez Alvarado continued to experience significant emotional and physical distress from being separated from her daughter, including extreme sadness, difficulty breathing, and tightness in her chest, for which she asked to see a doctor. She understood her pain as that of a mental breakdown.

55.     On the only phone call she was permitted, prior to the initiation of Viky's federal habeas petition, Ms. Benitez Alvarado was so distraught and tearful that she was unable to communicate with Viky.

56.     Defendant's mistreatment has had lasting effects on Ms. Benitez Alvarado. She experiences migraines and chest pain. She often has a hard time concentrating and sleeping. She still wonders why officers laughed and taunted her while she was trying to find her daughter.

## II.     DEFENDANT FORCIBLY SEPARATED J.S.R. FROM MR. SANTOS GALVEZ.

### A.     *J.S.R. and Mr. Santos Galvez Fled Death Threats in Honduras and*

***DHS Officials Forcibly Separated Them in the United States.***

57.     Mr. Santos Galvez was born in 1987 and raised in Trujillo, Colón, Honduras. Around 2007, Mr. Santos Galvez migrated to the United States to find work to support his family, but immigration agents apprehended him and sent him back to Honduras.

58.     Mr. Santos Galvez's son J.S.R. was born in Honduras in 2009. In 2014, Mr. Santos Galvez assumed full custody of J.S.R. from the boy's mother. In that same year, Mr. Santos Galvez and his current partner, Dorca Najera, had their first child, W.J.S.N.

59.     Throughout this time, Mr. Santos Galvez was actively involved with the National Party of Honduras, as set forth in more detail in his immigration case filings.

60.     Since his life was in danger due to his political activity, Mr. Santos Galvez and Ms. Najera determined that he and J.S.R. needed to leave Honduras. Due to Ms. Najera's high-risk pregnancy, only J.S.R. and Mr. Santos Galvez fled Honduras. They left around April 2018.

61.     J.S.R. and his father traveled for about two months. The trip was long and arduous.

62.     While in Mexico, Mr. Santos Galvez worked slaughtering chickens for an acquaintance. His earnings allowed the two to buy meals and send money to Honduras for his family, but the pair still struggled.

63.     Mr. Santos Galvez and J.S.R. did not feel safe in Mexico, and so after a month, they traveled north. On or about June 11, 2018, they crossed the Rio Grande River in an inflatable raft.

64.     CBP arrested Mr. Santos Galvez and J.S.R. soon after they crossed the river.

65.     CBP officers incarcerated Mr. Santos Galvez and J.S.R. for about three nights in a *hielera*. The facility was large, frigid, and windowless. It contained wire cages, each crowded with people. Officers kept the lights on at all times in the *hielera*, and because of this, Mr. Galvez and J.S.R. could not tell night from day.

11

66.     During their time in the *hielera,* agents gave Mr. Santos Galvez and J.S.R. two aluminum blankets and one thin mattress topper. Mr. Santos Galvez gave the items to his child. J.S.R. has memories of his father crying and constantly shaking in the *hielera*. Seeing the only stable family figure in his life in such a state terrified the boy and caused him great anguish.

67.     The family's time in the *hielera* ended when immigration agents entered and told Mr. Santos Galvez to leave his sleeping son behind and head outside. He tried to wake J.S.R., but the agents stopped him and told him that he would see J.S.R. shortly. Once Mr. Santos Galvez had exited the *hielera*, however, the DHS agents prevented him from returning, thus forcibly and dishonestly separating father and son.

68.     Immigration agents told Mr. Santos Galvez that he would never see his son again. Convulsed with fear, Mr. Santos Galvez wrapped himself around a pole in the facility and cried out for his son while an officer threatened to tase him.

### B.     DHS Officials Transferred J.S.R. Thousands of Miles from His Father, to a Shelter in Connecticut, Causing Him Severe Emotional Distress.

69.     After immigration agents separated J.S.R. from his father, they caged the nine year-old with other young children for approximately four days.

70.     J.S.R. asked several times to see his father, but DHS officials claimed not to know why he was not with his father and deceived him into believing that they would be reunited soon.

71.     J.S.R. cried for his father frequently and witnessed the other young children in the cages crying. The officials overseeing the cages did not do anything to comfort the children. J.S.R. did not understand why he was separated from his father, when he would see him again, or whether he was at risk of being returned to Honduras, a place he associated with violence and death.

72.     DHS transferred J.S.R. to ORR custody, which in turn placed him at the Noank Community Support Services shelter in Groton, Connecticut on or around June 16, 2018. When

J.S.R. was informed he would be transferred, government officials provided him conflicting information. One immigration official stated that he was going far away from his father and would not be able to see his father, while another stated that he would soon be close to his father and be able to see him often.

73.    After thousands of miles of travel, J.S.R. arrived to Groton distraught, anxious, and worried about his father's well-being as well as his own.

74.    While in Connecticut, U.S. government employees did not provide J.S.R. with any sufficient form of care for his mental and emotional distress.

75.    DHS and HHS employees failed to provide Noank shelter staff with information regarding the location of J.S.R.'s father or the means for parent and child to communicate.

76.    Upon information and belief, shelter staff requested information from DHS and HHS employees regarding the location of J.S.R.'s father and an opportunity for father and son to communicate, but DHS and HHS employees failed to provide this information.

77.    A legal services attorney appointed to assist J.S.R. in Connecticut attempted unsuccessfully to locate Mr. Santos Galvez and facilitate contact between father and son. U.S. government officials did not provide J.S.R.'s appointed counsel with Mr. Santos Galvez's contact information.

78.    The negligent failure of DHS and HHS employees to provide Noank shelter staff with information regarding the location of J.S.R.'s father and the means for father and son to communicate caused substantial emotional distress to J.S.R.

79.    On or about June 28, 2018, the attorney learned that J.S.R. had spoken to his father for the first time since they were separated the previous day. Father and son were not able to exchange many words because they were both sobbing for most of the call.

80.     On July 1, 2018, Dr. Martin evaluated J.S.R. He diagnosed J.S.R. with PTSD and concluded that immigration officers caused J.S.R.'s PTSD when they forcibly separated the child from his father. Continued separation in Connecticut exacerbated J.S.R.'s PTSD symptoms.

81.     During his meeting with J.S.R., Dr. Martin employed two standardized instruments commonly used to diagnose PTSD.

82.     The first, the Trauma Health Questionnaire, is an inventory of potentially traumatic exposures. J.S.R. scored positively on fourteen out of twenty-three possible items.

83.     The second, the Child PTSD Symptom Scale (CPSS) scale, has two parts. The first part asks about symptoms of trauma during the two weeks prior to the evaluation. J.S.R. scored thirty-eight out of a possible fifty-one, well above the cutoff of fifteen required for a PTSD diagnosis.

84.     In the second part of the CPSS, J.S.R. was asked about domains of his life in which his exposure to trauma interfered with his functioning. J.S.R. scored seven out of seven. Dr. Martin noted that J.S.R.'s life was disturbed in every domain that the instrument measured.

85.     Dr. Martin concluded that J.S.R.'s chronic trauma stemmed from his exposure to violence and loss from an early age and "was triggered by the acute trauma of forcible separation from his father."

86.     Dr. Martin recommended the immediate release and reunification of J.S.R and his father to mitigate the lasting traumatic effects of their separation. The time  spent apart from his father worsened J.S.R's mental well-being. Dr. Martin also recommended that J.S.R. receive appropriate trauma-informed psychotherapeutic interventions.

87.     On or around July 2, 2018, the day after J.S.R. filed a federal habeas petition, he was able to speak to his father again via a videoconference. Mr. Santos Galvez noticed that his son

14

was different. J.S.R. is a bright child, but during the call, J.S.R. was unable to focus, taciturn, and downcast. An ICE officer was present with Mr. Santos Galvez during the call.

88.     After Dr. Martin's evaluation, Noank Community Support Services arranged a visit with J.S.R.'s medical provider at the Community Health Center of Groton.

89.     A pediatric clinician at Noank Community Support Services noted that J.S.R. "needs evaluation for underlying depression." The treatment notes were "referral to BH [behavioral health] team for evaluation and treatment due to trauma from travel and separation."

90.     Throughout J.S.R.'s time at Noank Community Support Services and while separated from his father, J.S.R. did not sleep at night because he felt that he needed to remain vigilant. He did not trust adults. The government's forceful separation of the family continued to harm him while in Connecticut, resulting in ever-present depression and tearfulness.

### C.     Mr. Santos Galvez Suffered Physical, Emotional, and Mental Harm Due to DHS's Unlawful Separation of Him from His Son.

91.     While J.S.R. was transferred to Connecticut, Mr. Santos Galvez remained detained in Texas. DHS officers told Mr. Santos Galvez that he would never see J.S.R. again.

92.     Mr. Santos Galvez feared that when J.S.R. woke up without him, the boy would assume that his father had abandoned him. The prospect of never seeing J.S.R. again caused Mr. Santos Galvez, a usually healthy and positive person, to cry, faint, and become sick.

93.     After the separation, Mr. Santos Galvez appeared in criminal court and admitted he had entered the country without permission. Immigration agents then took Mr. Santos Galvez to Port Isabel Service Detention Center in Los Fresnos, Texas. An immigration officer there told Mr. Santos Galvez that he had come alone without a son and that they would deport him. Mr. Santos Galvez protested that he had arrived with J.S.R., but the officer insisted that all the documentation indicated that he had come alone and would be deported.

94.    The officer's inaccurate information caused Mr. Santos Galvez to become very emotional and cry. He told the agent that he needed to see his son and he did not want to leave J.S.R. without a parent.

95.    In the middle of the exchange, Mr. Santos Galvez remembered that officers had given him and J.S.R. a card listing their possessions when they were arrested. Mr. Santos Galvez had kept J.S.R.'s card hidden, because he had heard that officers took away children's cards so as to deny the existence of a parent-child relationship and then justify deportations. When Mr. Santos Galvez showed the cards to the officer, the officer acknowledged that there was a mistake.

96.    ICE officers eventually took Mr. Santos Galvez from Port Isabel to the South Texas Detention Center (STDC) in Pearsall, Texas. At STDC, Mr. Santos Galvez repeatedly asked ICE officers if someone could tell him how J.S.R. was doing or where he was. No agent helped him.

97.    The separation caused Mr. Santos Galvez to become deeply depressed. He could not eat, became very sick, developed a golf ball-sized growth on his armpit, and felt weak.

98.    A mental health evaluation conducted during Mr. Santos Galvez's time at STDC noted that he "does not know about his son['s] whereabouts and would like to speak with his son. . . . [Patient] was crying at times during the interview. [Patient's] stressors were processed and coping skills techniques were discussed."

99.    Eventually, ICE officers shipped Mr. Santos Galvez back to Port Isabel Detention Center. He remained there for about nineteen more days. Officers refused to tell him anything about J.S.R. An attorney who met with Mr. Santos Galvez at Port Isabel could see him "pacing the hallway" while he waited to meet with her. During the meeting he was "just beside himself," "so wound up and tense," and "very, very desperate" to find out where his son was. "The number of times that he broke down and started crying" during their meeting were too many to count.

16

100.    Finally, Mr. Santos Galvez's attorneys were able to arrange for him to talk to J.S.R. by phone, and then via videoconferencing. Mr. Santos Galvez noticed that J.S.R.'s demeanor was dramatically different. He could see that J.S.R. was confused and sad. While he was happy to see his son, the change in the child's demeanor broke Mr. Santos Galvez's heart.

### III.    JUDGE BOLDEN CONCLUDES DEFENDANT VIOLATED THE CONSTITUTIONAL RIGHTS OF VIKY AND J.S.R.

101.    On July 2, 2018, Viky and J.S.R. filed federal habeas petitions and sought to compel reunification with their parents out of detention.

102.    After briefing from the parties and an evidentiary hearing, in an opinion dated July 13, 2018, Judge Bolden concluded that "the constitutional rights of J.S.R. and [Viky] have been violated" and "irreparable harm has occurred as a result."

103.    Consequently, the Court ordered the parties to address the trauma the children had experienced, including through family reunification and post-relief care. *Id.*

104.    Both children were promptly reunited with their parents and released from ICE physical custody in Connecticut, where they have resided since.

### IV.    THE U.S. GOVERNMENT'S FAMILY SEPARATION POLICY WAS DELIBERATELY CRUEL AND INHUMANE.

#### A.    *Government Officials Intentionally Separated Families to Unlawfully Coerce Newly Arrived Asylum Seekers and Deter Future Asylum Seekers.*

105.    In early 2017, U.S. government officials discussed a preliminary policy that would separate families at the Southern border as a means to discourage Central Americans from seeking asylum in the United States.

106.    In April 2017, then-Attorney General Jeff Sessions sent a memorandum to federal prosecutors entitled "Renewed Commitment to Criminal Immigration Enforcement." In the memo,

17

he instructed each U.S. Attorney's Office on the Southwest Border to work with DHS to develop prosecution guidelines for illegal entry and re-entry violations. The memo states "[t]hese guidelines should aim to accomplish the goal of deterring first-time improper entrants."

107.   In July 2017, ICE ended the Family Case Management Program, which allowed asylum seekers to remain in the community during the pendency of their proceedings while receiving case management services like legal and social services. Ending this program signaled a concerted policy of prolonged detention of asylum seekers. Subsequently, between March and November 2017, senior government officials implemented a pilot program in El Paso, Texas. It ran for several months and previewed what would become the U.S.'s family separation policy ("El Paso Initiative"). Off. of the Inspector Gen., *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services*, DEP'T OF JUSTICE, at ii (Jan. 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf ("2021 DOJ OIG Report").

108.   These officials used results from the El Paso Initiative to launch a zero-tolerance program across the entire Southern border.

109.   In December 2017, then-Secretary of Homeland Security Kirstjen Nielsen and then-Commissioner of U.S. Customs and Border Protection Kevin McAleenan supervised the development of a policy memorandum entitled "Policy Options to Respond to Border Surge of Illegal Immigration." It explained that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in [Health and Human Services] custody" and that the policy would have a "substantial deterrent effect" ("2017 Family Separation Memo").

110.   Following the issuance of the 2017 Family Separation Memo, top government officials, conspired to expand forcible separations of children and parents along the Southern

border.

111.    In early 2018, top government officials discussed family separations in multiple meetings. They also drafted, reviewed, or edited memoranda that detailed how to deter new migration by separating families at the Southern border.

112.    For example, on April 6, 2018, then-Attorney General Sessions issued a memorandum requiring federal prosecutors along the Southwest border to charge and prosecute the misdemeanor offense of illegal entry into the United States for all referred cases.

113.    In a subsequent press release, the DOJ confirmed that the government would implement a Zero Tolerance policy for "criminal illegal entry" under 8 U.S.C. § 1325(a). In the release, then-Attorney General Sessions stated, "I warn you; illegally entering this country will not be rewarded, but instead be met with the full prosecutorial powers of the [DOJ]."

114.    Previously, asylum seekers, especially families, had not been systematically referred for prosecution for unlawful entry. Prior to the Zero Tolerance policy, less than one-third of CBP apprehensions had resulted in criminal prosecutions.

115.    Thus, the Zero Tolerance policy resulted in the separation of families entering the United States along the Southern border.

116.    On April 23, 2018, then-Commissioner McAleenan co-authored a memorandum to then-Secretary Nielsen seeking further approval for expanded family separations along the Southern border (the "2018 Family Separation Memo"). The memorandum presented options for increasing prosecutions at the border.

117.    Pursuant to the government's family separation policy, DHS referred parents for prosecution, and DOJ would initiate a prosecution for illegal entry. DHS would transfer the parent – but not the accompanying child – to the custody of the U.S. Marshals. DOJ would conclude the

prosecutions rapidly, often in forty-eight hours or less, with the parent pleading guilty and receiving a sentence of time served. DOJ would then return the parent to DHS custody.

118.     However, DHS refused to reunite parent and child upon the parent's return to DHS custody. In fact, in the brief period when the U.S. Marshals held a parent for prosecution, DHS frequently moved the child, sometimes far across the country.

119.      In practice, ICE and DHS objected to rapid reunification. In emails between ICE and DHS officials in May 2018, DHS shared concerns that "adults that were separated from their children" returned **too quickly** upon entering a guilty plea, as it resulted "in a situation in which the parents are back in the exact same facility as their children – possibly in a matter of hours – who have yet to be placed in ORR custody."

120.     In a May 10, 2018 email, CBP was ordered "to prevent this from happening" and asked to confirm with DHS "that the expectation is that we are NOT to reunite the families and release."

121.     DHS officials knew and intended that its officers might transfer the child to another DHS facility or to ORR custody, even when a parent went to court and returned to DHS detention the same day. In some cases, DHS purposely transferred parents to another facility after DOJ had completed a prosecution, in order to separate a family

122.     Through the meetings, memoranda, and other directives, government officials directed DHS employees to separate families at the Southern border, and DHS employees knowingly and purposefully did so.

123.     A DHS Inspector General report found that DHS and CBP did not have Information technology (IT) systems adequate to track separated families and that "CBP officials have been aware of these IT deficiencies since at least November 2017 when U.S. Border Patrol conducted

an initiative [El Paso Initiative] that mirrored the *Zero Tolerance Policy*." Off. of the Inspector Gen., *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families*, DEP'T OF HOMELAND SEC., at *i* (Nov. 25, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf ("2019 DHS OIG Report"). The agency's refusal to address these known IT problems frustrated efforts to reunite families.

124.    McAleenan confirmed in a June 2018 interview that the purpose of the Zero Tolerance policy was "to dissuade crossing between ports of entry, which is dangerous for people making those crossings."

125.    In the same interview, McAleenan acknowledged the policy of family separation: "We're prosecuting the parents; they're temporarily separated for prosecutors. So they go to the marshals; they will be prosecuted by the U.S. attorney's office. Then they're detained by ICE while the child is sent to Health and Human Services, in the custody of HHS."

126.    In July 2019, McAleenan also testified before Congress that he  understood the family separation policy to be a means to avoid piecemeal enforcement of immigration law. By prosecuting entrants without "exception[] . . . prosecutions increased from about 20 percent of amenable adults to 50 percent of amenable adults."

127.    Once CBP classified a young person as an Unaccompanied Alien Child (UAC), CBP would transfer the minor to ORR custody. This transfer had to be completed within 72 hours. Off. of the Inspector Gen. and Gov't Accountability Off., *Special Review – Initial Observations Regarding Family Separation Issues under the Zero Tolerance Policy*, DEP'T OF HOMELAND SEC., at 3 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf ("2018 DHS OIG Report").

128.   CBP violated the 72-hour requirement in many cases, and instead, it confined minors classified as UACs in facilities not meant for longer-term custody. *Id.* at 9.

129.   A UAC is a child who "has no lawful immigration status in the United States; has not attained 18 years of age; and with respect to whom there is no parent or legal guardian in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

130.   When challenged in July 2019 about the United States' detention of children who did not qualify as UACs under the statute, McAleenan responded, "So are you suggesting that an unaccompanied child that has a parent somewhere in the U.S. is not unaccompanied?" The unlawful implication of his statement is that the United States could permissibly detain children as UACs even when a parent or legal guardian in the United States was available to provide care and physical custody.

>   **B.   The United States' Failure to Coordinate Between Agencies Further Exacerbated the Effects of the Policy and Length of the Separations.**

131.   Defendant developed and implemented the family separation policy to coerce *bona fide* asylum seekers like Plaintiffs into abandoning their claims and to torture Plaintiffs and other refugees so as to deter future migration to the United States.

132.   During the 2017 El Paso Initiative, while DOJ temporarily jailed parents on charges related to their entry, DHS scattered children into HHS shelters across the United States. Even then, parents received little or no information about where their children were, and the increase in separated children stressed programs that were responsible for housing these children.

133.   In November 2017, the Deputy Director of ORR expressed concern to senior DHS officials about the increase in separated children and the burden on the UAC program. According to a March 2020 HHS Inspector General report, CBP and ICE officials acknowledged this

communication, but there was no direct response to the issue of family separations. Off. of the Inspector Gen., *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy*, DEP'T OF HEALTH AND HUM. SERVICES, at 16 (Mar. 2020), https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf ("2020 HHS OIG Report").

134.    Former Secretary Nielsen admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with former Attorney General Sessions prior to the DOJ's April 2018 Zero Tolerance policy announcement.

135.    Nielsen and McAleenan failed to prepare or warn those responsible for the care of separated children that a substantial number of young, traumatized children would be entering ORR custody.  As a result, ORR facilities and foster families failed to provide necessary medical, mental health, and other services to separated children, exacerbating their trauma.

136.    The 2020 HHS OIG Report stated that there were "no procedures or systems" to "track separated families" between DHS and HHS.

137.    Neither DHS nor DOJ notified HHS in advance about the implementation of the Zero Tolerance policy or other family separation policies, which meant many HHS officials heard about the policy through the media. *Id.* at *i.*

138.    In an email between HHS officials in February 2017 regarding "unaccompanied children," officials stated "DHS stressed told [sic] ORR that the overall intent of the actions is to serve a deterrent in the longer term, but ORR believes the immediate impact is certain to have capacity and budgetary impacts for the UAC program."

139.    The failure of Nielsen and McAleenan and other senior officials to warn the shelters regarding the increasing numbers of separated children entering ORR custody meant that there were too few case workers available to take children to medical and mental health appointments,

even in cases where children needed specialized care with outside providers. *Id.* at 9.

140.    As a result, "facilities struggled to address the mental health needs of children who had experienced intense trauma, including separated children." *Id.*

141.    On June 13, 2018, DHS and HHS announced that they had a "central database" that contained information about separated families that could be accessed by both agencies. However, the 2018 DHS OIG Report found that no such database existed, and this lack of preparation further prolonged the separations and made the reunification process more difficult.

142.    Defendant also employed practices, other than the Zero Tolerance policy, to separate families entering the United States along the Southern border.

143.    In some cases, officials offered no reason or justification for the separation. At other times, when a family presented itself legally at a port of entry to apply for asylum, officials would claim that they were unsure that the adult traveling with the child was truly the parent and then separate the child, without taking any steps to verify parentage.

144.    Prior to the Zero Tolerance policy, CBP separated parents from the children only "if the adult had a criminal history or an outstanding warrant, or if CBP could not determine whether the adult was the child's parent or guardian." 2018 DHS OIG Report at 2. Under the Zero Tolerance policy, all parents were separated from their children because the children could not be held in criminal custody.

145.    Former Commissioner McAleenan also testified that when the Zero Tolerance policy was implemented, he and the Chief Director of Border Patrol directed that this policy would exempt parents traveling with children under five years old, so if parents in those circumstances were separated from their children, there had to be another reason why, such as a criminal history.

Nevertheless, in CBP emails from May 2018, CBP officials confirmed that "all adults are amenable to prosecution – 100%."

        **C.**       **DHS Violated its Legal Obligations Regarding the Detention of Children by Separating Viky and J.S.R. from Their Parents.**

146.    Former Senior Advisor Miller, former Attorney General Sessions, former Secretary Nielsen, and and former Commissioner McAleenan, along with other officials conducted their discussions in secret, without consulting career technical experts in the government. They did so in order to avoid interference from those who did not share their objectives. They also excluded individuals with technical expertise because they knew that widespread family separations were illegal and inhumane.

147.    Viky and J.S.R. were among more than 5,300 children that government employees cruelly and purposefully separated from their parents. Defendant separated Plaintiffs and others in similar situations to deter noncitizens from seeking refuge in the United States.

148.    DHS also manufactured the conditions under which Viky and J.S.R. would be treated as unaccompanied minors by processing Viky separately from her mother—despite their joint arrival—and by prosecuting Mr. Santos Galvez for unlawful entry. In so doing, DHS illegally prolonged the detention of Viky and J.S.R.

149.    DHS, including its components ICE and CBP, has a long-standing legal obligation to ensure the prompt release of minors held in immigration custody. *See Flores v. Reno*, CV 85-4544-DMBAGR, No. 177 (C.D. Cal. July 24, 2015).

150.    The consent decree in the *Flores* class action litigation sharply limits the circumstances, duration, and manner of immigration detention of minor children. Among other things, the decree requires ICE to prioritize the prompt release of detained children, to hold

children in safe and sanitary conditions, and make continuous efforts to reunite children with family members while children are in the agency's custody.

151.     Aware of these legal obligations, DHS officials in December 2017 emails discuss "a legislative fix to Flores and the Trafficking in Victims Protection Reauthorization Act (TVPRA)."

152.     Government employees knowingly violated the *Flores* consent decree in multiple ways. They failed to hold Viky and J.S.R. in safe and sanitary conditions, failed to reunite and make efforts to reunite Vicky and J.S.R. with their parents, and failed to promptly release Viky and J.S.R from detention. Government employees' actions in this case prolonged Viky's and J.S.R.'s time in detention.

153.     In February 2018, Sessions, Nielsen, and McAleenan were sued in their official capacity in a class action habeas petition challenging the government's family separation practice. That lawsuit is known as the *Ms. L* litigation.

> ### D.     Government Officialss Ignored the Well-Known Physical and Mental Health Trauma that Results from Family Separation.

154.     Separating a young child from a parent—particularly when the child has no information about the parent's whereabouts or the possibility of reunification—is a traumatic event in the child's life.

155.     Substantial research establishes that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays, and long-term trauma. Recent studies confirm that a traumatic separation can cause memory impairments and interfere with the normal production of cortisol, a hormone produced in response to stress.

156.    Government officials repeatedly and deliberately ignored warnings that separating families would violate civil and constitutional rights and cause both children and parents physical and psychological harm.

157.    In March 2017, the American Academy of Pediatrics ("AAP") issued a statement that family separation would cause children trauma, urging policymakers "to always be mindful that these are vulnerable, scared children."

158.    In December 2017, immigrant rights organizations filed a complaint with DHS, citing the traumatic impact family separation has on those subjected to it as well as the interference it inflicts on accessing the immigration legal system.

159.    Neither DHS nor any other government agency conducted any study of the medical or psychological effect the separations could have on children or parents.

160.    In January 2018, then-Secretary Nielsen received a letter from the Children's Defense Fund, on behalf of more than 200 organizations with expertise in child welfare, juvenile justice, and child health, development, and safety. The letter implored Nielsen to "reverse course" given that increasing family separations "will have significant and long-lasting consequences for the safety, health, development, and well-being of children."

161.    Also in early 2018, Congress responded to growing alarm about family separations. Concerned members of Congress condemned the policy as "unconscionable" and asserted that the "reported justification of this practice as a deterrent to family migration suggests a lack of understanding about the violence many families are fleeing in their home countries." More pointedly, they concluded that the pretext of deterrence is "not a legally sufficient basis for separating families."

162.     Government officials ignored these objections and proceeded with its unconscionably cruel and inhumane actions.

163.     As the President of the American Academy of Pediatrics wrote to Nielsen by letter dated March 1, 2018, the real life harm of separating child from parent can be severe: "Fear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."

164.     Two months later, the American Academy of Pediatrics repeated its concerns in a public statement opposing the policy: "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."

165.     As the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment concluded, harms like those experienced by the Plaintiffs can "amount to torture if they are intentionally imposed, encouraged or tolerated by States . . . for the purpose of deterring, intimidating, or punishing migrants or their families [or] coercing them into withdrawing their requests for asylum."The trauma caused by the government's inhumane actions will have a devastating and lasting impact on the Plaintiffs' psychological well-being.

## V.     PLAINTIFFS CONTINUE TO SUFFER FROM THEIR UNLAWFUL FORCED SEPARATION.

166.     Viky continues to experience the effects of her separation. Some evenings, as she tries to fall asleep, Viky remembers parts of the experience of being separated from her mother and cries. When a teacher raised immigration issues at school, Viky burst into tears in her classroom. She regularly visits with a school counselor to talk about these feelings.

167.   Ms. Benitez Alvarado also suffers ongoing challenges related to the separation. When Viky goes to school, Ms. Benitez Alvarado has found herself frightened that authorities will steal her daughter away again. When she sees law enforcement officers or cars that remind her of DHS vehicles, she feels afraid that she will be carted to detention again.

168.   To date, J.S.R. is terrified of law enforcement officers. When he sees an officer, including local police, he becomes anxious, holds Mr. Santos Galvez tightly, and expresses fear of being separated from his father again. For example, shortly after reunification, when J.S.R saw a police officer in a store, he wrapped himself tightly around his father and threatened to bite the officer if they tried to separate them again.

169.   Shortly after his release from immigration custody, Mr. Santos Galvez had nightmares about being in detention and being forcibly separated from his child again. Mr. Santos Galvez's haunting nightmares occurred so frequently that he would sometimes wake up believing that he was back in detention and separated from his child.

170.   Since being reunited, Mr. Santos Galvez and J.S.R. have difficulty spending time apart and often fear being put through the same experience again. This happens even in innocuous settings.

171.   Not long ago, Mr. Santos Galvez let his child go on a sleepover with friends. Hours after dropping him off, J.S.R., crying and in distress, called Mr. Santos Galvez, also in distress, to pick him up. This is the second time an incident of this nature has happened to the father and son.

## VI.   PLAINTIFFS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES UNDER THE FEDERAL TORT CLAIMS ACT.

172.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be

liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

173.    Pursuant to 28 U.S.C. § 2675(a), on December 7, 2018, the Plaintiffs filed FTCA administrative claims with DHS, ICE, CBP, DOJ, and HHS for the tortious actions alleged here.

174.    As of the filing of this complaint, DHS, ICE, CBP, DOJ, and HHS have not responded to Plaintiffs' claims. The agency's failure to dispose of the claim within six months of filing "shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." 28 U.S.C. § 2675(a); 28 C.F.R. §§ 14.2(c), 14.9(b).

175.    Plaintiffs have administratively exhausted their claims under the FTCA.

## CLAIMS

### Federal Tort Claims Act - 28 U.S.C. § 1346(b)

176.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

### Intentional Infliction of Emotional Distress

177.    Under Connecticut law, intentional infliction of emotional distress exists where (1) the defendant intended to inflict emotional distress, or the defendant knew or should have known that emotional distress was likely a result of the conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress was severe.

178.    Under Texas law, a claim for intentional infliction of emotional distress exists where (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress was severe.

179.    Defendant United States intentionally caused Plaintiffs severe emotional distress by carrying out a policy designed to cause suffering by separating the parents from their minor children, resulting in emotional distress that led to diagnoses of PTSD for the children and ongoing trauma for the parents. Defendant's conduct was extreme and outrageous and caused the Plaintiffs' severe emotional distress.

180.    Defendant's conduct constitutes intentional infliction of emotional distress under Texas and Connecticut law.

181.    Under the FTCA, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**Negligent Infliction of Emotional Distress**

182.    Under Connecticut law, a claim for negligent infliction of emotional distress exists where (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

183.    In Connecticut, DHS and HHS employees enforced the Zero Tolerance policy by forcibly transferring and detaining Viky and J.S.R. away from their parents. DHS and HHS employees failed to provide information to Noank shelter staff regarding the location of Viky's mother and J.S.R.'s father and failed to facilitate communication between parent and child, affirmatively or in response to inquiries from shelter staff. As result, each child was held effectively *incommunicado* for weeks in isolation from their parent.

184.    Defendant's conduct was directed at Plaintiffs Viky and J.S.R. The child Plaintiffs' distress and illness, including PTSD, were caused by, and were foreseeable consequences of, the

actions of DHS and HHS employees.

185.     DHS and HHS officials and employees exercised control and had custody over child Plaintiffs. As such, they had a duty to Plaintiffs to act with ordinary care so as to not cause harm or injury to Plaintiffs. DHS officials and employees also had legal duties to Plaintiffs under the *Flores* consent decree. By engaging in the acts herein, Defendant breached its duty of care to Plaintiffs. As a result, Plaintiffs suffered substantial damages.

186.     The conduct of federal agents and employees conduct constitutes negligent infliction of emotional distress under Connecticut law.

187.     Under the FTCA, the United States is liable to Plaintiffs for negligent infliction of emotional distress.

## Negligence

188.     Under Connecticut and Texas Law, negligence exists where (1) the Defendant owed the Plaintiff a legal duty; (2) the Defendant breached that duty; and (3) the Defendant's breach proximately caused damages to the Plaintiff.

189.     DHS, DOJ, and HHS officials and employees exercised control and had custody over Plaintiffs. As such, they had a duty to Plaintiffs to act with ordinary care so as to not cause harm or injury to Plaintiffs. DHS officials and employees also had legal duties to Plaintiffs under the *Flores* consent decree. By engaging in the acts herein, Defendant breached its duty of care to Plaintiffs. As a result, Plaintiffs suffered substantial damages.

190.     Defendant's conduct constitutes negligence under Texas and Connecticut law.

191.     Under the FTCA, the United States is liable to Plaintiffs for negligence.

**Abuse of Process**

192.    Under Connecticut law, abuse of process requires that (1) the defendant instituted an action against the plaintiff and (2) defendant used the proceedings primarily to accomplish a purpose other than that for which they were designed.

193.    Under Texas law, an abuse of process is committed when (1) the defendant made an illegal, improper, or perverted use of legal process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) there is damage to the plaintiff as a result of such illegal act.

194.    Federal officials and employees abused criminal prosecution, civil detention, and removal procedures in order to effectuate the ulterior motives of coercing Plaintiffs into abandoning their asylum claims and of deterring other people from seeking asylum in the United States. Defendants' actions caused serious emotional damage to Plaintiffs by separating Viky and J.S.R. from Ms. Benitez Alvarado and Mr. Santos Galvez, respectively.

195.    Defendant's conduct constitutes abuse of process under Texas and Connecticut law.

196.    Under the FTCA, the United States is liable to Plaintiffs for abuse of process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

a.    Award Plaintiffs compensatory damages in an amount to be proven at trial;

b.    Award attorneys' fees and costs; and

c.    Grant such other relief as the Court deems just and equitable.

September 7, 2023
New Haven, Connecticut

                              Respectfully submitted,

                              /s/ Michael J. Wishnie
                              Michael J. Wishnie (ct27221)
                              Kirby Tyrrell (phv206703)
                              Muneer I. Ahmad (ct28109)
                              Audrey Huynh, Law Student Intern*
                              Solveig Olson-Strom, Law Student Intern
                              Natasha Reifenberg, Law Student Intern
                              Tanveer Singh, Law Student Intern
                              Gabriela Torres-Lorenzotti, Law Student Intern
                              Theodore Watler, Law Student Intern
                              Worker and Immigrant Rights Advocacy Clinic
                              Jerome N. Frank Legal Services Organization
                              P.O. Box 902020
                              New Haven, Connecticut 06520-9090
                              Email: muneer.ahmad@ylsclinics.org
                              Email: kirby.tyrrell@ylsclinics.org
                              Phone: (203) 432-4800

                              /s/ Jeremy M. Creelan
                              Jeremy M. Creelan
                              Jacob D. Alderdice
                              Remi Jaffre
                              JENNER & BLOCK LLP
                              1155 Avenue of the Americas
                              New York, NY 10036
                              (212) 891-1678

                              Alyssa G. Bernstein
                              JENNER & BLOCK LLP
                              1099 New York Avenue, NW
                              Suite 900
                              Washington, DC 20001

                              *Counsel for Plaintiffs*

* Motion for law student appearance forthcoming.